FILED WITH THE
COURT SECURITY OFFICER
CSO: _____
DATE: ___-__-05



FILED

NOV 0 1 2004

US DISTRICT COURT, E/NC
BY: _____ CK



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:04-CR-211-BO(1)

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DAVID A. PASSARO | MEMORANDUM IN SUPPORT OF<br>MOTION TO DISMISS FOR LACK OF<br>JURISDICTION<br><br>Fed. R. Crim. P. 12(b)(2)<br>Local Criminal Rule 47.1, EDNC |

DAVID ANTHONY PASSARO, defendant in the above-captioned case, by and through

undersigned counsel, hereby submits to this Honorable Court his Memorandum in Support of

Motion to Dismiss for Lack of Jurisdiction.

## STATEMENT OF CASE

The indictment alleges that on June 19 and 20, 2003, "at a United States army base near the

town of Asadabad, in Kunar Province, Afghanistan," Mr. Passaro assaulted an Afghani suspected of

launching rocket attacks on American and Afghani troops, in violation of 18 U.S.C. § 113(a)(3) and

(6), which criminalize assaults "within the special maritime and territorial jurisdiction of the United

States." The indictment grounds jurisdiction upon 18 U.S.C. § 7(9)(A), which provides in relevant

part:

> With respect to offenses committed by or against a national of the United States . . .
> [special maritime and territorial jurisdiction includes] the premises of United States
> diplomatic, consular, military or other United States Government missions or entities
> in foreign States . . . .

The deadline for filing pre-trial motions has been set for thirty (30) days after receipt of

classified discovery, which remains incomplete. Trial of this matter is currently scheduled to begin December 13, 2004.

STATEMENT OF FACTS

**A. Terrorist Attacks of September 11th and America's Response**

On September 11, 2001, members of the al Qaeda terrorist organization highjacked four passenger aircrafts and used them as flying bombs, crashing two into the World Trade Center towers and one into the Pentagon. The fourth aircraft, which had apparently targeted the United States Capitol, crashed in rural Pennsylvania after passengers conducted a heroic charge on the cockpit. The terrorists murdered over 3,000 men, women, and children.

On September 18, 2001, Congress passed a joint resolution authorizing military action against Afghanistan, where al Qaeda and its leader Osama bin Laden operated with the tacit support of the Taliban, Afghanistan's extremist Islamic regime. Pub. L. No. 107-40, 115 Stat. 224 (2001). The military action began with air strikes against the al-Qaeda terrorist training camps and against the Taliban's infrastructure and military installations throughout the country. Insertion of forces from the Special Operations Command and CIA operatives followed the air strikes. These forces assisted local militias in the effort to topple the Taliban regime. The objective of this military action was to bring to justice those responsible for the September 11th attacks and to destroy the ability of al Qaeda and the Taliban to launch future terrorist attacks.

In a further response to the terrorist attacks, Congress adopted the USA Patriot Act of 2001. Based on proposed legislation submitted to Congress by the Administration via Attorney General John Ashcroft, the Patriot Act expanded federal intelligence-gathering and law enforcement authority, created new domestic and international terrorism crimes, and increased regulatory powers to combat terrorist-support networks.

Section 804 of the Patriot Act, titled "Jurisdiction over Crimes Committed at U.S. Facilities Abroad," amended 18 U.S.C. § 7 by clarifying that "the premises of United States diplomatic, consular, military or other United States Government missions or entities in foreign States" formed part of the special maritime and territorial jurisdiction of the United States. (Attach. 1). Except for minor changes, it maintained the exact wording of the Administration's proposed version. (Attach. 2). The section analyses from the Administration's version and the penultimate draft of the Patriot Act specified that § 7(9) would apply to "U.S. Government property," "embassies," and "diplomatic and consular premises." (Attach. 2 & 3).

## B. The Asadabad Firebase

By December 2001, the Taliban regime had fallen and Hamid Karzai had been chosen as leader of a transitional government, yet Taliban supporters and Al-Qaeda members maintained strongholds in eastern Afghanistan along the Afghan-Pakistani border. Joint Coalition Task-Force 180 formed in May 2002 and assumed control over the operation to capture or destroy the Taliban and Al-Qaeda remnants and to train the fledgling Afghani National Army. (Attach. 4). Task-Force 180 included military forces from the United States and at least twenty (20) other countries. *Id.*

Special Operations forces ("Special Ops") and CIA paramilitaries under the command of Task-Force 180 operated from tactical firebases located within striking distance of the Taliban and al Qaeda strongholds.

One such firebase was located five miles from the Pakistani border near Asadabad, the capital of Kunar Province. (Attach. 5). The Asadabad firebase was an open-air mud-walled compound "the size of a small parking lot." *Id.* Its occupants relied upon generators for electricity and a nearby creek for drinking water. *Id.* Upon information and belief, the family who previously occupied the compound fled after the initiation of military action.

3

Taliban and al-Qaeda guerillas launched frequent rocket and mortar attacks on the Asadabad firebase and on the patrols operating in the region. *Id.* One of the suspected attackers, an Afghani named Abdul Wali, was taken into custody June 18, 2003 by paratroopers of the 82nd Airborne and held for questioning at the firebase. Mr. Passaro was among those tasked with interrogating the suspect and questioned him on June 19 and 20, 2003.

Mr. Wali died of unknown causes on June 21, 2003. A few days later, the governor of Kunar Province, Fazel Akbar, announced in a radio interview that Wali likely died from heart complications, a problem which apparently ran in the Wali family. (Attach. 6). A year later, just days after Mr. Passaro was indicted, Governor Akbar's son and spokesperson, Hyder Akbar, characterized this statement as "speculation" based on the Wali family's reported history of health problems. *Id.*

## C. June 17, 2004 Arrest, Indictment, and Press Conference

In July 2003, Mr. Passaro completed his obligations with the CIA and returned to North Carolina. During this time, both the Department of Defense (DOD) and the CIA conducted investigations into the circumstances surrounding Wali's death. In February 2004, the Justice Department sent Mr. Passaro a "target letter," informing him that it intended to pursue criminal

charges. (Attach. 7).

In a reference to 18 U.S.C. § 7(9), Attorney General Ashcroft noted: "This case would have been more difficult to investigate and prosecute were it not for the USA PATRIOT Act. The Act expanded U.S. law enforcement jurisdiction over crimes committed by or against U.S. nationals on land or facilities designated for use by the United States government." *Id.*

## STATUTORY AND LEGISLATIVE BACKGROUND OF 18 U.S.C. § 7(9)

### A. The Federal Enclave Provisions

18 U.S.C. § 7 defines those federal enclaves which form part of the "special maritime and territorial jurisdiction of the United States." *See United States v. Markiewicz*, 978 F.2d 786, 797 (2nd Cir. 1992) (explaining federal enclave provisions). These enclaves fall into three broad categories and one very specific category: (1) American transport vessels located outside the jurisdictional sovereignty of a particular country; (2) areas outside the jurisdictional sovereignty of a particular country where an offense by or against an American occurs; (3) lands considered federal property, though within a state's jurisdictional borders; and (4) islands containing "deposits of guano" and considered as "appertaining to the United States," *Jones v. United States*, 137 U.S. 202 (1890) (applying predecessor to § 7(4)). Prior to the Patriot Act's addition of § 7(9), none of the federal enclave provisions expressly applied to land within the sovereign jurisdiction of another country.

### B. Circuit Split over Extraterritorial Application of 18 U.S.C. § 7(3)

Under 18 U.S.C. §7(3), "special and maritime jurisdiction" includes "any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof."

In 1973, the Fourth Circuit became the first circuit court to apply § 7(3) outside the geographical boundaries of the United States, upholding federal criminal jurisdiction over a diplomat who killed an embassy employee on embassy premises leased from a private citizen of the host country. *United States v. Erdos*, 474 F.2d 157 (4th Cir. 1973) (Craven, J.) The Court held that "'special' territorial jurisdiction embrac[es] an embassy in a foreign country acquired for the use of the United States and under its concurrent jurisdiction." *Id.* at 159. It found the lease agreement satisfied the usage prong and that the recognized dominion a country has over its embassy conferred concurrent jurisdiction. *Id.* at 159-160.

In 2000, the Second Circuit split with the Fourth Circuit when it held that § 7(3) did not apply to military bases and base housing outside the geographic boundaries of the United States. *United States v. Gatlin*, 216 F.3d. 207 (2nd Cir. 2000). Gatlin, a civilian married to a servicewoman, was convicted in federal court for molesting his step-daughters on leased military housing in Germany. The Second Circuit reversed on jurisdictional grounds, finding that nothing in the legislative history evidenced congressional intent to give 18 U.S.C. § 7(3) extraterritorial reach. *Id.* at 209. The court criticized *Erdos* for ignoring the presumption against extraterritoriality, a rule of statutory interpretation which requires "clear evidence" of congressional intent to extend criminal jurisdiction beyond America's borders. *Id.* at 215; *infra* at 14-15. It also chided Congress for failing to close a forty-year jurisdictional gap created by a series of Supreme Court decisions that effectively removed all civilians from military court jurisdiction except those accompanying the

armed forces during a war declared by Congress.[1] *Id.* at 223.

## C. Legislative History of 18 U.S.C. § 7(9)

On September 20, 2001, just nine days after the September 11th attacks, Attorney General

Ashcroft delivered to Congress the Administration's proposed "Anti-Terrorism Act of 2001"

("ATA") (Attach. 3). Section 356 of the ATA, titled "Jurisdiction Over Crimes Committed At U.S.

Facilities Abroad," proposed amending 18 U.S.C. § 7 by adding subsection (9). *Id.* at 86. The

section analysis of § 356 explains:

> This amendment would explicitly extend the special and maritime criminal
> jurisdiction of the United States to U.S. diplomatic and consular premises and related
> private residences overseas, to the extent an offense is committed by or against a
> U.S. national. When offenses are committed by or against a U.S. national abroad **on
> U.S. government property**, the country in which the offense occurs may have little
> interest in prosecuting the case. Unless the United States is able to prosecute such
> offenders, these crimes may go unpunished. **This section clarifies inconsistent
> caselaw to establish that the United States may prosecute offenses committed in
> its missions abroad, by or against its nationals.**

*Id.* at 63 (Emphasis added).

On September 24, 2001, the House Judiciary Committee conducted a hearing on the ATA.

*House Judiciary Committee Hearing on Administration's Draft Anti-Terrorism Act*, Serial No. 39

(available at www.house.gov.judiciary/75288.pdf) ("Sep. 24, 2001 Hearing") (Attach. 3). The

Senate Judiciary Committees conducted a similar hearing on September 25, 2001. 147 Cong. Rec.

S10547, 10567-69. Questions and comments focused on expansion of wiretaps and pen registers,

---

[1] This series of Supreme Court holdings began with *Reid v. Colvert*, 354 U.S. 1 (1957)
and ended with *McElroy v. Guargliardo*, 361 U.S. 281 (1960). *See* George Schmitt, *Closing the
Gap in Criminal Jurisdiction Over Civilians Accompanying the Armed Forces Abroad – A First
Person Account of the Creation of the Military Extraterritorial Jurisdiction Act of 2000*, 51 Cath.
U.L. Rev. 55, 60-72 (2001). In 2000, Congress passed the Military Extraterritorial Jurisdiction
Act of 2000 (MEJA), Pub. L. No. 106-523, 114 Stat. 2488 (codified at 18 U.S.C. §§ 3261-3267).
MEJA only applies to members of the armed forces, DOD civilian employees, and their
dependents. 18 U.S.C. §§ 3261, 3267.

and on the broadened definition of "terrorism." No mention was made of § 7(9), other than

Representative Conyers' comment that both parties agreed on its passage. Sep. 24, 2001 Hearing, at

43. On October 11, 2001, the House Judiciary Committee recommended passage of H.R. 2975 (the

"Patriot Act"). 107 H.R. Rpt. 236. H.R. 2975 contained the following analysis of the ATA's

proposed Section 356 (renumbered as Section 355):

> Title 18 U.S.C. Sec. 7 entitled 'Special Maritime and Territorial Jurisdiction of the United States defined' is a critical means of jurisdiction for Diplomatic Security agents . . .. In the year 2000, extraterritoriality regarding U.S. embassies and U.S. embassy housing overseas was the subject of differing interpretations by judicial circuits. **Diplomatic Security agents have operated under the legal precedent of *United States v. Erdos*, 474 F.2d. 157 (4th Cir. 1973), which held that an Embassy was within the special maritime and territorial jurisdiction of the United States. This precedent is now being challenged. This section would make it clear that embassies and embassy housing of the United States in foreign states are included in the special maritime and territorial jurisdiction of the United States.** This section does not apply to members of the Armed Forces because they would already be subject to the special maritime and territorial jurisdiction of the United States under title 18 U.S.C. Sec. 3261(a) [MEJA].

107 H.R. Rpt. 236 (Emphasis added) (Attach. 3).

The House and Senate passed the Patriot Act on October 24, 2001, under a suspension of

rules. 147 Cong. Rec. H7224; 147 Cong. Rec. S10969. Section 804 contained the new subsection,

18 U.S.C. § 7(9). (Attach. 1). It maintained the exact wording of the administration's original

version except that it excluded persons subject to MEJA[2] and stated that § 7(9) could not contradict

any international treaty or agreement, regardless of the time of enactment, a temporal limit not in the

Administration's version. *Id.*

---

[2] The likely reason for this exclusion was to preserve the hard-won procedural protections for those arrested overseas pursuant to MEJA, protections which secured MEJA's passage. *See* 18 U.S.C. §§ 3263-65; 51 Cath. U. L. Rev. at 94-108.

<u>ARGUMENT:</u>

<u>The Language and Legislative History of § 18 U.S.C. § 7(9) Demonstrate that Congress did not Intend to Extend America's Jurisdictional Reach to Special Ops Tactical Outposts, a Conclusion Buttressed by Application of the Presumption Against Extraterritoriality and the Rule of Lenity.</u>

Subject matter jurisdiction is lacking if this Court determines that Congress did not intend § 7(9)'s definition of special maritime and territorial jurisdiction to encompass the Asadabad compound, a Special Ops tactical firebase located in a virtual war zone. *See Markham v. U.S.*, 215 F.2d 56, 57 (4th Cir. 1954). This is an issue of statutory interpretation and territorial boundaries of criminal jurisdiction, properly decided by this Court as a matter of law. *See United States v. Jones*, 480 F.2d 1135, 1139 (2nd Cir. 1973) (holding that a judge should determine issues of territorial boundaries and the jury should determine "whether an offense is committed within or without a jurisdictional boundary"); *U.S. v. Hernandez-Fundora*, 58 F.3d 802, 810 (2nd Cir. 1995).

Statutory interpretation begins with analysis of "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Ex rel. Wilson v. Graham County Soil & Water Conservation Dist.*, 367 F.3d 245, 247-248 (4th Cir. 2004) (internal cites and quotations omitted). If this analysis produces "more than one reasonable interpretation," a court selects the one "most harmonious with . . . the general purposes that Congress manifested." *Id.* Resort to legislative history "is also appropriate if a literal application would . . . lead to an absurd result." *Id.*

**A. Extending America's Jurisdictional Reach to Special Ops Tactical Outposts Does not Accord with the Language and Context of 18 U.S.C. § 7(9).**

The language of § 7(9) provides in relevant part:

With respect to offenses committed by or against a national of the United States . . . [special maritime and territorial jurisdiction includes] the **premises** of United States diplomatic, consular, military or other United States Government **missions or entities** in foreign States, including the buildings, parts of buildings, and land

appurtenant or ancillary thereto or used for purposes of those missions or entities, irrespective of ownership . . . . Nothing in this paragraph shall be deemed to supersede any treaty or international agreement with which this paragraph conflicts. This paragraph does not apply with respect to an offense by a person described in [18 U.S.C. § 3261(a) (MEJA)]." 18 U.S.C. § 7(9)(A) (Emphasis added).

