

NO. 5:04-CR-211-BO

| | | |
|---|---|---|
| UNITED STATES AMERICA | ) | |
| | ) | **GOVERNMENT'S OPPOSITION TO** |
| v. | ) | **DEFENDANT"S MOTION TO DISMISS** |
| | ) | **FOR LACK OF JURISDICTION** |
| DAVID A. PASSARO | ) | |

The United States hereby opposes the "Defendant's Motion to Dismiss For Lack of Jurisdiction" on the ground that 18 U.S.C. § 7(9), which defines the special territorial jurisdiction of the United States to embrace "military missions or entities in foreign states," does not embrace the locus of the offenses of which has been charged. Reduced to its essentials, defendant's argument is predicated upon the addition of a jurisdictional qualification that is neither contained in the plain language of the statute nor implicit from its legislative genesis and context in international law.

STATEMENT

1. As set out in the Indictment, the government anticipates proving at trial that the defendant, a former member of the U.S. Army, was an independent contractor working on behalf of the Central Intelligence Agency (CIA) to engage in paramilitary activities in support of United States military personnel in Kunar Province, in the nation of Afghanistan. On June 18, 2003, the

1

IC: Boyko

47

defendant was contracted to be at a U.S. Army base near the town of Asadabad, Afghanistan. We anticipate establishing at trial that Asadabad base was constructed on an old Soviet fort approximately five miles from the Pakastani border. As of June 2003, it was occupied by members of the U.S. Army 82nd Airborne Division and Special Operations forces personnel and was also a temporary destination for certain CIA contractors and employees. It continues to be occupied by U.S. military forces to this date. The compound was employed by U.S. personnel as a base from which to launch missions against terrorists, gather intelligence, and train fledgling Afghani military forces to assume responsibility for their own defense. During the months preceding June 18, 2003, it was the target of sporadic rocket attacks by hostile paramilitary forces.

2. The Indictment also alleges (and the government anticipates proving at trial), that on June 18, 2003, Abdul Wali, a local Afghani national who was suspected of participating in the rocket attacks, voluntarily presented himself at the front gate of Asadabad base. The defendant assisted military personnel in detaining him and, between June 19 and June 20, 2003, interrogated him at the Asadabad Army base concerning the attacks. During the interrogations, the defendant is alleged to have beaten Wali with his hands, his feet and a large flashlight. Wali died in a cell on Asadabad Base on June 21, 2003. The following month, the defendant

returned to his residence in this District.

3. On June 17, 2004, a grand a jury of this District returned a four-count Indictment charging the defendant with two counts of assault with a dangerous weapon, in violation of Title 18 U.S.C. § 113(a)(3); and two counts of assault resulting in serious bodily injury, in violation of Title 18 U.S.C. § 113(a)(6).[1]   All of the counts alleged that the offenses were committed by a United States national and occurred within the "special maritime and territorial jurisdiction of the United States, within the meaning of 18 U.S.C. § 7(9), namely, "at a United States Army base near the town of Asadabad, in Kunar Province, Afghanistan."

In this regard, Title VIII, Section 804 of the USA Patriot Act of 2001, Pub. L. 107-56, 115 Stat. 377 (Oct. 26, 2001), expanded 18 U.S.C. § 7, which defines the "special maritime and territorial jurisdiction of the United States" to include:

> (9)   With respect to offenses committed by or against a national of the United States as that term is used in section 101 of the Immigration and Nationality Act –
>
> (A)   the premises of United States diplomatic, counselor, military or other United States Government missions or entities in foreign States, including the buildings, parts of buildings, and land appurtenant thereo or ancillary thereto or used for purposes of those missions or entities, irrespective of ownership; and

---

[1]   The counts were predicated upon the defendant's alleged activities on June 19, 2003 and June 20, 2003.

> (B) residences in foreign States and the land
> appurtenant or ancillary thereto, irrespective
> of ownership, used for purposes of those
> missions or entities or used by United States
> personnel assigned to those missions or
> entities.

> Nothing in this paragraph shall be deemed to supersede
> any treaty or international agreement with which this
> paragraph conflicts. This paragraph does not apply with
> respect to an offense committed by a person described in
> section 3261(a) of this title.

18 U.S.C. 7(9).

It is the Government's position that the U. S. Army base at
Asadabad, in Kunar Province, Afghanistan falls squarely within the
ambit of Section 7(9)(A) and (B), *i.e.*, that it constitutes the
premises and residence of a U.S. military mission or entity in a
foreign state.

### ARGUMENT

As we understand it, the burden of the defendant's argument
is that implicit in the extraterritorial locations embraced by
Section 7(9) is the requirement of permanency; that is that, in
enacting the amendment to Title 18 U.S.C. § 7, Congress intended to
confine its scope to embassy premises and similar enclaves abroad,
and not also to reach temporary U. S. military premises or
residences occupied by U.S. personnel, such as that at Asadabad.
This claim is not predicated upon the commonly understood meaning
of the words used by Congress in enacting the amendment; instead,
it is based upon what the defendant maintains is the diplomatic
context of the statute and its underlying legislative purpose.

