UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:04-CR-211-BO(1)


FILED
NOV 12 2004

| UNITED STATES OF AMERICA | MEMORANDUM IN SUPPORT OF |
| | MOTION TO COMPEL DISCOVERY |
| v. | |
| DAVID A. PASSARO | |

(u) DAVID A. PASSARO, defendant in the above-captioned case, hereby submits to this Honorable Court his Memorandum in Support of Motion to Compel Discovery.

## (u) STATEMENT OF CASE

(u) On June 17, 2004, a grand jury returned an unsealed indictment that identified Mr. Passaro as "a contractor working on behalf of the Central Intelligence Agency" and charged him with assaulting Abdul Wali, an Afghani suspected of launching rocket attacks on American and Afghani forces at a firebase near Asadabad, during Mr. Passaro's questioning of Wali on June 19 and 20, 2003. (Docket Entry ("DE") 1).

(u) On June 24, 2004, the government moved for a protective order, asserting that concerns for national security required implementation of the Classified Information Protective Act ("CIPA"). (DEs 18, 27). On August 2, 2004, the Court entered the protective order proposed by the government. (DE 29).

(u) The government has twice moved to amend the scheduling order, citing delays in completing the pre-requisites to classified discovery set forth in the protective order. (DEs 39, 42). The deadline

Redacted Copy

for filing pre-trial motions has been set for thirty (30) days after receipt of classified discovery, which remains incomplete. (DEs 40, 41).

(u) On October 5, 2004, Mr. Passaro entered a plea of not guilty. Trial of this matter is currently scheduled to begin December 13, 2004.

## (u) STATEMENT OF FACTS

(u) Taliban and al Qaeda guerillas launched frequent rocket and mortar attacks on the Asadabad firebase and on the patrols operating in the region. One of the suspected attackers, an Afghani named Abdul Wali, was taken into custody June 18, 2003 by paratroopers of the 82nd Airborne and held for questioning at the firebase. Mr. Passaro was among those tasked with interrogating the suspect and questioned him on June 19 and 20, 2003.

(u) Mr. Wali died of unknown causes on June 21, 2003. A few days later, the governor of Kunar Province, Fazel Akbar, announced in a radio interview that Wali likely died from heart complications, a problem which apparently ran in the Wali family. A year later, just days after Mr. Passaro was indicted, Governor Akbar's son and spokesperson, Hyder Akbar, characterized this statement as "speculation" based on the Wali family's reported history of health problems.

(u) In July 2003, Mr. Passaro completed his obligations with the CIA and returned to North Carolina. During this time, the Department of Defense, Department of Justice, FBI, and the CIA

conducted investigations into the circumstances surrounding Wali's death.

(u) On February 10, 2004, Michael P. Sullivan, an attorney from the Justice Department's Counterterrorism Section, sent Mr. Passaro a target letter stating that the government had formally initiated grand jury proceedings and considered him "a putative defendant" for the alleged felonious assault of an unnamed "detainee." (Attach. 1). Mr. Passaro immediately retained H. Gerald Beaver as his pre-indictment counsel. (Attach. 2).

(u) By letters dated May 7, 14, and 18, 2004, Mr. Beaver requested access to information necessary to defending Mr. Passaro. (Attach. 3). The requested information included: all governmental and military message traffic concerning Abdul Wali; identities of persons with relevant information; photographic, video, audio, and written documentation concerning Mr. Passaro or Wali; contents of any investigations; post-mortem examination reports and results; interrogation rules of engagement; and any governmental program giving advance approval to kill or capture terrorist targets. *Id.* The name of the addressee is redacted.