A proper interpretation of § 7(9) begins with the words, "mission" and "premises," terms of art with commonly understood meanings in the context of foreign relations. *See Morissette v. United States*, 342 U.S. 246, 263 (1952) ("Where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning . . . .").

In this context, a "mission" is a country's representative to a foreign government and his or her staff. *See* 22 U.S.C. § 254(a) ("the term 'mission' includes missions within the meaning of the Vienna Convention and any missions representing foreign governments); 23 U.S.T. 3227, 1961 U.S.T. LEXIS 883, at *4 (Vienna Convention) (defining the function of missions as "representing States"). The highest ranking mission is an embassy, which consists of the ambassador and his or her diplomatic staff. Black's Law Dictionary, 7th ed. (1999) (noting that ambassadors represent a country's government and sovereign, unlike envoys and ministers, who only represent the government).

Article I of the Vienna Convention defines "premises of the mission" as "the buildings or parts of buildings and the land ancillary thereto, irrespective of ownership, used for purposes of the mission including the residence of the head of the mission." *Id.* at *3. Subsection 7(9)(A) closely tracks this definition, referring to "buildings, parts of buildings, and land appurtenant or ancillary thereto or used for purposes of those missions or entities, irrespective of ownership." Use of virtually identical language indicates that Congress intended to employ the definition of "premises" utilized in the context of foreign relations.

The Vienna Treaty requires that the premises of a mission be "inviolable" against entry by the host country. 1961 U.S.T. LEXIS, at *9. It also prohibits the sending State from unilaterally establishing satellite offices outside the locality of the mission. *Id.* at 13. In essence, the host country grants the governmental mission dominion and control over the "premises," but treats it as a company's headquarters – there can be only one.

Applying these definitions of "mission" and "premises" in § 7(9) produces a jurisdictional reach consistent with the statutory language of § 7(9) and the other federal enclave provisions of § 7, which trod carefully upon the jurisdiction of another sovereign. Under § 7(9), the status of a "mission" or "entity" of the United States Government in a foreign country would not derive merely from the presence of a group of government employees in that foreign country. Rather, the group must represent the United States Government. Moreover, before a piece of real estate occupied by employees of the American government qualifies as "premises," the host country must formally designate a piece of its terrain to serve as a home base for that mission or entity, effectively treating it as U.S. Government property and allowing the U.S. to "govern" activities on that terrain.

To extend § 7(9) to reach a piece of Afghani terrain used by Special Ops forces and CIA paramilitaries as a tactical firebase requires application of an expansive definition of "premises" and "entity." In the military context, such an expansive definition would create a floating federal enclave that follows the boots of two or more soldiers wherever they tactically deploy. It would permit the United States to exert jurisdiction over foreign lands acquired through military might, not through an acquired property right to land recognized by the host country as subject to U.S. control. The legislative history demonstrates that Congress did not intend for § 7(9) to produce this absurd result. *Ex rel. Wilson*, 367 F.3d at 247-248.

**B. The Legislative History of § 7(9) Supports Limiting the Extension of Special Maritime and Territorial Jurisdiction to Embassies, Established Military Bases, and Similar Permanent Establishments.**

The legislative history of § 7(9) speaks with a clear, singular voice and affirms that Congress intended to limit "premises" to those used by permanent establishments of the United States government, such as embassies and military bases.

The section analyses for § 7(9) from both the House of Representatives and the Administration's versions specify that § 7(9) extends jurisdiction to "embassies," "diplomatic and consular premises," and "U.S. government property." (Attach. 2 & 3). Additionally, both reference the circuit split over extraterritorial application of § 7(3) created in 2000 by the *Gatlin* case. This split addressed territorial jurisdiction over embassies and established military bases, not over tactical outposts of Special Ops forces in virtual war zones in a country only partially under the control of a provisional government. The section analyses clarify that Congress merely intended § 7(9) to codify those cases which applied § 7(3) extraterritorially to land designated by the host country as a federal enclave of the United States Government, i.e., *Erdos*, 427 F.2d at 157-160, which the sectional analysis to H.R. 2975 § 355 specifically mentions. (Attach. 3).

**C. The Asadabad Firebase Falls Woefully Short of any Definition for the "Premises" of a United States "Mission" or "Entity" that the Language and Legislative History of § 7(9) can Support.**

The group of Special Operations forces, CIA paramilitaries, and Afghani soldiers who operated out of the compound did not represent the United States as a governmental "mission" or "entity." Rather, the mission of this Special Ops contingent was to hunt for terrorists, train the Afghani soldiers to do the same, and to win the hearts and minds of the locals. It was not to establish a sovereign enclave of the United States federal government on this piece of Afghani terrain.

12

Their presence at the Asadabad compound resulted from the immediate tactical necessity to remain within striking distance of Taliban and al Qaeda guerillas, not from a formal agreement between the United States and the Afghani transitional government. Rather, the facts suggest that occupation resulted from a tactical and unilateral military choice by a small unit operating under the operational control of Task-Force 180, a coalition force of over twenty countries.

The compound cannot even be considered an army base, as that term is defined and applied by the Department of Defense. The Asadabad firebase consisted of an open field the size of a small parking lot bordered by mud walls and containing a few mud huts. The forces relied upon a generator for electricity and a creek for drinking water. This falls short of the Department's definition of "Army base," which consists of "facilities necessary for support of Army activities including security, internal lines of communications, utilities, plants and systems, and real property for which the Army has operating responsibility." Department of Defense Dictionary of Military and Associated Terms, 12 April 2001, p. 47 (As amended through 9 June 2004) (available at http://www.dtic.mil/doctrine/jel/new_pubs/jp1_02.pdf) (Attach. 9).

Given the constant attacks from al Qaeda and Taliban forces, the firebase did not even meet the definition of a Special Ops "forward operations base," which is "usually located in friendly territory." *Id.*, p. 212. Understandably, the firebase is not included in the Defense Department's September 30, 2003 Base Structure Report, which lists all real property owned or used by DOD worldwide. (available at http://www.dod.gov/pubs/20040910_2004BaseStructureReport.pdf) (Attach. 10).

Finally, a broad definition of "premises" would likely conflict with existing international agreements, a result which § 7(9) expressly prohibits. America's unilateral extension of jurisdiction over any plot of land occupied by American troops conflicts with the Vienna Convention, which

prohibits the sending State from unilaterally establishing satellite offices outside the locality of the established mission. 1961 U.S.T. LEXIS, at **9, 13.

It would also conflict with the Status of Forces Agreement (SOFA) between the United States and the Transitional Islamic Government of Afghanistan. 2002 U.S.T. LEXIS 100 (May 23, 2003). The SOFA limits coverage to "United States military and civilian personnel of the U.S. Department of Defense," and affords the equivalent of diplomatic immunity to those personnel. *Id.* It also grants the United States exclusive criminal jurisdiction over these persons regardless of where the criminal act occurs. It does not, however, grant criminal jurisdiction over other American civilian personnel, who remain subject to Afghani criminal jurisdiction. A broad definition of "premises" that extends American jurisdiction over plots of land occupied by non-DOD personnel conflicts with the SOFA's intent, as the Afghani government did not cede jurisdictional dominion over those Americans.

**D. The Presumption Against Extraterritoriality and Rule of Lenity Favor a Determination that Tactical Outposts of Special Ops and CIA Paramilitary Forces Are Not Part of the "Special Maritime and Territorial Jurisdiction of the United States."**

The presumption against extraterritoriality applies here to limit the scope of § 7(9) to only those portions of Afghanistan Congress clearly intended to claim as subject to United States jurisdiction.

A "longstanding principle" of American law states: "legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) ("Aramaco"). This presumption against extraterritoriality "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." *Aramaco*, 499 U.S. at 248. Courts therefore "assume that Congress legislates against the backdrop of the presumption against

14

extraterritoriality" and require "clear evidence" of congressional intent to extend criminal jurisdiction beyond America's borders. *Id.*

As part of the federal enclave provisions of 18 U.S.C. § 7, § 7(9) confers jurisdiction only over *certain lands* in foreign countries. It differs from MEJA, which confers jurisdiction over *certain persons* who commit crimes in foreign lands, 18 U.S.C. § 3261(a), and from the terrorism crimes, which confer universal jurisdiction over *certain criminal acts,* 18 U.S.C. §§ 2331-2339A.

The language and legislative history of § 7(9) indicate that Congress did not intend to create a scenario whereby any plot of ground or structure used by a military unit falls within the special territorial jurisdiction of the United States, regardless of size of the military unit or the relation between the unit and the ground it occupies. Rather, it limited its jurisdictional reach to the "premises" of embassies and military bases that are under the dominion and control of the United States Government pursuant to a formal agreement with the host country. If Congress intended § 7(9) to extend beyond embassies, consulates, established military bases, and similarly permanent United States government facilities, the statutory language and legislative history do not indicate how far. This failure to clearly evidence Congressional intent to claim jurisdiction over a tactical military outpost requires a finding that § 7(9) does not incorporate the Asadabad firebase. *See Reyes-Gaona v. N.C. Growers Assoc.*, 250 F.3d 861, 865-67 (4th Cir. 2001) (applying presumption to interpret statute that allowed only "limited extraterritorial application").

This same statutory ambiguity also triggers application of the rule of lenity, which resolves doubts in favor of the defendant when legislative intent remains unclear. *Moskal v. United States,* 498 U.S. 103, 112 (1990).

## CONCLUSION

The statutory language and legislative history of 18 U.S.C. § 7(9) indicate that Congress did

not intend to assert territorial jurisdiction over the Asadabad firebase, a tactical outpost for Special Operations forces and CIA paramilitaries. To use this provision against a person sent by the United States to capture members of the terrorist organization responsible for the September 11th attacks would contradict Congressional intent and turn the Patriot Act on its head.

Respectfully requested this 1st day of November, 2004.

*Thomas P. McNamara*

THOMAS P. McNAMARA
Federal Public Defender
N.C. State Bar No. 5099

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served upon:

JAMES A. CANDELMO
Assistant United States Attorney
Suite 800, Federal Building
310 New Bern Avenue
Raleigh, NC 27601-1461

by hand delivering a copy of same

This the 1st day of November, 2004.

*Thomas P. McNamara*

THOMAS P. McNAMARA
Federal Public Defender
N.C. State Bar No. 5099

# Attachment
# 1

Public Law 107–56
107th Congress

## An Act

Oct. 26, 2001

[H.R. 3162]

To deter and punish terrorist acts in the United States and around the world, to enhance law enforcement investigatory tools, and for other purposes.

Uniting and
Strengthening
America by
Providing
Appropriate
Tools Required to
Intercept and
Obstruct
Terrorism (USA
PATRIOT ACT)
Act of 2001.
18 USC 1 note.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

SECTION 1. SHORT TITLE AND TABLE OF CONTENTS.

(a) SHORT TITLE.—This Act may be cited as the "Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001".

(b) TABLE OF CONTENTS.—The table of contents for this Act is as follows:

Sec. 1. Short title and table of contents.
Sec. 2. Construction; severability.

TITLE I—ENHANCING DOMESTIC SECURITY AGAINST TERRORISM

Sec. 101. Counterterrorism fund.
Sec. 102. Sense of Congress condemning discrimination against Arab and Muslim Americans.
Sec. 103. Increased funding for the technical support center at the Federal Bureau of Investigation.
Sec. 104. Requests for military assistance to enforce prohibition in certain emergencies.
Sec. 105. Expansion of National Electronic Crime Task Force Initiative.
Sec. 106. Presidential authority.

TITLE II—ENHANCED SURVEILLANCE PROCEDURES

Sec. 201. Authority to intercept wire, oral, and electronic communications relating to terrorism.
Sec. 202. Authority to intercept wire, oral, and electronic communications relating to computer fraud and abuse offenses.
Sec. 203. Authority to share criminal investigative information.
Sec. 204. Clarification of intelligence exceptions from limitations on interception and disclosure of wire, oral, and electronic communications.
Sec. 205. Employment of translators by the Federal Bureau of Investigation.
Sec. 206. Roving surveillance authority under the Foreign Intelligence Surveillance Act of 1978.
Sec. 207. Duration of FISA surveillance of non-United States persons who are agents of a foreign power.
Sec. 208. Designation of judges.
Sec. 209. Seizure of voice-mail messages pursuant to warrants.
Sec. 210. Scope of subpoenas for records of electronic communications.
Sec. 211. Clarification of scope.
Sec. 212. Emergency disclosure of electronic communications to protect life and limb.
Sec. 213. Authority for delaying notice of the execution of a warrant.
Sec. 214. Pen register and trap and trace authority under FISA.
Sec. 215. Access to records and other items under the Foreign Intelligence Surveillance Act.
Sec. 216. Modification of authorities relating to use of pen registers and trap and trace devices.

Sec. 217. Interception of computer trespasser communications.
Sec. 218. Foreign intelligence information.
Sec. 219. Single-jurisdiction search warrants for terrorism.
Sec. 220. Nationwide service of search warrants for electronic evidence.
Sec. 221. Trade sanctions.
Sec. 222. Assistance to law enforcement agencies.
Sec. 223. Civil liability for certain unauthorized disclosures.
Sec. 224. Sunset.
Sec. 225. Immunity for compliance with FISA wiretap.

TITLE III—INTERNATIONAL MONEY LAUNDERING ABATEMENT AND ANTI-
TERRORIST FINANCING ACT OF 2001

Sec. 301. Short title.
Sec. 302. Findings and purposes.
Sec. 303. 4-year congressional review; expedited consideration.

Subtitle A—International Counter Money Laundering and Related Measures

Sec. 311. Special measures for jurisdictions, financial institutions, or international
transactions of primary money laundering concern.
Sec. 312. Special due diligence for correspondent accounts and private banking ac-
counts.
Sec. 313. Prohibition on United States correspondent accounts with foreign shell
banks.
Sec. 314. Cooperative efforts to deter money laundering.
Sec. 315. Inclusion of foreign corruption offenses as money laundering crimes.
Sec. 316. Anti-terrorist forfeiture protection.
Sec. 317. Long-arm jurisdiction over foreign money launderers.
Sec. 318. Laundering money through a foreign bank.
Sec. 319. Forfeiture of funds in United States interbank accounts.
Sec. 320. Proceeds of foreign crimes.
Sec. 321. Financial institutions specified in subchapter II of chapter 53 of title 31,
United States code.
Sec. 322. Corporation represented by a fugitive.
Sec. 323. Enforcement of foreign judgments.
Sec. 324. Report and recommendation.
Sec. 325. Concentration accounts at financial institutions.
Sec. 326. Verification of identification.
Sec. 327. Consideration of anti-money laundering record.
Sec. 328. International cooperation on identification of originators of wire transfers.
Sec. 329. Criminal penalties.
Sec. 330. International cooperation in investigations of money laundering, financial
crimes, and the finances of terrorist groups.

Subtitle B—Bank Secrecy Act Amendments and Related Improvements

Sec. 351. Amendments relating to reporting of suspicious activities.
Sec. 352. Anti-money laundering programs.
Sec. 353. Penalties for violations of geographic targeting orders and certain record-
keeping requirements, and lengthening effective period of geographic
targeting orders.
Sec. 354. Anti-money laundering strategy.
Sec. 355. Authorization to include suspicions of illegal activity in written employ-
ment references.
Sec. 356. Reporting of suspicious activities by securities brokers and dealers; in-
vestment company study.
Sec. 357. Special report on administration of bank secrecy provisions.
Sec. 358. Bank secrecy provisions and activities of United States intelligence agen-
cies to fight international terrorism.
Sec. 359. Reporting of suspicious activities by underground banking systems.
Sec. 360. Use of authority of United States Executive Directors.
Sec. 361. Financial crimes enforcement network.
Sec. 362. Establishment of highly secure network.
Sec. 363. Increase in civil and criminal penalties for money laundering.
Sec. 364. Uniform protection authority for Federal Reserve facilities.
Sec. 365. Reports relating to coins and currency received in nonfinancial trade or
business.
Sec. 366. Efficient use of currency transaction report system.