4

*See, e.g.*, Memorandum in Support of Motion to Dismiss (hereafter "Memo") at 10-12. Neither, however, is contrary to the application of Section 7(9) to the Asadabad base. Indeed, as we show below, the antecedent judicial decisions that the defendant acknowledges the amendment was designed "to codify" (Memo at 12), purported to extend the "special maritime and territorial jurisdiction of the United States" to overseas premises occupied by U. S. nationals working for the government that could not conceivably fall within the ambit of the defendant's proposed judicial gloss.

1. The Plain Language of Section 7(9) Embraces the Asadabad Army Base.

At the outset, the short answer to the defendant's claim that Section 7(9) was intended by Congress to reach only premises used "by permanent establishments of the United States, such as embassies and military bases" (Motion at 12), or to be otherwise confined to "a sovereign enclave of the United States," acquired by a formal agreement with a host nation (Motion at 12-13), "'is that Congress did not write the statute that way.'" Russello v. United States, 464 U.S. 16, 22 (1983), *quoting* United States v. Naftalin, 441 U.S. 768, 773-74 (1979). Thus, although Congress carefully circumscribed the scope of Section 7(9) by reference to conflicting treaties or international agreements; the identity of the victims or perpetrators as U. S. nationals; and the amenability of potential subjects to prosecution under the Military

5

Extraterritorial Jurisdiction Act ("MEJA"), 18 U.S.C. § 3263 *et seq.*, it included no similar provision confining its scope to permanent diplomatic or military facilities acquired by formal agreement with the host nation. To the contrary, although the amendment undeniably embraces embassies and diplomatic missions as defined by Title 22 U.S.C. 254(a) and the Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227 (ratified Dec. 13, 1972), which likely qualify under the defendant's "permanency" test, in enacting the statute, Congress painted with a much broader brush. Thus, in addition to such enclaves, the amendment also embraces "the premises of United States military . . . missions or entities in foreign States, including the. . . land appurtenant or ancillary thereto or used for purposes of those missions or entities, irrespective of ownership . . . .," as well as "residences in foreign States, and the land appurtenant thereto, irrespective of ownership, used for those missions or entities or used by United States personnel assigned to those missions or entities." If Congress had intended such locations to be coextensive with permanent diplomatic missions, it surely would not have found it necessary to include them in the statute. Indeed, a reading of the statute in a manner so as to make superfluous the enumeration of such premises would contravene the "assumption that Congress intended each of its terms to have meaning [and the canon of construction that] '[j]udges should hesitate . . . to treat [as

surplusage] statutory terms in any setting . . . ." <u>Bailey v. United States</u>, 516 U.S. 137, 144 (1995), quoting <u>Ratslaf v. United States</u>, 510 U.S. 135, 140-141 (1994).

More to the point, however, one of the most fundamental canons of statutory construction is that "[w]hen terms used in a statute are undefined, we give them their ordinary meaning." <u>Asgrow Seed Co. v. Winterboer</u>, 513 U.S. 179, 187 (1995), *citing* <u>FDIC v. Meyer</u>, 510 U.S. 471, 476 (1994), a matter that can be deduced by recourse to dictionary definitions. *See*, *e.g.*, <u>Smith v. United States</u>, 508 U.S. 223, 228 (1993); see also 2A N. Singer, <u>Sutherland Statutes and Statutory Construction</u> § 47.27 at 337-338 (6th ed. 2000). Nothing about the terms in the statute that brings the Asadabad Army base within its scope connotes a requirement of permanency. Thus, the term "premises" simply means "a tract of land with buildings thereon." <u>Webster's New Collegiate Dictionary</u>, at 901 (1979); *see* <u>Blacks Law Dictionary</u> 1063 (1979)("[l]and with its appurtenances"). In the military context, the term "mission" is commonly defined as "a team of military specialists sent to a foreign country to assist in the training of its armed forces." <u>Webster's Third New International Dictionary</u> 1445 (1981) (def. 3.e)("military [missions] sent by its allies have helped greatly to modernize its army"). The word "entity" broadly embraces any "independent, separate, or self-contained existence." <u>Websters New Collegiate Dictionary</u>, <u>supra</u>, at 377-38 and would, thus, include a

unit of the U. S. Army, such as part of the 82d Airborne Division assigned to the base. And, finally, the term "residence" simply means "the place where one actually lives as distinguished from his domicile *or a place of temporary sojourn.*" *Id.* at 977. Thus, the "premises" of a "military . . . mission[ ] or entit[y] in [a] foreign State[ ], including . . . land appurtenant or ancillary thereto or used for purposes of those missions or entities" (18 U.S.C. § 7(9)(A)) would embrace any land, along with any buildings and appurtenances, occupied by a U.S. military organization (*i.e.*, a "mission" or "entity") for the purpose of providing training or in furtherance of any other operation conducted by the occupying unit.[2] Similarly, "residences in a foreign State[ ] used for purposes of [military] missions or entities in foreign states," (18 U.S.C. § 7(9)(B)) is broad enough to embrace any location, building or other facility in a foreign country in which members of the U.S.