(u) Mr. Sullivan replied to these requests by letters dated May 18 and May 25, 2004. (Attach. 4). He stated: "Please be advised that the materials you requested . . . will not be made available unless and until there is an indictment returned in this matter against your client . . . ." *Id.* Mr. Sullivan further stated that though "producible" post-indictment, CIPA would control the discovery of any classified information. *Id.*

(u) On June 17, 2004, a grand jury returned an unsealed indictment that identified Mr. Passaro as "a contractor working on behalf of the Central Intelligence Agency." (DE-1). Shortly after Mr. Passaro's arrest, Attorney General Ashcroft conducted a nationally-televised press conference in which he announced the indictment and identified Mr. Passaro as a CIA operative.

(u) On June 18, 2004, Mr. Passaro filed his request for discovery, as provided by Fed. R. Crim

P. 16, and by *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny. (DE 7).

(u) On June 24, 2004, the day before the detention hearing, the government filed a motion for a CIPA protective order. In its supporting memorandum, the government asserted that the alleged assault occured within "a theater of war," and that "the litigative process involved in this prosecution is likely to confront the Court with a variety of issues related to the handling of classified information bearing on national security." (DE 18, 4-5). The motion further represented that information responsive to the government's discovery obligations would "be classified as 'confidential,' 'Secret,' 'Top Secret,' or 'Sensitive Compartmented Information.'" *Id.*

(u) In its proposed protective order, the government defined "classified national security information" to include not only classified information but also "any information or document . . . that refers or relates to national security or intelligence matters." *Id.*, para. 9. It also mandated that "all defense counsel" receive security clearances as a pre-requisite to having access to information covered by Paragraph 9 and prohibited Defendant and his counsel from discussing "any classified national security information . . . in the presence of any person who does not have a clearance . . . ." *Id.*, paras. 1, 6, 16.

(u) Paragraph 14 required that all "classified national security information . . . shall only be kept, discussed, or reviewed, in a "sensitive compartmented information facility" ("SCIF"). *Id.*

(u) Mr. Passaro objected to the government's expansive definition of "classified national security information." (DE-24). On August 2, 2004, the Court entered the protective order proposed by the government. (DE 29). The order removed some of the overbroad language from the government's first proposed definition, but maintained that "any information or document . . . that refers or relates to national security or intelligence matters" was "classified national security information." *Id.*, para. 9(g).

(u) The Court also entered a scheduling order directing the government to: 1) provide defense counsel with non-classified discovery by August 10, 2004; (2) complete the defense team's security clearances by August 15, 2004; (3) provide classified discovery materials to the defense by September 30, 2004; and (4) complete the construction of two SCIFs, one for the defense and one for the government, by September 30, 2004. (DE 30).

(u) The defense team timely submitted their security clearance applications to the Department of Justice on July 26, 2004, and August 5, 2004. Over the next two months, the Government twice moved to extend the scheduling order, both times citing "complexity of the case" and relying upon the failure to complete the SCIF and finalize the security clearances. (DEs 39, 41).

(u) On August 23, 2004, this Court granted Mr. Passaro's motion to revoke detention. (DE 36). At Mr. Passaro's bond hearing on August 27, 2004, the government requested as a condition of release that Mr. Passaro not contact the government's witnesses. (Attach. 6). The government also told the Court it would supply Mr. Passaro with the witness list within a week of the August 27, 2004 bond hearing. *Id.*

(u) Between the time of Mr. Passaro's release and his arraignment on October 5, 2004, the

5

government sent two packets of unclassified discovery, primarily consisting of Mr. Passaro's own statements. At arraignment, counsel explained, "the latest package came to us with so much redaction in it, it's hard to understand what they are talking about, and we have been told that the bulk of the evidence is Top Secret, and we cannot get that until we receive this security clearance. Now, our client will talk to us, but he is scared to reveal any secrets knowing that we are not cleared, so we are in a predicament." (Attach. 7). At one point, the district court inquired whether the delays should qualify as excludable time under the Speedy Trial Act. *Id.*

(U) Counsel for the government asserted that the delays were beyond its control, "because of the complexity of the case and the fact that they require security clearance to talk with their client." *Id.* at 13. The government later asserted that even absent the CIPA requirements, Mr. Passaro risked further criminal charges if he disclosed classified information to his attorneys before they received security clearances. *Id.*, 16.