Subtitle C—Currency Crimes and Protection

Sec. 371. Bulk cash smuggling into or out of the United States.
Sec. 372. Forfeiture in currency reporting cases.

Sec. 373. Illegal money transmitting businesses.
Sec. 374. Counterfeiting domestic currency and obligations.
Sec. 375. Counterfeiting foreign currency and obligations.
Sec. 376. Laundering the proceeds of terrorism.
Sec. 377. Extraterritorial jurisdiction.

### TITLE IV—PROTECTING THE BORDER

#### Subtitle A—Protecting the Northern Border

Sec. 401. Ensuring adequate personnel on the northern border.
Sec. 402. Northern border personnel.
Sec. 403. Access by the Department of State and the INS to certain identifying information in the criminal history records of visa applicants and applicants for admission to the United States.
Sec. 404. Limited authority to pay overtime.
Sec. 405. Report on the integrated automated fingerprint identification system for ports of entry and overseas consular posts.

#### Subtitle B—Enhanced Immigration Provisions

Sec. 411. Definitions relating to terrorism.
Sec. 412. Mandatory detention of suspected terrorists; habeas corpus; judicial review.
Sec. 413. Multilateral cooperation against terrorists.
Sec. 414. Visa integrity and security.
Sec. 415. Participation of Office of Homeland Security on Entry-Exit Task Force.
Sec. 416. Foreign student monitoring program.
Sec. 417. Machine readable passports.
Sec. 418. Prevention of consulate shopping.

#### Subtitle C—Preservation of Immigration Benefits for Victims of Terrorism

Sec. 421. Special immigrant status.
Sec. 422. Extension of filing or reentry deadlines.
Sec. 423. Humanitarian relief for certain surviving spouses and children.
Sec. 424. "Age-out" protection for children.
Sec. 425. Temporary administrative relief.
Sec. 426. Evidence of death, disability, or loss of employment.
Sec. 427. No benefits to terrorists or family members of terrorists.
Sec. 428. Definitions.

### TITLE V—REMOVING OBSTACLES TO INVESTIGATING TERRORISM

Sec. 501. Attorney General's authority to pay rewards to combat terrorism.
Sec. 502. Secretary of State's authority to pay rewards.
Sec. 503. DNA identification of terrorists and other violent offenders.
Sec. 504. Coordination with law enforcement.
Sec. 505. Miscellaneous national security authorities.
Sec. 506. Extension of Secret Service jurisdiction.
Sec. 507. Disclosure of educational records.
Sec. 508. Disclosure of information from NCES surveys.

### TITLE VI—PROVIDING FOR VICTIMS OF TERRORISM, PUBLIC SAFETY OFFICERS, AND THEIR FAMILIES

#### Subtitle A—Aid to Families of Public Safety Officers

Sec. 611. Expedited payment for public safety officers involved in the prevention, investigation, rescue, or recovery efforts related to a terrorist attack.
Sec. 612. Technical correction with respect to expedited payments for heroic public safety officers.
Sec. 613. Public safety officers benefit program payment increase.
Sec. 614. Office of Justice programs.

#### Subtitle B—Amendments to the Victims of Crime Act of 1984

Sec. 621. Crime victims fund.
Sec. 622. Crime victim compensation.
Sec. 623. Crime victim assistance.
Sec. 624. Victims of terrorism.

### TITLE VII—INCREASED INFORMATION SHARING FOR CRITICAL INFRASTRUCTURE PROTECTION

Sec. 701. Expansion of regional information sharing system to facilitate Federal-State-local law enforcement response related to terrorist attacks.

TITLE VIII—STRENGTHENING THE CRIMINAL LAWS AGAINST TERRORISM

Sec. 801. Terrorist attacks and other acts of violence against mass transportation systems.
Sec. 802. Definition of domestic terrorism.
Sec. 803. Prohibition against harboring terrorists.
Sec. 804. Jurisdiction over crimes committed at U.S. facilities abroad.
Sec. 805. Material support for terrorism.
Sec. 806. Assets of terrorist organizations.
Sec. 807. Technical clarification relating to provision of material support to terrorism.
Sec. 808. Definition of Federal crime of terrorism.
Sec. 809. No statute of limitation for certain terrorism offenses.
Sec. 810. Alternate maximum penalties for terrorism offenses.
Sec. 811. Penalties for terrorist conspiracies.
Sec. 812. Post-release supervision of terrorists.
Sec. 813. Inclusion of acts of terrorism as racketeering activity.
Sec. 814. Deterrence and prevention of cyberterrorism.
Sec. 815. Additional defense to civil actions relating to preserving records in response to Government requests.
Sec. 816. Development and support of cybersecurity forensic capabilities.
Sec. 817. Expansion of the biological weapons statute.

TITLE IX—IMPROVED INTELLIGENCE

Sec. 901. Responsibilities of Director of Central Intelligence regarding foreign intelligence collected under Foreign Intelligence Surveillance Act of 1978.
Sec. 902. Inclusion of international terrorist activities within scope of foreign intelligence under National Security Act of 1947.
Sec. 903. Sense of Congress on the establishment and maintenance of intelligence relationships to acquire information on terrorists and terrorist organizations.
Sec. 904. Temporary authority to defer submittal to Congress of reports on intelligence and intelligence-related matters.
Sec. 905. Disclosure to Director of Central Intelligence of foreign intelligence-related information with respect to criminal investigations.
Sec. 906. Foreign terrorist asset tracking center.
Sec. 907. National Virtual Translation Center.
Sec. 908. Training of government officials regarding identification and use of foreign intelligence.

TITLE X—MISCELLANEOUS

Sec. 1001. Review of the department of justice.
Sec. 1002. Sense of congress.
Sec. 1003. Definition of "electronic surveillance".
Sec. 1004. Venue in money laundering cases.
Sec. 1005. First responders assistance act.
Sec. 1006. Inadmissibility of aliens engaged in money laundering.
Sec. 1007. Authorization of funds for dea police training in south and central asia.
Sec. 1008. Feasibility study on use of biometric identifier scanning system with access to the fbi integrated automated fingerprint identification system at overseas consular posts and points of entry to the United States.
Sec. 1009. Study of access.
Sec. 1010. Temporary authority to contract with local and State governments for performance of security functions at United States military installations.
Sec. 1011. Crimes against charitable americans.
Sec. 1012. Limitation on issuance of hazmat licenses.
Sec. 1013. Expressing the sense of the senate concerning the provision of funding for bioterrorism preparedness and response.
Sec. 1014. Grant program for State and local domestic preparedness support.
Sec. 1015. Expansion and reauthorization of the crime identification technology act for antiterrorism grants to States and localities.
Sec. 1016. Critical infrastructures protection.

**SEC. 2. CONSTRUCTION; SEVERABILITY.**

18 USC 1 note.

Any provision of this Act held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, shall be construed so as to give it the maximum effect permitted by law, unless such holding shall be one of utter invalidity or unenforceability, in which event such provision shall be deemed

# Attachment
# 2

# ADMINISTRATION'S DRAFT ANTI-TERRORISM ACT OF 2001

## HEARING

BEFORE THE

## COMMITTEE ON THE JUDICIARY
## HOUSE OF REPRESENTATIVES

ONE HUNDRED SEVENTH CONGRESS

FIRST SESSION

SEPTEMBER 24, 2001

## Serial No. 39

Printed for the use of the Committee on the Judiciary



Available via the World Wide Web: http://www.house.gov/judiciary

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 2001

75-288 PDF

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512-1800; DC area (202) 512-1800
Fax: (202) 512-2250   Mail: Stop SSOP, Washington, DC 20402-0001

Mr. CONYERS. Well, Mr. Chairman, the length and accuracy and sincerity of your comments make mine very brief indeed. First of all, I want to thank you on behalf of nearly half the colleagues here. I think you're right. I think that no one in this body can accuse you of trying to slow down the process, and you've pointed out correctly that our jurisdiction differs from the two other Committees that have acted previously. Why? Because we have jurisdiction over the Constitution. The Constitution cannot be rushed, and there's no one on this Committee trying to slow this down. But I think because Yom Kippur is coming very shortly, and if you chose to take the—tomorrow's schedule and make it a conference in which we could talk over the 16 points taken out of the Ashcroft proposal that is now being reduced to legislative language, I think we'd be able to move this thing along remarkably well and meet the accommodations of our leadership on both sides.

I would also ask unanimous consent to include the clarification of the 16 provisions taken out of Ash—the Ashcroft plan.

[The information referred to follows:]

There are a number of provisions which we can agree to today:

### 109 CLARIFICATION OF SCOPE

Law enforcement must have the capability to trace, intercept, and obtain records of the communications of terrorists and other criminals with great speed, even if they choose to use a cable provider for their telephone and Internet service. This section amends the Cable Communications Policy Act ("Cable Act") to clarify that when a cable company acts as a telephone company or an Internet service provider, it must comply with the same laws governing the interception and disclosure of wire and electronic communications that apply to any other telephone company or Internet service provider. The Cable Act, passed in 1984 to regulate various aspects of the cable television industry, could not take into account the changes in technology that have occurred over the last seventeen years. Cable television companies now often provide Internet access and telephone service in addition to television programming. Because of perceived conflicts between the Cable Act and the laws that govern law enforcement's access to communications and records of communications carried by cable companies, cable providers have refused to comply with lawful court orders, thereby slowing or ending critical investigations.

### 110 EMERGENCY DISCLOSURE OF ELECTRONIC COMMUNICATIONS

Existing law contains no provision that allows providers of electronic communications service to disclose the communications (or records relating to such communications) of their customers or subscribers in emergencies that threaten death or serious bodily injury. This section amends 18 U.S.C. § 2702 to authorize such disclosures if the provider reasonably believes that an emergency involving immediate danger of death or serious physical injury to any person requires disclosure of the information without delay.

Current law also contains an odd disconnect: a provider may disclose the contents of the customer's communications in order to protect its rights or property but the current statute does not expressly permit a provider to voluntarily disclose non-content records (such as a subscriber's login records). 18 U.S.C. § 2702(b)(5). This provision substantially hinders the ability of providers to protect themselves from cyberterrorists and criminals. Yet the right to disclose the contents of communications necessarily implies the less intrusive ability to disclose non-content records. In order to promote the protection of our nation's critical infrastructures, this section's amendments allow communications providers to voluntarily disclose both content and non-content records to protect their computer systems.

### 151 PERIOD OF ORDERS OF ELECTRONIC SURVEILLANCE

This section reforms a critical aspect of the Foreign Intelligence Surveillance Act (FISA). It will enable the Foreign Intelligence Surveillance Court (FISC), which presides over applications made by the U.S. government under FISA, to authorize the search and surveillance in the U.S. of officers and employees of foreign powers and

foreign members of international terrorist groups for up to a year. Currently, the FISC may only authorize such searches and surveillance for up to 45 days and 90 days, respectively. The proposed change would bring the authorization period in line with that allowed for search and surveillance of the foreign establishments for which the foreign officers and employees work. The proposed change would have no effect on electronic surveillance or physical searches of U.S. citizens or permanent resident aliens.

### 206 INTERAGENCY DATA SHARING

This amendment to the Immigration and Nationality Act (INA) would recognize that the interagency cooperation provided for in INA Section 105 now serves a broader border security function, and would enhance that function by improving consular officers' access to crime information. This is consistent with the fact that securing the borders of the U.S. against the entry of international terrorists, traffickers in narcotics, weapons or persons, international organized crime members, and illegal entrants is not the responsibility of any single federal agency. Consular officers abroad must facilitate legitimate travel while preventing the travel of individuals who present security or other threats to U.S. government interests. These officers need electronic access to information from border security and law enforcement agencies that will assist in identifying high-risk travelers, including information maintained by the FBI on aliens suspected of committing crimes in the U.S. (e.g., information contained in the NCIC-III and Wanted Persons File databases). Without this information, a consular officer could unknowingly grant a visa to a known or suspected criminal.

### 35x DNA IDENTIFICATION OF TERRORISTS

The statutory provisions governing the collection of DNA samples from convicted federal offenders (42 U.S.C. § 14135a(d)) are restrictive, and do not include persons convicted for the crimes that are most likely to be committed by terrorists. DNA samples cannot now be collected even from persons federally convicted of terrorist murders in most circumstances. For example, 49 U.S.C. § 46502, which applies to terrorists who murder people by hijacking aircraft, 18 U.S.C. § 844(i), which applies to terrorists who murder people by blowing up buildings, and 18 U.S.C. § 2332, which applies to terrorists who murder U.S. nationals abroad, are not included in the qualifying federal offenses for purposes of DNA sample collection under existing law. This section addresses the deficiency of the current law in relation to terrorists by extending DNA sample collection to all persons convicted of terrorism crimes.

### 366 DEFINITION EXTENDING MARITIME JURISDICTION

This amendment would explicitly extend the special and maritime criminal jurisdiction of the United States to U.S. diplomatic and consular premises and related private residences overseas, to the extent an offense is committed by or against a U.S. national. When offenses are committed by or against a U.S. national abroad on U.S. government property, the country in which the offense occurs may have little interest in prosecuting the case. Unless the United States is able to prosecute such offenders, these crimes may go unpunished. This section clarifies inconsistent caselaw to establish that the United States may prosecute offenses committed in its missions abroad, by or against its nationals.

### 401 LAUNDERING THE PROCEEDS OF TERRORISM

Money-laundering under 18 U.S.C. § 1956 involves conducting or attempting to conduct a financial transaction knowing that the property involved represents the proceeds of an unlawful activity specified in subsection (c)(7) of the statute. Violations of 18 U.S.C. § 2339A, which prohibits providing material support to terrorists within the United States, are already included as specified unlawful activities. This section provides more complete coverage of money-laundering related to terrorism by adding as a further predicate offense 18 U.S.C. § 2339B, which prohibits providing material support or resources to foreign terrorist organizations.

### 402 MATERIAL SUPPORT FOR TERRORISM

18 U.S.C. § 2339A prohibits providing material support to terrorism. Under the statute's definitional subsection, the prohibited forms of support include (among many other things) "currency or other financial securities." This section adds an explicit reference to "monetary instruments" to the definition. The purpose of the amendment is to make it clear that the definition is to be taken expansively to encompass any and all forms of money, monetary instruments, or securities.

MATERIAL SUBMITTED FOR THE HEARING RECORD

CONSULTATION DRAFT OF SEPTEMBER 20, 2001

ANTI-TERRORISM ACT OF 2001
SECTION-BY-SECTION ANALYSIS

TITLE I—INTELLIGENCE GATHERING

SUBTITLE A: ELECTRONIC SURVEILLANCE

Section 101. Modification of Authorities Relating to Use of Pen Registers And Trap And Trace Devices

This section authorizes courts to grant pen register/trap and trace orders that are valid anywhere in the nation, and subjects Internet communications to the same rules as telephone communications. At present, the government must apply for new pen/trap orders in every jurisdiction where an investigation is being pursued. Hence, law enforcement officers tracking a suspected terrorist in multiple jurisdictions must waste valuable time and resources by obtaining a duplicative order in each jurisdiction.

In greater detail, the section amends 18 U.S.C. §3123(a) by allowing courts to grant orders that are valid "anywhere within the United States." Thus, the government would be able to obtain one pen register/trap and trace order that could be applied to any communications provider in the chain of providers carrying the suspects' communications. This amendment would increase tracing efficiency by eliminating the current need to apply for new orders each time the investigation leads to another jurisdiction. The section also includes a number of provisions which ensure that the pen/trap provisions apply to facilities other than telephone lines (e.g., the Internet). These amendments will promote effective tracing regardless of the media employed.