_____

[2] The defendant makes much of the fact that the Asadabad Army base does not appear to qualify within the Department of Defense definition of an "Army base" as contained in the Department of Defense Dictionary of Associated Terms, and is not listed as such in the 2003 DOD "Base Structure Report." See Def. Memo at 13 & Attachments 9,10. The short answer to this argument is that nothing in the statutory language of Section 7(9) purports to incorporate by reference that term or to confine its application to U.S. military enclaves overseas that fall within that definition. Moreover, the list in the "Base Structure Report" is expressly confined to U.S. military facilities abroad that meet specific "predetermined size and value criteria, *i.e.*, larger than 10 acres or having a "Plant Replacement Value" of more than $10 million. See Def. Memo. Att. 10 at 6. Nothing in Section 7(9) suggests similar size and value qualifications with respect to the U.S. premises of U.S. military missions or entities in foreign states that it embraces.

armed forces, conducting training or engaged in other military operations, are temporarily billeted. However humble the quarters of the members of the 82d Airborne Division and other military units at the Asadabad base may have been, they undeniably qualified as their "residences" while they conducted training and executed other military responsibilities at that location.

        2.    The Legislative Context Of Section 7(9) Does No Require That Its Terms Be Afforded a Narrower Construction.

        Nor is this a case – as the defendant suggests (Memo 9) – in which other contextual indicia in the statute suggest that its operative terms must be construed more narrowly than their dictionary definitions would otherwise permit. We have already addressed the defendant's primary contention that such terms – "premises" and "residences" – should be construed *in pari materia* with embassies and other permanent diplomatic enclaves. If that argument were correct, Congress would likely have either omitted such terms or exercised its demonstrated ability to qualify them accordingly.    That Congress did not choose to do so, is itself a strong indication that it had no such intent. *Cf.*, <u>Russello</u>, 464 U.S. at 23 (where Congress demonstrates its ability to qualify the operation of a statute, but omits the qualification in another portion of the statute, it is presumed that Congress acted intentionally).

        Nor is there substance to the defendant's argument (Memo 13-14) that the ability of the United States to exercise its criminal

jurisdiction over its nationals at such temporary military bases conflicts with both a diplomatic note between the United States and Afghanistan concerning the status of U. S. personnel in that nation and the Vienna Convention On Diplomatic Relations and therefore would contravene the "treaty" limitation contained in the final paragraph of Section 7(9). This argument misapprehends both the fundamental principles of international law governing the assertion of extraterritorial jurisdiction and the operation of a SOFA or similar agreement allocating jurisdictional responsibilities between a sending and receiving state. In the first place, it is a well settled principle of customary international law that one nation may assert extraterritorial jurisdiction over the conduct of its own nationals in the territory of a foreign nation without infringing upon the sovereignty of that state. *See, e.g.*, United States v. Yousef, 56, 91 n. 24 (2d Cir. 2003); United States v. Gatlin, 216 F.3d 207, 211 (2d Cir. 2000) (noting a lack of dispute that Congress has the authority to regulate the conduct of its nationals outside the territorial boundaries of the United States); *see also* Harvard Research On International Law, Jurisdiction With Respect to Crime, 29 Am. J. Int'l. L. 445, 519 (Supp. 1935)("The competence of the State to prosecute and punish its nationals on the sole basis of their nationality is universally conceded."). Neither of the diplomatic instruments upon which the defendant relies qualify that understanding in our relationship with the

nation of Afghanistan. The operative language of the diplomatic note prepared by the Embassy of the United States, in which the Ministry of Foreign Affairs of the Transitional Islamic Government of Afghanistan concurred, provides a follows:[3]

> The Government of Afghanistan recognizes the particular importance of disciplinary control by United States military authorities over United States personnel, and therefore Afghanistan authorizes the United States to exercise criminal jurisdiction over United States personnel. The Government of Afghanistan and the Government of the United States of America confirm that such personnel may not be surrendered to, or otherwise transferred to, the custody of an international tribunal or any other entity or state without the express consent of the United States.

Thus, the plain language of this provision obviates the possibility of a jurisdictional conflict with the nation of Afghanistan over U.S. nationals, such as the defendant by vesting "criminal jurisdiction over United States personnel" exclusively in the United States.[4]

---

[3] We have attached the pertinent diplomatic correspondence as an addendum to this Response.

[4] Although the defendant maintains (Memo. 14) that the term "United States personnel," as employed in this Note, should be construed to mean only U.S. military personnel and civilian employees of the Department of Defense, the antecedent phrase defining "United States personnel" broadly refers to "United States . . . military and civilian personnel, contractors and contractor personnel." Nothing in the subsequent portions of the Note purports to qualify that language. Moreover, even if the language quoted above granted *exclusive* criminal jurisdiction to U.S. authorities only in cases involving DOD personnel as the defendant suggests, such a grant would not be tantamount to depriving the United States its well recognized right under international law to exercise concurrent criminal jurisdiction over its own nationals in Afghanistan.