(U) On October 13, 2004, the Court held a show cause hearing to determine the status of the pending security clearances. At this hearing, government changed its position on the nature of its case when counsel stated: "Your Honor, the Government believes this is a simple assault case. We believe we can try this case without any classified information utilized." (Attach. 8). The government then appeared to change its position again when counsel stated that discovery in the case, "is classified, at minimum, at the top secret level that we need to provide to defense. . . . We cannot do that until they have received their security clearances." *Id.*

(U) At this same hearing, the CIPA Court Security Officer ("CSO") informed the Court that he would issue interim top secret clearances to those members of Mr. Passaro's defense team who had not yet received final clearances. *Id.* The CSO also stated that classified discovery did not need to await the completion of the SCIF, as provided in the protective order, since CIPA authorized the

storage of top secret discovery in a CIPA-compliant safe. *Id.*

(u) Following the hearing, the undersigned asked counsel for the government whether the government would require Mr. Passaro to request classified discovery by letter. Counsel for the government informed the undersigned that the time for sending letters had passed, and that future discovery requests should be made by motion.

(u) Counsel for the government subsequently informed the undersigned in an October 27, 2004 phone conversation that the government did in fact have some classified discovery. This discovery has not yet been identified or provided by the government.

## (u) ARGUMENT

(u) Mr. Passaro maintains that the government has in its possession the documents requested in this motion and that these documents contain exculpatory evidence or could lead to the discovery of other exculpatory evidence. Since CIPA does not alter the government's discovery obligations, this Court should order the immediate disclosure of material discoverable under Rule 16 and *Brady v. Maryland*, and its progeny. Furthermore, the interests of due process and judicial economy favor the early release of its witness list and *Jencks* Act material.

### (u) A. The Government's Expansive Application of CIPA has Inhibited Mr. Passaro's Defense.

(u) The procedures sought by the government exceeded those required by CIPA in three ways. First, CIPA does not require defense counsel to obtain security clearances; it only requires that counsel be found "trustworthy." Paragraph five of CIPA Section 9 pertains to "Persons Acting for the Defendant" and states, "The government may obtain information by any lawful means concerning the trustworthiness of person associated with the defense and may bring such information to the attention of the court for the court's consideration in framing an appropriate protective order." This contrasts with the requirement in Paragraph four that court personnel obtain

security clearances.

(u) Second, CIPA does not require the construction of a SCIF to store top secret documents. Paragraph seven pertains to the "Custody and Storage of Classified Materials" and directs,

> When not in use, the court security officer shall store all classified materials in a safe or safe-type steel file container with built-in, dial-type, three position, changeable combinations which conform to the General Services Administration standards for security containers. Classified information shall be segregated from other information unrelated to the case at hand by securing it in a separate security container.

18 U.S.C., App. 3, § 9(7). Third, the government insisted on a definition of "classified national security information" that included not only classified information but also "any information or document ... that refers or relates to national security or intelligence matters." This is inconsistent with the definition of "classified national security information" set forth in Section 1.1 of Executive Order 12958, which the government attached to its motion for protective order. 1995 WL 231453 (defining phrase as "information that has been determined pursuant to this order or any predecessor order to require protection against unauthorized disclosure *and* is marked to indicate its classified status when in documentary form").

(u) Combined with the security clearance and the SCIF requirements, this excessively broad definition precluded counsel from having access to discovery and from discussing the case with Mr. Passaro for five months, during which time the government pursued its prosecution unimpeded.

(u) Moreover, the government's continual threats to charge Mr. Passaro with criminal disclosure of classified information severely limited his communications with counsel, which in turn impeded his Sixth Amendment right to counsel. These threats, like the government's protective order, were the product of over-reaching. As noted above, CIPA itself contemplates that defense counsel found "trustworthy" will have access to classified discovery. Here, the government's over-reaching is also

inconsistent with the fact that the government itself released classified information to the public by identifying a CIA operative by his real name in the indictment and in a nationally-televised press conference.