Section 102. Seizure of Voice Mail Messages Pursuant to Warrants

This section enables law enforcement personnel to seize suspected terrorists' voice mail messages pursuant to a search warrant. At present, 18 U.S.C. §2510(1) anomalously defines "wire communication" to include "electronic storage of such communication," meaning that the government must apply for a Title III wiretap order before it can obtain unopened voice mail messages held by a service provider. The section amends the definition of "wire communication" so that it no longer includes stored communications. It also amends 18 U.S.C. §2703 to specify that the government may use a search warrant (instead of a wiretap order) to compel the production of unopened voicemail, thus harmonizing the rules applicable to stored voice and non-voice (e.g., e-mail) communications.

Section 103. Authorized Disclosure

This section facilitates the disclosure of Title III information to other components of the intelligence community in terrorism investigations. At present, 18 U.S.C. §2517(1) generally allows information obtained via wiretap to be disclosed only to the extent that it will assist a criminal investigation. One must obtain a court order to disclose Title III information in non-criminal proceedings. Section 103 would modify the wiretap statutes to permit the disclosure of Title III-generated information to a non-law enforcement officer for such purposes as furthering an intelligence investigation. This will harmonize Title III standards with those of the Foreign Intelligence Surveillance Act (FISA), which allows such information-sharing. Allowing disclosure under Title III is particularly appropriate given that the requirements for obtaining a Title III surveillance order in general are more stringent than for a FISA order, and because the attendant privacy concerns in either situation are similar and are adequately protected by existing statutory provisions.

Section 104. Savings Provision

This provision clarifies that the collection of foreign intelligence information is governed by foreign intelligence authorities rather than by criminal procedural statutes, as the current statutory scheme envisions.

Section 105. Use of Wiretap Information From Foreign Governments

Under current case law, federal prosecutors appear to have the ability to use electronic surveillance conducted by foreign governments in criminal proceedings. As criminal law enforcement becomes more of a global effort, such information will come to play a larger role in federal prosecutions. To ensure uniformity of federal

Without this information, a consular officer could unknowingly grant a visa to a known or suspected criminal.

## TITLE III—CRIMINAL JUSTICE

### SUBTITLE A: SUBSTANTIVE CRIMINAL LAW

*Section 301. No Statute of Limitations For Prosecuting Terrorism Offenses*

This section amends 18 U.S.C. §3286 to provide that terrorism offenses may be prosecuted without limitation of time. This will make it possible to prosecute the perpetrators of terrorist acts whenever they are identified and apprehended.

The section expressly provides that it is applicable to offenses committed before the date of enactment of the statute, as well as those committed thereafter. This retroactivity provision ensures that no limitation period will bar the prosecution of crimes committed in connection with the September 11, 2001 terrorist attacks. The constitutionality of such retroactive applications of changes in statutes of limitations is well-settled. See, e.g., *United States v. Grimes*, 142 F.3d 1342, 1350–51 (11th Cir. 1998); *People v. Frazer*, 982 P.2d 180 (Cal. 1999).

Existing federal law (18 U.S.C. §3282) bars prosecuting most offenses after five years. 18 U.S.C. §3286, as currently formulated, extends the limitation period for prosecution for certain offenses that may be committed by terrorists—but only to eight years. While this is a limited improvement over the five-year limitation period for most federal offenses, it is patently inadequate in relation to the catastrophic human and social costs that frequently follow from such crimes as destruction of aircraft (18 U.S.C. §32), aircraft hijackings (42 U.S.C. §§46502, 46504–06), attempted political assassinations (18 U.S.C. §§351 , 1116, 1751), or hostage taking (18 U.S.C. §1203). These are not minor acts of misconduct which can properly be forgiven or forgotten merely because the perpetrator has avoided apprehension for some period of time. Anomalously, existing law provides longer limitation periods for such offenses as bank frauds and certain artwork thefts (18 U.S.C. §§3293–94) than it does for the crimes characteristically committed by terrorists.

In many American jurisdictions, the limitation periods for prosecution for serious offenses are more permissive than those found in federal law, including a number of states which have no limitation period for the prosecution of felonies generally. While this section does not go so far, it does eliminate the limitation period for prosecution of the major crimes that are most likely to be committed by terrorists ("Federal terrorism offenses"), as specified in section 309 of this bill.

*Section 302. Alternative Maximum Penalties For Terrorism Crimes*

Under existing law, the maximum prison terms for federal offenses are normally determined by specifications in the provisions which define them. These provisions can provide inadequate maxima in cases where the offense is aggravated by its terrorist character or motivation. This section accordingly adds a new subsection (e) to 18 U.S.C. §3559 which provides alternative maximum prison terms, including imprisonment for any term of years or for life, for crimes that are likely to be committed by terrorists. This is analogous to the maximum fine provisions of 18 U.S.C. §3571(b)(c)—which supersede lower fine amounts specified in the statutes defining particular offenses—and will more consistently ensure the availability of sufficiently high maximum penalties in terrorism cases. As in several other provisions of this bill, the list of the serious crimes most frequently committed by terrorists set forth in section 309 of the bill ("Federal terrorism offenses") is used in defining the scope of the provision.

This section affects only the maximum penalty allowed by statute. It does not limit the authority of the Sentencing Commission and the courts to tailor the sentences imposed in particular cases to offense and offender characteristics.

*Section 303. Penalties For Terrorist Conspiracies*

The maximum penalty under the general conspiracy provision of federal criminal law (18 U.S.C. §371) is five years, even if the object of the conspiracy is a serious crime carrying a far higher maximum penalty. For some individual offenses and types of offenses, special provisions authorize conspiracy penalties equal to the penalties for the object offense—see, e.g., 21 U.S.C. §846 (drug crimes)—but there is no consistently applicable provision of this type for the crimes that are likely to be committed by terrorists.

This section accordingly adds a new §2332c to the terrorism chapter of the criminal code—parallel to the drug crime conspiracy provision in 21 U.S.C. §846—which provides maximum penalties for conspiracies to commit terrorism crimes that are equal to the maximum penalties authorized for the objects of such conspiracies. This

will more consistently provide adequate penalties for terrorist conspiracies. As in various other provisions in this bill, the relevant class of offenses is specified by use of the notion of "Federal terrorism offense," which is defined in section 309 of the bill.

### Section 304. Terrorism Crimes as Rico Predicates

The list of predicate federal offenses for RICO, appearing in 18 U.S.C. § 1961(1), includes none of the offenses which are most likely to be committed by terrorists. This section adds terrorism crimes to the list of RICO predicates, so that RICO can be used more frequently in the prosecution of terrorist organizations. As in various other provisions, the list of offenses in section 309 of the bill ("Federal terrorism offenses") is used in identifying the relevant crimes.

### Section 305. Biological Weapons

Current law prohibits the possession, development, acquisition, etc., of biological agents or toxins "for use as a weapon." 18 U.S.C. § 175. This section amends the definition of "for use as a weapon" to include all situations in which it can be proven that the defendant had any purpose other than a prophylactic, protective, or peaceful purpose. This will enhance the government's ability to prosecute suspected terrorists in possession of biological agents or toxins, and conform the scope of the criminal offense in 18 U.S.C. § 175 more closely to the related forfeiture provision in 18 U.S.C. § 176. Moreover, the section adds a subsection to 18 U.S.C. § 175 which defines an additional offense of possessing a biological agent or toxin of a type or in a quantity that, under the circumstances, is not reasonably justified by a prophylactic, protective or other peaceful purpose. The section also enacts a new statute, 18 U.S.C. § 175b, which generally makes it an offense for a person to possess a listed biological agent or toxin if the person is disqualified from firearms possession under 18 U.S.C. § 922(g).

The section further provides that the Department of Heath and Human Services enhance its role in bioterrorism prevention by requiring registration of all research and public health laboratories and manufacturing facilities that possess certain hazardous microorganisms and toxins (the "Select Agents") that have a high national security risk; requiring all such registered laboratories and manufacturing facilities to meet regulatory standards regarding the physical environment within which such Select Agents are maintained or used; specifying the qualifications of individuals authorized to work with such Select Agents; and specifying the institutional procedures for access to such Select Agents or the facilities in which they are maintained or used.

### Section 306. Support of Terrorism Through Expert Advice or Assistance

18 U.S.C. § 2339A prohibits providing material support or resources to terrorists. The existing definition of "material support or resources" is generally not broad enough to encompass expert services and assistance—for example, advice provided by a person with expertise in aviation matters to facilitate an aircraft hijacking, or advice provided by an accountant to facilitate the concealment of funds used to support terrorist activities. This section accordingly amends 18 U.S.C. § 2339A to include expert services and assistance, making the offense applicable to experts who provide services or assistance knowing or intending that the services or assistance is to be used in preparing for or carrying out terrorism crimes. The section also amends 18 U.S.C. § 2339A to conform its coverage of terrorism crimes to the more complete list specified in section 309 of the bill ("Federal terrorism offenses").

### Section 307. Prohibition Against Harboring Terrorists

18 U.S.C. § 792 makes it an offense to harbor or conceal persons engaged in espionage. There is no comparable provision for terrorism, though the harboring of terrorists creates a risk to the nation readily comparable to that posed by harboring spies This section accordingly amends 18 U.S.C. § 792 to make the same prohibition apply to harboring or concealing persons engaged in federal terrorism offenses (as defined in section 309 of the bill).

### Section 308. Post-Release Supervision of Terrorists

Existing federal law (18 U.S.C. § 3583(b)) generally caps the maximum period of post-imprisonment supervision for released felons at 3 or 5 years. Thus, in relation to a released but still unreformed terrorist, there is no means of tracking the person or imposing conditions to prevent renewed involvement in terrorist activities beyond a period of a few years. The drug laws (21 U.S.C. § 841) mandate longer supervision periods for persons convicted of certain drug trafficking crimes, and specify no upper

limit on the duration of supervision, but there is nothing comparable for terrorism offenses.

This section accordingly adds a new subsection to 18 U.S.C. § 3583 to authorize longer supervision periods, including potentially lifetime supervision, for persons convicted of terrorism crimes. This would permit appropriate tracking and oversight following release of offenders whose involvement with terrorism may reflect lifelong ideological commitments. As in other provisions in this bill, the covered class of crimes is federal terrorism offenses, which are specified in section 309 of the bill.

This section affects only the maximum periods of post-release supervision allowed by statute. It does not limit the authority of the Sentencing Commission and the courts to tailor the supervision periods imposed in particular cases to offense and offender characteristics, and the courts will retain their normal authority under 18 U.S.C. § 3583(e)(1) to terminate supervision if it is no longer warranted.

### Section 309. Definitions

This section adds a new § 25 to title 18 of the United States Code, which defines the term "Federal terrorism offense." The term is used in various provisions in this bill. The definition is designed to cover the major crimes which are most frequently involved in or associated with terrorism. The definition in the new 18 U.S.C. § 25 is largely based on an existing listing of terrorism-related offenses in 18 U.S.C. § 2332(g)(5)(B). The section also adds to 18 U.S.C. § 2331 a definition of "domestic terrorism," a term used in a number of the bill's provisions.

## SUBTITLE B. CRIMINAL PROCEDURE

### Section 351. Single-Jurisdiction Search Warrants For Terrorism

Rule 41(a) of the Federal Rules of Criminal Procedure currently requires a search warrant to be obtained within a district for searches within that district. The only exception is for cases in which the property or person is presently within the district but might leave the district before the warrant is executed.

The restrictiveness of the existing rule creates unnecessary delays and burdens for the government in the investigation of terrorist activities and networks that span a number of districts, since warrants must be separately obtained in each district. This section resolves that problem by providing that warrants can be obtained in any district in which activities related to the terrorism may have occurred, regardless of where the warrants will be executed.

### Section 352. Notice

The law that currently governs notice to subjects of warrants, where there is a showing to the court that immediate notice would jeopardize an ongoing investigation or otherwise interfere with lawful law-enforcement activities, is a mix of inconsistent rules, practices, and court decisions varying widely from jurisdiction to jurisdiction across the country. This greatly hinders the investigation of many terrorism cases and other cases.

This section resolves this problem by establishing a statutory, uniform standard for all such circumstances. It incorporates by reference the familiar, court-enforced standards currently applicable to stored communications under 18 U.S.C. § 2705, and applies them to all instances where the court is satisfied that immediate notice of execution of a search warrant would jeopardize an ongoing investigation or otherwise interfere with lawful law-enforcement activities.

### Section 353. DNA Identification of Terrorists

The statutory provisions governing the collection of DNA samples from convicted federal offenders (42 U.S.C. § 14135a(d)) are restrictive, and do not include persons convicted for the crimes that are most likely to be committed by terrorists. DNA samples cannot now be collected even from persons federally convicted of terrorist murders in most circumstances. For example, 49 U.S.C. § 46502, which applies to terrorists who murder people by hijacking aircraft, 18 U.S.C. § 844(i), which applies to terrorists who murder people by blowing up buildings, and 18 U.S.C. § 2332, which applies to terrorists who murder U.S. nationals abroad, are not included in the qualifying federal offenses for purposes of DNA sample collection under existing law. This section addresses the deficiency of the current law in relation to terrorists by extending DNA sample collection to all persons convicted of terrorism crimes.

### Section 354. Grand Jury Matters

This section makes changes in Rule 6(e) of the Federal Rules of Criminal Procedure, relating to grand jury secrecy, to facilitate the sharing of information with fed-

eral law enforcement, intelligence, protective, national defense, and immigration personnel in terrorism and national security cases. The section is in part complimentary to section 154 of the bill, relating to sharing of foreign intelligence information, and reflects a similar purpose of promoting a coordinated governmental response to terrorist and national security threats.

*Section 355. Extraterritoriality*

Under existing law, some terrorism crimes have extraterritorial applicability, and can be prosecuted by the United States regardless of where they are committed— for example, 18 U.S.C. §§ 175 (biological weapons offense) and 2332a (use of weapons of mass destruction), contain language which expressly contemplates their application to conduct occurring outside of the United States. However, there are no explicit extraterritoriality provisions in the statutes defining many other offenses which are likely to be committed by terrorists. This section helps to ensure that terrorist acts committed anywhere in the world can be effectively prosecuted by specifying that there is extraterritorial jurisdiction for the prosecution of all federal terrorism offenses.

*Section 356. Definition.*

This amendment would explicitly extend the special and maritime criminal jurisdiction of the United States to U.S. diplomatic and consular premises and related private residences overseas, to the extent an offense is committed by or against a U.S. national. When offenses are committed by or against a U.S. national abroad on U.S. government property, the country in which the offense occurs may have little interest in prosecuting the case. Unless the United States is able to prosecute such offenders, these crimes may go unpunished. This section clarifies inconsistent caselaw to establish that the United States may prosecute offenses committed in its missions abroad, by or against its nationals.

## TITLE IV—FINANCIAL INFRASTRUCTURE

*Section 401. Laundering The Proceeds of Terrorism*

Money-laundering under 18 U.S.C. § 1956 involves conducting or attempting to conduct a financial transaction knowing that the property involved represents the proceeds of an unlawful activity specified in subsection (c)(7) of the statute. Violations of 18 U.S.C. § 2339A, which prohibits providing material support to terrorists within the United States, are already included as specified unlawful activities. This section provides more complete coverage of money-laundering related to terrorism by adding as a further predicate offense 18 U.S.C. § 2339B, which prohibits providing material support or resources to foreign terrorist organizations.

*Section 402. Material Support For Terrorism*

18 U.S.C. § 2339A prohibits providing material support to terrorism. Under the statute's definitional subsection, the prohibited forms of support include (among many other things) "currency or other financial securities." This section adds an explicit reference to "monetary instruments" to the definition. The purpose of the amendment is to make it clear that the definition is to be taken expansively to encompass any and all forms of money, monetary instruments, or securities.