11

Likewise, although the Vienna Convention On Diplomatic Relations immunizes diplomatic agents of the sending state from arrest (art. 29), makes the premises of diplomatic missions inviolable from searches and seizures by authorities of the receiving state (art. 22), and prohibits the sending state from establishing offices and missions (subject to such protections) without the assent of the receiving state (art. 12), it says nothing about the right of the sending state to exercise criminal jurisdiction over its own nationals, who lack diplomatic immunity, concurrently with the authorities of the host nation in instances where an act of misconduct violates the law of both states. In short, neither of these agreements in any way qualifies the ability of the United States to assert criminal jurisdiction over one of its own nationals in Afghanistan or, in particular, over the defendant in this case.

Nor does the presumption of extraterritoriality assist the defendant in his effort to truncate the broad language of Section 7(9) so as to preclude his prosecution. Memo at 14. As the Court explained in United States v. Bowman, 260 U.S. 92, 98 (1922), in the criminal context, that doctrine is properly confined to "crimes against private individuals or their property, assaults, murder, burglary, larceny, robbery, arson, embezzlement, and frauds of all kinds which affect the peace and good order of the community . . . ". It does not extend to acts where it can be inferred from the

12

nature of the offense that Congress intended to legislate extraterritorially. *Id.* at 98-99. *See also* <u>EEOC v. Arabian Am. Oil Co</u>. 499 U.S. 244, 248 (1991) (presumption of extraterritoriality is a valid approach whereby unexpressed Congressional intent can be ascertained, "unless a contrary intent appears."). Here, in enacting Section 7(9), which is a *jurisdictional* statute, the manifest purpose of Congress was to assert extraterritorial jurisdiction over an additional class of United States facilities overseas by bringing another category of territory outside the geographic boundaries of the United States within the definition of the "special maritime and territorial jurisdiction."[5] Nothing about that effort invites the possibility of an "unintended clash between our laws and those of other nations which could result in international discord" as the defendant suggests. Memo 14. As explained, it is a well recognized

_____

[5] Section 7(9) therefore does not present the question at issue in <u>United States v. Gatlin</u>, 216 F.3d 207 (2d Cir. (2000) to which the court or appeals applied the presumption against extraterritoriality. *See* id. at 214-15. At issue in that case was whether 18 U.S.C. § 7(3), which brings within the special maritime and territorial jurisdiction of the United States "[a]ny lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof." As the <u>Gatlin</u> court recognized (and as we explain in greater detail, *infra*.) it was unclear from the text of that provision whether Congress intended it to encompass locations outside the United States. In view of such uncertainty, the presumption could readily be applied to resolve the issue against the government. In contrast, in enacting Section 7(9), it is beyond cavil that Congress intended that it apply to "missions or entities in foreign states."

principle of customary international law that two nations can possess concurrent prosecutive jurisdiction over a particular offense – one on the basis of the locus of the offense's occurrence; the other on the basis of the offender's nationality.

Finally, Congress's antecedent enactment of MEJA, Pub. L. 106-523, 114 Stat. 2488 *et seq.* (Nov. 22, 2000) (codified at 18 U.S.C. §§ 3261 -67), neither suggests that Congress intended to qualify the reach of Section 7(9) in any manner nor conflicts in any way with that statute. See Def. Memo at 15. As the defendant concedes, the two statutes reach two entirely different categories of extraterritorial offenders. Thus, whereas Section 7(9) was designed by Congress to reach federal offenses based upon their locus (and the identity of the defendant or the victim as a U.S. national), MEJA was enacted to eliminate the jurisdictional loophole created by <u>Reid v. Covert</u>, 354 U.S. 1 (1957), and its progeny which prohibited the assertion of court-martial jurisdiction over employees of the Department of Defense and other civilians accompanying the armed forces overseas. See H.R. Rep. No. 106-778 at 7 (2000). It therefore predicates extraterritorial criminal jurisdiction upon the *status* of the defendant as a Department of Defense employee or dependent overseas rather than upon the locus of the crime. As explained, persons subject to jurisdiction under MEJA are not also amenable to concurrent

jurisdiction under Section 7(9).[6]

3. The Legislative History Of Section 7(9) Is Not Inconsistent With Its Broad Application.

It is, of course, settled law that, "[i]n determining the scope of a statute, we look first to its language. If the statutory language is unambiguous, in the absence of clearly legislative history to the contrary, that language must ordinarily be regarded as conclusive. Russello, 464 U.S. at 20 (citations omitted). Thus, where, as here, "'[n]othing on the face of a statute suggests a congressional intent to limit its coverage, '" Dickerson v. New Banner Institute, Inc., 460 U.S. 103, 112 (1983), quoting Lewis v. United States, 445 U.S. 60 (1980), there is no need to resort to legislative history to divine its scope. See Caminetti v. United States, 242 U.S. 470, 485 (1917); see also Garcia v. United States, 469 U.S. 70, 75 (1984)(the courts "are not willing to narrow the