(u) Finally, after insisting on an unnecessarily expansive protective order which has impeded Mr. Passaro from preparing his defense, the government now asserts that it can prosecute what it calls a "simple assault case" without any classified information. However, this latest position contradicts Mr. Sullivan's pre-indictment representations to Mr. Passaro that classified information relevant to Mr. Passaro's defense would be available post-indictment. Presumably, the government's current position is that it believes it can secure a conviction with unclassified information, so long as Mr. Passaro does not present a defense.

(u) **B. CIPA Does Not Alter the Government's Discovery Obligations.**

(u) As the Fourth Circuit has noted, CIPA does not "change the existing standards for determining relevance and admissibility." *United States v. Smith*, 780 F.2d 1102, 1106 (4th Cir. 1985) (en banc); *United States v. Fernandez*, 913 F.2d 148, 158 (4th Cir. 1990) (concluding, "*Smith* requires the admission of classified information that is 'helpful to the defense of an accused, or is essential to a fair determination of a cause'"). Recognizing the importance of preserving the due process rights of an accused, the Fourth Circuit has further cautioned that "[a]lthough CIPA contemplates that the use of classified information be streamlined, courts must not be remiss in protecting a defendant's right to a full and meaningful presentation of his claim to innocence." *Id.*

(u) Since CIPA does not alter the standards of relevance and admissibility, under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny, the government must immediately "produce or disclose any evidence which tends to establish the defendant's innocence, to mitigate punishment, or to impeach, discredit or contradict the testimony of any witness whom the government

9

anticipates calling at trial." *United States v. King*, 121 F.R.D. 277, 279-80 (E.D.N.C. 1988).

(u) Mr. Passaro recognizes that the some requested discovery may contain information classified in the interest of national security *and* which may not be relevant and material to this case.[1] He has no desire that such information be released improperly. If the government contends that national security concerns require the redaction of classified material from discoverable documents, the government should immediately provide that classified information to the Court for in camera inspection, with a statement of reasons why it should not be provided to Defendant, in accordance with section 4 of CIPA. If the Court concludes that some discoverable material should be redacted, it would then determine the appropriate substitute for the redacted evidence.

(u) **C. The Interests of Due Process and Judicial Expediency Favor Early Production of Witness List and *Jencks* Material.**

(u) The interests of due process and judicial efficiency favor early disclosure of the government's witness list[2] and all evidence subject to disclosure under the *Jencks* Act.

(u) As noted above, the government's overbroad definition of classified information and insistence on two pre-requisites to classified discovery not even required by CIPA prevented Mr. Passaro from preparing his defense during the five months since being indicted. During this same time, the government has prepared for prosecution unimpeded.

(u) Moreover, Mr. Passaro specifically requested most of the information listed in this motion in May 2004. At that time, the government acknowledged that the material was relevant to Mr.

---

(u) [1] Some of the requested material is relevant to the public authority defense, for which Mr. Passaro will provide notice this week, in accordance with Fed. R. Crim. P. 12.3.

(u) [2] By separate motion, Mr. Passaro has moved for production of the witness list on the alternative ground that the government requested a "no-contact" provision as a condition of release and indicated that it would produce the list within a week of the August 27, 2004 bond hearing.

Passaro's defense and indicated it would be produced post-indictment. Yet, now the government represents to this Court that it can try this "simple" assault case with unclassified information, and represents to counsel for Mr. Passaro that it will not produce classified discovery absent a court order. As the Fourth Circuit noted in another case, "the government is simultaneously prosecuting the defendant and attempting to restrict his ability to use information that he feels is necessary to defend himself against prosecution." *Fernandez*, 913 F.2d at 154.

(u) To correct this unfair imbalance created by the government's over-reaching, early production of the government's witness list and all *Jencks* material is necessary to provide Mr. Passaro with "'a meaningful opportunity to present a complete defense.'" *Id.* (citation omitted).