*Section 403. Assets of Terrorist Organizations*

Current law does not contain any authority tailored specifically to the confiscation of terrorist assets. Instead, currently, forfeiture is authorized only in narrow circumstances for the proceeds of murder, arson, and some terrorism offenses, or for laundering the proceeds of such offenses. However, most terrorism offenses do not yield "proceeds," and available current forfeiture laws require detailed tracing that is quite difficult for accounts coming through the banks of countries used by many terrorists.

This section increases the government's ability to strike at terrorist organizations' economic base by permitting the forfeiture of its property regardless of the source of the property, and regardless of whether the property has actually been used to commit a terrorism offense. This is similar in concept to the forfeiture now available under RICO. In parity with the drug forfeiture laws, the section also authorizes the forfeiture of property used or intended to be used to facilitate a terrorist act, regardless of its source. There is no need for a separate criminal forfeiture provision because criminal forfeiture is incorporated under current law by reference. The provision is retroactive to permit it to be applied to the events of September 11, 2001.

(2) by inserting after subparagraph (F) a new subparagraph as follows:

"(G) Any Federal terrorism offense (as defined in section 25 of title 18, United States Code); ".

### SEC. 354. GRAND JURY MATTERS.

Rule 6(e)(3)(A) of the Federal Rules of Criminal Procedure is amended—

(1) by striking "and" at the end of subdivision (i);

(2) by replacing the period at the end of subdivision (ii) with "; and"; and

(3) by inserting after subdivision (ii) the following:

"(iii) federal law-enforcement, intelligence, protective, or national-defense personnel, or any federal personnel responsible for administering the immigration laws of the United States, or to any officer named in section 19 of title 3 of the United States Code, where the matters pertain to international terrorism or domestic terrorism (as defined in section 2331 of title 18, United States Code), or a matter of national security.".

### SEC. 355. EXTRATERRITORIALITY.

Chapter 113B of title 18, United States Code, is amended—

(1) in the heading, by striking "Exclusive";

(2) by inserting "There is extraterritorial Federal jurisdiction over any Federal terrorism offense and any offense under this chapter." at the beginning; and

(3) in the chapter analysis, by striking "Exclusive" in the item relating to section 2338.

### SEC. 356. JURISDICTION OVER CRIMES COMMITTED AT U.S. FACILITIES ABROAD.

Section 7 of title 18, United States Code, is amended by adding the following at the end thereof:

"(9) With respect to offenses committed by or against a United States national, as defined in Section 1203(c) of this title, (A) the premises of United States diplomatic, consular, military or other U.S. Government missions or entities in foreign states, including the buildings, parts of buildings, and land appurtenant or ancillary thereto or used for purposes of those missions or entities, irrespective of ownership, and (B) residences in foreign states and the land appurtenant or ancillary thereto, irrespective of ownership, used for purposes of those missions or entities or used by United States personnel assigned to those missions or entities, provided that nothing in this subsection shall be deemed to supersede any treaty or international agreement in force on the date of enactment of this subsection with which this subsection conflicts.

## Title IV—FINANCIAL INFRASTRUCTURE

### SEC. 401. LAUNDERING THE PROCEEDS OF TERRORISM.

Section 1956(c)(7)(D) of title 18, United States Code, is amended by inserting "or 2339B" after "2339A".

### SEC. 402. MATERIAL SUPPORT FOR TERRORISM.

Section 2339A of title 18, United States Code, is amended—

(1) in subsection (a), by inserting "A violation of this section may be prosecuted in any Federal judicial district in which the underlying offense was committed, or in any other Federal judicial district as provided by law." at the end; and

(2) in subsection (b), by replacing "or other financial securities" with "or monetary instruments or financial securities".

### SEC. 403. ASSETS OF TERRORIST ORGANIZATIONS.

Section 981(a)(1) of title 18, United States Code, is amended after paragraph (F) by adding the following new paragraph:

# Attachment
# 3

## H.R. 2975, SEC. 355. JURISDICTION OVER CRIMES COMMITTED AT UNITED STATES FACILITIES ABROAD.

Section 7 of title 18, United States Code, is amended by adding at the end the following:

"(9)(A) With respect to offenses committed by or against a United States national, as defined in section 1203(c) of this title

"(i) the premises of United States diplomatic, consular, military, or other United States Government missions or entities in foreign states, including the buildings, parts of buildings, and the land appurtenant or ancillary thereto, irrespective of ownership, used for purposes of those missions or entities; and

"(ii) residences in foreign states and the land appurtenant or ancillary thereto, irrespective of ownership, used for purposes of those missions or entities or used by United States personnel assigned to those missions or entities, except that this paragraph does not supercede any treaty or international agreement in force on the date of the enactment of this paragraph.

"(B) This paragraph does not apply with respect to an offense committed by a person described in section 3261(a).".

107 H.R. Rpt. 236


**Section 355. Jurisdiction over crimes committed at the United States facilities abroad.**

Title 18 U.S.C. Section(s) 7 entitled "Special Maritime and Territorial Jurisdiction of the United States defined" is a critical means of jurisdiction for Diplomatic Security agents. Certain statutes are limited to the scope of 18 U.S.C. Section(s) 7, such as 18 U.S.C. Section(s) 114 (Maiming), 18 U.S.C. Section(s) 1111 (Murder), 18 U.S.C. Section(s) 1112 (Manslaughter), 18 U.S.C. Section(s) 1113 (Attempt to commit Murder or Manslaughter), and 18 U.S.C.Section(s) 2243(a) (Sexual Abuse of a minor). In the year 2000, extraterritoriality regarding U.S. embassies and U.S. embassy housing overseas was the subject of differing interpretations by judicial circuits.

Diplomatic Security agents have operated under the legal precedent of United States v. Erdos, 474 F2d 157 (4th Cir., 1973), which held that an Embassy was within the special maritime and territorial jurisdiction of the United States. This precedent is now being challenged. This section would make it clear that embassies and embassy housing of the United States in foreign states are included in the special maritime and territorial jurisdiction of the United States. This section does not apply to members of the Armed Forces because they would already be subject to the special maritime and territorial jurisdiction of the United States under title 18 U.S.C. Section(s) 3261(a).

107 H.R. Rpt. 236

# Attachment
# 4



# NEWS RELEASE

HEADQUARTERS UNITED STATES CENTRAL COMMAND
7115 South Boundary Boulevard
MacDill AFB, Fla. 33621-5101
Phone: (813) 827-5894; FAX: (813) 827-2211; DSN 651-5894

May 27, 2003
Release Number: 03-05-102

FOR IMMEDIATE RELEASE

COALITION JOINT TASK FORCE 180 CONDUCTS TRANSITION OF
AUTHORITY

BAGRAM, AFGHANISTAN – Major General John R. Vines took command of
Coalition Joint Task Force 180 from Lt. Gen. Dan K. McNeill during a transition of
authority ceremony at Bagram Air Base, Afghanistan, today.

General Vines will lead the 11,500-strong coalition as CJTF 180 continues its focus
on establishing the conditions for stability and reconstruction. The TOA is part of
the regular rotation of coalition forces. It will not change the coalition's
commitment to providing stability to the people of Afghanistan.

Coalition Joint Task Force 180 includes servicemembers from all the U.S. Armed
Services and as many as 33 coalition countries.

The Task Force, formed in May 2002, has conducted combat and civil-military
operations to destroy remnants of al Qaeda and the Taliban in Afghanistan.

Vines, a native of Alabama, commanded the Coalition Task Force 82 in
Afghanistan from August 2002 until its inactivation April 28. He has served as the
Deputy Commanding General of CJTF 180 since then.

Part of the 10th Mountain Division from Fort Drum, N.Y., will replace selected
staff members and assume leadership duties with coalition forces of CJTF 180. A
brigade from the 10th Mountain Division is scheduled to replace the 82nd Airborne
Division's 1st Brigade from Fort Bragg, as the lead U.S. conventional combat arms
unit in Afghanistan.

In the past year, under Gen. McNeill's command, CJTF 180 conducted civil
military and humanitarian assistance operations, established Provincial
Reconstruction Teams, trained more than 5,000 soldiers for the Afghan National
Army, and conducted both lethal and non-lethal combat operations to destroy the
ability of al Qaeda and Taliban forces from conducting terrorist activity in
Afghanistan.

Gen. McNeill's next assignment has not been announced.

During a visit to Afghanistan in May, the Honorable Donald Rumsfeld, Secretary of
Defense, told President Karzai, "We are at a point where we clearly have moved
from major combat activity to a period of stability, and stabilization and
reconstruction activities. The bulk of this country today is progressive and secure."

Rumsfeld's remarks marked a shift in the coalition's effort from lethal to non-lethal
operations more focused now on civil affairs and humanitarian assistance.

"We have a very important job here in Afghanistan," said Gen. Vines as he addressed the coalition audience and guests from the government of Afghanistan.

"Our governments are committed to helping Afghanistan establish a peaceful nation," Gen. Vines said. "That's not an easy task, but one we're committed to doing."

"After nearly 24 years of continuous conflict, Afghanistan is more stable today than a year ago by almost any measurement," said Col. Rodney Davis, CJTF 180 Director of Public Affairs. "Although there are some areas of instability within regions, it's clear that CJTF 180 has had a significant impact on the enemy."

Compared to where coalition operations were at the beginning of Operation Enduring Freedom, the key indicators as far as conflict is concerned are all down, said Col. Davis. The number and frequency of lethal combat operations are down. The number of deaths, firefights and improvised explosive devices are all down. The Taliban is no longer ruling the country. There is a functioning government and a measure of stability in Afghanistan. A new Afghan National Army is being formed, and more than one million displaced Afghans have returned, demonstrating that many have faith that the country can rebuild, Davis said.

Through Gen. Vines' leadership, CJTF 180 will continue to build conditions for stability, security and reconstruction for Afghanistan.

-30-





# Coalition forces in Afghanistan come under fire

August 11, 2003

WASHINGTON (Army News Service, Aug. 11, 2003) -- Soldiers with the Coalition Joint Task Force-180 in Afghanistan came under fire, captured enemy forces and lost a soldier in a drowning accident this past weekend.

In Paktika Province, three enemy soldiers were captured and another was killed during a brief battle with coalition soldiers in the vicinity of Gayan Aug. 9. While conducting an area clearance as part of Operation Warrior Sweep, coalition soldiers observed the four enemy soldiers and ordered them to lay down their arms and surrender.

Coalition soldiers fired three warning shots, and one of the men refused to comply. A brief firefight ensued and he was killed. The three remaining enemy soldiers were captured and detained by coalition personnel for questioning.

Special Operations Forces in the vicinity of the firebase at Orgun-E received small arms fire from about five enemy soldiers on the evening of Aug. 9. The enemy fire was suppressed by close air support.

A landmine detonated near Parwan Province in the vicinity of the firebase at Bagram also during the evening of Aug. 9. Bagram security personnel heard a loud explosion and observed a large plume of smoke about 100 meters from a guard tower near the base. There were no reported injuries to coalition soldiers nor damage to equipment or property.

A coalition service member died in an apparent drowning accident near Mazer-e-Sharif about noon, Aug. 10. The soldier while swimming in a river, went under the water and failed to surface. The death is under investigation. The name and nationality of the dead service member is being withheld, pending notification of next of kin.

CJTF-180 is a coalition military operation in Afghanistan with military forces from 20 coalition partner countries focused on creating the conditions for security, stability and reconstruction.

In another incident, a rocket impacted in the vicinity of the coalition firebase in Asadabad 7 p.m., Aug. 10. Coalition forces returned fire with mortars. There were no coalition personnel wounded and no damage to coalition equipment.

(Editor's note: This information was submitted from the CJTF-180 Public Affairs Office.)

# Attachment
5

# Map of Afghanistan



Source: Map Resources. Adapted by CRS. (1/03 M.Chin)



Close this window

Published on: 2004-08-19

# Passaro served in harsh Afghan outpost

By Kevin Maurer
Staff writer

The only signs of the last soldiers to occupy Asadabad, Afghanistan before the Americans came are their bloody hand prints.

Afghans told U.S. soldiers that mujahedeen freedom fighters massacred the Russian garrison at the small fire base during the Soviet occupation in the 1980s.

Almost 20 years later, the old Russian base has become an isolated outpost in the hunt for Osama bin Laden. It was there, federal authorities allege, that David Passaro beat Abdul Wali with a flashlight during an interrogation. Wali later died.



Passaro

At the time, a platoon of soldiers from Fort Bragg's 82nd Airborne Division was based at the camp more than 100 miles northeast of Kabul. The soldiers - who spoke about their time at the camp and their recollections of Passaro on condition that their names not be used - said the area near the Pakistani border is a popular crossing point for Taliban and al-Qaida fighters.

There, the soldiers lived in harsh conditions and under constant threat of rocket attacks. On the walls of the compound were the hand prints of their Russian predecessors to remind them of how dangerous their corner of Afghanistan could be.

## A CIA job

Passaro was in Afghanistan from May to August 2003. He took a leave of absence from his job as an intelligence analyst at the Army Special Operations Command at Fort Bragg to take a CIA contract in Afghanistan.

Most of the 82nd paratroopers said they remembered him. He was one of the Special Forces soldiers, Navy Seals, CIA operators and Rangers who worked out of the camp.

Passaro spoke Dari and Pashto, the main languages of Afghanistan, and often visited the medical tent to talk with patients, 82nd soldiers said.

Passaro is a former Special Forces medic. He was part of a paramilitary team composed of CIA operatives and Special Forces soldiers who captured and questioned members of al-Qaida and the Taliban.

The 82nd soldiers, meanwhile, guarded the base and patrolled the town of Asadabad. They also guarded the jail.

The government says that Passaro beat Wali while interrogating him there.

The 82nd soldiers said the jail was a small mud building with four rooms - three cells and an interrogation room. The prisoners were given cots and blankets. The soldiers would take them to the bathroom, allow them to pray and feed them.

Previous

- Butner prison won't accept Passaro (Aug. 14)
- CIA mum on Passaro (Aug. 5)
- Passaro's interrogation abilities called into question (June 23)
- Civilian arrested in Afghanistan prison death (June 18)

The paratroopers said they were told by Special Forces soldiers and CIA operatives to keep the prisoners separated. Detainees were not allowed to talk to each other.

"We would make them stand in the corner like a little kid," one paratrooper said.

Some of the paratroopers interviewed by The Fayetteville Observer said they saw detainees being interrogated, but none of them saw anyone get beaten.

Federal prosecutors have indicated, however, that some 82nd soldiers did see beatings. They plan to call three paratroopers to testify that Passaro hit a detainee with a metal flashlight 10 to 30 times and kicked him so hard that he flew in the air.

Passaro is facing four charges of assault and could be sentenced to 40 years in prison if he is convicted. He says the Bush administration is making him a scapegoat in the wake of other abuse allegations about Abu Ghraib prison in Iraq.

### The detainee

The detainee Passaro is accused of beating turned himself in at the gate to the camp, news reports have said. He was suspected of shooting rockets at the camp.

Rocket attacks were common, 82nd paratroopers said. About twice a week, guerrillas would fire at the camp. The soldiers were forced to sleep in their boots to be ready to run for bunkers at a second's notice.

Once, a rocket armed with white phosphorous fell short of the camp and set a nearby hillside afire. The incendiary round could have destroyed the camp's canvas tents.

Life at Asadabad was hard in general, the paratroopers said. The camp was surrounded by a horseshoe of mountains. Supplies were brought in by helicopter. The paratroopers said it was an hour and a half ride from Bagram airfield.

The walled camp was made up of about a dozen canvas tents, in which the soldiers slept, and several mud huts. The base was about the size as a small parking lot.

"You could literally throw a rock from one side to the other," said one paratrooper. Soldiers went on patrols just to escape the monotony of camp life.