_____

[6] In this case, the defendant did not fall within either of the categories of civilians subject to jurisdiction under MEJA, as enacted at the time of the offenses of which he stands charged. Thus, he was not a civilian "employed by the Armed Forces of the United States" but, rather, was a contractor working on behalf of the CIA. 18 U.S.C. § 3267(1). Similarly, he did not fall within the jurisdictional trigger "accompanying the Armed Forces outside the United States" as that phrase then applied exclusively to dependants of: (1) members of the Armed Forces, (2) DOD civilian employees; or (3) contract employees. See 18 U.S.C. § 3267(2). We note, however, that as part of the Ronald W. Reagan National Defense Appropriations Act for FY 2005, Section 3267(1)(A), was recently amended to include within the definition of "employed by the Armed Forces outside the United States" a person who is "a civilian employee of any other Federal agency, or provisional authority to the extent such employment relates to supporting the mission of the Department of Defense overseas."

plain meaning of even a criminal statute on the basis of the gestalt judgment as to what Congress probably intended.").

But, even if this were a case in which resort to legislative history were appropriate to divine the Congressionally-intended reach of the jurisdictional provision at issue, "[n]othing in the legislative history of [Section 7(9)] militates against honoring [its] plain language . . . ." <u>Hallstrom v. Tillamook County</u>, 493 U.S. 20, 28 (1989). Here, as the defendant explains, the draft legislation that was to become Section 7(9) was submitted to Congress by the Administration and enacted as Title VIII, § 804 of Pub. L. 107-56, commonly known as the "USA Patriot Act of 2001." The explanation furnished by the Administration for the proposed amendment to Section 7, which is identical in all relevant respects to the amendment ultimately enacted,[7] provided as follows:

Section 356. Definition

> This amendment would explicitly extend the special and maritime criminal jurisdiction of the United States to U.S. diplomatic and counselor premises and related private residences overseas, to the extent to the extent an offense is committed by or against a U.S. national abroad on U.S. government property, the country in which the offense occurs may have little interest in prosecuting the case. Unless the United States is able to prosecute such offenders, these crimes may go unpunished. This section clarifies inconsistent caselaw to establish that the United States may prosecute

---

[7] See 147 Cong. Rec. H 7200 (daily ed, Oct. 23, 2001) (noting that the final version of the legislation was "the same as the Administration proposal except those actions involving military personnel are excluded per Representative Scott's amendment).

offenses committed in its missions abroad, by or against its nationals.

<u>Administration's Draft Antiterrorist Act of 2001</u>, Hearing Before the Committee on the Judiciary, House of Representatives, 107th Cong. 1st. Sess. at 63 (2001).[8]   The Report addressing the House version of the USA Patriot Act contains similar explanatory language:[9]

**Section 355. Jurisdiction over crimes committed at United States facilities abroad**

. . . In the year 2000, extraterritoriality regarding U.S. embassies and U.S. embassy housing overseas was the subject of differing interpretations by judicial circuits.

Diplomatic Security agents have operated under the legal precedent of <u>United States v. Erdos</u>, 474 F.2d 157 (4th Cir. 1973), which held that an Embassy was within the special maritime and territorial jurisdiction of the United States. This precedent is now being challenged. This section would make it clear that embassies and embassy housing of the United States in foreign states are included in the special maritime and territorial jurisdiction of the United States. This section does not apply to members of the Armed Forces because they would .already be subject to the special maritime and territorial jurisdiction under title 18 U.S.C. § 3261(a).

H.R. Rep. 107- 236(I) at 66  (2001).

The defendant maintains that the terms "embassies," "diplomatic and counselor premises," as they appear in these snippets of "legislative history," "affirms that Congress intended that the

---

[8] The pertinent portion of the House Hearing is contained in Attachment 1 of defendant's Memorandum of Law in support of his Motion to Dismiss.

[9] Excerpts of the House Report appear as Attachment 3 of defendant's Memorandum of Law.

amendment apply only to "permanent establishments of the United States government, such as embassies and military bases." Memo at 12. But, as the Supreme Court had repeatedly explained, "it is not the law that a statute can have no effects which are not explicitly mentioned in its legislative history, and the text of the present statute embraces criteria of more general application." Standifer v. United States, 447 U.S. 10, 20 n. 12 (1990)(rejecting "argument that would permit an omission in the legislative history to nullify the plain meaning of the statute" because "[i]t is not necessary for Congress in its committee reports to identify all of the 'weeds' which are being excised from the garden"); see, e.g., Eli Lilly & Co. v. Medtroinc, Inc., 496 U.S. 661, 668 n.2 (1990)(the fact that the legislative history mentions only drugs "is quite different . . . from saying (as it does not) that only drugs are included"). Indeed, "it would be a strange canon of statutory construction that would require Congress to state in committee reports or elsewhere in its deliberations that which is obvious on the face of the statute." Harrison v. PPG Industries, Inc., 446 US. 578, 592 (1980).