(u) In addition to protecting Mr. Passaro's due process rights, early production will serve the interest of judicial economy. CIPA aims to resolve all disputes regarding the government's disclosure of classified material to a defendant and the use of such material at trial before trial begins. CIPA also permits the government to take an interlocutory appeal of adverse decisions. Early production will facilitate the timely identification and resolution of CIPA disputes and avoid trial interruptions.

(u) If the government objects to the production of all *Jencks* material, it should at least be ordered to produce any *Brady* material contained therein. *See United States v. Starusko*, 729 F.2d 256, 263-64 (1st Cir. 1984) (concluding that even though statements "could be classified properly as *Jencks* Act material, that does not mean that it would be exempted from a pretrial disclosure order based on *Brady*"). Finally, Mr. Passaro also contends that the proceeding contemplated by Section 4 of CIPA is sufficiently similar to a suppression hearing such that Rule 26.2(g) would require the disclosure of statements of persons who testify at that proceeding.

## CONCLUSION

(u) Based on the foregoing, Mr. Passaro respectfully seeks an order directing the immediate disclosure of the information requested in the Motion to Compel and providing any further relief the Court finds proper and reasonable.

(u) Respectfully requested this ___ day of November, 2004.

_____
(u) THOMAS P. McNAMARA
Federal Public Defender
N.C. State Bar No. 5099

## (u) CERTIFICATE OF SERVICE

(u) I HEREBY CERTIFY that a copy of the foregoing was served upon:

(u) JAMES A. CANDELMO
Assistant United States Attorney
Suite 800, Federal Building
310 New Bern Avenue
Raleigh, NC 27601-1461

by hand delivering a copy of same

This the ___ day of November, 2004.

_____
(u) THOMAS P. McNAMARA
Federal Public Defender
N.C. State Bar No. 5099

12



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:04-211-BO(1)

| UNITED STATES OF AMERICA | NOTICE OF INTENT TO ASSERT PUBLIC AUTHORITY DEFENSE |
|---|---|
| v. | Fed. R. Crim. P. 12.3 |
| DAVID A. PASSARO | (Under Seal) |

DAVID A. PASSARO, by and through undersigned counsel, hereby provides notice of his intent to assert the public authority defense. In accordance with Rule 12.3(a)(1), Mr. Passaro files this notice under seal.

Mr. Passaro asserts that he acted under the authority of the Central Intelligence Agency (CIA) and President George W. Bush, acting in his capacity as Commander-in-Chief. Fed. R. Crim. P. 12.3(a)(2). Mr. Passaro's with the CIA lasted from December 2002 until September 2003. *Id.* From May of 2003 until July of 2003, Mr. Passaro served with Special Operations Forces out of the Asadabad firebase, in Kunar Province, Afghanistan, where he acted on behalf of: the CIA at the Asadabad firebase; the subsequent CIA at the Asadabad firebase; CIA advisor to the at Asadabad; the CIA the CIA representative with whom Mr. Passaro contracted; the head of the CIA component with which Mr. Passaro contracted (presumably, either the Counterterrorist Center or the Office of Military Affairs); the CIA Director of Operations during the relevant time; George J. Tenet, Director of the CIA during the relevant

1

time period; and President George W. Bush, acting in his capacity as Commander-in-Chief. *Id.*

Respectfully submitted this 12th day of November, 2004.

*Thomas P. McNamara*
THOMAS P. McNAMARA
Federal Public Defender
N.C. State Bar No. 5099

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served upon:

JAMES A. CANDELMO
Assistant United States Attorney
Suite 800, Federal Building
310 New Bern Avenue
Raleigh, NC 27601-1461

by hand delivering a copy of same

This the 12th day of November, 2004.

*Thomas P. McNamara*
THOMAS P. McNAMARA
Federal Public Defender
N.C. State Bar No. 5099

2