The paratroopers joked that the detainees lived better than they did. The tents leaked when it rained. There was no contractor providing hot food and there were few amenities. The main water source was a creek. Soldiers could purify the water, but many were still sick.

"That is the worst place I've ever been," one soldier said.

Staff writer Kevin Maurer can be reached at maurerk@fayettevillenc.com or 486-3587.

Copyright 2004 The Fayetteville [N.C.] Observer (http://www.fayettevillenc.com)

# Attachment
6







PRINTTHIS

Powered by Clickability

# Afghan official: Heart attack may not have killed prisoner

KABUL, Afghanistan (AP) — Days after a former CIA contractor was charged in the death of an Afghan in U.S. custody, a regional official Saturday cast doubt on a defense lawyer's claim that the prisoner died of a heart attack.

David Passaro, a 38-year-old former Army special operations soldier, became the first American Thursday to face civilian charges over prisoner abuse in either Iraq or Afghanistan.

Passaro faces four counts of assault and assault with a dangerous weapon — a flashlight — on Abdul Wali, who died at a U.S. base in the Afghan town of Asadabad on June 21, 2003. Wali was 28.

Passaro's defense has seized on a June 27, 2003, comment made to an Iranian radio station by Fazel Akbar, the governor of Kunar province where the base is located, as evidence that Wali died of a heart attack.

But the governor's spokesman said Saturday that Akbar had only suspected heart problems because U.S. officials insisted the man was not mistreated and after a cursory examination by Afghan officials of the corpse.

Spokesman Hyder Akbar, who is also the governor's son, said that his father's initial assessment was "just speculation."

Hyder Akbar said Wali turned himself in to the governor's office because he was suspected of involvement in rocket attacks on the American base at Asadabad, 120 miles east of the capital, Kabul.

Hyder Akbar, a fluent English speaker from studies in the United States, said he accompanied Wali to the base to act as an interpreter. But he said he walked out of the interrogation in disgust after Passaro began threatening the prisoner.

"There was only hearsay evidence, but he was treating Abdul Wali with such contempt it got me off the wrong way," Hyder Akbar said in a telephone interview from Asadabad. "He was huffing and puffing and playing the role of bad cop."

Hyder Akbar declined to say what the threats were and said he saw no abuse.

He said Afghan officials were informed three days later of the death and went to view the body. No autopsy was carried out to determine the exact cause of Wali's death.

"In retrospect, we realized we didn't see his back or his thighs, and that the room was dimly lit, just through the door," Hyder Akbar said. "We couldn't see any marks that could show extreme torture that could lead to death."

He said that U.S. officials including Passaro told the Afghans "that Abdul Wali was not beaten or abused in any way."

Wali's relatives said he had suffered from health problems and that he had passed out at times, Hyder Akbar said.

"As far as the heart attack is concerned, that was just speculation," he said.

Hyder Akbar, a student of Diablo Valley College, in Pleasant Hill, Calif., said he had spoken to U.S. federal prosecutors in Washington but didn't know if he would be called to testify in court.

Passaro has a detention hearing scheduled Tuesday morning in U.S. District Court in Raleigh, N.C.

If convicted, Passaro faces up to 40 years in prison and a $1 million fine.

No civilians have been charged in connection with alleged abuses at Abu Ghraib in Iraq. Seven soldiers were charged by the military.

The furor over detainee mistreatment there has drawn fresh attention to similar allegations in Afghanistan.

Military spokesman in Afghanistan, Lt. Col. Tucker Mansager, declined to comment Saturday on the death of Abdul Wali. But he said the charges against his interrogator showed American resolve in rooting out mistreatment.

"That's good testimony to the fact that we are making sure that we treat all people with dignity and respect," Mansager said.

Two more prisoners died at Bagram, the main U.S. base north of Kabul, in December 2002. Both were ruled homicides after autopsies, but the military has yet to release any results of its criminal investigation.

The military says it has already begun making unspecified changes to its prison regime in Afghanistan as a result of an internal review begun last month. Findings are to be released by early July, though commanders say procedures used on prisoners will remain confidential.

Copyright 2004 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.

**Find this article at:**
http://www.usatoday.com/news/world/2004-06-19-afghan-death_x.htm

☐ Check the box to include the list of links referenced in the article.



# Attachment
# 7



**U.S. Department of Justice**

Criminal Division

*Counterterrorism Section*                    *Washington, D.C. 20530*

Feb. 10, 2004

David A. Passaro
105 Cherokee Ln.
Lillington, N.C.

Dear Mr. Passaro,

    I am a trial attorney with the Counterterrorism Section of the Criminal Division of the U.S. Department of Justice. I write to formally advise you that you are the target of a criminal investigation being conducted by a federal grand jury in the Eastern District of North Carolina. A "target" is defined by the Dept. of Justice as a person to whom the prosecutor or the grand jury has substantial evidence linking him to the commission of a crime or crimes, and who, in the judgment of the prosecutor, is a putative defendant.

    You are considered a putative defendant due to your alleged commission of felonious crimes arising from your physical abuse of a detainee in your custody on a government reservation in or about June, 2003.

    I encourage you to promptly retain an attorney to represent you in this matter. After you have done so, please have the attorney contact me at 202/353-3125 to discuss future proceedings that may occur in this matter.

Sincerely,

Michael P. Sullivan
Trial Attorney, Counterterrorism Section
U.S. Dept. of Justice
Washington, D.C.

H. GERALD BEAVER
F. THOMAS HOLT III
MARK A. STERNLICHT *
DAVID T. COURIE

* ALSO ADMITTED IN PA

# BEAVER HOLT
## STERNLICHT & COURIE, PA
ATTORNEYS AND COUNSELORS AT LAW

www.beaverholt.com

HAL W. BROADFOOT JR.
J. SCOTT FLOWERS
MARK L. HEARP

JANET H. DOWNING
OF COUNSEL

July 30, 2004

Thomas McNamara, Esq.
Federal Public Defender
Eastern District of North Carolina
150 Fayetteville Street Mall
Suite 450
Raleigh NC 27601

**RE:  David Passaro**
**Via Facsimile 919-856-4477 & US Mail**

Dear Tom:

In response to our telephone conversation of July 30, 2004, I am writing to give you information regarding my pre-indictment representation of David Passaro which may be useful to you in your continued representation of him in his pending federal indictment and in his detention hearing before Judge Boyle. In so doing, I act within the boundary of NC Rule of Professional Conduct § 1.6(a) to disclose information impliedly authorized to carry out my responsibility as Mr. Passaro's former counsel.

David Passaro first presented himself to my office on or about February 12, 2004 after having received a "target" letter, dated February 10, 2004, from Michael P. (Pat) Sullivan, Trial Attorney, Counterterrorism Section, United States Department of Justice, Washington. DC. This "target" letter, which is enclosed, informed David that he was considered a "putative defendant due to [his] alleged commission of felonious crimes arising from [his] physical abuse of a detainee in [his] custody on a government reservation in or about June, 2003." The letter encouraged David to promptly obtain legal counsel and to contact Mr. Sullivan.

At the time of David's initial contact with our office, I was on vacation in Hawaii and David was seen by my partner David Courie. I am informed and believe Mr. Courie promptly contacted Mr. Sullivan and determined the nature of the investigation including the possibility of charges being preferred for capital homicide, capital torture and/or assault. I am further informed Mr. Courie informed Mr. Sullivan of our involvement in the matter, my absence on vacation and our willingness to make Mr. Passaro available

during the course of the investigation and his willingness to surrender in the event formal charges were preferred.

Upon my return from vacation, I met with Mr. Passaro and a contract was entered into regarding my representation of him in a pre-indictment setting. Because of the unusual nature of the proceedings, in an uncommon attack of good sense, I felt it unwise to contract for representation on a post-indictment basis, but pledged my good will toward working with Mr. Passaro in such an effort for my assistance should he be indicted and should he be unable to afford counsel, to assist him in obtaining competent representation in a post-indictment setting.

I ascertained that Mr. Passaro was working then as a civilian employee with the United States Army at Fort Bragg, NC in a position which required a secret clearance. I became aware that David was liquidating resources in order to obtain counsel. I further became aware that he was gathering documents and information he felt would be helpful to his defense, which he would deliver to me, and in the event of his being charged, would see were delivered to me.

After talking with David, I contacted Michael P. Sullivan in Washington and discussed the matter with him. Mr. Sullivan confirmed the information I had received from Mr. Courie and added that a Federal grand jury in Raleigh had been taking testimony for several sessions and we could expect an indictment as early as April, 2004. I acknowledged the information and informed him of my client's willingness to make himself available to Federal investigators and his willingness to surrender himself upon indictment. Mr. Sullivan was extremely cooperative, acknowledged my offer, but frankly could not commit to the idea of self surrender of Mr. Passaro. After thirty (30) years of practice in the Federal courts, it was obvious to me that the question of whether Mr. Passaro was to be allowed an opportunity to self-surrender was a matter over which Mr. Sullivan did not possess final authority. In any event, all pertinent facts surrounding the matter were relayed by me to David Passaro, including the potential capital nature of potential charges and the Government's unwillingness to agree to self-surrender upon indictment.

Over the course of the next several months I spoke with Mr. Sullivan on 2 to 3 additional occasions. In each conversation, I made clear Mr. Passaro's willingness to make himself available to Government agents and to self-surrender upon indictment. Mr. Sullivan remained non-committal on the question. In my capacity as David's counsel, I spoke on numerous times and met on one occasion with the agency with which Mr. Passaro was affiliated in the location outside of the United States where the incident involved in the indictment occurred. At that time, several members of my staff and I applied for top

July 30, 2004
Page 3

secret clearances needed to represent David. At this time, we were informed that a "Chinese" wall was to be drawn between the governmental agency and Mr. Passaro, that both the Government and the defense were bound by the secrecy laws and that because of national security concerns, no information regarding the agency with which he was affiliated was to be mentioned in any court pleadings, and any such mention would lead to criminal prosecution of the persons responsible. These government representatives promised complete cooperation in the investigation and invited me to make requests for information through a "liaison" officer in the organization. On at least two instances I requested information through this official, and was stunned when I received responses from Mr. Sullivan of the DOJ.

During this period, the Abu Ghraib Prisoner Abuse scandal was revealed, along with the Army Inspector General's Article 15-6 Investigation of the 800th Military Police Brigade. Shortly thereafter the August 1, 2002 memorandum from the US Department of Justice's Legal Counsel to Alberto Gonzalez, counsel to the president entitled "Re: Standards of Conduct for Interrogation under 18 U.S.C. §§ 2340-2340" was published by the Washington Post causing further embarrassment to the Government. Because of these matters in the body politic, I became convinced David's indictment was imminent and I informed him of this fact emphasizing that the government had not committed itself to self-surrender and he might be arrested at any time.

Despite this knowledge, David continued to meet with me regularly on the matter, to assemble material useful to his defense, and to take steps to raise funds to retain counsel if he were to be indicted. On a number of occasions when I needed to see David on short order, my secretary would make a call to Fort Bragg and he would be in my office within a matter of hours. He was never unavailable.

During all of this time, he knew an indictment was imminent, that he might not be allowed to self-surrender and that he could be swept off the street at any moment. Despite this he continued to report daily to his top secret Fort Bragg post, continued to meet with me on a weekly basis, continued to try and raise money for his defense and continued to accumulate documentary evidence to assist me in his defense. As you will recall, I contacted you in late March of 2004 and made you generally aware of the pending proceedings and the possibility that your office might have to step in for representation of David should he be indicted.

On the date of David's arrest I was at lunch at approximately noon when I noticed I had a voice mail on my cellular phone. It was Mr. Sullivan, then in Raleigh, calling to inform me that David had been picked up by Federal authorities and was being transported to Raleigh for an Initial Appearance that afternoon. In that message, a tape recorded copy of

July 30, 2004
Page 4

which has been provided to you, Mr. Sullivan acknowledged our previous offers of self-surrender but stated "that was just not going to happen." Within an hour the Attorney General of the United States was on national television trumpeting David's arrest and describing how he had "brutally" attacked the detainee. I was dismayed to discover this had occurred, and was even more dismayed to discover later that afternoon on the internet that the indictment returned in the case had identified David by his true name and had alleged that he was affiliated with a particular governmental agency, an affiliation which I had been informed was Top Secret and the disclosure of which would lead to criminal prosecution. In short, David had been "outed" and he and his family have now become potential targets for terrorist retaliation by the very government he sought to serve and which had promised him anonymity. Suddenly, he was front page news on a national stage.

For five months prior to his arrest, David Passaro was aware of the likelihood of indictment. He was aware of the grand jury proceedings, the detention process, the possible penalties and the fact that he could be literally swept off the street without warning. During this entire period he was continually available, took no evasive action, followed the instructions of the target letter, obtained counsel and communicated through counsel with the Justice Department and the governmental organization with which he was affiliated. Even more importantly, the United States Department of Justice was aware he had knowledge of these facts, because it wrote him and put him on notice of it, never sought an arrest warrant, never sought to detain him, continued to allow him to work at a sensitive position at FBNC, yet on the date of his arrest moved to detain him on the ground he was a risk of flight or danger to the community.

David Passaro did exactly what any responsible citizen of the United States should do. Upon being notified of the investigation he retained counsel, the government was contacted; he agreed to make himself available to the Government and offered to self-surrender. David is an honorably discharged member of the United States military and has a long history of service to his country. The very thought of deserting his post to avoid this prosecution would be abhorrent to him.

With Kindest regards, I remain

Very truly yours,

H. Gerald Beaver

HGB:dll

# Attachment
# 8



**Prepared Remarks of Attorney General John Ashcroft**
**Passaro Indictment Announcement**
**Thursday - June 17, 2004**

Good afternoon. Joining me today are Assistant Attorney General Christopher Wray of the Criminal Division, and U.S. Attorney Frank Whitney of the Eastern District of North Carolina.

This morning, a federal grand jury in Raleigh, North Carolina, has indicted a contractor working on behalf of the Central Intelligence Agency for brutally assaulting an Afghan detainee on a U.S. military base in Afghanistan.

David A. Passaro, age 38, a resident of Lillington, N.C., faces two counts of assault with a dangerous weapon and two counts of assault resulting in serious bodily injury. Each charge carries a maximum penalty of 10 years in prison and a $250,000 fine. I note that an indictment is merely an accusation and the defendant is presumed innocent unless and until proven guilty.

Passaro was arrested this morning in Fayetteville, North Carolina, and he is scheduled for an initial appearance before a federal magistrate judge in Raleigh today. The charges Passaro faces relate to his alleged activities in Afghanistan working as a contractor on behalf of the Central Intelligence Agency (CIA).

As the indictment details, Passaro was in Afghanistan working in support of United States military personnel at a base near the town of Asadabad. The military base was called Asadabad Base.

Asadabad is located in the northeastern province of Kunar. It is a mountainous region, and Asadabad is about five miles from the Pakistani border. During the past two years, U.S. Army Special Forces units and Air Force bombers have been active in the area. It is an area in which remnants of al Qaeda and the Taliban remain active.

As alleged in the indictment, on June 18, 2003, a local Afghani man named Abdul Wali, who was suspected of participating in rocket attacks on the Asadabad Base, surrendered voluntarily at the front gate of the base. Defendant Passaro allegedly assisted military personnel in detaining Wali, who was held in a detention cell at the base.

The indictment alleges that beginning on the day after Wali's detention began, Passaro began interrogating him about the rocket attacks. During these interrogations on June 19th and 20th, 2003, it is alleged that Passaro beat Wali repeatedly, using his hands and feet and a large flashlight. Wali died in a cell on Asadabad Base on June 21, 2003.

Authorities immediately began an investigation, and the CIA formally referred the case to the Department of Justice last fall. After the Criminal Division determined that venue was in the Eastern District of North Carolina, the matter was sent there earlier this

year for a grand jury investigation.