Here, the manifest purpose of references to diplomatic premises - embassies and embassy housing -  in the explanatory materials relating to Section 7(9) was simply to highlight the specific problem that prompted its submission by the Administration and its subsequent enactment by Congress - a conflict among the courts of

18

appeals as to whether such premises and residences fell within the "special maritime and territorial jurisdiction of the United States" as that phrase is explicated in 18 U.S.C. § 7(3). The explanatory statements upon which the defendant relies made no pretense of defining the full scope of that statute as reflected by its literal terms. Thus, although Section 7(9) plainly embraces "the premises of United States . . . military or other United States government missions or entities" as well as "residences in foreign States and the land appurtenant or ancillary thereto, irrespective of ownership . . . used by United States personnel assigned to those missions or entities," the statements contain nothing to elucidate precisely what was intended by the Administration and, ultimately, by Congress in including those locations; indeed, even though military premises are expressly included in the statutory language, the materials makes no reference to them at all. In short, the upshot of the defendant's inverted legislative analysis is that the explanatory notes, which do not purport to define the compass of the amendment, should be read to trump the broad language adopted by Congress. As explained, such a proposal is at odds with the most fundamental canons of statutory construction.

Finally, if the defendant is to be taken at his word that the legislative history of Section 7(9) demonstrates that it "was intended to codify those cases" which had previously extended the special maritime and territorial jurisdiction of the United States

to certain extraterritorial enclaves (Memo 12), such an
understanding would plainly contemplate that its breadth would
extend beyond embassies, established military bases and other
extraterritorial "permanent establishments of the United States
government." Id. Subsection (3) of the statute defining the
"Special maritime and territorial jurisdiction of the United States"
provides, in part, that it embraces "[a]ny lands reserved or
acquired for the use of the United States and under the exclusive
or concurrent jurisdiction thereof . . ." 18 U.S.C. § 7(3). As
the defendant (and the explanatory materials relating to Section
7(9)) explain, the courts of appeals were in disarray as to whether
Section 7(3) included certain premises overseas occupied by U.S.
diplomatic personnel at the sufferance of the host nation, or was
confined in its scope to such locations within the United States.
In United States v. Erdos, 474 F.2d 157 (4th Cir. 1973), the court
held that premises "leased by the United States from a private
citizen of the new Republic of Equatorial Guinea" and used as an
embassy fell within the ambit of phrase and that therefore it vested
a federal district court with jurisdiction over a murder committed
within such premises. Id. at 159-160. In United States v. Corey,
232 F.3d 1166 (9th Cir. 2000), a divided court reached a similar
conclusion concerning the scope of Section 7(3). The panel majority
held that the subsection vested a federal district court with
jurisdiction over sexual assaults committed by a civilian postmaster

employed by the U.S. Air Force against his step-daughter at two overseas locations: the first at Yokota Air Force Base in Japan; the second "at Lopez Court, a private apartment building rented by [the U.S.] embassy for the use of its employees." Id. at 1169. In the court's view, both locations "fall within the "special maritime and territorial jurisdiction of the United States" as defined by Section 7(3). Finally, in contrast to these holdings, in United States v. Gatlin, 216 F.2d at 223, the Second Circuit held that Section 7(3) does not apply extraterritorially and that, consequently, it could not constitute the basis for reaching the sexual abuse of a minor at the Lincoln Village housing complex, property leased from the German Government for the exclusive use of the U.S. military.

If – as the defendant suggests – Congress intended Section 7(9) to codify the favorable precedents, i.e.. Erdos and Corey, it surely did not intend to engraft upon its structure an implicit requirement of permanency. Thus, in Corey, the off-post residence in the Philippines leased from a private party by the U. S. embassy for the use of its employees, can in no wise be viewed as a "permanent establishment of the United States." Def. Memo at 12.[10] And, likewise, the premises that the United States leased from a

---

[10] We note that the defendant's explanation of the of the intercircuit conflict that precipitated the enactment of Section 7(9) (Memo at 6, 12), conveniently omits reference to the Corey decision which is at odds with his argument that, in enacting subsection (9), Congress intended to reach only premises under the dominion and control of the U.S. pursuant to a formal agreement with the host nation.

private party in Equatorial Guinea for use as an embassy would not likely have been viewed as property "under the dominion and control of the United States pursuant to a formal agreement with the host country" (id. at 15). Particularly because Congress, is presumed "to [be aware] of existing law when it passes legislation," South Dakota v. Yankton Sioux Tribe, 522 U.S. 329, 351 (1998), and in the absence of any indication to the contrary, there is every reason to believe that Congress not only intended such locations, e.g., leased housing for U.S. government employees abroad, to be embraced by Section 7(9) but also intended that it extend to similar premises of a less than permanent nature occupied by members of U.S. government missions or entities, including military missions in foreign states.

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss should be denied.

Respectfully submitted, on the _15th_ day of November, 2004.


FRANK W. WHITNEY
United States Attorney


BY: JAMES A. CANDELMO
Assistant United States Attorney
Criminal Division

LEXSEE 2002 UST LEXIS 100

U.S. Treaties on LEXIS

AFGHANISTAN

Agreement regarding the status of United States military and civilian personnel of the U.S. Department of Defense present in Afghanistan in connection with cooperative efforts in response to terrorism, humanitarian and civic assistance, military training and exercises, and other activities.