The American people are familiar by now with the images of prisoner abuse committed in our detention facilities overseas. Today, a wholly different - and more accurate - picture of our nation emerges. Today, we see a nation dedicated to its ideals of freedom, respect for human dignity, to its insistence for justice, and the rule of law.

Regarding other prisoner abuse allegations, I can report that the Justice Department has received one referral from the Department of Defense, and additional referrals from the CIA. These are ongoing investigations; I cannot offer further details at this time.

I have assigned all of our other ongoing prisoner abuse cases to a prosecution team at the United States Attorney's Office for the Eastern District of Virginia. Any new referrals will also be assigned to that office whose jurisdictional boundaries encompass the Pentagon and the CIA. The Eastern District of Virginia has shown consistently its ability to handle complex cases involving national security, classified information and military intelligence and associated personnel.

I also note that this case would have been more difficult to investigate and prosecute were it not for the USA PATRIOT Act. The Act expanded U.S. law enforcement jurisdiction over crimes committed by or against U.S. nationals on land or facilities designated for use by the United States government.

In the reports of abuse of detainees by United States personnel in Iraq and Afghanistan over the past two months, the world has witnessed a betrayal of America's most basic values by a small group of individuals. Their actions call us to the defense of our values - our belief in decency and respect for human life - through the enforcement of the law.

President Bush has made clear that the United States will not tolerate criminal acts of brutality such as those alleged in this indictment. The types of illegal abuse detailed run counter to our values and our policies and are not representative of our men and women in the military and associated personnel serving honorably and admirably for the cause of freedom.

Those who are responsible for such criminal acts will be investigated, prosecuted and, if found guilty, punished.

I thank Chris Wray, Assistant Attorney General of the Criminal Division and U.S. Attorney Frank Whitney and his team in the Eastern District of North Carolina for their leadership and work in this criminal matter. I also note with appreciation the investigative efforts of the CIA's Office of the Inspector General.

###

# Attachment
# 9

Joint Publication 1-02

 

# Department of Defense Dictionary of Military and Associated Terms



12 April 2001

(As Amended Through
9 June 2004)

 



**armored personnel carrier** — A lightly armored, highly mobile, full-tracked vehicle, amphibious and air-droppable, used primarily for transporting personnel and their individual equipment during tactical operations. Production modifications or application of special kits permit use as a mortar carrier, command post, flame thrower, antiaircraft artillery chassis, or limited recovery vehicle. Also called **APC**.

**arms control** — A concept that connotes: a. any plan, arrangement, or process, resting upon explicit or implicit international agreement, governing any aspect of the following: the numbers, types, and performance characteristics of weapon systems (including the command and control, logistics support arrangements, and any related intelligence-gathering mechanism); and the numerical strength, organization, equipment, deployment, or employment of the Armed Forces retained by the parties (it encompasses disarmament); and b. on some occasions, those measures taken for the purpose of reducing instability in the military environment.

**arms control agreement** — The written or unwritten embodiment of the acceptance of one or more arms control measures by two or more nations.

**arms control agreement verification** — A concept that entails the collection, processing, and reporting of data indicating testing or employment of proscribed weapon systems, including country of origin and location, weapon and payload identification, and event type.

**arms control measure** — Any specific arms control course of action.

**Army Air Defense Command Post** — The tactical headquarters of an Army air defense commander.

**Army air-ground system** — The Army system which provides for interface between Army and tactical air support agencies of other Services in the planning, evaluating, processing, and coordinating of air support requirements and operations. It is composed of appropriate staff members, including G-2 air and G-3 air personnel, and necessary communication equipment. Also called **AAGS**.

**Army and Air Force Exchange Service imprest fund activity** — A military-operated retail activity, usually in remote or forward sites, when regular direct operations exchanges cannot be provided. It is a satellite activity of an Army and Air Force Exchange Service (AAFES) direct operation. The supported unit appoints the officer in charge of an imprest fund activity, who is issued an initial fund by AAFES to purchase beginning inventory. Money generated from sales is used to replenish the merchandise stock. See also **imprest fund**. (JP 1-0)

**Army base** — A base or group of installations for which a local commander is responsible, consisting of facilities necessary for support of Army activities including security, internal lines of communications, utilities, plants and systems, and real property for which the Army has operating responsibility. See also **base complex**.

**forward edge of the battle area** — (*) The foremost limits of a series of areas in which ground combat units are deployed, excluding the areas in which the covering or screening forces are operating, designated to coordinate fire support, the positioning of forces, or the maneuver of units. Also called **FEBA**.

**forward line of own troops** — A line that indicates the most forward positions of friendly forces in any kind of military operation at a specific time. The forward line of own troops (FLOT) normally identifies the forward location of covering and screening forces. The FLOT may be at, beyond, or short of the forward edge of the battle area. An enemy FLOT indicates the forward-most position of hostile forces. Also called **FLOT**.

**forward logistic site** — See naval forward logistic site. Also called **FLS**. (JP 4-01.3)

**forward-looking infrared** — An airborne, electro-optical thermal imaging device that detects far-infrared energy, converts the energy into an electronic signal, and provides a visible image for day or night viewing. Also called **FLIR**. (JP 3-09.3)

**forward oblique air photograph** — Oblique photography of the terrain ahead of the aircraft.

**forward observer** — An observer operating with front line troops and trained to adjust ground or naval gunfire and pass back battlefield information. In the absence of a forward air controller, the observer may control close air support strikes. Also called **FO**. See also **forward air controller; spotter**. (JP 3-09.1)

**forward operating base** — An airfield used to support tactical operations without establishing full support facilities. The base may be used for an extended time period. Support by a main operating base will be required to provide backup support for a forward operating base. Also called **FOB**. (JP 3-09.3)

**forward operating location** — Primarily used for counterdrug operations. Similar to a forward operating base (FOB) but without the in-place infrastructure associated with a FOB. Also called **FOL**.

**forward operations base** — In special operations, a base usually located in friendly territory or afloat that is established to extend command and control or communications or to provide support for training and tactical operations. Facilities may be established for temporary or longer duration operations and may include an airfield or an unimproved airstrip, an anchorage, or a pier. A forward operations base may be the location of special operations component headquarters or a smaller unit that is controlled and/or supported by a main operations base. Also called **FOB**. See also **advanced operations base; main operations base**. (JP 3-05.1)

**forward recovery mission profile** — A mission profile that involves the recovery of an aircraft at a neutral or friendly forward area airfield or landing site.

**main airfield** — (*) An airfield planned for permanent occupation in peacetime, also suitable for use in wartime and having sufficient operational facilities for full use of its combat potential. See also **airfield; departure airfield; diversion airfield; redeployment airfield.**

**main armament** — The request of the observer or spotter to obtain fire from the largest guns installed on the fire support ship.

**main attack** — (*) The principal attack or effort into which the commander throws the full weight of the offensive power at his disposal. An attack directed against the chief objective of the campaign, major operation, or battle.

**main battle area** — That portion of the battlefield in which the decisive battle is fought to defeat the enemy. For any particular command, the main battle area extends rearward from the forward edge of the battle area to the rear boundary of the command's subordinate units.

**main convoy** — (*) The convoy as a whole which sails from the convoy assembly port/anchorage to its destination. It may be supplemented by joiners or joiner convoys, and leavers or leaver convoys may break off.

**main deck** — The highest deck running the full length of a vessel (except for an aircraft carrier's hanger deck). See also **watercraft.** (JP 4-01.6)

**main detonating line** — (*) In demolition, a line of detonating cord used to transmit the detonation wave to two or more branches.

**main line of resistance** — A line at the forward edge of the battle position, designated for the purpose of coordinating the fire of all units and supporting weapons, including air and naval gunfire. It defines the forward limits of a series of mutually supporting defensive areas, but it does not include the areas occupied or used by covering or screening forces.

**main operations base** — In special operations, a base established by a joint force special operations component commander or a subordinate special operations component commander in friendly territory to provide sustained command and control, administration, and logistical support to special operations activities in designated areas. Also called **MOB.** See also **advanced operations base; forward operations base.** (JP 3-05.1)

**main supply route** — The route or routes designated within an operational area upon which the bulk of traffic flows in support of military operations. Also called **MSR.**

**maintain** — When used in the context of deliberate planning, the directed command will keep the referenced operation plan, operation plan in concept format, or concept summary, and any associated Joint Operation Planning and Execution System (JOPES) automated data processing files active in accordance with applicable tasking documents describing the

# Attachment
# 10

DEPARTMENT OF DEFENSE

# BASE STRUCTURE REPORT

(A Summary of DoD's Real Property Inventory)



# FISCAL YEAR 2004 BASELINE

OFFICE OF THE DEPUTY UNDER SECRETARY OF DEFENSE

(INSTALLATIONS & ENVIRONMENT)

# Department of Defense
## Base Structure Report (BSR)

I.      INTRODUCTION .................................................................................DoD-2

II.     PORTFOLIO SUMMARY ......................................................................DoD-2

III.    CONTENT AND ORGANIZATION ......................................................DoD-6

IV.     DATA SOURCES AND DEFINITIONS...................................................DoD-7

V.      SUMMARY OF CHANGES ...................................................................DoD-9

VI.     CONCLUSION ......................................................................................DoD-11

VII.    INSTALLATION SUMMARIES .............................................................DoD-22

VIII.   TOTAL DOD INVENTORY ....................................................................DoD-83

IX.     INDIVIDUAL SERVICE INVENTORIES..................................................ARMY-1

        1.   ARMY ...........................................................................................ARMY-1

        2.   NAVY ............................................................................................NAVY-1

        3.   AIR FORCE.....................................................................................AIR FORCE-1

        4.   MARINE CORPS ............................................................................USMC-1

        5.   WASHINGTON HEADQUARTERS SERVICE ..................................WHS-1

X.      STATE OWNED INVENTORY ................................................................STATE-1

# Department of Defense
# Base Structure Report (BSR)

## I. INTRODUCTION

Since the 1999 edition, the Department of Defense has used its consolidated real property inventory (the Facilities Analysis Database) as the basis for the annual publication of the Base Structure Report. This report contains a comprehensive listing of installations and sites owned and used by the Department. It summarizes the current facilities inventory and provides other basic information, such as information concerning the site locations, names of the nearest city, and, where available, includes personnel authorizations.

The Department's physical plant is large by any standard, consisting of more than $86,000 real property records (buildings, structures and utilities) located at more than 5,500 locations, on more than 29 million acres. Sites range in size from small, unoccupied locations supporting a single navigational aid on less than one-half acre, to the Navy's complex of installations at Norfolk, Virginia with more than 78,000 employees, and to the Air Force's Nellis Air Force Range in Nevada, that includes over 3.0 million acres. Capturing this vast set of assets in a single, manageable document requires some summarization and, as in previous Base Structure Reports, the focus of this report is on the number of sites and their location, owned and leased buildings, square footage, and acreage.

## II. PORTFOLIO SUMMARY

The Department of Defense owns or has use of large amounts of real property in the United States and throughout the world. Over 83% of the 5,543 DoD sites are located in the United States or U.S. Territories. The majority of the foreign sites are located in Germany (306 sites), Japan (158 sites) and South Korea (105 sites). The remaining sites are dispersed among 43 other foreign countries.

The real property portfolio managed and reported by the Department is classified as buildings, structures, utilities, or land. If the land records were excluded, then 57% of all DoD's real property records are categorized as buildings, roughly 30% are reported as structures, and the remaining 13% are classified as utilities. Records for structures consist of carport, covered outdoor storage areas, tent pads, etc., for example. Utility records consist of pavements, pipelines, electrical cabling, etc. Of the total reported DoD inventory, 89% of the real property records show facilities that are owned by the Military Departments with less than 6% being leased facilities. The remaining facilities are primarily foreign owned (2.6%) and privately owned (2.3%), but are reported because they are being used or permitted to the Department for use. The reported plant replacement value, which is the cost to replace these facilities using today's construction costs and standards, of DoD's inventory is approximately $646 billion - $406 billion for buildings, $159 billion for structures, and $81 billion for utilities. Over 81% of the DoD portfolio's plant replacement value (PRV) is located in the United States or its territories. Of the 29 million acres of land used by the Department of Defense, 82% of the department's land is owned and 98% of the acreage (owned or leased) is located in the United States or U.S. Territories.

# Department of Defense
## Base Structure Report (BSR)

The table below summarizes owned and leased real property to include acreage, number of buildings and square feet, which make up the DoD portfolio for the fiscal year 2004 baseline, as of September 30, 2003.

| Real Property Location | Number Buildings Owned | Buildings Owned SqFt | Number Buildings Leased | Buildings Leased SqFt | Total Acres Owned | Acres Owned | Total PRV ($M) |
|---|---|---|---|---|---|---|---|
| United States | 254,513 | 1,858,157,792 | 8,193 | 48,369,150 | 28,389,706 | 27,404,619 | 510,314 |
| U.S. Territories | 6,563 | 27,982,268 | 18 | 457,156 | 100,861 | 82,302 | 16,037 |
| Foreign | 30,172 | 143,367,095 | 15,930 | 155,826,307 | 709,095 | 876 | 120,454 |
| Grand Total | 291,248 | 2,029,507,155 | 24,141 | 204,652,613 | 29,199,662 | 27,487,798 | 646,809 |

Table 1: Overview of Federally DoD Real Property holdings.

DoD sites are located at all 50 States, 9 of the U.S. Territories, and 46 foreign locations. Figure 1 summarizes locations of DoD sites by Service and Agency.



Figure 1: Location of DoD Sites by Service/Agency.

# Department of Defense
# Base Structure Report (BSR)

## Building Profile

DoD owns and leases a reported 315,389 buildings throughout the world, valued at over $405 billion and comprising over 2.2 billion square feet of building area. The Department implemented a facility classification system that groups facilities with similar functions and units of measures into Facility Classes. Those Facility Classes driving the largest PRV costs are Maintenance and Production, Supply, and Troop Housing and Mess Facilities.



### Building Profile by PRV $B

- Operation & Training
- Maintenance & Production
- Research, Development, Test, and Evaluation
- Supply
- Hospital & Medical
- Administrative
- Family Housing
- Troop Housing and Mess Facilities
- Community Facilities

**Figure 2: Building Profile by PRV $B.**

# Department of Defense
## Base Structure Report (BSR)

### Land Profile

DoD manages a reported 29.2 million acres of land worldwide. More than 98% of that land is located in the United States or U.S. Territories. The majority of land controlled by the Department (82%) is government owned or acquired through withdrawal from the public. Not surprisingly, the Army controls the largest percentage of the Department's land - 53%. The Air Force manages the next largest portion of the total acreage at 34%. Washington Headquarters Service, which reports the Pentagon Reservation, owns 442 acres.



**Acreage by Service/Agency**

Figure 3: Acreage by Service/Agency.

## III. CONTENT AND ORGANIZATION

It is important to note the following parameters for the content of this report:

- **Timeliness.** While the base structure is changing continuously, the BSR is a "snapshot" of the DoD's physical plant, as reported on September 30, 2003. The bases listed may be in various stages of activity, including unused or awaiting disposal. Due to the legalities involved in transferring deeded property, individual Service inventories may include a property record long after the decision has been made to transfer that asset to another organization. Likewise, ongoing additions to the base structure, including in-transfers, are often not officially recorded until well after the actual decision has been finalized.

- **Mode of View.** For the purpose of this report, each entry is defined as a site at a specific location with a name and real property assets (see definition of a "site" in the next section). As an exception, Air Force strategic missile sites were rolled up to the appropriate one of seven parent installations. In the case of F. E. Warren AFB, those missile sites located in Nebraska and Colorado were counted as part of the parent installation total for the state of Wyoming. Additionally, separate Navy/Marine Corps Special Areas are now broken out separately and may or may not be in the same geographical area.