03-67

*2002 U.S.T. LEXIS 100*

September 26, 2002; December 12, 2002; May 28, 2003, Date-Signed

May 28, 2003, Date-In-Force

**STATUS:**
 [*1] Effected by exchange of notes September 26 and December 12, 2002 and May 28, 2003. Entered into force May 28, 2003.

[NO LONG-TITLE IN ORIGINAL]

**TEXT:**
*Embassy of the United States of America*

 *DIPLOMATIC NOTE*

No. 202

The Embassy of the United States of America presents it compliments to the Ministry of Foreign Affairs of the Islamic Transitional Government of Afghanistan, and has the honor to refer to discussions between representatives of our two governments regarding issues related to United States military and civilian personnel of the United States Department of Defense who may be present in Afghanistan in connection with cooperative efforts in response to terrorism, humanitarian and civic assistance, military training and exercises, and other activities.

The Embassy proposes, without prejudice to the conduct of ongoing military operations by the United States, that such personnel be accorded a status equivalent to that accorded to the administrative and technical staff of the Embassy of the United States of America under the Vienna Convention on Diplomatic Relations of April 18, 1961; that United States personnel be permitted to enter and exit Afghanistan with United States [*2] identification and with collective movement or individual travel orders; that Afghan authorities shall accept as valid, without a driving fee or test, driving licenses or permits issued by the appropriate United States authorities to United States personnel for the operation of vehicles; and that such personnel be authorized to wear uniforms while performing official duties and to carry weapons when their orders call for it.

The Embassy further proposes that vehicles and aircraft owned or operated by or for the United States armed forces shall not be subject to the payment of landing, navigation, over flight or parking charges or overland transit fees or tolls while in Afghanistan; however, the United States armed forces shall pay reasonable charges for services requested and received. Aircraft and vehicles of the United States shall be free of inspections.

The Government of the United States of America, its military and civilian personnel contractors and contractor personnel shall not be liable to pay any tax or similar charge assessed within Afghanistan.

The Government of the United States of America, its military and civilian personnel, contractors and contractor personnel may [*3] import into, export out of, and use in the Republic of Afghanistan any personal property, equipment, supplies, materials, technology, training or services required to implement this agreement. Such importation, exportation and use shall be exempt from any inspection, license, other restrictions, customs duties, taxes or any other charges assessed within Afghanistan. The governments of the United States of America and Afghanistan shall cooperate in taking such steps as shall be necessary to ensure the security of United States personnel and property in Afghanistan.

In the event that the government of the United States of America awards contracts for the acquisition of articles and services, including construction, such contracts shall be awarded in accordance with the laws and regulations of the Government of the United States of America. Acquisition of articles and services in the republic of Afghanistan by or on behalf of the Government of the United States of America in implementing this agreement shall not be subject to any taxes, customs duties or similar charges in Afghanistan.

The Government of Afghanistan recognizes the particular importance of disciplinary control by United [*4] States military authorities over United States personnel and, therefore, Afghanistan authorizes the United States Government to exercise criminal jurisdiction over United States personnel. The Government of Afghanistan and the Government of the United States of America confirm that such personnel may not be surrendered to, or otherwise transferred to, the custody of an international tribunal or any other entity or state without the express consent of the Government of the United States.

The Government of Afghanistan recognizes that it shall be necessary for United States personnel and systems to use the radio spectrum. The United States Government shall be allowed to operate its own telecommunication systems (as telecommunication is defined in the 1992 Constitution of the International Telecommunication Union). This shall include the right to utilize such means and services as required to assure full ability to operate telecommunication systems, and the right to use all necessary radio spectrum for this purpose. Use of radio spectrum shall be free of cost.

Finally, the Embassy proposes that, other than contractual claims, the parties waive any and all claims against each other for [*5] damage to, or loss or destruction of, property owned by each party, or death or injury to any military or civilian personnel of the armed forces of either party, arising out of activities in Afghanistan under this agreement. Claims by third parties arising out of the acts or omissions of any United States personnel may, at the discretion of the United States Government, be dealt with and settled by the United States Government in accordance with United States law.

If the foregoing is acceptable to the Government of Afghanistan, the Embassy proposes that this note, together with the Ministry's reply to that effect, shall constitute an agreement between the two governments which shall enter into force on the date of the Ministry's reply.

The Embassy of the United States of America avails itself of this opportunity to renew to the Ministry of Foreign Affairs of the Transitional Islamic Government of Afghanistan the assurances of its highest consideration.

Transitional Islamic State of Afghanistan
Ministry of Foreign Affairs

    [SEAL]

Fifth Political Department

    Document No. 791

    Date: December 12, 2002

    **Note**

The Ministry of Foreign Affairs of the Transitional Islamic Government of [*6] Afghanistan respectfully informs the Embassy of the United States of America:

Following the negotiations between the Honorable Minister of Foreign Affairs and the American side that took

place in Washington, the Ministry of Foreign Affairs declares its concurrence with the content of Note No. 202 dated, September 26, 2002, of the esteemed Embassy regarding the application of the provisions of the 1961 Vienna Convention to the civilian and military personnel of the United States of America.