- **Display Criteria.** For practicality of use, this report includes specific information on sites meeting predetermined size and value criteria (except for the Army National Guard State Installations in Section XI). If located in the United States, the site must be larger than 10 acres AND have a Plant Replacement Value (PRV) greater than $10 million to be listed. If the site is located in a foreign country, a site must be larger than 10 acres OR have a Plant Replacement Value (PRV) greater than $10 million to be listed. To preserve comprehensiveness of the report, sites that do not meet these criteria are aggregated as an "Other" location within each state or country. For the Army National Guard State Installations, the criteria is slightly reduced to show approximately the same percentage of the total number of sites as shown in the rest of the report. State sites are shown if the site is larger than 5 acres AND has a Plant Replacement Value (PRV) greater than $5 million. State sites not meeting this criteria are aggregated as "Other" for each state.

- **Personnel Data.** Personnel data at the level of detail shown in this report was not readily available from a single source, so data was collected from multiple sources including the individual Services personnel databases. Since personnel totals reflected in this report are shown as they relate to individual sites or locations and attempt to show all personnel regardless of Service affiliation, totals should not be confused and viewed as representing only individual Service total strength and may not reflect the actual population at a particular site. Detailed personnel questions should be addressed to the appropriate Service manpower or personnel offices.

The report is organized by State/Country and presented first as overall DoD, then by each Military Service. Each record includes the site name, the component (Active, Guard, or Reserves), the name of the nearest city, zip code, primary phone number (where possible), the number of buildings owned and leased, total acres owned by the Services and the total acres used, the PRV (in $ millions) and the authorized number of military, civilian, and other personnel (when available). The PRV represents the reported cost of replacing the facility and its supporting infrastructure using today's construction cost (labor and material) and standards

(methodologies and codes). Other personnel include any non-appropriated employees, government contractors (if identified) or foreign nationals performing work at the site.

## IV. DATA SOURCES AND DEFINITIONS

The facilities data included in this report is extracted directly from the native Services' real property inventories; i.e., Army - HQ Army Integrated Facilities System (IFS), Navy and Marine Corps -- Navy Facilities Assets Database (NFADB), and the Air Force's Real Property Asset (RPA) database. Washington Headquarters Service provided their real property inventory. This report does not attempt to replicate all the details included the source databases. Instead, this report provides a summary view of the Department's installations using common elements that should answer most questions. An explanation of criteria used for each column in the BSR is shown below:

-- SITE: Indicates the installation or site name as used in the Services' databases. This is based on the Services' Installation Number (Army and Air Force), Unit Identification Code/Special Area Code (Navy and Marine Corps), or Site Code (Washington Headquarters Service).

-- COMPONENT: Designates the primary component for the owner/reporter of a site or installation, either Active, Guard, or Reserve. For the Navy, this column is also used to designate those sites in caretaker status pending some type of further action. This action may be a pending closure or realignment, or the site could remain in caretaker status.

-- NAME NEAREST CITY: Identifies the name of the nearest city of reasonable size as reported by the Services.

-- ZIP CODE: Identifies primary ZIP Code (postal delivery area code) associated with the site or installation. Many large installations may have several ZIP codes; however, only one ZIP code is shown in this report.

-- PHONE NUMBER: Identifies a local phone number when available. In some cases, a central locator number was used or, for others, the Public Affairs office number was listed.

**Important Note on Buildings Information:** Buildings and acreage are classified according to the DoD Real Property Classification System (RPCS) Facility Type in lieu of the Services' classification. Square footage amounts are normalized by applying RPCS size limits to each facility according to its RPCS classification. Building sizes exceeding the size limit are reset to the median size based on its facility classification, unless the reported data has been validated by the Service. State Owned building/square footage is applicable to Army National Guard State Installations only.

-- BLDGS OWNED: Represents the number of buildings owned by the Service at the particular site or installation. It does not include licensed or permited facilities, State-owned National Guard facilities, or facilities provided by other nations at foreign locations.

# Department of Defense
## Base Structure Report (BSR)

– **BLDGS OWNED SQFT:** Reflects the normalized RPCS building square footage for the buildings identified as owned.

– **BLDGS STATE OWNED:** Represents the number of buildings that are owned by the State in which the particular site or installation is located.

– **BLDGS STATE OWNED SQFT:** Reflects the normalized RPCS building square footage for the buildings identified as State.

– **BLDGS LEASED:** Identifies the number of buildings leased by the Services.

– **BLDGS LEASED SQFT:** Reflects the normalized RPCS building square footage for the buildings identified as leased in the Services databases.

– **TOTAL ACRES:** Identifies the total number of acres owned, used by, or leased to the DoD. It includes public land, state land, land owned by other federal agencies, and acreage of foreign soil used by DoD sites.

– **PRV ($M):** Total Plant Replacement Value (PRV) for all facilities (buildings, structures, and utilities) included in the Services RPI databases. This reported value is the cost to replace the current physical plant (facilities and supporting infrastructure) using today's construction costs (labor and materials) and standards (methodologies and codes). The PRV represents the Service-calculated value adjusted for facilities that exceeded the RPCS size limit. The PRV is reduced by the proportional reduction of the facility size.

**Important Note on Personnel Data:** Each Service does not maintain their personnel data to relate directly to their Real Property Information. Every effort was made to match the personnel strengths to the appropriate site. The population outlined in the report may not reflect the actual population of the site. Detailed personnel questions should be addressed to the appropriate Service manpower or personnel offices. This information is provided only to project a level of magnitude when comparing sites.

– **MIL:** Identifies all known military personnel authorized for the site or installation. Includes Active Duty, Guard, and Reserve personnel, regardless of Service affiliation.

– **CIV:** Identifies all known DoD civilian personnel authorized for the site or installation, regardless of Service affiliation. Note: civilian numbers for the Navy represent assigned personnel not authorized.

– **OTHER:** Identifies all known other civilian personnel authorized for the site or installation, including personnel paid from Non-appropriated Funds (NAF), Foreign Nationals (direct hire) at foreign locations, and, if available, any full-time contractor personnel, regardless of Service affiliation.

– **TOTAL:** Sum of MIL, CIV, and OTHER personnel columns.

## V. SUMMARY OF CHANGES MADE IN THIS YEAR'S REPORT FORMAT.

- This year the DoD Real Property Classification System (RPCS) business rules were applied to the Services' Real Property Inventory (RPI) data to facilitate cross-Service analysis. In previous years' reports, facilities were classified according to the Services business rules (e.g., facility type, facility size, Plant Replacement Value). Facilities classified under the RPCS resulted in a mix of facility types (buildings, structures, utility, land) based on the individual Services' business rules. Applying the DoD RPCS Facility Type classification permitted all like Service facilities being classified the same. Additionally, size limits were applied to the facilities to identify and normalize anomalous data. If a facility was over the prescribed DoD limit for the facility type, the size was set to the median size for the facility type unless the reported size was certified as valid by the Services. Since the Plant Replacement Value (PRV) is directly proportional to the size (unit of measure of the facility), PRVs were also proportional adjusted.

- Included for the first time is information from the Washington Headquarters Service (WHS) outlining the Pentagon Reservation. WHS supports DoD's mission in the National Capital Region.

- A section summarizing DoD's real property inventory portfolio was added.

- A new section outlining the State Owned installations and facilities in the Army National Guard was added. As the criteria for listing in this report, a State site must have a Plant Replacement Value (PRV) greater than $5 million AND the site must be larger than 5 acres. State sites not meeting this criteria are aggregated as "Other" for each state.

- Navy/Marine Corps Special Areas, previously counted with their sponsoring activity, are now broken out to permit visibility of areas that were geographically separate from the sponsoring activity, resulting in an increase in the number of Navy/Marine Corps sites being reported.

- Leased buildings include permits and licenses resulting in increased building counts and square footage from last year's report.

## VI. CONCLUSION

The Base Structure Report presents the framework upon which America's military readiness is built. A major pillar of our Defense Installations Strategic Plan is to develop and field the "Right Tools and Metrics" for understanding and managing the vast Department of Defense base structure. This document, which provides the ability to view the basic elements of our installations and facilities quickly and concisely, is a valuable tool.

For any questions concerning this report, please send an email message to: BSR@osd.mil. An electronic copy of the BSR is available at http://www.defenselink.mil/pubs under reports.

| SITE | NAME COMPONENT | NEAREST CITY | PHONE | ZIP CODE | BLDGS OWNED | BLDGS OWNED SQFT | BLDGS LEASED | BLDGS LEASED SQFT | TOTAL ACRES | ACRES OWNED | PRV ($M) | MIL | CIV | OTHER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Belgium** | | | | | | | | | | | | | | | |
| Brussels | Army Active | Brussels | | 1000 | | | 18 | 159,494 | 4 | | 34.2 | 79 | 74 | 461 | 614 |
| Chateau Gendbrien | Army Active | Mons | | 7000 | 1 | 1,620 | 5 | 26,295 | 20 | | 5.1 | 18 | 0 | 0 | 18 |
| Chievres Airbase | Army Active | Ath | | 7950 | 46 | 156,787 | 37 | 294,021 | 1,012 | | 271.4 | 48 | 18 | 310 | 376 |
| Daumerie Caserns | Army Active | Ath | | 7950 | 2 | 648 | 29 | 210,477 | 35 | | 56.4 | 107 | 90 | 121 | 318 |
| Mons | Army Active | Mons | | 7000 | 1 | 5,912 | 110 | 449,998 | 16 | | 69.8 | 0 | 0 | 0 | 0 |
| pe Headquarters | Army Active | Mons | | 7010 | 3 | 35,538 | 37 | 356,220 | 16 | | 87.3 | 484 | 134 | 315 | 933 |
| ...drebeek Dependent School | Army Active | Stenebeek | | 1933 | 6 | 84,359 | | | 16 | | 23.4 | 12 | 4 | 48 | 64 |
| OTHER SITE(S) [1], [3] | | | | | 1 | 151 | 45 | 89,699 | 7 | 16 | 10.5 | | | | |
| **Belgium Total:** | | | | | 62 | 289,613 | 281 | 1,596,205 | 1,119 | 16 | 555.2 | 748 | 320 | 1,255 | 2,323 |
| **Germany** | | | | | | | | | | | | | | | |
| AG Pub & Trng Ards Cir | Army Active | FrankfurtMain | | 09175 | 21 | 655,425 | 5 | 339,227 | 10 | | 52.8 | 0 | 10 | 51 | 61 |
| Avin York Vil Fam Hsg | Army Active | Bad Nauheim | | 09074 | | | 9 | | 23 | | 88.5 | 0 | 0 | 43 | 43 |
| Amberg Fam Hsg | Army Active | Amberg | | 09112 | 1 | 155 | | 263,236 | 8 | | 28.4 | 0 | 0 | 21 | 21 |
| Armberg Fam Hsg | Army Active | Amberg | | 09090 | 1 | | | | 5 | | 47.0 | | | | |
| Ametla Einhalt Hotel | Army Active | Wiesbaden | | 09096 | | | 3 | 213,451 | 5 | | | 5 | 240 | 92 | 341 |
| American Arms Hotel | Army Active | Wiesbaden | | 09096 | | | | 291,351 | | | 63.4 | 2 | | 383 | 390 |
| Anderson Barracks | Army Active | Dexheim | | 09095 | 30 | 156,138 | 20 | 225,931 | 105 | | 131.4 | 873 | | | 878 |
| Ansbach | Army Active | Ansbach | | 09177 | | 160,085 | 105 | 557,356 | 10 | | 58.3 | 0 | 120 | 218 | 338 |
| Argonner Kaserne | Army Active | Hanau | | 09165 | 8 | | 26 | 657,462 | 51 | | 138.2 | 719 | 8 | 58 | 785 |
| Armstrong Barracks | Army Active | Büdingen | | 09970 | 10 | 25,821 | 23 | 425,265 | 59 | | 138.8 | 0 | 8 | | |
| Armstrong Village Fam Hsg | Army Active | Büdingen | | 09076 | 2 | 8,776 | 15 | 370,953 | 16 | | 52.4 | 0 | 0 | 29 | 29 |
| Artillery Kaserne | Army Active | Garmisch | | 09053 | 9 | 18,899 | 27 | 454,899 | 37 | | 117.4 | 26 | 30 | 138 | 194 |
| Aschaffenburg Fam Hsg | Army Active | Aschaffenburg | | 09175 | 1 | 6,289 | 26 | 747,284 | 59 | | 98.5 | 0 | 1 | 4 | 5 |
| Aschaffenburg Trng Areas (8) | Army Active | Aschaffenburg | | 09175 | 9 | 18,022 | 26 | 34,834 | 3,456 | | 19.0 | 0 | 4 | | |
| Avinov Manor Trng Fam Hsg | Army Active | Schweinfurt | | 09903 | 16 | 29,465 | 55 | 1,444,093 | 73 | | 222.5 | 0 | 36 | 172 | 210 |
| Aikim Manor Fam Hsg | Army Active | Schweinfurt | | 09903 | 16 | 47,223 | 109 | 1,263,091 | 93 | | 191.3 | 0 | 0 | 23 | 23 |
| inm Hsg Area | Army Active | Wiesbaden | | 09098 | 2 | 184,956 | 20 | 603,140 | 40 | | 95.7 | 0 | 0 | 27 | 27 |
| ...enhausen Family Hsg | Army Active | Babenhausen | | 09175 | 66 | 358,128 | 65 | 692,972 | 327 | | 251.0 | 860 | 49 | 43 | 952 |
| Babenhausen Kaserne | Army Active | Babenhausen | | 09175 | 32 | 99,770 | 45 | 1,129,947 | 317 | | 292.8 | 231 | 21 | 464 | 716 |
| Bad Aibling Kaserne | Army Active | Bad Aibling | | 09098 | 18 | | 147 | 1,088,698 | 26 | | 112.7 | | | | |
| Bamberg | Army Active | Bamberg | | 09139 | 4 | 9,894 | 4 | 5,412 | 26 | | 8.0 | | | | |
| Bamberg | Army Active | Bamberg | | 09139 | 22 | 7,909 | 29 | 135,619 | 220 | | 44.2 | | | | |
| Bamberg Airfield | Army Active | Bamberg | | 09139 | 5 | 58,896 | 26 | 423,877 | 157 | | 123.0 | 50 | 0 | | 50 |
| Bamberg Stir & Range Area | Army Active | Bamberg | | 09139 | | | 88 | 489,338 | 33 | | 50.8 | 111 | 130 | 117 | 358 |
| Barton Barracks | Army Active | Ansbach | | 09177 | 3 | 10,085 | 65 | 1,500 | 47 | | 7.8 | 0 | 5 | 76 | 81 |
| Baumholder | Army Active | Baumholder | | APO A | 9 | 24,288 | 66 | 2,742,337 | 94 | | 291.9 | 0 | 21 | 28 | 90 |
| Baumholder Airfield | Army Active | Baumholder | | APO A | 4 | 21,664 | 11 | 179,817 | 13 | | 53.1 | 41 | 4 | 13 | 27 |
| Baumholder Hospital | Army Active | Baumholder | | APO A | | | | | | | | | | | |
| Baumholder Ord Area | Army Active | Baumholder | | APO A | 14 | 10,422 | 31 | 385,938 | 60 | | 71.8 | 5 | | | |
| Benjamin Frankln Vil Fam Hsg | Army Active | Mannheim | | 09086 | 32 | 182,214 | 177 | 4,357,955 | 217 | | 619.4 | 58 | 45 | 654 | 757 |
| Bensheim Maint & Supply Fac | Army Active | Bensehm | | 09175 | | | 8 | 82,844 | 8 | | 11.5 | | 5 | 5 | 6 |

1 US Locations that do not meet criteria of at least ten (10) Acres AND at least $10M PRV. US Territories and Non-US Locations that do not meet criteria of at least ten (10) Acres OR at least $10M PRV.