The Ministry of Foreign Affairs avails itself of this opportunity to reiterate the assurances of its consideration.

[Stamp of the Ministry of Foreign Affairs]

To the Embassy of the United States of America in Kabul

Transitional Islamic State of Afghanistan
Ministry of Foreign Affairs

[SEAL]

America and Canada Political Affairs Division

Document No. 93

Date: May 28, 2003

To the Embassy of the United States of America in Kabul:

Pursuant to Note No. 791, dated December 12, 2002, regarding the conclusion of an agreement for application of the provisions of the 1961 Vienna Convention to the civilian and military personnel of the United States Department of Defense present in Afghanistan for the [*7] useful campaign against terrorism, humanitarian assistance, and other activities, the Ministry of Foreign Affairs declares its concurrence with the terms of Note No. 202, dated September 26, 2002, which reads as follows.

(The Embassy of the United States of America without prejudice to the ongoing military operations by the United States, proposes that such personnel be given the status equivalent to the one given to the administrative and technical staff of the United States Embassy under the Vienna Convention on Diplomatic Relations of April 18, 1961; that the personnel of the United States be permitted to enter and exit Afghanistan with United States identification and with collective movement or individual travel orders; that Afghan authorities shall accept as valid, without a driving fee or test, the licenses and permits issued by the appropriate authorities of the United States to the personnel of the United States for operating vehicles; and that while performing official duties, the personnel should be authorized to wear uniforms and carry weapons when needed.

The Embassy also proposes that vehicles and airplanes owned or operated by or for the United States armed forces shall [*8] not be subject to the payment of landing, navigation, over flight or parking charges or overland transit fees or tolls while in Afghanistan. However, the United States armed forces shall pay reasonable charges for service requested or received. US planes and vehicles of the United States shall be free of inspection.

The Government of the United States, its military and civilian personnel, contractors and contractor personnel shall not be liable for any kind of tax or other similar fees assessed within Afghanistan.

The Government of the United States, its military and civilian personnel, contractors and contractors personnel may import and export any personal property, equipment, supplies, materials, technology, training services that are required for the implementation of this agreement and use them in Afghanistan. Such importation, exportation and use should be exempt from any inspection, license, other limitations, tariffs or any other rental charges assessed in Afghanistan. If necessary, the Governments of the United States and Afghanistan shall cooperate for takings steps to ensure the security of the United States personnel and property in Afghanistan.

If at any time the Government [*9] of the United States of America awards contracts to acquire materials and services, including construction, they should be awarded in accordance with the law and regulations of the Government of the United States. The acquisition of material and services in Afghanistan by the Government of the United States of America or on its behalf in implementation of this agreement shall not be subject to any taxes, tariffs or similar charges in Afghanistan.

The government of Afghanistan recognizes the particular importance of disciplinary control by the United States military authorities over United States personnel and the Government of Afghanistan authorizes the United States of America to exercise its criminal jurisdiction over the personnel of the United States. The Government of Afghanistan and the Government of the United States confirms that without the explicit consent of the Government of the United States, such personnel may not be surrendered to, or otherwise transferred to the custody of an international tribunal or any other entity or State.

The Government of Afghanistan recognizes the right of use of the radio spectrum for the personnel and systems of the United States. The United [*10] States shall be allowed to operate its own telecommunication systems (as defined in the constitution of the International Telecommunication Union). This shall include the right to use such means and services as required, assuring full ability to operate telecommunication systems, and the right to use all necessary radio spectrum for this purpose. Use of the radio spectrum shall be free of cost.

Finally the Embassy proposes that, other than contractual claims, the parties waive any and all claims against each other for damage to or loss or destruction of property owned by either party, or death or injury to any military or civilian personnel of the armed forces of either party, as a result of activities in Afghanistan under this agreement. Claims by third parties that will arise as a result of the actions or omissions of United States personnel should, at the discretion of the United States Government, be dealt with and settled in accordance with United States law).

With reference to the content of the above Note of the esteemed Embassy, the Ministry of Foreign Affairs declares that this document shall enter into force upon signature.

Respectfully,

**SIGNATORIES:**
Embassy of the United States of America [*11]

Kabul, September 26, 2002

[Signature]

Doctor Abdullah

Minister of Foreign Affairs of the Transitional Islamic State of Afghanistan

## CERTIFICATE OF SERVICE

This is to certify that I have this _15th_ day of November,
2004, served a copy of the foregoing **GOVERNMENT'S OPPOSITION TO
DEFENDANT"S MOTION TO DISMISS FOR LACK OF JURISDICTION** upon the
defendant in this action by hand delivery of the same addressed as
follows:

      THOMAS MCNAMARA
      Federal Public Defender
      Raleigh, North Carolina


                              _____
                              JAMES A. CANDELMO
                              Assistant United States Attorney
                              Criminal Division