

FILED WITH
COURT SECURITY OFFICER
12/7/04
DATE 1:32 pm

# UNCLASSIFIED



FILED

DEC 0 7 2004

CLERK
US DISTRICT COURT, EDNC
BY _____ DEP. CLK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:04-CR-211-BO(1)

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DAVID A. PASSARO | MEMORANDUM IN SUPPORT OF MOTION TO DISMISS INDICTMENT AS UNCONSTITUTIONAL INFRINGEMENT OF THE COMMANDER-IN-CHIEF'S WAR-MAKING DUTIES AND POWERS, AND CONTRARY TO THE CONGRESSIONAL JOINT RESOLUTION AUTHORIZING PREEMPTIVE USE OF "NECESSARY AND APPROPRIATE FORCE" |

DAVID A. PASSARO, defendant in the above-captioned case, by and through counsel, hereby submits to this Honorable Court his memorandum in support of his motion to dismiss the indictment.

## STATEMENT OF CASE

On June 17, 2004, a grand jury returned an unsealed indictment that identified Mr. Passaro as "a contractor working on behalf of the Central Intelligence Agency" and charged him with assaulting an Afghani suspected of launching rocket attacks on American and Afghani forces, during Mr. Passaro's questioning of the terrorist suspect on June 19 and 20, 2003.

The deadline for filing pre-trial motions has been set for thirty (30) days after receipt of classified discovery, which remains incomplete. Trial is currently scheduled to begin March 1, 2005.



# STATEMENT OF FACTS

## A. Terrorist Attacks and America's Response

On September 11, 2001, members of the al Qaeda terrorist organization highjacked four

passenger aircraft and used them as flying bombs, crashing two into the World Trade Center towers

and one into the Pentagon. The fourth aircraft, which had apparently targeted the United States

Capitol, crashed in rural Pennsylvania after passengers conducted a heroic assault on the cockpit.

The terrorists murdered over 3,000 men, women, and children.

Addressing the nation that evening, President Bush vowed: "The search is underway for

those who are behind these evil acts. I've directed the full resources of our intelligence and law

enforcement communities to find those responsible and bring them to justice. We will make no

distinction between the terrorists who committed these acts and those who harbor them." Attach. 1,

1. On September 12, 2004, the President declared:

> The deliberate and deadly attacks which were carried out yesterday against our
> country were more than acts of terror. They were acts of war. . . . The American
> people need to know that we're facing a different enemy than we have ever faced.
> This enemy hides in shadows, and has no regard for human life. This is an enemy
> who preys on innocent and unsuspecting people, then runs for cover. But it won't be
> able to run for cover forever. . . . The United States of America will use all our
> resources to conquer this enemy.

*Id.*, 3.

On September 18, 2001, Congress passed Senate Joint Resolution 23, which authorized "the

use of United States Armed Forces against those responsible for the recent attacks launched against

the United States." Pub. L. No. 107-40, 115 Stat. 224 (2001). Attach. 2. Joint Resolution 23

described the attacks as "acts of treacherous acts of violence" that continued to pose "an unusual

and extraordinary threat to the national security and foreign policy of the United States." *Id.* It

recognized the President's "authority under the Constitution to take action to deter and prevent acts

of international terrorism against the United States," and authorized the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks . . ., or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations, or persons." *Id.*

In signing the resolution, President Bush declared: "Senate Joint Resolution 23 recognizes the seriousness of the terrorist threat to our Nation and the authority of the President under the Constitution to take action to deter and prevent acts of terrorism against the United States." Attach. 1, 4.

On October 7, 2001, President Bush launched a military campaign against terrorist forces in Afghanistan, where al Qaeda and its leader Osama bin Laden operated with the tacit support of the Taliban, Afghanistan's extremist Islamic regime. The attack began with air strikes against the al-Qaeda terrorist training camps and against the Taliban's infrastructure and military installations throughout the country. Insertion of Special Operations forces and CIA operatives followed the air strikes. These forces assisted local militias in the effort to topple the Taliban regime and hunt for al Qaeda terrorists.

Looking beyond the initial attacks, the President noted: "Initially, the terrorists may burrow deeper into caves and other entrenched hiding places. Our military action is also designed to clear the way for sustained, comprehensive and relentless operations to drive them out and bring them to justice." *Id.*, 5. Citing his Constitutional authority as Commander-in-Chief, on December 14, 2001, President Bush declared Afghanistan an active combat zone, effective September 19, 2001. *Id.*, 7.

In a further response to the terrorist attacks, on October 24, 2001, Congress adopted the USA PATRIOT Act of 2001, Pub. L. 107-56, 115 Stat. 272. Based on proposed legislation submitted to

Congress by the Administration via Attorney General John Ashcroft, the Patriot Act expanded

federal intelligence-gathering and law enforcement authority, created new domestic and

international terrorism crimes, and increased regulatory powers to combat terrorist-support

networks. Upon signing the Patriot Act, President Bush commented on its purpose:

> With my signature, this law will give intelligence and law enforcement officials important new tools to fight a present danger. . . . **These terrorists must be pursued, they must be defeated, and they must be brought to justice. And that is the purpose of this legislation.** Since the 11th of September, the men and women of our intelligence and law enforcement agencies have been relentless in their response to new and sudden challenges. . . . The bill before me takes account of the new realities and dangers posed by modern terrorists. It will help law enforcement to identify, to dismantle, to disrupt, and to punish terrorists before they strike.

Attach. 1, 8-9 (emphasis added).

By the end of 2001, the Taliban regime had fallen and Hamid Karzai had been chosen as

leader of a transitional government, yet Taliban supporters and Al-Qaeda members maintained

strongholds in eastern Afghanistan along the Afghan-Pakistani border. Forces from the Special

Operations Command and CIA agents and paramilitaries operated from tactical firebases within

striking distance of the Taliban and al Qaeda strongholds. These forces and paramilitaries took

hundreds of al Qaeda and Taliban forces into custody.

## B. Justice Department's Legal Opinions and President Bush's Determination Regarding Inapplicability of Geneva Convention to Taliban and al Qaeda Detainees

As chronicled by White House Counsel, Judge Alberto Gonzalez, in January of 2002, the

Department of Justice, through its Office of Legal Counsel, issued a formal legal opinion which

concluded that al Qaeda and Taliban detainees did not qualify for protection under the Geneva

Convention on the Treatment of Prisoners of War ("GPW"), 6 U.S.T. 2216. Attach. 3.[1] On January

---

[1] The legal opinions issued by the Justice Department, the President's February 7, 2002 memorandum, and other related documents, were released by the White House at a June 22, 2004

18, 2002, Judge Gonzalez advised the President of the Justice Department's conclusion and the President subsequently determined that al Qaeda and Taliban detainees did not have Geneva protection as prisoners of war. *Id.*, 1. Secretary of State Colin Powell requested that the President reverse this decision. *Id.* Judge Gonzalez counseled against reversal, and stated:

> [The Office of Legal Counsel's] interpretation of this legal issue is definitive. The Attorney General is charged by statute with interpreting the law for the Executive Branch. This interpretive authority extends to both domestic and international law. He has in turn, delegated this role to the [Office of Legal Counsel].

*Id.*

Citing his authority as Commander in Chief, on February 7, 2002, President Bush determined that "none of the provisions of Geneva apply to our conflict with al Qaeda in Afghanistan or elsewhere throughout the world . . .." Attach. 4, 1. He also determined that the Taliban detainees were unlawful combatants and therefore did not qualify for Geneva protection as prisoners of war. *Id.,* 2. President Bush accepted the Justice Department's conclusion that he possessed Constitutional authority "to suspend Geneva as between United States and Afghanistan," however, he expressly declined to exercise such authority at that time. *Id.,* 1-2.

Though the President concluded that Taliban and al Qaeda detainees were not "legally entitled" to humane treatment, he declared that "[a]s a matter of policy, the United States Armed Forces shall continue to treat detainees humanely and, to the extent appropriate and consistent with military necessity, in a manner consistent with the principles of Geneva." *Id.* The President's memorandum did not clarify whether this policy directed to the "Armed Forces" contemplated

---

press conference conducted by Judge Gonzalez. These documents are available through the Syracuse Law School's web page, <http://www.law.syr.edu/academics/centers/insct>. To conserve space, only those portions of released documents quoted in Mr. Passaro's brief are included as attachments.

interrogations conducted by the CIA.

On August 1, 2002, in response to an inquiry made by Judge Gonzalez, the Office of Legal Counsel issued a legal opinion regarding the application of the anti-torture statutes of 18 U.S.C. § 2340, 2340A to "conduct of interrogations outside of the United States." Attach. 5, 1. Authored by then- Assistant Attorney General Jay Bybee, head of the Office of Legal Counsel,[2] the opinion concluded "that torture as defined in and proscribed by Sections 2340-2340A, covers only extreme acts" intended to cause "[s]evere pain . . . of the kind difficult for the victim to endure." *Id.*, 46. Judge Bybee also concluded that "under the circumstances of the current war against al Qaeda and its allies, application of Section 2340A to interrogations undertaken pursuant to the President's Commander-in-Chief powers may be unconstitutional." *Id.*

## C. Taliban and al Qaeda Attacks on the Asadabad Firebase

President Bush updated military leaders on the war on terror in the Summer of 2003, at which time he affirmed America's resolve to eradicate the remaining terrorist forces operating out of Afghanistan:

> Many terrorists sought sanctuary along the Afghanistan-Pakistan border, and some are still hiding there. These al Qaeda and Taliban holdouts have attacked allied bases with unguided rockets, conducted ambushes, and fired upon border posts. In close cooperation with the Afghan and Pakistani governments, America is engaged in operations to find and destroy these terrorists.

Attach 1, 11. Discussing the war on terror in Iraq, President Bush vowed: "As Commander-in-Chief, I assure [the American forces], we will stay on the offensive against the enemy. And all who attack our troops will be met with direct and decisive force." *Id.*, 12.

As noted previously, Special Operations forces and CIA paramilitaries operated from tactical

---

[2] Judge Bybee now sits on the Ninth Circuit Court of Appeals.

firebases located within striking distance of the Taliban and al Qaeda strongholds referenced by President Bush. One such firebase was located five miles from the Pakistani border near Asadabad, the capital of Kunar Province. Attach. 6, 1.

Mr. Passaro arrived at the Asadabad firebase in May 2003, to serve with the paramilitary teams that captured and questioned members of al Qaeda and the Taliban ("capture teams"). At that time, approximately 100 people operated out of the compound. *Id.*, 2. Special Ops forces and CIA operatives, along with approximately 30 members of the Afghani Army, formed the capture teams. A platoon of paratroopers from the Army's 82nd Airborne Division provided security. *Id.*

Soldiers from the 82nd Airborne described this region as a popular crossing point for Taliban and al-Qaeda guerillas from Pakistan into Afghanistan. *Id.* Due to the "constant threat of rocket attacks," from these terrorists, the soldiers slept "in their boots to be ready to run for the bunkers at a second's notice." *Id.*, 2-3.

Taliban and al-Qaeda forces launched frequent rocket and mortar attacks on the Asadabad firebase and frequently ambushed patrols operating in the region. *Id.* In June of 2003, the US Army reported that terrorists rocketed the firebase on June 5, 7, 14, 15, 17, and 18. *Id.*, 4-15. The June 5th attacks involved white phosphorus rounds, which easily could have incinerated the tents in which the 82nd troops slept, and a rocket attack that struck close to a nearby girl's school. *Id.*, 3, 9.

The terrorists also planted improvised explosive devices in the roads patrolled by American and Afghani forces. On June 17, 2003, a Special Forces patrol was ambushed near the Asadabad firebase after one of these land mines disabled their vehicle. *Id.*

The next day, one of the suspected rocket attackers, an Afghani named Abdul Wali, was taken into custody by paratroopers of the 82nd Airborne and held for questioning at the firebase. Mr. Passaro was among those tasked with interrogating the suspect and questioned him on June 19 and

20, 2003.

Mr. Wali died of unknown causes on June 21, 2003. A few days later, the governor of Kunar Province, Fazel Akbar, announced in a radio interview that Wali likely died from heart complications, a problem which apparently ran in the Wali family. Attach. 7.

After a brief lull following the capture of Wali, toward the end of July 2003, terrorist forces renewed their attacks on the Asadabad firebase. On July 19, an improvised explosive device wounded three soldiers on patrol near the firebase. Attach. 6, 11-12. On July 23, terrorists again rocketed the firebase. *Id.* Coalition forces returned fire with mortars and called in close air support. In response, a B-52 dropped a cluster bomb and a Harrier jet dropped a one-thousand pound laser-guided bomb on the suspected attackers. *Id.*

### D. June 17, 2004 Arrest, Indictment, and Press Conferences

In July 2003, Mr. Passaro completed his obligations with the CIA and returned to North Carolina, where he worked as a civilian employee with the Special Operations Command at Fort Bragg.

During the Spring of 2004, the release of pictures from the military's Abu Ghraib detention center in Iraq created intense media scrutiny of the treatment of detainees in Iraq, Guantanamo Bay, and Afghanistan. On June 9, 2004, the Washington Post obtained a copy of the August 1, 2002 legal opinion on the standards and applicability of the anti-torture statute, authored by Judge Bybee, then head of the Justice Department's Office of Legal Counsel, and directed to Judge Gonzalez. Attach. 8.

Eight days later, on June 17, 2004, a grand jury returned an unsealed indictment that identified Mr. Passaro as "a contractor working on behalf of the Central Intelligence Agency." That same day, shortly after Mr. Passaro's arrest, Attorney General Ashcroft conducted a nationally-

televised press conference in which he announced the indictment and identified Mr. Passaro as a CIA operative. (Attach. 9).

That same afternoon, Secretary of Defense Rumsfeld also conducted a press conference. Attach. 10. In response to questions about the practice of not reporting the existence and identity of certain detainees to the Red Cross, Secretary Rumsfeld responded that withholding the existence of the detainee was done at the request of CIA Director George Tenet. Secretary Rumsfeld stated, "We know from our knowledge that he [had] the authority to do this." *Id.*, 4.

### D. Judge Gonzalez' June 22, 2004 Press Conference

On June 22, 2004, White House Counsel Judge Alberto Gonzalez conducted a press conference to address the Defense Department's interrogation practices. Attach. 11. In addition, Judge Gonzalez released a series of White House, Department of Defense and Department of Justice documents related to the detention and interrogation of detainees. *Id.* Certain classified documents released by Judge Gonzalez – including the President's February 7, 2002 Memorandum and Defense Department memoranda on interrogation techniques – were de-classified between June 17 and 21, 2004. Attach. 4, 12.

Judge Gonzalez began by emphasizing that "the President has not authorized, ordered, or directed in any way any activity that would transgress the standards of the torture conventions or the torture statute, or other applicable laws." *Id.*, 2. Judge Gonzalez stated that as defined by Congress and applied by the Administration, torture meant the "specific intent to inflict severe physical or mental harm or suffering," the same definition given by Judge Bybee in his August 1, 2002 Memorandum to Judge Gonzalez. *Id.*, 7; Attach. 5, 46.

At the beginning of the press conference, Judge Gonzalez clarified: "[T]his briefing does not include CIA activities. I will say that all interrogation techniques authorized for use by the Agency

9

and against the Taliban and al Qaeda and in Iraq are lawful and do not constitute torture." *Id.*, 3.

When questioned later whether the CIA had authorization to employ interrogation methods other than those approved for DOD personnel, Judge Gonzalez again emphasized:

> I'm not going to get into discussions about the CIA, except to repeat what I just said, and that is that the techniques that they used that have been approved – they've been approved and vetted by the Department of Justice, are lawful and do not constitute torture.

*Id.*, 17.

### E. Burial of Capt. Daniel Eggers, June 22, 2004

On June 22, 2004, Capt. Daniel Eggers, who had served in 2003 with Mr. Passaro and the Special Forces unit at the Asadabad firebase, was buried at Arlington National Cemetery. Attach. 13. Capt. Eggers was killed by a land mine on May 29, 2004 while serving his second tour of duty in Afghanistan. *Id.*

<u>ARGUMENT</u>

### A. Application of 18 U.S.C. § 113 to the Battlefield Interrogation of a Terrorist Suspect Linked to Rocket Attacks on Troops and Civilians Unconstitutionally Infringes Upon the Commander-in-Chief's Exclusive War-Making Duties and Powers.

The Constitution vests this country's war-making powers in one person, the President. "The President shall be Commander in Chief of the Army and Navy of the United States." U.S. Const. art. II, § 2; *see Hamilton v. Dillin*, 88 U.S. (21 Wall.) 73, 87 (1874) ("[T]he President alone [] is constitutionally invested with the entire charge of hostile operations"). Article 2 also entrusts plenary control of American foreign policy in the President's hands. As the Supreme Court emphasized, "The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319 (1936). In light of this clear constitutional mandate, "unless Congress specifically has provided

otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Navy v. Egan*, 484 U.S. 518, 530 (1988).

The Supreme Court has also concluded that Article 2's "grant of war power includes all that is necessary and proper for carrying these powers into execution." *Johnson v. Eisentrager*, 339 U.S. 763, 788 (1950). These constitutional powers are at their zenith during time of war. *See The Prize Cases*, 67 U.S. (2 Black) 635, 670 (1862) (concluding President Lincoln was "justified in treating the southern States as belligerents and instituting a blockade," for it is the Commander-in-Chief who "must determine what degree of force the crisis demands"); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) (acknowledging "broad powers in military commanders engaged in day-to-day fighting in a theater of war").

The capture and detention of enemy combatants "'are important incident[s] of war.'" *Hamdi v. Rumsfeld*, 124 S. Ct. 2633, 2640 (2004) (recognizing the President's authority to detain United States citizens as enemy combatants, but affording those persons opportunity to challenge their enemy combatant status). Specifically, the battlefield detention of enemy combatants serves the dual objective of removing a hostile force and providing the battlefield commander with information about the enemy.

Accordingly, the Supreme Court has cautioned that the detention of combatants "ordered by the President in the declared exercise of his powers as Commander in Chief in time of war and of grave public danger – are not to be set aside by the courts without the clear conviction that they are in conflict with the Constitution or laws of Congress constitutionally enacted." *Ex parte Quirin*, 317 U.S. 1, 25, 28 (1942).

As proximity to the battlefield increases, so does the Commander-in-Chief's detention authority. In *Hamdi*, the Supreme Court excluded from its holding "initial captures on the

battlefield," recognizing that "military officers ought not to have to wage war under the threat of litigation." 124 S. Ct. at 2649. As the Supreme Court observed *Eisentrager*, "It would be fantastic to suggest that alien enemies could hail our military leaders into judicial tribunals to account for their day-to-day activities on the battlefront." 339 U.S. at 798.

Here, the detention and interrogation of Wali occurred on the battlefield, in a Presidentially-declared combat zone, while under the constant threat of rocket attacks. As a suspected terrorist and a suspect in the rocket attacks on the Asadabad firebase, Wali likely possessed information that could help bring other terrorists to justice, perhaps even those who shared responsibility for the September 11th attacks. More immediately, he likely had information that could help prevent future attacks on American and Afghani forces and on the region's civilian population. Thus, the interrogation of Wali fulfilled the strategic objectives articulated by President Bush when he launched Operation Enduring Freedom, to bring to justice the terrorists responsible for the September 11th attacks and other terrorist attacks, and to prevent future acts of terrorism on Americans. It also served the tactical necessity of taking all necessary and appropriate actions to prevent future terrorist attacks against the coalition forces operating in the Asadabad region, such as the ambush of American patrols on June 17, 2003, and against the civilian population, such as the attack which struck near the girls' school on June 5, 2003.

In order for the Commander-in-Chief to fulfill his constitutional duties to protect his citizens both at home and abroad, American forces who detain combatants on the field of battle must be afforded the greatest protection from a "threat of litigation" in a civilian court for an alleged infraction of a criminal statute not designed for application to the front lines of battle. Specifically, exposing those who serve the Commander-in-Chief on the battlefield to criminal prosecution under 18 U.S.C. § 113, which criminalizes negligent acts and tortious assaults, contravenes the

Constitutional vesting of exclusive war-making powers in the Commander-in-Chief and dangerously weakens the war-fighting capability of the battlefield commander.

The Fourth Circuit has rejected a similar "interjection of tort law into the realm of national security" in the context of a civil suit brought against the United States, emphasizing that the "strategy and tactics employed on the battlefield are clearly not subject to judicial review." *Tiffany v. United States*, 931 F.2d 271, 277 (4th Cir. 1991) (reversing judgment for widow of private pilot killed in a collision of an Air Force jet). Certainly, this same deference should apply where American lives, not just the taxpayer's money, are at stake.

This Administration's own legal opinions demonstrate that this Court should not countenance the prosecution of this case. As the head of the Office of Legal Counsel, Judge Bybee concluded in his August 1, 2002 Memorandum to Judge Gonzalez, "Congress can no more interfere with the President's conduct of the interrogation of enemy combatants than it can dictate strategic or tactical decisions on the battlefield." Attach. 5, 39. Judge Bybee also concluded, "[T]he Department of Justice could not bring a criminal prosecution against a defendant who had acted pursuant to an exercise of the President's constitutional power." *Id.*, 36. [The] "Department of Justice could not enforce [the] torture statute against federal officials acting pursuant to the President's constitutional authority to wage a military campaign." *Id.* Finally, "[a] criminal prosecution for the exercise of a presumptively valid, constitutionally based privilege is not consistent with the Constitution." *Id.* In the words of the Department of Justice, "[a]ny effort to apply [18 U.S.C.] Section 2340A in a manner that interferes with the President's direction of such core war matters as the detention and interrogation of enemy combatants thus would be unconstitutional." *Id.*

It necessarily follows that it would be no more constitutional to apply an assault statute in a manner that interferes with the President's direction of such core war matters as the detention and

interrogation of enemy combatants. Such application invites both the Legislative and the Judicial Branches to unconstitutionally infringe upon the exclusive duties and powers of the Commander-in-Chief.

**B. Application of 18 U.S.C. § 113 to the Battlefield Interrogation of a Suspected Terrorist Linked to Attacks on American Citizens Contravenes the Congressional Joint Resolution Authorizing Preemptive Use of "Necessary and Appropriate Force."**

In Joint Resolution 23, Congress endorsed the constitutional authority of our Commander-in-Chief to use "all necessary and appropriate force" to bring to justice those responsible for the September 11th attacks, and "to prevent any future acts of international terrorism against the United States." Pub. L. 107-40. Attach. 2. Congress also recognized President Bush's constitutional duty and authority as Commander-in-Chief to direct America's military response to this "unusual and extraordinary threat" against America's "national security and foreign policy." *Id.*

The application of 18 U.S.C. § 113 to the battlefield interrogation of a suspected terrorist linked to past attacks on the military and civilian population, and who likely has knowledge of future similar attacks, does not accord with Congressional recognition of the Commander-in-Chief's constitutional authority to employ "all necessary and appropriate force" to prevent future attacks on Americans. *See New York Telephone v. New York Department of Labor*, 440 U.S. 519, 540 n.32 (1979) (concluding that "ultimate resolution" in a case "presenting a potential conflict between two federal statutes . . . depends on an analysis of congressional intent").

As used in 18 U.S.C. § 113, "assault" incorporates not only criminal assault, but also a tortious assault. *United States v. Matthews*, No. 91-5888, 1992 U.S. App. LEXIS 13044, *3 (4th Cir. June 5, 1992) (citing *United States v. Guilbert*, 692 F.2d 1340, 1343 (11th Cir. 1982)). Application of this section of the criminal code to the battlefield therefore criminalizes an act which merely puts "another person in reasonable apprehension of immediate bodily harm." *Id.* In addition, the Fourth

Circuit has held that § 113(6), assault resulting in serious bodily injury, is a general intent crime.[3] *United States v. Lewis*, 780 F.2d 1140, 1142-43 (4th Cir. 1986); *See* Black's Law Dictionary, 813 (7th ed.1999) ("General intent usually takes the form of recklessness . . . or negligence.").

Since general intent may encompass reckless or even negligent actions, any number of actions taken on the battlefield would expose a person to criminal prosecution for a general intent assault such as § 113(6). For example, if the person who requested the bombing run following the July 23, 2003 rocket attack on the Asadabad firebase negligently called in the wrong coordinates, that person would face criminal prosecution for inflicting serious bodily injuries upon those not associated with the rocket attacks.

Even the toned-down interrogation methods approved by Secretary Rumsfeld in April of 2003 for application in Guantanamo – a place far removed from the battlefield – would violate 18 U.S.C. 113, as Techniques E and F both call for "increasing the fear level in a detainee," which would constitute a tortious assault. Attach. 13. Obviously, techniques which Secretary Rumsfeld approved December 2, 2002, such as "using detainee's individual phobias (such as fear of dogs) to induce stress," the "use of scenarios designed to convince the detainee that death or severely painful consequences are imminent for him and/or his family," and the "use of a wet towel and dripping water to induce the misperception of suffocation," all constitute assault under 18 U.S.C. § 113. *Id.* Though Secretary Rumsfeld later withdrew approval of these techniques, presumably his initial approval complied with the President's February 7, 2002 directive that the "United States Armed Forces shall continue to treat detainees humanely and, to the extent appropriate and consistent with military necessity, in a manner consistent with the principles of Geneva." Attach. 4, 2.

---

[3] Counts II and IV charge Mr. Passaro with violating §113(6).

In this case, Wali was captured on battlefield. Those responsible for interrogating him suspected he was responsible for previous attacks on the Asadabad firebase, which meant that he likely knew the locations of more rockets and land mines. Under these circumstances, the use of "all necessary and appropriate force" must include the actions taken under the threat of imminent attack designed to use only that amount of force necessary to save lives (by discovering rocket and land mine locations) and lead to capture of other terrorists. To conclude otherwise would mean that the battlefield interrogation of a terrorist with information that could have saved Captain Egger's life could not utilize encompass techniques designed to timely elicit that life-saving information.

By recognizing the constitutional authority of the Commander-in-Chief to employ "all necessary and appropriate force" against an "unusual and extraordinary threat to the national security and foreign policy of the United States," Congress cannot have contemplated that 18 U.S.C. § 113, which incorporates tort liability, should provide grounds for criminal prosecution of a battlefield interrogation of a suspected terrorist linked to constant rocket attacks, where the suspect likely had information which could prevent the next attack.

## CONCLUSION

For each of the foregoing reasons, this Court should dismiss the indictment returned against Mr. Passaro, who served under the Commander-in-Chief in the field of battle in Afghanistan, with the mission of bringing to justice those responsible for the September 11th attacks and to prevent future attacks against American citizens. To subject Mr. Passaro to prosecution for actions taken in battle and in furtherance of this war-time mission under a criminal statute not intended for battlefield application violates the United States Constitution, contravenes Congressional intent, and, as previously stated, turns the Patriot Act on its head.

Respectfully submitted this ⎡⎤ day of December, 2004.

_(signature)_

for THOMAS P. McNAMARA
Federal Public Defender
N.C. State Bar No. 5099


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that pursuant to paragraph 20 of the Protective Order issued by the Court on July 29, 2004, a copy of the foregoing was submitted to Jennifer H. Campbell, one of the Court Security Officers identified in paragraph 4 of the Protective Order, by hand delivering a copy of same.

This the 7th day of December, 2004.

_(signature)_

for THOMAS P. McNAMARA
Federal Public Defender
N.C. State Bar No. 5099

17

# ATTACHMENT
# 1


President George W. Bush


Click to Print
this document

For Immediate Release
Office of the Press Secretary
September 11, 2001

## Statement by the President in His Address to the Nation

View the President's Remarks
Listen to the President's Remarks

8:30 P.M. EDT

THE PRESIDENT: Good evening. Today, our fellow citizens, our way of life, our very freedom came under attack in a series of deliberate and deadly terrorist acts. The victims were in airplanes, or in their offices; secretaries, businessmen and women, military and federal workers; moms and dads, friends and neighbors. Thousands of lives were suddenly ended by evil, despicable acts of terror.

The pictures of airplanes flying into buildings, fires burning, huge structures collapsing, have filled us with disbelief, terrible sadness, and a quiet, unyielding anger. These acts of mass murder were intended to frighten our nation into chaos and retreat. But they have failed; our country is strong.

A great people has been moved to defend a great nation. Terrorist attacks can shake the foundations of our biggest buildings, but they cannot touch the foundation of America. These acts shattered steel, but they cannot dent the steel of American resolve.

America was targeted for attack because we're the brightest beacon for freedom and opportunity in the world. And no one will keep that light from shining.

Today, our nation saw evil, the very worst of human nature. And we responded with the best of America -- with the daring of our rescue workers, with the caring for strangers and neighbors who came to give blood and help in any way they could.

Immediately following the first attack, I implemented our government's emergency response plans. Our military is powerful, and it's prepared. Our emergency teams are working in New York City and Washington, D.C. to help with local rescue efforts.

Our first priority is to get help to those who have been injured, and to take every precaution to protect our citizens at home and around the world from further attacks.

The functions of our government continue without interruption. Federal agencies in Washington which had to be evacuated today are reopening for essential personnel tonight, and will be open for business tomorrow. Our financial institutions remain strong, and the American economy will be open for business, as well.

The search is underway for those who are behind these evil acts. I've directed the full resources of our intelligence and law enforcement communities to find those responsible and to bring them to justice. We will make no distinction between the terrorists who committed these acts and those who harbor them.

I appreciate so very much the members of Congress who have joined me in strongly condemning these attacks. And on behalf of the American people, I thank the many world leaders who have called to offer their condolences and assistance.

America and our friends and allies join with all those who want peace and security in the world, and we stand together to win the war against terrorism. Tonight, I ask for your prayers for all those who grieve, for the children whose worlds have been shattered, for all whose sense of safety and security has been threatened. And I pray

they will be comforted by a power greater than any of us, spoken through the ages in Psalm 23: "Even though I walk through the valley of the shadow of death, I fear no evil, for You are with me."

This is a day when all Americans from every walk of life unite in our resolve for justice and peace. America has stood down enemies before, and we will do so this time. None of us will ever forget this day. Yet, we go forward to defend freedom and all that is good and just in our world.

Thank you. Good night, and God bless America.

END 8:35 P.M. EDT

---

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2001/09/20010911-16.html

**Click to Print
this document**

1 - 2


President George W. Bush

Click to Print
this document 

For Immediate Release
Office of the Press Secretary
September 12, 2001

## Remarks by the President In Photo Opportunity with the National Security Team
The Cabinet Room

View the President's Remarks
Listen to the President's Remarks

10:53 A.M. EDT

THE PRESIDENT: I have just completed a meeting with my national security team, and we have received the latest intelligence updates.

The deliberate and deadly attacks which were carried out yesterday against our country were more than acts of terror. They were acts of war. This will require our country to unite in steadfast determination and resolve. Freedom and democracy are under attack.

The American people need to know that we're facing a different enemy than we have ever faced. This enemy hides in shadows, and has no regard for human life. This is an enemy who preys on innocent and unsuspecting people, then runs for cover. But it won't be able to run for cover forever. This is an enemy that tries to hide. But it won't be able to hide forever. This is an enemy that thinks its harbors are safe. But they won't be safe forever.

This enemy attacked not just our people, but all freedom-loving people everywhere in the world. The United States of America will use all our resources to conquer this enemy. We will rally the world. We will be patient, we will be focused, and we will be steadfast in our determination.

This battle will take time and resolve. But make no mistake about it: we will win.

The federal government and all our agencies are conducting business. But it is not business as usual. We are operating on a heightened security alert. America is going forward, and as we do so, we must remain keenly aware of the threats to our country. Those in authority should take appropriate precautions to protect our citizens.

But we will not allow this enemy to win the war by changing our way of life or restricting our freedoms. This morning, I am sending to Congress a request for emergency funding authority, so that we are prepared to spend whatever it takes to rescue victims, to help the citizens of New York City and Washington, D.C. respond to this tragedy, and to protect our national security.

I want to thank the members of Congress for their unity and support. America is united. The freedom-loving nations of the world stand by our side. This will be a monumental struggle of good versus evil. But good will prevail.

Thank you very much.

END          10:56 A.M. EDT

1 - 3



*The White House*
President George W. Bush

For Immediate Release
Office of the Press Secretary
September 18, 2001

## President Signs Authorization for Use of Military Force bill

Statement by the President

Today I am signing Senate Joint Resolution 23, the "Authorization for Use of Military Force."

On September 11, 2001, terrorists committed treacherous and horrific acts of violence against innocent Americans and individuals from other countries. Civilized nations and people around the world have expressed outrage at, and have unequivocally condemned, these attacks. Those who plan, authorize, commit, or aid terrorist attacks against the United States and its interests -- including those who harbor terrorists -- threaten the national security of the United States. It is, therefore, necessary and appropriate that the United States exercise its rights to defend itself and protect United States citizens both at home and abroad.

In adopting this resolution in response to the latest terrorist acts committed against the United States and the continuing threat to the United States and its citizens from terrorist activities, both Houses of Congress have acted wisely, decisively, and in the finest traditions of our country. I thank the leadership of both Houses for their role in expeditiously passing this historic joint resolution. I have had the benefit of meaningful consultations with members of the Congress since the attacks of September 11, 2001, and I will continue to consult closely with them as our Nation responds to this threat to our peace and security.

Senate Joint Resolution 23 recognizes the seriousness of the terrorist threat to our Nation and the authority of the President under the Constitution to take action to deter and prevent acts of terrorism against the United States. In signing this resolution, I maintain the longstanding position of the executive branch regarding the President's constitutional authority to use force, including the Armed Forces of the United States and regarding the constitutionality of the War Powers Resolution.

Our whole Nation is unalterably committed to a direct, forceful, and comprehensive response to these terrorist attacks and the scourge of terrorism directed against the United States and its interests.

GEORGE W. BUSH

THE WHITE HOUSE,

September 18, 2001.

### # #

Return to this article at:
http://www.whitehouse.gov/news/releases/2001/09/20010918-10.html

1 - 4



Click to Print
this document

For Immediate Release
Office of the Press Secretary
October 7, 2001

## Presidential Address to the Nation
The Treaty Room

    ˢ View the President's Remarks
    ◄ Listen to the President's Remarks

1:00 P.M. EDT

THE PRESIDENT. Good afternoon. On my orders, the United States military has begun strikes against al Qaeda terrorist training camps and military installations of the Taliban regime in Afghanistan. These carefully targeted actions are designed to disrupt the use of Afghanistan as a terrorist base of operations, and to attack the military capability of the Taliban regime.

We are joined in this operation by our staunch friend, Great Britain. Other close friends, including Canada, Australia, Germany and France, have pledged forces as the operation unfolds. More than 40 countries in the Middle East, Africa, Europe and across Asia have granted air transit or landing rights. Many more have shared intelligence. We are supported by the collective will of the world.

More than two weeks ago, I gave Taliban leaders a series of clear and specific demands: Close terrorist training camps; hand over leaders of the al Qaeda network; and return all foreign nationals, including American citizens, unjustly detained in your country. None of these demands were met. And now the Taliban will pay a price. By destroying camps and disrupting communications, we will make it more difficult for the terror network to train new recruits and coordinate their evil plans.

Initially, the terrorists may burrow deeper into caves and other entrenched hiding places. Our military action is also designed to clear the way for sustained, comprehensive and relentless operations to drive them out and bring them to justice.

At the same time, the oppressed people of Afghanistan will know the generosity of America and our allies. As we strike military targets, we'll also drop food, medicine and supplies to the starving and suffering men and women and children of Afghanistan.

The United States of America is a friend to the Afghan people, and we are the friends of almost a billion worldwide who practice the Islamic faith. The United States of America is an enemy of those who aid terrorists and of the barbaric criminals who profane a great religion by committing murder in its name.

This military action is a part of our campaign against terrorism, another front in a war that has already been joined through diplomacy, intelligence, the freezing of financial assets and the arrests of known terrorists by law enforcement agents in 38 countries. Given the nature and reach of our enemies, we will win this conflict by the patient accumulation of successes, by meeting a series of challenges with determination and will and purpose.

Today we focus on Afghanistan, but the battle is broader. Every nation has a choice to make. In this conflict, there is no neutral ground. If any government sponsors the outlaws and killers of innocents, they have become outlaws and murderers, themselves. And they will take that lonely path at their own peril.

I'm speaking to you today from the Treaty Room of the White House, a place where American Presidents have worked for peace. We're a peaceful nation. Yet, as we have learned, so suddenly and so tragically, there can be no peace in a world of sudden terror. In the face of today's new threat, the only way to pursue peace is to pursue those who threaten it.

/-5

We did not ask for this mission, but we will fulfill it. The name of today's military operation is Enduring Freedom. We defend not only our precious freedoms, but also the freedom of people everywhere to live and raise their children free from fear.

I know many Americans feel fear today. And our government is taking strong precautions. All law enforcement and intelligence agencies are working aggressively around America, around the world and around the clock. At my request, many governors have activated the National Guard to strengthen airport security. We have called up Reserves to reinforce our military capability and strengthen the protection of our homeland.

In the months ahead, our patience will be one of our strengths -- patience with the long waits that will result from tighter security; patience and understanding that it will take time to achieve our goals; patience in all the sacrifices that may come.

Today, those sacrifices are being made by members of our Armed Forces who now defend us so far from home, and by their proud and worried families. A Commander-in-Chief sends America's sons and daughters into a battle in a foreign land only after the greatest care and a lot of prayer. We ask a lot of those who wear our uniform. We ask them to leave their loved ones, to travel great distances, to risk injury, even to be prepared to make the ultimate sacrifice of their lives. They are dedicated, they are honorable; they represent the best of our country. And we are grateful.

To all the men and women in our military -- every sailor, every soldier, every airman, every coastguardsman, every Marine -- I say this: Your mission is defined; your objectives are clear; your goal is just. You have my full confidence, and you will have every tool you need to carry out your duty.

I recently received a touching letter that says a lot about the state of America in these difficult times -- a letter from a 4th-grade girl, with a father in the military: "As much as I don't want my Dad to fight," she wrote, "I'm willing to give him to you."

This is a precious gift, the greatest she could give. This young girl knows what America is all about. Since September 11, an entire generation of young Americans has gained new understanding of the value of freedom, and its cost in duty and in sacrifice.

The battle is now joined on many fronts. We will not waver; we will not tire; we will not falter; and we will not fail. Peace and freedom will prevail.

Thank you. May God continue to bless America.

       END     1:07 P.M, EDT

---

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2001/10/20011007-8.html

Click to Print
this document

1 - 6

The
*White House*
President George W. Bush

Click to Print
this document

For Immediate Release
Office of the Press Secretary
December 14, 2001

## Afghanistan Combat Zone Executive Order

Executive Order Designation of Afghanistan and the Airspace Above as a Combat Zone

Pursuant to the authority vested in me as President by the Constitution and the laws of the United States of America, including section 112 of the Internal Revenue Code of 1986 (26 U.S.C. 112), I designate, for purposes of that section, Afghanistan, including the airspace above, as an area in which Armed Forces of the United States are and have been engaged in combat.

For purposes of this order, I designate September 19, 2001, as the date of the commencement of combatant activities in such zone.

GEORGE W. BUSH
THE WHITE HOUSE,
De

# # #

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2001/12/20011214-8.html

**Click to Print**
**this document**

/ - 7

*White House*
President George W. Bush

Click to Print
this document

For Immediate Release
Office of the Press Secretary
October 26, 2001

## President Signs Anti-Terrorism Bill
Remarks by the President at Signing of the Patriot Act, Anti-Terrorism Legislation
The East Room

    ☆ View the President's Remarks
    ◄ Listen to the President's Remarks

9:49 A.M. EDT

THE PRESIDENT: Good morning and welcome to the White House. Today, we take an essential step in defeating terrorism, while protecting the constitutional rights of all Americans. With my signature, this law will give intelligence and law enforcement officials important new tools to fight a present danger.

I commend the House and Senate for the hard work they put into this legislation. Members of Congress and their staffs spent long nights and weekends to get this important bill to my desk. I appreciate their efforts, and bipartisanship, in passing this new law.

I want to thank the Vice President and his staff for working hard to make sure this law was passed. I want to thank the Secretary of State and the Secretary of Treasury for being here, both of whom lead important parts of our war against terrorism. I want to thank Attorney General John Ashcroft for spending a lot of time on the Hill to make the case for a balanced piece of legislation. I want to thank the Director of the FBI and the Director of the CIA for waging an incredibly important part on the two-front war -- one overseas, and a front here at home.

I want to thank Governor Tom Ridge for his leadership. I want to thank the members of Congress who are here on the stage, the Leaders, on this impressive effort. Senator Hatch and Senator Leahy and Senator Sarbanes and Senator Graham and Senator Reid.

I also want to thank Representative Porter Goss, LaFalce, Oxley, and Sensenbrenner for their hard work. And I want to welcome the men and women of law enforcement who are here in the White House with us today, as well.

The changes, effective today, will help counter a threat like no other our nation has ever faced. We've seen the enemy, and the murder of thousands of innocent, unsuspecting people. They recognize no barrier of morality. They have no conscience. The terrorists cannot be reasoned with. Witness the recent anthrax attacks through our Postal Service.

Our country is grateful for the courage the Postal Service has shown during these difficult times. We mourn the loss of the lives of Thomas Morris and Joseph Curseen; postal workers who died in the line of duty. And our prayers go to their loved ones.

I want to assure postal workers that our government is testing more than 200 postal facilities along the entire Eastern corridor that may have been impacted. And we will move quickly to treat and protect workers where positive exposures are found.

But one thing is for certain: These terrorists must be pursued, they must be defeated, and they must be brought to justice. (Applause.) And that is the purpose of this legislation. Since the 11th of September, the men and women of our intelligence and law enforcement agencies have been relentless in their response to new and sudden challenges.

We have seen the horrors terrorists can inflict. We may never know what horrors our country was spared by the

diligent and determined work of our police forces, the FBI, ATF agents, federal marshals, Custom officers, Secret Service, intelligence professionals and local law enforcement officials, under the most trying conditions. They are serving this country with excellence, and often with bravery.

They deserve our full support and every means of help that we can provide. We're dealing with terrorists who operate by highly sophisticated methods and technologies, some of which were not even available when our existing laws were written. The bill before me takes account of the new realities and dangers posed by modern terrorists. It will help law enforcement to identify, to dismantle, to disrupt, and to punish terrorists before they strike.

For example, this legislation gives law enforcement officials better tools to put an end to financial counterfeiting, smuggling and money-laundering. Secondly, it gives intelligence operations and criminal operations the chance to operate not on separate tracks, but to share vital information so necessary to disrupt a terrorist attack before it occurs.

As of today, we're changing the laws governing information-sharing. And as importantly, we're changing the culture of our various agencies that fight terrorism. Countering and investigating terrorist activity is the number one priority for both law enforcement and intelligence agencies.

Surveillance of communications is another essential tool to pursue and stop terrorists. The existing law was written in the era of rotary telephones. This new law that I sign today will allow surveillance of all communications used by terrorists, including e-mails, the Internet, and cell phones.

As of today, we'll be able to better meet the technological challenges posed by this proliferation of communications technology. Investigations are often slowed by limit on the reach of federal search warrants.

Law enforcement agencies have to get a new warrant for each new district they investigate, even when they're after the same suspect. Under this new law, warrants are valid across all districts and across all states. And, finally, the new legislation greatly enhances the penalties that will fall on terrorists or anyone who helps them.

Current statutes deal more severely with drug-traffickers than with terrorists. That changes today. We are enacting new and harsh penalties for possession of biological weapons. We're making it easier to seize the assets of groups and individuals involved in terrorism. The government will have wider latitude in deporting known terrorists and their supporters. The statute of limitations on terrorist acts will be lengthened, as will prison sentences for terrorists.

This bill was carefully drafted and considered. Led by the members of Congress on this stage, and those seated in the audience, it was crafted with skill and care, determination and a spirit of bipartisanship for which the entire nation is grateful. This bill met with an overwhelming -- overwhelming agreement in Congress, because it upholds and respects the civil liberties guaranteed by our Constitution.

This legislation is essential not only to pursuing and punishing terrorists, but also preventing more atrocities in the hands of the evil ones. This government will enforce this law with all the urgency of a nation at war. The elected branches of our government, and both political parties, are united in our resolve to fight and stop and punish those who would do harm to the American people.

It is now my honor to sign into law the USA Patriot Act of 2001. (Applause.)

(The bill is signed.) (Applause.)

END          10:57 A.M. EDT

Return to this article at:
http://www.whitehouse.gov/news/releases/2001/10/20011026-5.html

/-9

*The* **White House**
President George W. Bush

Click to Print
this document



For Immediate Release
Office of the Press Secretary
July 1, 2003

### President Discusses Progress in Afghanistan, Iraq
Remarks by the President at Reenlistment of Military Service
Members
The East Room

🔳 VIDEO Multimedia

President's Remarks
🔲 view
🔊 listen

🅑 Fact Sheet

2:00 P.M. EDT

THE PRESIDENT: Please be seated. (Applause.) Welcome. Thank you all very much. Welcome to the White House. We're joined today by 30 men and women who have chosen to reenlist in the United States Armed Forces. Each of them decided years ago to serve and defend our country. Today they reaffirm their commitment and take the oath again.

Like many thousands of other soldiers, sailors, airmen, Coast Guardsmen and Marines who will re-enlist this year, these men and women are answering the highest call of citizenship. They have stood between the American people and the dangers of the world -- and we are glad they are staying on duty. (Applause.)



I want to thank Paul Wolfowitz, the Deputy Secretary of Defense, for joining us, and members of the defense team. I want to thank Richard Myers, Chairman of the Joint Chiefs; and Pete Pace, the Vice Chairman of the Joint Chiefs. I want to thank James Roche, the Secretary of the Air Force; Les Brownlee, the Acting Secretary of the Army; HT Johnson, the Acting Secretary of the Navy, for being with us today.

I appreciate Admiral Vernon Clark, the Chief of Naval Operation for being here; General Michael W. Hagee, the Commandant of the Marine Corps; General John M. Keane, Acting Chief of Staff for the Army. I appreciate Terry D. Scott, Master Chief Petty Officer of the Navy, for being with us today; John L. Estrada, Sergeant Major of the Marine Corps; Frank A. Welch, Master Chief Petty Officer of the Coast Guard; members of the Armed Forces and our fellow Americans.

Before the draft ended on July 1st, 1973, generations of men entered military service by the decision of others. And during two world wars, and in Korea, and in Vietnam, they served nobly and they served well. Yet in the past 30 years, we have seen the great advantages of a military in which all serve by their own decision. Our country's all-volunteer force attracts idealistic and committed young Americans. They stay in service longer because they have chosen the military life. The result is a military with the highest levels of training, experience, motivation, and professionalism.

The military life is rewarding. Yet, even at its best, that life is difficult, often involving separation and danger. Those who willingly make these sacrifices, and the families who share their hardships, have the respect and the gratitude of their fellow Americans.

All in our military are serving in one of history's critical hours. Less than two years ago, determined enemies of America entered our country, committed acts of murder against our people, and made clear their intentions to strike again. As long as terrorists and their allies plot to harm America, America is at war. We did not choose this war. Yet, with the safety of the American people at stake, we will continue to wage this war with all our might.

From the beginning, we have known the effort would be long and difficult, and that our resolve would be tested. We know that sacrifice is unavoidable. We have seen victories in the decisive defeat of two terror regimes, and in the relentless pursuit of a global terror network. Yet the war on terror goes on. We will not be distracted, and we will prevail. (Applause.)

Of those directly involved in organizing the September the 11th attacks, almost all are now in custody or confirmed dead. Of the senior al Qaeda leaders, operational managers, and key facilitators we have been tracking, 65 percent have been captured or killed.

Still, we recognize that al Qaeda has trained thousands of foot soldiers in many nations and that new leaders may emerge. And we suspect that some al Qaeda deserters will attach themselves to other terrorist groups in order to strike American targets. Terrorists that remain can be certain of this: We will hunt them by day and by night in every corner of the world until they are no longer a threat to America and our friends. (Applause.)

At this moment, American and allied forces continue the work of fighting terrorists and establishing order in Afghanistan. When we removed the Taliban from power, surviving al Qaeda members fled from most of that country. However, many terrorists sought sanctuary along the Afghanistan-Pakistan border, and some are still hiding there. These al Qaeda and Taliban holdouts have attacked allied bases with unguided rockets, conducted ambushes, and fired upon border posts. In close cooperation with the Afghan and Pakistani governments, America is engaged in operations to find and destroy these terrorists.

Since the beginning of Operation Enduring Freedom, it is important for our fellow citizens to know that Pakistan has apprehended more than 500 terrorists, including hundreds of members of al Qaeda and the Taliban.

As this fight continues, the people of Afghanistan are moving forward with the reconstruction of their country and the founding of a democratic government. They have selected a President. They're building a national army. And they are now in the final stages of drafting a new constitution.

America and other countries continue to provide humanitarian aid and assistance in building clinics and schools and roads. Joined by other nations, we are deploying the first group of provincial reconstruction teams to various cities in Afghanistan, groups of experts who are working with local officials to improve public safety, promote reconstruction, and solidify the authority of elected governments.

Afghanistan still has many challenges, but that country is making progress, and its people are a world away from the nightmare they endured under the Taliban. Pakistan and Afghanistan are among many governments that understand the threat of terror and are determined to root it out.

After the terrible attacks in Riyadh on May the 12th, the government of Saudi Arabia has intensified its longstanding efforts against the al Qaeda network. Recently Saudi's security services apprehended Abu Bakr, believed to be a central figure in the Riyadh bombing, and killed a major al Qaeda operational planner and fundraiser, a man known in terrorist circles as "Swift Sword."

Saudi authorities have also uncovered terrorist operations in the holy city of Mecca, demonstrating once again that terrorists hold nothing sacred and have no home in any religion. America and Saudi Arabia face a common terrorist threat, and we appreciate the strong, continuing efforts of the Saudi government in fighting that threat.

The war on terror also continues in Iraq, where coalition forces are engaging remanent of the former regime, as well as members of terrorist groups. We met the major combat objectives in Operation Iraqi Freedom. We ended a regime that possessed weapons of mass destruction, harbored and supported terrorists, suppressed human rights, and defied the just demands of the United Nations and the world.

The true monuments of Saddam Hussein's rule have been brought to light -- the mass graves, the torture

/-1/

chambers, the jail cells for children. And now we are moving forward with the reconstruction of that country by restoring basic services, maintaining order, searching for the hidden weapons, and helping Iraqis to establish a representative government.

The rise of Iraq as an example of moderation and democracy and prosperity is a massive and long-term undertaking. And the restoration of that country is critical to the defeat of terror and radicalism throughout the Middle East. With so much in the balance, it comes as no surprise that freedom has enemies inside of Iraq. The looting and random violence that began in the immediate aftermath of war remains a challenge in some areas. A greater challenge comes from former Baath Party and security officials who will stop at nothing to regain their power and their privilege.

But there will be no return to tyranny in Iraq. And those who threaten the order and stability of that country will face ruin, just as surely as the regime they once served.

Also present in Iraq are terrorist groups seeking to spread chaos and to attack American and coalition forces. Among these terrorists are members of Ansar al-Islam, which operated in Iraq before the war and is now active in the Sunni heartland of the country. We suspect that the remnants of a group tied to al Qaeda associate al-Zarqawi are still in Iraq, waiting for an opportunity to strike. We're also beginning to see foreign fighters enter Iraq.

These scattered groups of terrorists, extremists and Saddam loyalists are especially active to the north and west of Baghdad, where they have destroyed electricity lines and towers, set off explosions at gas pipelines and ignited sulfur fires. They have attacked coalition forces and they're trying to intimidate Iraqi citizens. These groups believe they have found an opportunity to harm America, to shake our resolve in the war on terror, and to cause us to leave Iraq before freedom is fully established. They are wrong, and they will not succeed. (Applause.)

Those who try to undermine the reconstruction of Iraq are not only attacking our coalition, they are attacking the Iraqi people. And we will stand with the Iraqi people, strongly, as they build a hopeful future. Having liberated Iraq as promised, we will help that country to found a just and representative government, as promised. Our goal is a swift transition to Iraqi control of their own affairs. People of Iraq will be secure, and the people of Iraq will run their own country.

At present, 230,000 Americans are serving inside or near Iraq. Our whole nation, especially their families, recognizes that our people in uniform face continuing danger. We appreciate their service under difficult circumstances, and their willingness to fight for American security and Iraqi freedom. As Commander-in-Chief I assure them, we will stay on the offensive against the enemy. And all who attack our troops will be met with direct and decisive force.

As America fights our war against terror, we will continue to depend on the skill and the courage of our volunteer military. In these last 22 months, our Armed Forces have been tested and tested again. In every case, in every mission, America's servicemen and women have brought credit to the uniform, to our flag, and to our country. We have needed you, and you have never let us down.

I want to thank you for keeping your pledge of duty to America, and thank you for renewing that demanding pledge today.

And now, General Myers will administer the oath of enlistment in the Armed Forces of the United States. May God bless you. (Applause.)

END 2:17 P.M. EDT

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2003/07/20030701-9.html

**Click to Print**
**this document**

/ - 12

# ATTACHMENT
# 2

107 P.L. 40, *; 115 Stat. 224, **;

2001 Enacted S.J. Res. 23; 107 Enacted S.J. Res. 23

### LEXSEE 107 PL 40

### UNITED STATES PUBLIC LAWS
107th Congress -- 1st Session
(c) 2001, LEXIS-NEXIS, A DIVISION OF REED ELSEVIER INC. AND REED ELSEVIER PROPERTIES INC.

### PUBLIC LAW 107-40 [S.J. Res. 23]
SEPT. 18, 2001
[SENSE OF CONGRESS REGARDING TERRORIST ATTACKS]

107 P.L. 40; 115 Stat. 224; 2001 Enacted S.J. Res. 23; 107 Enacted S.J. Res. 23

BILL TRACKING REPORT:     107 Bill Tracking S.J. Res. 23
FULL TEXT VERSION(S) OF BILL:   107 S.J. Res. 23

Joint Resolution

To authorize the use of United States Armed Forces against those responsible for the recent attacks launched against the United States.

Whereas, on September 11, 2001, acts of treacherous violence were committed against the United States and its citizens; and

Whereas, such acts render it both necessary and appropriate that the United States exercise its rights to self-defense and to protect United States citizens both at home and abroad; and

Whereas, in light of the threat to the national security and foreign policy of the United States posed by these grave acts of violence; and

Whereas, such acts continue to pose an unusual and extraordinary threat to the national security and foreign policy of the United States; and

Whereas, the President has authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States: Now, therefore, be it

Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,

[*1] SECTION 1. <50 USC 1541 note> SHORT TITLE.

This joint resolution may be cited as the "Authorization for Use of Military Force".

[*2] SEC. 2. AUTHORIZATION FOR USE OF UNITED STATES ARMED FORCES.

(a) In General.--That the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

(b) War Powers Resolution Requirements.--

(1) Specific statutory authorization.-- Consistent with section 8(a)(1) of the War Powers Resolution, the Congress declares that this section is intended to constitute specific statutory authorization within the meaning of section 5(b) of the War Powers Resolution.

[**225] (2) Applicability of other requirements.-- Nothing in this resolution supercedes any requirement of the War Powers Resolution.

ATTACH 2

# ATTACHMENT
# 3

January 25, 2002



MEMORANDUM FOR THE PRESIDENT

FROM:      ALBERTO R. GONZALES

SUBJECT:   DECISION RE APPLICATION OF THE GENEVA CONVENTION ON PRISONERS OF
           WAR TO THE CONFLICT WITH AL QAEDA AND THE TALIBAN

## Purpose

On January 18, I advised you that the Department of Justice had issued a formal legal opinion concluding that the Geneva Convention III on the Treatment of Prisoners of War (GPW) does not apply to the conflict with al Qaeda. I also advised you that DOJ's opinion concludes that there are reasonable grounds for you to conclude that GPW does not apply with respect to the conflict with the Taliban. I understand that you decided that GPW does not apply and, accordingly, that al Qaeda and Taliban detainees are not prisoners of war under the GPW.

The Secretary of State has requested that you reconsider that decision. Specifically, he has asked that you conclude that GPW does apply to both al Qaeda and the Taliban. I understand, however, that he would agree that al Qaeda and Taliban fighters could be determined not to be prisoners of war (POWs) but only on a case-by-case basis following individual hearings before a military board.

It is a memorandum outlines the considerations in support of your decision and that of Secretary's request for reconsideration.

## Legal Background

As an initial matter, I note that you have the constitutional authority to make the determination you made on January 18 that the GPW does not apply to al Qaeda and the Taliban. (Of course, you could nevertheless, as a matter of policy, decide to apply the principles of GPW to the conflict with al Qaeda and the Taliban.) The Office of Legal Counsel of the Department of Justice has opined that, as a matter of international and domestic law, GPW does not apply to the conflict with al Qaeda. OLC has further opined that you have the authority to determine that GPW does not apply to the Taliban. As I discussed with you, the grounds for such a determination may include:

- A determination that Afghanistan was a failed state because the Taliban did not exercise full control over the territory and people, was not recognized by the international community, and was not capable of fulfilling its international obligations (e.g., was in widespread material breach of its international obligations).
- A determination that the Taliban and its forces were, in fact, not a government, but a militant, terrorist-like group.

OLC's interpretation of this legal issue is definitive. The Attorney General is charged by statute with interpreting the law for the Executive Branch. This interpretive authority extends to both domestic and international law. He has, in turn, delegated this role to OLC. Nevertheless, you should be aware that the Legal Adviser to the Secretary of State has expressed a different view.

The consequences of a decision to adhere to what I understood to be your earlier determination that the GPW does not apply to the Taliban include the following:

Positive:

- Preserves flexibility:
  - As you have said, the war against terrorism is a new kind of war. It is not the traditional clash between nations adhering to the laws of war that formed the backdrop for GPW. The nature of the new war places a high premium on other factors, such as the ability to quickly obtain information from captured terrorists and their sponsors in order to avoid further atrocities against American civilians, and the need to try terrorists for war crimes such as wantonly killing civilians. In my judgment, this new paradigm renders obsolete Geneva's strict limitations on questioning of enemy prisoners and renders quaint some of its provisions requiring that captured enemy be afforded such things as commissary privileges, scrip (i.e., advances of monthly pay), athletic uniforms, and scientific instruments.
  - Although some of these provisions do not apply to detainees who are not POWs, a determination that GPW does not apply to al Qaeda and the Taliban eliminates any argument regarding the need for case-by-case determinations of POW status. It also holds open options for the future conflicts in which it may be more difficult to determine whether an enemy force as a whole meets the standard for POW status.
  - By concluding that GPW does not apply to al Qaeda and the Taliban, we avoid foreclosing options for the future, particularly against nonstate actors.
- Substantially reduces the threat of domestic criminal prosecution under the War Crimes Act (18 U.S.C. 2441).
  - That statute, enacted in 1996, prohibits the commission of a "war crime" by or against a U.S. person, including U.S. officials. "War crime" for these purposes is defined to include any grave breach of GPW or any violation of common Article 3 thereof (such as "outrages against personal dignity"). Some of these provisions apply (if the GPW applies) regardless of whether the individual being detained qualifies as a POW. Punishments for violations of Section 2441 include the death penalty. A determination that the GPW is not applicable to the Taliban would mean that Section 2441 would not apply to actions taken with respect to the Taliban.
  - Adhering to your determination that GPW does not apply would guard effectively against misconstruction or misapplication of Section 2441 for several reasons.
    - First, some of the language of the GPW is undefined (it prohibits, for example, "outrages upon personal dignity" and "inhuman treatment"), and it is difficult to predict with confidence what actions might be deemed to constitute violations of the relevant provisions of GPW.
    - Second, it is difficult to predict the needs and circumstances that could arise in the course of the war on terrorism.
    - Third, it is difficult to predict the motives of prosecutors and independent counsels who may in the future decide to pursue unwarranted charges based on Section 2441. Your determination would create a reasonable basis in law that Section 2441 does not apply, which would provide a solid defense to any future prosecution.

Negative:

On the other hand, the following arguments would support reconsideration and reversal of your decision that the GPW does not apply to either al Qaeda or the Taliban:

Since the Geneva Conventions were concluded in 1949, the United States has never denied their applicability to either U.S. or opposing forces engaged in armed conflict, despite several opportunities to do so. During the last Bush Administration, the United States stated that it "has a policy of applying the Geneva Conventions of 1949 whenever armed hostilities occur with regular foreign armed forces, even if arguments could be made that the threshold standards for the applicability of the Conventions . . . are not met."

- The United States could not invoke the GPW if enemy forces threatened to mistreat or mistreated U.S. or coalition forces captured during operations in Afghanistan, or if they denied Red Cross access or other POW privileges.

- The War Crimes Act could not be used against the enemy, although other criminal statutes and the customary law of war would still be available.

- Our position would likely provoke widespread condemnation among our allies and in some domestic quarters, even if we make clear that we will comply with the core humanitarian principles of the treaty as a matter of policy.

- Concluding that the Geneva Convention does not apply may encourage other countries to look for technical "loopholes" in future conflicts to conclude that they are not bound by GPW either.

- Other countries may be less inclined to turn over terrorists or provide legal assistance to us if we do not recognize a legal obligation to comply with the GPW.

- A determination that GPW does not apply to al Qaeda and the Taliban could undermine U.S. military culture which emphasizes maintaining the highest standards of conduct in combat, and could introduce an element of uncertainty in the status of adversaries.

## Response to Arguments for Applying GPW to the al Qaeda and the Taliban

On balance, I believe that the arguments for reconsideration and reversal are unpersuasive.

- The argument that the U.S. has never determined that GPW did not apply is incorrect. In at least one case (Panama in 1989) the U.S. determined that GPW did not apply even though it determined for policy reasons to adhere to the convention. More importantly, as noted above, this is a new type of warfare – one not contemplated in 1949 when the GPW was framed – and requires a new approach in our actions towards captured terrorists. Indeed, as the statement quoted from the administration of President George Bush makes clear, the U.S. will apply GPW "whenever hostilities occur *with regular foreign armed forces.*" By its terms, therefore, the policy does not apply to a conflict with terrorists, or with irregular forces, like the Taliban, who are armed militants that oppressed and terrorized the people of Afghanistan.

- In response to the argument that we should decide to apply GPW to the Taliban in order to encourage other countries to treat captured U.S. military personnel in accordance with the GPW, it should be noted that your policy of providing humane treatment to enemy detainees gives us the credibility to insist on like treatment for our soldiers. Moreover, even if GPW is not applicable, we can still bring war crimes charges against anyone who mistreats U.S. personnel. Finally, I note that our adversaries in several recent conflicts have not been deterred by GPW in their mistreatment of captured U.S. personnel, and terrorists will not follow GPW rules in any event.

- The statement that other nations would criticize the U.S. because we have determined that GPW does not apply is undoubtedly true. It is even possible that some nations would point to that determination as a basis for failing to cooperate with us on specific matters in the war against terrorism. On the other hand, some international and domestic criticism is already likely to flow from your previous decision not to treat the detainees as POWs. And we can facilitate cooperation with other nations by reassuring them that we fully support GPW where it is applicable and by acknowledging that in this conflict the U.S. continues to respect other recognized standards.

3

J-3

* In the treatment of detainees, the U.S. will continue to be constrained by (i) its commitment to treat the detainees humanely and, to the extent appropriate and consistent with military necessity, in a manner consistent with the principles of GPW, (ii) its applicable treaty obligations, (iii) minimum standards of treatment universally recognized by the nations of the world, and (iv) applicable military regulations regarding the treatment of detainees.
* Similarly, the argument based on military culture fails to recognize that our military remain bound to apply the principles of GPW because that is what you have directed them to do.

# ATTACHMENT
4



UNCLASSIFIED

## THE WHITE HOUSE
### WASHINGTON

February 7, 2002

MEMORANDUM FOR THE VICE PRESIDENT
        THE SECRETARY OF STATE
        THE SECRETARY OF DEFENSE
        THE ATTORNEY GENERAL
        CHIEF OF STAFF TO THE PRESIDENT
        DIRECTOR OF CENTRAL INTELLIGENCE
        ASSISTANT TO THE PRESIDENT FOR NATIONAL
        SECURITY AFFAIRS
        CHAIRMAN OF THE JOINT CHIEFS OF STAFF

SUBJECT:        Humane Treatment of al Qaeda and Taliban Detainees

1.  Our recent extensive discussions regarding the status
    of al Qaeda and Taliban detainees confirm that the appli-
    cation of the Geneva Convention Relative to the Treatment
    of Prisoners of War of August 12, 1949 (Geneva) to the
    conflict with al Qaeda and the Taliban involves complex
    legal questions.  By its terms, Geneva applies to conflicts
    involving 'High Contracting Parties,' which can only be
    states.  Moreover, it assumes the existence of 'regular'
    armed forces fighting on behalf of states.  However, the
    war against terrorism ushers in a new paradigm, one in
    which groups with broad, international reach commit horrific
    acts against innocent civilians, sometimes with the direct
    support of states.  Our Nation recognizes that this new
    paradigm -- ushered in not by us, but by terrorists --
    requires new thinking in the law of war, but thinking that
    should nevertheless be consistent with the principles of
    Geneva.

2.  Pursuant to my authority as Commander in Chief and Chief
    Executive of the United States, and relying on the opinion
    of the Department of Justice dated January 22, 2002, and on
    the legal opinion rendered by the Attorney General in his
    letter of February 1, 2002, I hereby determine as follows:

    a.  I accept the legal conclusion of the Department of
        Justice and determine that none of the provisions
        of Geneva apply to our conflict with al Qaeda in
        Afghanistan or elsewhere throughout the world because,
        among other reasons, al Qaeda is not a High Contracting
        Party to Geneva.

    b.  I accept the legal conclusion of the Attorney General
        and the Department of Justice that I have the authority
        under the Constitution to suspend Geneva as between
        the United States and Afghanistan, but I decline to

NSC DECLASSIFICATION REVIEW [E.O. 12958 as amended]
DECLASSIFIED IN FULL ON 6/17/2004
by R.Soubers

Reason:  1.5 (d)
Declassify on:  02/07/12

ATTACH  4-1



UNCLASSIFIED

2

exercise that authority at this time.  Accordingly, I
determine that the provisions of Geneva will apply to
our present conflict with the Taliban.  I reserve the
right to exercise this authority in this or future
conflicts.

   c.    I also accept the legal conclusion of the Department of
Justice and determine that common Article 3 of Geneva
does not apply to either al Qaeda or Taliban detainees,
because, among other reasons, the relevant conflicts
are international in scope and common Article 3 applies
only to "armed conflict not of an international
character."

   d.    Based on the facts supplied by the Department of
Defense and the recommendation of the Department of
Justice, I determine that the Taliban detainees are
unlawful combatants and, therefore, do not qualify as
prisoners of war under Article 4 of Geneva.  I note
that, because Geneva does not apply to our conflict
with al Qaeda, al Qaeda detainees also do not qualify
as prisoners of war.

3.    Of course, our values as a Nation, values that we share with
many nations in the world, call for us to treat detainees
humanely, including those who are not legally entitled to
such treatment.  Our Nation has been and will continue to
be a strong supporter of Geneva and its principles.  As
a matter of policy, the United States Armed Forces shall
continue to treat detainees humanely and, to the extent
appropriate and consistent with military necessity, in
a manner consistent with the principles of Geneva.

4.    The United States will hold states, organizations, and
individuals who gain control of United States personnel
responsible for treating such personnel humanely and
consistent with applicable law.

5.    I hereby reaffirm the order previously issued by the
Secretary of Defense to the United States Armed Forces
requiring that the detainees be treated humanely and,
to the extent appropriate and consistent with military
necessity, in a manner consistent with the principles
of Geneva.

6.    I hereby direct the Secretary of State to communicate my
determinations in an appropriate manner to our allies, and
other countries and international organizations cooperating
in the war against terrorism of global reach.

UNCLASSIFIED

ATTACH 4-2

# ATTACHMENT
# 5


WWW.FINDLAW.COM

U.S. Department of Justice

Office of Legal Counsel

Office of the Assistant Attorney General

*Washington, D.C. 20530*

August 1, 2002

## Memorandum for Alberto R. Gonzales
## Counsel to the President

*Re: Standards of Conduct for Interrogation under 18 U.S.C. §§ 2340–2340A*

You have asked for our Office's views regarding the standards of conduct under the Convention Against Torture and Other Cruel, Inhuman and Degrading Treatment or Punishment as implemented by Sections 2340–2340A of title 18 of the United States Code. As we understand it, this question has arisen in the context of the conduct of interrogations outside of the United States. We conclude below that Section 2340A proscribes acts inflicting, and that are specifically intended to inflict, severe pain or suffering, whether mental or physical. Those acts must be of an extreme nature to rise to the level of torture within the meaning of Section 2340A and the Convention. We further conclude that certain acts may be cruel, inhuman, or degrading, but still not produce pain and suffering of the requisite intensity to fall within Section 2340A's proscription against torture. We conclude by examining possible defenses that would negate any claim that certain interrogation methods violate the statute.

In Part I, we examine the criminal statute's text and history. We conclude that for an act to constitute torture as defined in Section 2340, it must inflict pain that is difficult to endure. Physical pain amounting to torture must be equivalent in intensity to the pain accompanying serious physical injury, such as organ failure, impairment of bodily function, or even death. For purely mental pain or suffering to amount to torture under Section 2340, it must result in significant psychological harm of significant duration, e.g., lasting for months or even years. We conclude that the mental harm also must result from one of the predicate acts listed in the statute, namely: threats of imminent death; threats of infliction of the kind of pain that would amount to physical torture; infliction of such physical pain as a means of psychological torture; use of drugs or other procedures designed to deeply disrupt the senses, or fundamentally alter an individual's personality; or threatening to do any of these things to a third party. The legislative history simply reveals that Congress intended for the statute's definition to track the Convention's definition of torture and the reservations, understandings, and declarations that the United States submitted with its ratification. We conclude that the statute, taken as a whole, makes plain that it prohibits only extreme acts.

In Part II, we examine the text, ratification history, and negotiating history of the Torture Convention. We conclude that the treaty's text prohibits only the most extreme

ATTACH 5

acts by reserving criminal penalties solely for torture and declining to require such penalties for "cruel, inhuman, or degrading treatment or punishment." This confirms our view that the criminal statute penalizes only the most egregious conduct. Executive branch interpretations and representations to the Senate at the time of ratification further confirm that the treaty was intended to reach only the most extreme conduct.

In Part III, we analyze the jurisprudence of the Torture Victims Protection Act, 28 U.S.C. § 1350 note (2000), which provides civil remedies for torture victims, to predict the standards that courts might follow in determining what actions reach the threshold of torture in the criminal context. We conclude from these cases that courts are likely to take a totality-of-the-circumstances approach, and will look to an entire course of conduct, to determine whether certain acts will violate Section 2340A. Moreover, these cases demonstrate that most often torture involves cruel and extreme physical pain. In Part IV, we examine international decisions regarding the use of sensory deprivation techniques. These cases make clear that while many of these techniques may amount to cruel, inhuman or degrading treatment, they do not produce pain or suffering of the necessary intensity to meet the definition of torture. From these decisions, we conclude that there is a wide range of such techniques that will not rise to the level of torture.

In Part V, we discuss whether Section 2340A may be unconstitutional if applied to interrogations undertaken of enemy combatants pursuant to the President's Commander-in-Chief powers. We find that in the circumstances of the current war against al Qaeda and its allies, prosecution under Section 2340A may be barred because enforcement of the statute would represent an unconstitutional infringement of the President's authority to conduct war. In Part VI, we discuss defenses to an allegation that an interrogation method might violate the statute. We conclude that, under the current circumstances, necessity or self-defense may justify interrogation methods that might violate Section 2340A.

## I.    18 U.S.C. §§ 2340–2340A

Section 2340A makes it a criminal offense for any person "outside the United States [to] commit[] or attempt[] to commit torture."[1] Section 2340 defines the act of torture as an:

---

[1] If convicted of torture, a defendant faces a fine or up to twenty years' imprisonment or both. If, however, the act resulted in the victim's death, a defendant may be sentenced to life imprisonment or to death. *See* 18 U.S.C.A. § 2340A(a). Whether death results from the act also affects the applicable statute of limitations. Where death does not result, the statute of limitations is eight years; if death results, there is no statute of limitations. *See* 18 U.S.C.A. § 3286(b) (West Supp. 2002); *id.* § 2332b(g)(5)(B) (West Supp. 2002). Section 2340A as originally enacted did not provide for the death penalty as a punishment. *See* Omnibus Crime Bill, Pub. L. No.103-322, Title VI, Section 60020, 108 Stat. 1979 (1994) (amending section 2340A to provide for the death penalty); H. R. Conf. Rep. No. 103-711, at 388 (1994) (noting that the act added the death penalty as a penalty for torture).

Most recently, the USA Patriot Act, Pub. L. No. 107-56, 115 Stat. 272 (2001), amended section 2340A to expressly codify the offense of conspiracy to commit torture. Congress enacted this amendment as part of a broader effort to ensure that individuals engaged in the planning of terrorist activities could be prosecuted irrespective of where the activities took place. *See* H. R. Rep. No. 107-236, at 70 (2001)

Moreover, the Israeli Supreme Court concluded that in certain circumstances GSS officers could assert a necessity defense. [17]    CAT, however, expressly provides that "[n]o exceptional circumstance whatsoever, whether a state of war or a threat of war, internal political instability or any other public emergency may be invoked as a justification of torture." Art. 2(2).   Had the court been of the view that the GSS methods constituted torture, the Court could not permit this affirmative defense under CAT. Accordingly, the court's decision is best read as concluding that these methods amounted to cruel and inhuman treatment, but not torture.

In sum, both the European Court on Human Rights and the Israeli Supreme Court have recognized a wide array of acts that constitute cruel, inhuman, or degrading treatment or punishment, but do not amount to torture. Thus, they appear to permit, under international law, an aggressive interpretation as to what amounts to torture, leaving that label to be applied only where extreme circumstances exist.

## V.    The President's Commander-in-Chief Power

Even if an interrogation method arguably were to violate Section 2340A, the statute would be unconstitutional if it impermissibly encroached on the President's constitutional power to conduct a military campaign.   As Commander-in-Chief, the President has the constitutional authority to order interrogations of enemy combatants to gain intelligence information concerning the military plans of the enemy.  The demands of the Commander-in-Chief power are especially pronounced in the middle of a war in which the nation has already suffered a direct attack.  In such a case, the information gained from interrogations may prevent future attacks by foreign enemies.  Any effort to apply Section 2340A in a manner that interferes with the President's direction of such core war matters as the detention and interrogation of enemy combatants thus would be unconstitutional.

## A.    The War with Al Qaeda

At the outset, we should make clear the nature of the threat presently posed to the nation.  While your request for legal advice is not specifically limited to the current circumstances, we think it is useful to discuss this question in the context of the current war against the al Qaeda terrorist network.  The situation in which these issues arise is unprecedented in recent American history.  Four coordinated terrorist attacks, using hijacked commercial airliners as guided missiles, took place in rapid succession on the

---

[17] In permitting a necessity defense, the court drew upon the ticking time bomb hypothetical proffered by the GSS as a basis for asserting a necessity defense.  In that hypothetical, the GSS has arrested a suspect, who holds information about the location of a bomb and the time at which it is set to explode.  The suspect is the only source of this information, and without that information the bomb will surely explode, killing many people.  Under those circumstances, the court agreed that the necessity defense's requirement of imminence, which the court construed as the "imminent nature of the act rather than that of danger," would be satisfied. *Id.* ¶ 34.  It further agreed "that in appropriate circumstances" this defense would be available to GSS investigators. *Id.* ¶ 35.

morning of September 11, 2001. These attacks were aimed at critical government buildings in the Nation's capital and landmark buildings in its financial center. These events reach a different scale of destructiveness than earlier terrorist episodes, such as the destruction of the Murrah Building in Oklahoma City in 1994. They caused thousands of deaths. Air traffic and communications within the United States were disrupted; national stock exchanges were shut for several days; and damage from the attack has been estimated to run into the tens of billions of dollars. Moreover, these attacks are part of a violent campaign against the United States that is believed to include an unsuccessful attempt to destroy an airliner in December 2001; a suicide bombing attack in Yemen on the *U.S.S. Cole* in 2000; the bombings of the United States Embassies in Kenya and in Tanzania in 1998; a truck bomb attack on a U.S. military housing complex in Saudi Arabia in 1996; an unsuccessful attempt to destroy the World Trade Center in 1993; and the ambush of U.S. servicemen in Somalia in 1993. The United States and its overseas personnel and installations have been attacked as a result of Usama Bin Laden's call for a "jihad against the U.S. government, because the U.S. government is unjust, criminal and tyrannical."[18]

In response, the Government has engaged in a broad effort at home and abroad to counter terrorism. Pursuant to his authorities as Commander-in-Chief, the President in October, 2001, ordered the Armed Forces to attack al Qaeda personnel and assets in Afghanistan, and the Taliban militia that harbored them. That military campaign appears to be nearing its close with the retreat of al Qaeda and Taliban forces from their strongholds and the installation of a friendly provisional government in Afghanistan. Congress has provided its support for the use of forces against those linked to the September 11 attacks, and has recognized the President's constitutional power to use force to prevent and deter future attacks both within and outside the United States. S. J. Res. 23, Pub. L. No. 107-40, 115 Stat. 224 (2001). We have reviewed the President's constitutional power to use force abroad in response to the September 11 attacks in a separate memorandum. *See* Memorandum for Timothy E. Flanigan, Deputy Counsel to the President, from John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: The President's Constitutional Authority to Conduct Military Operations Against Terrorists and Nations Supporting Them* (Sept. 25, 2001) ("September 11 War Powers Memorandum"). We have also discussed the President's constitutional authority to deploy the armed forces domestically to protect against foreign terrorist attack in a separate memorandum. *See* Memorandum for Alberto R. Gonzales, Counsel to the President and William J. Haynes, II, General Counsel, Department of Defense, from John C. Yoo, Deputy Assistant Attorney General and Robert J. Delahunty, Special Counsel, Office of Legal Counsel, *Re: Authority for Use of Military Force to Combat Terrorist Activities Within the United States* at 2–3 (Oct. 17, 2001). The Justice Department and the FBI have launched a sweeping investigation in response to the September 11 attacks, and last fall Congress enacted legislation to expand the Justice Department's powers of surveillance against terrorists. *See* The USA Patriot Act, Pub. L. No. 107-56, 115 Stat. 272 (Oct. 26, 2001). This spring, the President proposed the creation of a new cabinet

---

[18] *See Osama Bin Laden v. The U.S.: Edicts and Statements*, CNN Interview with Osama bin Laden, March 1997, *available at* http://www.pbs.org/wgbh/pages/frontline/shows/binladen/who/edicts.html.

department for homeland security to implement a coordinated domestic program against terrorism.

Despite these efforts, numerous upper echelon leaders of al Qaeda and the Taliban, with access to active terrorist cells and other resources, remain at large. It has been reported that the al Qaeda fighters are already drawing on a fresh flow of cash to rebuild their forces. *See* Paul Haven, *U.S.: al-Qaida Trying to Regroup*, Associated Press, Mar. 20, 2002. As the Director of the Central Intelligence Agency has recently testified before Congress, "Al-Qa'ida and other terrorist groups will continue to plan to attack this country and its interests abroad. Their modus operandi is to have multiple attack plans in the works simultaneously, and to have al-Qa'ida cells in place to conduct them." Testimony of George J. Tenet, Director of Central Intelligence, Before the Senate Armed Services Committee at 2 (Mar. 19, 2002). Nor is the threat contained to Afghanistan. "Operations against US targets could be launched by al-Qa'ida cells already in place in major cities in Europe and the Middle East. Al-Qa'ida can also exploit its presence or connections to other groups in such countries as Somalia, Yemen, Indonesia, and the Philippines." *Id.* at 3. It appears that al Qaeda continues to enjoy information and resources that allow it to organize and direct active hostile forces against this country, both domestically and abroad.

Al Qaeda continues to plan further attacks, such as destroying American civilian airliners and killing American troops, which have fortunately been prevented. It is clear that bin Laden and his organization have conducted several violent attacks on the United States and its nationals, and that they seek to continue to do so. Thus, the capture and interrogation of such individuals is clearly imperative to our national security and defense. Interrogation of captured al Qaeda operatives may provide information concerning the nature of al Qaeda plans and the identities of its personnel, which may prove invaluable in preventing further direct attacks on the United States and its citizens. Given the massive destruction and loss of life caused by the September 11 attacks, it is reasonable to believe that information gained from al Qaeda personnel could prevent attacks of a similar (if not greater) magnitude from occurring in the United States. The case of Jose Padilla, a.k.a. Abdullah Al Mujahir, illustrates the importance of such information. Padilla allegedly had journeyed to Afghanistan and Pakistan, met with senior al Qaeda leaders, and hatched a plot to construct and detonate a radioactive dispersal device in the United States. After allegedly receiving training in wiring explosives and with a substantial amount of currency in his position, Padilla attempted in May, 2002, to enter the United States to further his scheme. Interrogation of captured al Qaeda operatives allegedly allowed U.S. intelligence and law enforcement agencies to track Padilla and to detain him upon his entry into the United States.

## B.    Interpretation to Avoid Constitutional Problems

As the Supreme Court has recognized, and as we will explain further below, the President enjoys complete discretion in the exercise of his Commander-in-Chief authority and in conducting operations against hostile forces. Because both "[t]he executive power and the command of the military and naval forces is vested in the President," the

Supreme Court has unanimously stated that it is *"the President alone* [] who is constitutionally invested with the *entire charge of hostile operations." Hamilton v. Dillin*, 88 U.S. (21 Wall.) 73, 87 (1874) (emphasis added). That authority is at its height in the middle of a war.

In light of the President's complete authority over the conduct of war, without a clear statement otherwise, we will not read a criminal statute as infringing on the President's ultimate authority in these areas. We have long recognized, and the Supreme Court has established a canon of statutory construction that statutes are to be construed in a manner that avoids constitutional difficulties so long as a reasonable alternative construction is available. *See, e.g., Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (citing *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 499–501, 504 (1979)) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, [courts] will construe [a] statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."). This canon of construction applies especially where an act of Congress could be read to encroach upon powers constitutionally committed to a coordinate branch of government. *See, e.g., Franklin v. Massachusetts*, 505 U.S. 788, 800–1 (1992) (citation omitted) ("Out of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of the [Administrative Procedure Act]. We would require an express statement by Congress before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion."); *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 465–67 (1989) (construing Federal Advisory Committee Act not to apply to advice given by American Bar Association to the President on judicial nominations, to avoid potential constitutional question regarding encroachment on Presidential power to appoint judges).

In the area of foreign affairs, and war powers in particular, the avoidance canon has special force. *See, e.g., Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988) ("unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs."); *Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 232–33 (1986) (construing federal statutes to avoid curtailment of traditional presidential prerogatives in foreign affairs). We do not lightly assume that Congress has acted to interfere with the President's constitutionally superior position as Chief Executive and Commander in Chief in the area of military operations. *See Egan*, 484 U.S. at 529 (quoting *Haig v. Agee*, 453 U.S. 280, 293-94 (1981)). *See also Agee*, 453 U.S. at 291 (deference to Executive Branch is "especially" appropriate "in the area . . . of . . . national security").

In order to respect the President's inherent constitutional authority to manage a military campaign against al Qaeda and its allies, Section 2340A must be construed as not applying to interrogations undertaken pursuant to his Commander-in-Chief authority. As our Office has consistently held during this Administration and previous Administrations, Congress lacks authority under Article I to set the terms and conditions under which the President may exercise his authority as Commander in Chief to control

the conduct of operations during a war. *See, e.g.*, Memorandum for Daniel J. Bryant, Assistant Attorney General, Office of Legislative Affairs, from Patrick F. Philbin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Swift Justice Authorization Act* (Apr. 8, 2002); Memorandum for Timothy E. Flanigan, Deputy Counsel to the President, from John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: The President's Constitutional Authority to Conduct Military Operations Against Terrorists and Nations Supporting Them* (Sep. 25, 2001) ("Flanigan Memorandum"); Memorandum for Andrew Fois, Assistant Attorney General, Office of Legislative Affairs, from Richard L. Shiffrin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Defense Authorization Act* (Sep. 15, 1995). As we discuss below, the President's power to detain and interrogate enemy combatants arises out of his constitutional authority as Commander in Chief. A construction of Section 2340A that applied the provision to regulate the President's authority as Commander-in-Chief to determine the interrogation and treatment of enemy combatants would raise serious constitutional questions. Congress may no more regulate the President's ability to detain and interrogate enemy combatants than it may regulate his ability to direct troop movements on the battlefield. Accordingly, we would construe Section 2340A to avoid this constitutional difficulty, and conclude that it does not apply to the President's detention and interrogation of enemy combatants pursuant to his Commander-in-Chief authority.

This approach is consistent with previous decisions of our Office involving the application of federal criminal law. For example, we have previously construed the congressional contempt statute not to apply to executive branch officials who refuse to comply with congressional subpoenas because of an assertion of executive privilege. In a published 1984 opinion, we concluded that

> if executive officials were subject to prosecution for criminal contempt whenever they carried out the President's claim of executive privilege, it would significantly burden and immeasurably impair the President's ability to fulfill his constitutional duties. Therefore, the separation of powers principles that underlie the doctrine of executive privilege also would preclude an application of the contempt of Congress statute to punish officials for aiding the President in asserting his constitutional privilege.

*Prosecution for Contempt of Congress of an Executive Branch Offical Who Has Asserted A Claim of Executive Privilege*, 8 Op. O.L.C. 101, 134 (May 30, 1984). Likewise, we believe that, if executive officials were subject to prosecution for conducting interrogations when they were carrying out the President's Commander-in-Chief powers, "it would significantly burden and immeasurably impair the President's ability to fulfill his constitutional duties." These constitutional principles preclude an application of Section 2340A to punish officials for aiding the President in exercising his exclusive constitutional authorities. *Id.*

## C. The Commander-in-Chief Power

It could be argued that Congress enacted 18 U.S.C. § 2340A with full knowledge and consideration of the President's Commander-in-Chief power, and that Congress intended to restrict his discretion in the interrogation of enemy combatants. Even were we to accept this argument, however, we conclude that the Department of Justice could not could not enforce Section 2340A against federal officials acting pursuant to the President's constitutional authority to wage a military campaign.

Indeed, in a different context, we have concluded that both courts and prosecutors should reject prosecutions that apply federal criminal laws to activity that is authorized pursuant to one of the President's constitutional powers. This Office, for example, has previously concluded that Congress could not constitutionally extend the congressional contempt statute to executive branch officials who refuse to comply with congressional subpoenas because of an assertion of executive privilege. We opined that "courts ... would surely conclude that a criminal prosecution for the exercise of a presumptively valid, constitutionally based privilege is not consistent with the Constitution." 8 Op. O.L.C. at 141. Further, we concluded that the Department of Justice could not bring a criminal prosecution against a defendant who had acted pursuant to an exercise of the President's constitutional power. "The President, through a United States Attorney, need not, indeed may not, prosecute criminally a subordinate for asserting on his behalf a claim of executive privilege. Nor could the Legislative Branch or the courts require or implement the prosecution of such an individual." *Id.* Although Congress may define federal crimes that the President, through the Take Care Clause, should prosecute, Congress cannot compel the President to prosecute outcomes taken pursuant to the President's own constitutional authority. If Congress could do so, it could control the President's authority through the manipulation of federal criminal law.

We have even greater concerns with respect to prosecutions arising out of the exercise of the President's express authority as Commander in Chief than we do with prosecutions arising out of the assertion of executive privilege. In a series of opinions examining various legal questions arising after September 11, we have explained the scope of the President's Commander-in-Chief power.[19] We briefly summarize the findings of those opinions here. The President's constitutional power to protect the security of the United States and the lives and safety of its people must be understood in light of the Founders' intention to create a federal government "cloathed with all the powers requisite to the complete execution of its trust." *The Federalist* No. 23, at 147 (Alexander Hamilton) (Jacob E. Cooke ed. 1961). Foremost among the objectives committed to that trust by the Constitution is the security of the nation. As Hamilton explained in arguing for the Constitution's adoption, because "the circumstances which may affect the public safety" are not "reducible within certain determinate limits,"

---

[19] *See, e.g.,* September 11 War Powers Memorandum; Memorandum for Alberto R. Gonzales, Counsel to the President, from Patrick F. Philbin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Legality of the Use of Military Commissions to Try Terrorists* (Nov. 6, 2001).

> it must be admitted, as a necessary consequence, that there can be no
> limitation of that authority, which is to provide for the defence and
> protection of the community, in any matter essential to its efficacy.

*Id.* at 147–48. Within the limits that the Constitution itself imposes, the scope and distribution of the powers to protect national security must be construed to authorize the most efficacious defense of the nation and its interests in accordance "with the realistic purposes of the entire instrument." *Lichter v. United States*, 334 U.S. 742, 782 (1948).

The text, structure and history of the Constitution establish that the Founders entrusted the President with the primary responsibility, and therefore the power, to ensure the security of the United States in situations of grave and unforeseen emergencies. The decision to deploy military force in the defense of United States interests is expressly placed under Presidential authority by the Vesting Clause, U.S. Const. Art. I, § 1, cl. 1, and by the Commander-in-Chief Clause, *id.*, § 2, cl. 1.[20] This Office has long understood the Commander-in-Chief Clause in particular as an affirmative grant of authority to the President. *See, e.g.*, Memorandum for Charles W. Colson, Special Counsel to the President, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: The President and the War Power: South Vietnam and the Cambodian Sanctuaries* (May 22, 1970) ("Rehnquist Memorandum"). The Framers understood the Clause as investing the President with the fullest range of power understood at the time of the ratification of the Constitution as belonging to the military commander. In addition, the structure of the Constitution demonstrates that any power traditionally understood as pertaining to the executive—which includes the conduct of warfare and the defense of the nation—unless expressly assigned in the Constitution to Congress, is vested in the President. Article II, Section 1 makes this clear by stating that the "executive Power shall be vested in a President of the United States of America." That sweeping grant vests in the President an unenumerated "executive power" and contrasts with the specific enumeration of the powers—those "herein"—granted to Congress in Article I. The implications of constitutional text and structure are confirmed by the practical consideration that national security decisions require the unity in purpose and energy in action that characterize the Presidency rather than Congress.[21]

---

[20] *See Johnson v. Eisentrager*, 339 U.S. 763, 789 (1950) (President has authority to deploy United States armed forces "abroad or to any particular region"); *Fleming v. Page*, 50 U.S. (9 How.) 603, 614–15 (1850) ("As commander-in-chief, [the President] is authorized to direct the movements of the naval and military forces placed by law at his command, and to employ them in the manner he may deem most effectual") *Loving v. United States*, 517 U.S. 748, 776 (1996) (Scalia, J., concurring in part and concurring in judgment) (The "inherent powers" of the Commander in Chief "are clearly extensive."); *Maul v. United States*, 274 U.S. 501, 515-16 (1927) (Brandeis & Holmes, JJ., concurring) (President "may direct any revenue cutter to cruise in any waters in order to perform any duty of the service"); *Commonwealth of Massachusetts v. Laird*, 451 F.2d 26, 32 (1st Cir. 1971) (the President has "power as Commander-in-Chief to station forces abroad"); *Ex parte Vallandigham*, 28 F.Cas. 874, 922 (C.C.S.D. Ohio 1863) (No. 16,816) (in acting "under this power where there is no express legislative declaration, the president is guided solely by his own judgment and discretion"); *Authority to Use United States Military Forces in Somalia*, 16 Op. O.L.C. 6, 6 (Dec. 4, 1992) (Barr, Attorney General).

[21] Judicial decisions since the beginning of the Republic confirm the President's constitutional power and duty to repel military action against the United States and to take measures to prevent the recurrence of an attack. As Justice Joseph Story said long ago, "[i]t may be fit and proper for the government, in the

As the Supreme Court has recognized, the Commander-in-Chief power and the President's obligation to protect the nation imply the ancillary powers necessary to their successful exercise. "The first of the enumerated powers of the President is that he shall be Commander-in-Chief of the Army and Navy of the United States. And, of course, the grant of war power includes all that is necessary and proper for carrying those powers into execution." *Johnson v. Eisentrager*, 339 U.S. 763, 788 (1950). In wartime, it is for the President alone to decide what methods to use to best prevail against the enemy. *See, e.g.*, Rehnquist Memorandum; Flanigan Memorandum at 3. The President's complete discretion in exercising the Commander-in-Chief power has been recognized by the courts. In the *Prize Cases*, 67 U.S. (2 Black) 635, 670 (1862), for example, the Court explained that whether the President "in fulfilling his duties as Commander in Chief" had appropriately responded to the rebellion of the southern states was a question "to be *decided by him*" and which the Court could not question, but must leave to "the political department of the Government to which this power was entrusted."

One of the core functions of the Commander in Chief is that of capturing, detaining, and interrogating members of the enemy. *See, e.g.*, Memorandum for William J. Haynes, II, General Counsel, Department of Defense, from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, *Re: The President's Power as Commander in Chief to Transfer Captured Terrorists to the Control and Custody of Foreign Nations* at 3 (March 13, 2002) ("the Commander-in-Chief Clause constitutes an independent grant of substantive authority to engage in the detention and transfer of prisoners captured in armed conflicts"). It is well settled that the President may seize and detain enemy combatants, at least for the duration of the conflict, and the laws of war make clear that prisoners may be interrogated for information concerning the enemy, its strength, and its plans.[22] Numerous Presidents have ordered the capture, detention, and questioning of

_____

exercise of the high discretion confided to the executive, for great public purposes, to act on a sudden emergency, or to prevent an irreparable mischief, by summary measures, which are not found in the text of the laws." *The Apollon*, 22 U.S. (9 Wheat.) 362, 366–67 (1824). If the President is confronted with an unforeseen attack on the territory and people of the United States, or other immediate, dangerous threat to American interests and security, it is his constitutional responsibility to respond to that threat with whatever means are necessary. *See, e.g., The Prize Cases*, 67 U.S. (2 Black) 635, 668 (1862) ("If a war be made by invasion of a foreign nation, the President is not only authorized but bound to resist force by force . . . without waiting for any special legislative authority."); *United States v. Smith*, 27 F. Cas. 1192, 1229-30 (C.C.D.N.Y. 1806) (No. 16,342) (Paterson, Circuit Justice) (regardless of statutory authorization, it is "the duty . . . of the executive magistrate . . . to repel an invading foe"); *see also* 3 Story, *Commentaries* § 1485 ("[t]he command and application of the public force . . . to maintain peace, and to resist foreign invasion" are executive powers).

[22] The practice of capturing and detaining enemy combatants is as old as war itself. *See* Allan Rosas, The Legal Status of Prisoners of War 44–45 (1976). In modern conflicts, the practice of detaining enemy combatants and hostile civilians generally has been designed to balance the humanitarian purpose of sparing lives with the military necessity of defeating the enemy on the battlefield. *Id.* at 59–80. While Article 17 of the Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3517, places restrictions on interrogation of enemy combatants, members of al Qaeda and the Taliban militia are not legally entitled to the status of prisoners of war as defined in the Convention. *See* Memorandum for Alberto R. Gonzales, Counsel to the President and William J. Haynes, II, General Counsel, Department of Defense, from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, *Re: Application of Treaties and Laws to al Qaeda and Taliban Detainees* (Jan. 22, 2002).

enemy combatants during virtually every major conflict in the Nation's history, including recent conflicts such as the Gulf, Vietnam, and Korean wars. Recognizing this authority, Congress has never attempted to restrict or interfere with the President's authority on this score. *Id.*

Any effort by Congress to regulate the interrogation of battlefield combatants would violate the Constitution's sole vesting of the Commander-in-Chief authority in the President. There can be little doubt that intelligence operations, such as the detention and interrogation of enemy combatants and leaders, are both necessary and proper for the effective conduct of a military campaign. Indeed, such operations may be of more importance in a war with an international terrorist organization than one with the conventional armed forces of a nation-state, due to the former's emphasis on secret operations and surprise attacks against civilians. It may be the case that only successful interrogations can provide the information necessary to prevent the success of covert terrorist attacks upon the United States and its citizens. Congress can no more interfere with the President's conduct of the interrogation of enemy combatants than it can dictate strategic or tactical decisions on the battlefield. Just as statutes that order the President to conduct warfare in a certain manner or for specific goals would be unconstitutional, so too are laws that seek to prevent the President from gaining the intelligence he believes necessary to prevent attacks upon the United States.

## VI.  Defenses

In the foregoing parts of this memorandum, we have demonstrated that the ban on torture in Section 2340A is limited to only the most extreme forms of physical and mental harm.  We have also demonstrated that Section 2340A, as applied to interrogations of enemy combatants ordered by the President pursuant to his Commander-in-Chief power would be unconstitutional. Even if an interrogation method, however, might arguably cross the line drawn in Section 2340, and application of the statute was not held to be an unconstitutional infringement of the President's Commander-in-Chief authority, we believe that under the current circumstances certain justification defenses might be available that would potentially eliminate criminal liability.  Standard criminal law defenses of necessity and self-defense could justify interrogation methods needed to elicit information to prevent a direct and imminent threat to the United States and its citizens.

### A.  Necessity

We believe that a defense of necessity could be raised, under the current circumstances, to an allegation of a Section 2340A violation. Often referred to as the "choice of evils" defense, necessity has been defined as follows:

> Conduct that the actor believes to be necessary to avoid a harm or evil to himself or to another is justifiable, provided that:

As we have made clear in other opinions involving the war against al Qaeda, the nation's right to self-defense has been triggered by the events of September 11. If a government defendant were to harm an enemy combatant during an interrogation in a manner that might arguably violate Section 2340A, he would be doing so in order to prevent further attacks on the United States by the al Qaeda terrorist network. In that case, we believe that he could argue that his actions were justified by the executive branch's constitutional authority to protect the nation from attack. This national and international version of the right to self-defense could supplement and bolster the government defendant's individual right.

## Conclusion

For the foregoing reasons, we conclude that torture as defined in and proscribed by Sections 2340–2340A, covers only extreme acts. Severe pain is generally of the kind difficult for the victim to endure. Where the pain is physical, it must be of an intensity akin to that which accompanies serious physical injury such as death or organ failure. Severe mental pain requires suffering not just at the moment of infliction but it also requires lasting psychological harm, such as seen in mental disorders like posttraumatic stress disorder. Additionally, such severe mental pain can arise only from the predicate acts listed in Section 2340. Because the acts inflicting torture are extreme, there is significant range of acts that though they might constitute cruel, inhuman, or degrading treatment or punishment fail to rise to the level of torture.

Further, we conclude that under the circumstances of the current war against al Qaeda and its allies, application of Section 2340A to interrogations undertaken pursuant to the President's Commander-in-Chief powers may be unconstitutional. Finally, even if an interrogation method might violate Section 2340A, necessity or self-defense could provide justifications that would eliminate any criminal liability.

Please let us know if we can be of further assistance.

Jay S. Bybee
Assistant Attorney General

---

as recognized by the charter of the United Nations." This right of self-defense is a right to effective self-defense. In other words, the victim state has the right to use force against the aggressor who has initiated an "armed attack" until the threat has abated. The United States, through its military and intelligence personnel, has a right recognized by Article 51 to continue using force until such time as the threat posed by al Qaeda and other terrorist groups connected to the September 11th attacks is completely ended." Other treaties re-affirm the right of the United States to use force in its self-defense. See, e.g., Inter-American Treaty of Reciprocal Assistance, art. 3, Sept. 2, 1947, T.I.A.S. No. 1838, 21 U.N.T.S. 77 (Rio Treaty); North Atlantic Treaty, art. 5, Apr. 4, 1949, 63 Stat. 2241, 34 U.N.T.S. 243.

ATTACHMENT
6

# Map of Afghanistan



Source: Map Resources. Adapted by CRS. (1/03 M.Chin)

ATTACH 6 — 1



Close this window

Published on  2004-08-19

# Passaro served in harsh Afghan outpost

By Kevin Maurer
Staff writer

The only signs of the last soldiers to occupy Asadabad, Afghanistan before the Americans came are their bloody hand prints.



Passaro

Afghans told U.S. soldiers that mujahedeen freedom fighters massacred the Russian garrison at the small fire base during the Soviet occupation in the 1980s.

Almost 20 years later, the old Russian base has become an isolated outpost in the hunt for Osama bin Laden. It was there, federal authorities allege, that David Passaro beat Abdul Wali with a flashlight during an interrogation. Wali later died.

At the time, a platoon of soldiers from Fort Bragg's 82nd Airborne Division was based at the camp more than 100 miles northeast of Kabul. The soldiers - who spoke about their time at the camp and their recollections of Passaro on condition that their names not be used - said the area near the Pakistani border is a popular crossing point for Taliban and al-Qaida fighters.

There, the soldiers lived in harsh conditions and under constant threat of rocket attacks. On the walls of the compound were the hand prints of their Russian predecessors to remind them of how dangerous their corner of Afghanistan could be.

## A CIA job

Passaro was in Afghanistan from May to August 2003. He took a leave of absence from his job as an intelligence analyst at the Army Special Operations Command at Fort Bragg to take a CIA contract in Afghanistan.

Most of the 82nd paratroopers said they remembered him. He was one of the Special Forces soldiers, Navy Seals, CIA operators and Rangers who worked out of the camp.

Passaro spoke Dari and Pashto, the main languages of Afghanistan, and often visited the medical tent to talk with patients, 82nd soldiers said.

Passaro is a former Special Forces medic. He was part of a paramilitary team composed of CIA operatives and Special Forces soldiers who captured and questioned members of al-Qaida and the Taliban.

The 82nd soldiers, meanwhile, guarded the base and patrolled the town of Asadabad. They also guarded the jail.

The government says that Passaro beat Wali while interrogating him there.

The 82nd soldiers said the jail was a small mud building with four rooms - three cells and an interrogation room. The prisoners were given cots and blankets. The soldiers would take them to the bathroom, allow them to pray and feed them.



Previous

- Other prison won't accept Passaro (Aug. 14)
- CIA men on Passaro (Aug. 4)
- Passaro's lawyer against abuse as called into question (June 20)
- Civilian arrested in Afghanistan prison death (June 18)

6 - 2

The paratroopers said they were told by Special Forces soldiers and CIA operatives to keep the prisoners separated. Detainees were not allowed to talk to each other.

"We would make them stand in the corner like a little kid," one paratrooper said.

Some of the paratroopers interviewed by The Fayetteville Observer said they saw detainees being interrogated, but none of them saw anyone get beaten.

Federal prosecutors have indicated, however, that some 82nd soldiers did see beatings. They plan to call three paratroopers to testify that Passaro hit a detainee with a metal flashlight 10 to 30 times and kicked him so hard that he flew in the air.

Passaro is facing four charges of assault and could be sentenced to 40 years in prison if he is convicted. He says the Bush administration is making him a scapegoat in the wake of other abuse allegations about Abu Ghraib prison in Iraq.

### The detainee

The detainee Passaro is accused of beating turned himself in at the gate to the camp, news reports have said. He was suspected of shooting rockets at the camp.

Rocket attacks were common, 82nd paratroopers said. About twice a week, guerrillas would fire at the camp. The soldiers were forced to sleep in their boots to be ready to run for bunkers at a second's notice.

Once, a rocket armed with white phosphorous fell short of the camp and set a nearby hillside afire. The incendiary round could have destroyed the camp's canvas tents.

Life at Asadabad was hard in general, the paratroopers said. The camp was surrounded by a horseshoe of mountains. Supplies were brought in by helicopter. The paratroopers said it was an hour and a half ride from Bagram airfield.

The walled camp was made up of about a dozen canvas tents, in which the soldiers slept, and several mud huts. The base was about the size as a small parking lot.

"You could literally throw a rock from one side to the other," said one paratrooper. Soldiers went on patrols just to escape the monotony of camp life.

The paratroopers joked that the detainees lived better than they did. The tents leaked when it rained. There was no contractor providing hot food and there were few amenities. The main water source was a creek. Soldiers could purify the water, but many were still sick.

"That is the worst place I've ever been," one soldier said.

Staff writer Kevin Maurer can be reached at maurerk@fayettevillenc.com or 486-3587.

Copyright 2004 The Fayetteville (N.C.) Observer (http://www.fayettevillenc.com)

6-3

DefendAmerica News - Afghanistan Update



## Security & Reconstruction

Coalition Joint Task Force-180 is a coalition military operation in Afghanistan with military forces from 20 coalition partner countries focused on creating the conditions for security, stability and reconstruction. Each day, CJTF-180 Public Affairs Press Center provides news and information about operations in the coalition joint operating area and about coalition partner military activities and their operations in Afghanistan.

### June 16, 2003
By U.S. Army Col. Rodney Davis , CJTF-180

BAGRAM AIR BASE, Afghanistan — Civil-Military Affairs in Kabul attended the opening of the Mahmood Hotaky School in the Kota Sangay School District in Kabul Saturday. The $38,000 school project serves 4,000 students in the area.

Two Afghan males of unknown age were medically evacuated from Orgun-E to Bagram Saturday afternoon with gunshot wounds. One had a wound to his abdomen, and the other had a wound to his left knee. It is not yet known how they received their wounds. They are in stable condition at this time.

An improvised explosive device found by Afghan border guards in a compound south of the firebase at Orgun-E, Saturday, was destroyed in place by a Task Force Devil element from Orgun-E.

A total of six rockets were fired at coalition forces compounds over the weekend. Yesterday afternoon one rocket was fired at the firebase near Asadabad, in Kunar Province. Four rockets impacted in the vicinity of the firebase at Deh Rawood, in Uruzgan Province early Sunday morning. An Afghan Military Forces patrol investigated the incident and found nothing. And, one rocket impacted in the vicinity of the firebase at Orgun-E, in Paktika Province Saturday night. There were no reported casualties or damage to equipment at any of the three locations.

Coalition forces did not observe where the rockets were fired from or who fired them.

### June 14, 2003
By U.S. Army Col. Rodney Davis , CJTF-180

BAGRAM AIR BASE, Afghanistan — The Civil-Military Operations Team in Kabul attended the ribbon cutting ceremony of the Sur-e-Tapa, Zorabad Well Refurbishment

The Civil-Military Operations team from Herat delivered 800 meters of fabric to the Academy of Educational Development yesterday for sewing training. The students will use the material to make clothing for the youth and development center, and will clothe 280 girls and 120 boys, four to ten years of age.

Special Operations Forces and Afghan Military Forces recovered unexploded ordnance and some former Taliban weapons in a cave near the village of Khawaja Qala, near Mazar-E-Sharif, in Balki province yesterday. The weapons included three artillery pieces, and one 14.5mm machine gun. The ordnance was destroyed and the weapons rendered inoperable by explosives.

One rocket impacted in the vicinity of the firebase at Chapman southeast of Khowst early this morning. There were no injuries or damage to equipment.

### June 9, 2003
By U.S. Army Col. Rodney Davis , CJTF-180

BAGRAM AIR BASE, Afghanistan — Three ISAF soldiers were medically evacuated to Bagram Saturday morning after the bus attack bombing in Kabul. All three are in stable condition and were evacuated to Germany.

An 812th Romanian patrol, supported by Task Force Devil civil affairs personnel, distributed school supplies and humanitarian rations to several villages north of Kandahar, in Kandahar province Friday. First they distributed 250 rations and school supplies to Qadzi Kariz, a village of 250 families. Then they distributed 50 rations to Din Muhuda, a small village of two families.

Coalition Engineers delivered school supplies to students at the Mahood Hotaky School, on the west side of Kabul Thursday. There are 4,000 students in the primary and secondary school. The supplies included 12 blue packs, which were given to the school's top students.

A Task Force Devil patrol took one person under control and discovered a small cache in the vicinity of Shkin on Sunday. The cache included: 2 AK-47s, 8 magazines of 100 rounds each of AK-47ammunition, 800 machine gun rounds, a shipping plug and cap to a mine and a 82mm mortar shipping case. The cache was found next to two mortar firing pits.

6-4

Project east of Kabul yesterday. Eight common use wells were rehabilitated to provide safe drinking water for a community of approximately 30,000 homes. The estimated cost of the project was $24,000 and took three months to complete.

An undisclosed number of individuals brought in three caches to an Afghan Military Forces compound in the vicinity of Jalalabad, in Nangarhar Province yesterday. The caches included: 40 cases 12.5mm ammunition, 15 rockets, 15 rocket fuses and 1 machine gun. Afghan Military Forces members informed Special Operations Forces members in the area about the cache. It has not been determined what will happen to the munitions at this time.

The Asadabad Director of Communications turned over an ordnance cache to Special Operations Forces members at the firebase at Asadabad, in Kunar province yesterday. The cache included: seven boxes of 12.7mm ammunition, 37 boxes of 14.5mm ammunition, one box of 7.62x54 ammunition, four 82mm recoilless rifle rounds, and 16 x 107mm rockets. Much of the ammunition was rusty, but the 107mm and 82mm rounds were serviceable. The director said the ammunition was left over from the conflict with the Russians. All usable ammunition will be given to the Afghan National Army and unserviceable ammunition destroyed.

*June 14*

Three rockets impacted in the vicinity of the firebase in Asadabad, in Kunar province this morning. There were no casualties or damage to equipment.

### June 13, 2003
#### By U.S. Army Col. Rodney Davis , CJTF-180

BAGRAM AIR BASE, Afghanistan — A U.S. female soldier was medically evacuated from Kabul Military Training Center to Bagram Air Base early this morning with acute appendicitis. She is in surgery at this time.

A Special Operations Forces team destroyed a cache found in the village of Da Ghuluguder, northeast of Kabul Wednesday. The cache included: 248 - rockets, 100 - 82mm mortar rounds, 13 - 14.5mm ammo cans, two - 7.62mm ammo cans and six - anti-tank mines. An Afghan citizen provided information about the cache.

With regards to reports of suspected coalition involvement in the use of herbicides and pesticides, we've checked and double-checked. The bottom line is the coalition has not been involved in the use of herbicides or pesticides. The coalition doesn't have helicopters capable of spraying herbicides or pesticides as some have claimed. That's not what we came here to do and it's not in our plans. None of our forces are stationed in that region and those who've patrolled through the area did not engage in the use of chemicals for drug or insect control. We don't have the resources or are we inclined to focus on opium eradication or bug control. That kind of activity requires experts and that's not our area of expertise. We know what we're good at and that type of activity is out of our lane. Our soldiers are focused on providing humanitarian assistance and hunting down anti-coalition Taliban and Al Qaeda operatives. That's what we're good at and that's what we're doing.

A Task Force Devil mounted patrol recovered a weapons cache north of the firebase at Shkin, in Paktika province yesterday. The cache included: 450 rifle rounds, 120 - machine gun rounds, 22 AK-47 full magazines, two full pistol magazines, seven grenades, four AK-47s, three rifles and one

*June 7*

Two rockets were fired in the direction of the firebase at Asadabad Saturday night. Soldiers at the firebase saw two individuals leaving the area. There were no casualties or damage to equipment.

### June 6, 2003
#### By U.S. Army Lt. Col. Douglas Lefforge

BAGRAM AIR BASE, Afghanistan — Approximately two companies from Task Force Devil out of Kandahar re-established a cordon and search mission in the mountains between Gardez and Khowst yesterday through this morning. The Operation has been tactically named Dragon Fury II. The operation was based on intelligence developed as a result of Operation Dragon Fury, which was conducted between Monday and Wednesday. During Dragon Fury II, anti-coalition fighters were observed firing into a crowd of civilians near a compound in an area north of the Khowst-Gardez road, wounding four. Coalition forces killed one enemy fighter and took another person under control. Two of the wounded civilians, an adult male with gunshot wounds to his right arm and chest, and a five- to seven-year-old boy with a gunshot wound to his chest, were medically evacuated from the vicinity to the Forward Operating Base at Salerno yesterday afternoon. They are both in critical condition. Initial reports do not indicate why the anti-coalition fighters fired at civilians.

There were three separate enemy actions that occurred in the vicinity of Asadabad yesterday. The first was the firing of a white phosphorus rocket that impacted away from the firebase. The second attack was two mortar rounds that also impacted away from the Base. The third attack was a 107mm rocket fired in the direction of the base and impacted near a girls' school close to the base. There was no report of injury or damage to equipment or property.

*June 5*

Three rockets were fired at the firebase near Shkin yesterday evening impacting away from the base. There were no casualties or damage to equipment.

An Afghan Military Forces soldier was medically evacuated from the vicinity of Spin Buldak to Kandahar yesterday afternoon with gunshot wounds to his left tricep, left thigh and buttocks. He underwent exploratory surgery and is in stable condition. The wounds were received during a fight between AMF and anti-coalition fighters. He is in stable condition.

### June 5, 2003
#### By U.S. Army Lt. Col. Douglas Lefforge

BAGRAM AIR BASE, Afghanistan — In an update to yesterday's press statement: The AH-64 Apache helicopter that crash-landed Tuesday northwest of Orgun-E was destroyed in place yesterday. There was only minor damage to windows at a nearby school from the detonation. The Civil Affairs team on site is coordinating repairs.

Task Force Devil Civil Affairs personnel supported an 812th Romanian-led team in distributing 350 Humanitarian Rations and toys to the villages of Haji Mohammad Zai Kalacha and Haji Parman Kalacha, south of Kandahar, in Kandahar province yesterday.

A 25-year old Afghan male was medically evacuated from Orgun-E to Kandahar airfield with a gunshot wound to his left thigh yesterday afternoon. He is in stable condition at this time. The cause of the wound is unknown.

rocket-propelled grenade launcher.

One rocket impacted in the vicinity of the firebase at Orgun-E, in Paktika province last night. There were no casualties or damage to equipment.

Two rockets impacted in the vicinity of the forward operating base at Salerno, in Khowst province yesterday. There were no casualties or damage to equipment.

### June 12, 2003

By U.S. Army Col. Rodney Davis, CJTF-180

BAGRAM AIR BASE, Afghanistan — An 812th Romanian patrol, with Task Force Devil Civil Affairs personnel, distributed 150 humanitarian rations and school notebooks to the children in the villages of Haji Mowladad Kalach, Mohammad Ghaws Kalay and Mullah Koch Kalay, south of Kandahar Tuesday.

A Task Force Devil convoy in route to Orgun-E south of Gayan District in Paktika province came in contact with three to five enemy personnel. The convoy returned fire, broke contact and continued to Orgun-E. There were no injuries to personnel or damage to equipment. No further action was taken and there is no information on enemy casualties.

A Task Force Devil patrol on highway four between Spin Boldak and Kandahar stopped two personnel driving a two-ton truck transporting munitions. The truck carried 500 - 82mm mortar rounds. The individuals had no identification and were taken under control. The truck was turned over to General Gulali at the Afghan Military Forces compound.

One rocket impacted in the vicinity of the firebase at Gardez in Paktia province yesterday evening. There were no casualties or damage to equipment.

### June 11, 2003

By: Lt. Col. Douglas Lefforge

BAGRAM AIR BASE, Afghanistan — A U.S. soldier was wounded this morning as a result of a 9mm accidental discharge at Kandahar Air Base. The soldier is in surgery and in stable condition. The accident is under investigation. The name of the wounded soldier is being withheld for privacy.

An Improvised Explosive Device exploded near a Special Operations Forces convoy one kilometer from the Gardez firebase yesterday morning. The convoy continued to the firebase and returned with other forces to investigate. There were no casualties and only a cracked windshield to one vehicle.

_____

6-6

DefendAmerica News - Afghanistan Update



## Security & Reconstruction

Coalition Joint Task Force-180 is a coalition military operation in Afghanistan with military forces from 20 coalition partner countries focused on creating the conditions for security, stability and reconstruction. Each day, CJTF-180 Public Affairs Press Center provides news and information about operations in the coalition joint operating area and about coalition partner military activities and their operations in Afghanistan.

### June 21, 2003
By U.S. Army Col. Rodney Davis , CJTF-180

BAGRAM AIR BASE, Afghanistan — Coalition civil affairs specialists and engineers visited the Kajaki Dam Hydroelectric Plant in Southern Afghanistan this week.

According to a power plant and electrical controls expert with the CA team, bearings in one of the two massive turbines at the dam are almost worn out and in need of replacement. The shutdown of one turbine would affect power to businesses, wells and other electric users in the region.

The fastest way to alleviate the problem at the dam that was built by the U.S. Army Corps of Engineers in the 1950s is to put another turbine in to bring more power online. Funding for the turbine is beyond the capabilities of the CA mission in Afghanistan.

In the meantime, the CA power expert has contacted the dam's parts manufacturer, to find out more information on the bearings and cooling system and come up with a way for a temporary fix. Officials plan to visit the dam in the near future to conduct more assessments.

One rocket impacted in the vicinity of Orgun-E, in Paktika province last night. There were no casualties or damage to equipment.

### June 20, 2003
By U.S. Army Col. Rodney Davis , CJTF-180

BAGRAM AIR BASE, Afghanistan — Task Force Devil medical and civil affairs personnel, conducted a cooperative medical assistance visit to the village of Nageel Abad, south of Kandahar, in Kandahar province yesterday. They treated 133 individuals, 74 male and 59 female, and distributed 100 pounds of personal hygiene kits.

### June 13, 2003
By U.S. Army Col. Rodney Davis , CJTF-180

BAGRAM AIR BASE, Afghanistan — A U.S. female soldier was medically evacuated from Kabul Military Training Center to Bagram Air Base early this morning with acute appendicitis. She is in surgery at this time.

A Special Operations Forces team destroyed a cache found in the village of Da Ghuluguder, northeast of Kabul Wednesday. The cache included: 248 - rockets, 100 - 82mm mortar rounds, 13 - 14.5mm ammo cans, two - 7.62mm ammo cans and six - anti-tank mines. An Afghan citizen provided information about the cache.

With regards to reports of suspected coalition involvement in the use of herbicides and pesticides, we've checked and double-checked. The bottom line is the coalition has not been involved in the use of herbicides or pesticides. The coalition doesn't have helicopters capable of spraying herbicides or pesticides as some have claimed. That's not what we came here to do and it's not in our plans. None of our forces are stationed in that region and those who've patrolled through the area did not engage in the use of chemicals for drug or insect control. We don't have the resources or are we inclined to focus on opium eradication or bug control. That kind of activity requires experts and that's not our area of expertise. We know what we're good at and that type of activity is out of our lane. Our soldiers are focused on conducting humanitarian assistance and hunting down anti-coalition Taliban and Al Qaeda operatives. That's what we're good at and that's what we're doing.

A Task Force Devil mounted patrol recovered a weapons cache north of the firebase at Shkin, in Paktika province yesterday. The cache included: 450 rifle rounds, 120 - machine gun rounds, 22 AK-47 full magazines, two full pistol magazines, seven grenades, four AK-47s, three rifles and one rocket-propelled grenade launcher.

One rocket impacted in the vicinity of the firebase at Orgun-E, in Paktika province last night. There were no casualties or damage to equipment.

Two rockets impacted in the vicinity of the forward operating base at Salerno, in Khowst province yesterday. There were no casualties or damage to equipment.

6-7

Seven rockets impacted in the vicinity of the firebase at Orgun-E last night. There were no casualties or damage to equipment.

*June 18*

Afghan Military Forces turned over 74, 107mm rocket rounds and 54, 107mm rocket fuses to coalition forces in Asadabad, Wednesday. The rockets and fuses were recovered during an Afghan Military Forces sweep of the Shahkahul area, east of Asadabad. The rockets and fuses will be destroyed at a date to be determined.

### June 19, 2003

By U.S. Army Col. Rodney Davis , CJTF-180

BAGRAM AIR BASE, Afghanistan - A military police patrol, supported by the Task Force Devil civil affairs section, distributed 100 humanitarian rations and approximately 150 pounds of personal hygiene supplies to three villages in the vicinity of Kandahar Wednesday. They went to Zarak Kalay, Din Mohammad and Habib Bullah Kalay. All three villages expressed appreciation for the aid and their support of the coalition.

Special Operations Forces took 15 persons under control Tuesday night when they assaulted a compound on the Helmund River north of Deh Rawood, in Uruzgan province. No coalition or enemy casualties were reported. As a matter of policy and individual protection, coalition forces will not discuss any details regarding persons taken under control.

Special Operations Forces recovered a weapons cache in the vicinity of Khowst on Tuesday. The cache included: seven 107mm rockets and two 82mm mortar rounds.

### June 18, 2003

By U.S. Army Col. Rodney Davis , CJTF-180

BAGRAM AIR BASE, Afghanistan - A German delegation performed a feasibility assessment to establish a German-sponsored provincial reconstruction team in Herat, in Herat province yesterday. The provincial reconstruction team director, civil military operations commander and civil affairs team leader met with the delegation in a round table discussion. Topics included the security situation, logistics, water quality and the delegation's schedule there. A decision by the German government to accept the PRT mission or not is forthcoming.

A Special Operations Forces vehicle in a convoy was damaged when an improvised explosive device exploded as it passed by the device approximately four kilometers outside of Asadabad in Kunar province yesterday. The convoy then received small arms fire from an unknown sized element. The unit broke contact, departing the area safely, returning to the firebase at Asadabad. There were no casualties and minor damage to the one vehicle, which was drivable.

*June 17*

### June 17, 2003

By U.S. Army Col. Rodney Davis , CJTF-180

BAGRAM AIR BASE, Afghanistan - An AH-64 Apache on a medical evacuation mission made a precautionary landing due to transmission problems 30 kilometers southeast of Kabul yesterday. Neither of the two pilots was injured. A downed aircraft recovery team prepares the aircraft to be sling-loaded back to Bagram Air Base this morning. The Quick Reaction Force from Bagram Air Field secured the site and remained with the aircraft overnight. Two individuals were spotted in the

### June 12, 2003

By U.S. Army Col. Rodney Davis , CJTF-180

BAGRAM AIR BASE, Afghanistan — An 812th Romanian patrol, with Task Force Devil Civil Affairs personnel, distributed 150 humanitarian rations and school notebooks to the children in the villages of Haji Mowladad Kalach, Mohammad Ghaws Kalay and Mullah Koch Kalay, south of Kandahar Tuesday.

A Task Force Devil convoy in route to Orgun-E south of Gayan District in Paktika province came in contact with three to five enemy personnel. The convoy returned fire, broke contact and continued to Orgun-E. There were no injuries to personnel or damage to equipment. No further action was taken and there is no information on enemy casualties.

A Task Force Devil patrol on highway four between Spin Boldak and Kandahar stopped two personnel driving a two-ton truck transporting munitions. The truck carried 500 - 82mm mortar rounds. The individuals had no identification and were taken under control. The truck was turned over to General Gulali at the Afghan Military Forces compound.

One rocket impacted in the vicinity of the firebase at Gardez in Paktia province yesterday evening. There were no casualties or damage to equipment.

### June 11, 2003

By: Lt. Col. Douglas Lefforge

BAGRAM AIR BASE, Afghanistan — A U.S. soldier was wounded this morning as a result of a 9mm accidental discharge at Kandahar Air Base. The soldier is in surgery and in stable condition. The accident is under investigation. The name of the wounded soldier is being withheld for privacy.

The Civil-Military Operations team from Herat delivered 800 meters of fabric to the Academy of Educational Development yesterday for sewing training. The students will use the material to make clothing for the youth and development center, and will clothe 280 girls and 120 boys, four to ten years of age.

Special Operations Forces and Afghan Military Forces recovered unexploded ordnance and some former Taliban weapons in a cave near the village of Khawaja Qaia, near Mazar-E-Sharif, in Balki province yesterday. The weapons included three artillery pieces, and one 14.5mm machine gun. The ordnance was destroyed and the weapons rendered inoperable by explosives.

One rocket impacted in the vicinity of the firebase at Chapman southeast of Khowst early this morning. There were no injuries or damage to equipment.

### June 9, 2003

By U.S. Army Col. Rodney Davis , CJTF-180

BAGRAM AIR BASE, Afghanistan — Three ISAF soldiers were medically evacuated to Bagram Saturday morning after the bus attack bombing in Kabul. All three are in stable condition and were evacuated to Germany.

An 812th Romanian patrol, supported by Task Force Devil civil affairs personnel, distributed school supplies and humanitarian rations to several villages north of Kandahar, in Kandahar province Friday. First they distributed 250 rations and school

6 - 8

vicinity of the aircraft later and dropped two items after they were spotted. The quick reaction force recovered and destroyed the items: one AK-47 and one rocket propelled grenade launcher.

An improvised explosive device that failed to detonate was found last night by Task Force Phoenix personnel on Jalalabad Road west of gate one in Kabul Military Training Center. Kabul police removed the device. Details of the design are not available.

ISLAMABAD - Representatives of the governments of Pakistan, Afghanistan and the United States held today in Islamabad the first meeting of the Tripartite Commission.

The Commission, established by President Pervez Musharraf and President Hamid Karzai, drew together senior military and diplomatic officials from Pakistan, Afghanistan and the United States. The Tripartite Commission has been established to discuss and address issues of mutual concern.

The Commission will meet again in Kabul to resume its work.

### June 16, 2003
By U.S. Army Col. Rodney Davis , CJTF-180
BAGRAM AIR BASE, Afghanistan — Civil-Military Affairs in Kabul attended the opening of the Mahmood Hotaky School in the Kota Sangay School District in Kabul Saturday. The $38,000 school project serves 4,000 students in the area.

Two Afghan males of unknown age were medically evacuated from Orgun-E to Bagram Saturday afternoon with gunshot wounds. One had a wound to his abdomen, and the other had a wound to his left knee. It is not yet known how they received their wounds. They are in stable condition at this time.

An improvised explosive device found by Afghan border guards in a compound south of the firebase at Orgun-E, Saturday, was destroyed in place by a Task Force Devil element from Orgun-E.

A total of six rockets were fired at coalition forces compounds over the weekend. Yesterday afternoon one rocket was fired at the firebase near Asadabad, in Kunar Province. Four rockets impacted in the vicinity of the firebase at Deh Rawood, in Uruzgan Province early Sunday morning. An Afghan Military Forces patrol investigated the incident and found nothing. And, one rocket impacted in the vicinity of the firebase at Orgun-E, in Paktika Province Saturday night. There were no reported casualties or damage to equipment at any of the three locations.

Coalition forces did not observe where the rockets were fired from or who fired them.

### June 14, 2003
By U.S. Army Col. Rodney Davis , CJTF-180

BAGRAM AIR BASE, Afghanistan — The Civil-Military Operations Team in Kabul attended the ribbon cutting ceremony of the Sur-e-Tapa, Zorabad Well Refurbishment Project east of Kabul yesterday. Eight common use wells were rehabilitated to provide safe drinking water for a community of approximately 30,000 homes. The estimated cost of the

supplies to Qadzi Kariz, a village of 250 families. Then they distributed 50 rations to Din Muhuda, a small village of two families.

Coalition Engineers delivered school supplies to students at the Mahood Hotaky School, on the west side of Kabul Thursday. There are 4,000 students in the primary and secondary school. The supplies included 12 blue packs, which were given to the school's top students.

A Task Force Devil patrol took one person under control and discovered a small cache in the vicinity of Shkin on Sunday. The cache included: 2 AK-47s, 8 magazines of 100 rounds each of AK-47ammunition, 800 machine gun rounds, a shipping plug and cap to a mine and a 82mm mortar shipping case. The cache was found next to two mortar firing pits.

Two rockets were fired in the direction of the firebase at Asadabad Saturday night. Soldiers at the firebase saw two individuals leaving the area. There were no casualties or damage to equipment.

### June 6, 2003
By U.S. Army Lt. Col. Douglas Lefforge
BAGRAM AIR BASE, Afghanistan — Approximately two companies from Task Force Devil out of Kandahar re-established a cordon and search mission in the mountains between Gardez and Khowst yesterday through this morning. The Operation has been tactically named Dragon Fury II. The operation was based on intelligence developed as a result of Operation Dragon Fury, which was conducted between Monday and Wednesday. During Dragon Fury II, anti-coalition fighters were observed firing into a crowd of civilians near a compound in an area north of the Khowst-Gardez road, wounding four. Coalition forces killed one enemy fighter and took another person under control. Two of the wounded civilians, an adult male with gunshot wounds to his right arm and chest, and a five- to seven-year-old boy with a gunshot wound to his chest, were medically evacuated from the vicinity to the Forward Operating Base at Salerno yesterday afternoon. They are both in critical condition. Initial reports do not indicate why the anti-coalition fighters fired at civilians.

There were three separate enemy actions that occurred in the vicinity of Asadabad yesterday. The first was the firing of a white phosphorus rocket that impacted away from the firebase. The second attack was two mortar rounds that also impacted away from the Base. The third attack was a 107mm rocket fired in the direction of the base and impacted near a girls' school close to the base. There was no report of injury or damage to equipment or property.

Three rockets were fired at the firebase near Shkin yesterday evening impacting away from the base. There were no casualties or damage to equipment.

An Afghan Military Forces soldier was medically evacuated from the vicinity of Spin Buldak to Kandahar yesterday afternoon with gunshot wounds to his left tricep, left thigh and buttocks. He underwent exploratory surgery and is in stable condition. The wounds were received during a fight between AMF and anti-coalition fighters. He is in stable condition.

### June 5, 2003
By U.S. Army Lt. Col. Douglas Lefforge

project was $24,000 and took three months to complete.

An undisclosed number of individuals brought in three caches to an Afghan Military Forces compound in the vicinity of Jalalabad, in Nangarhar Province yesterday. The caches included: 40 cases 12.5mm ammunition, 15 rockets, 15 rocket fuses and 1 machine gun. Afghan Military Forces members informed Special Operations Forces members in the area about the cache. It has not been determined what will happen to the munitions at this time.

The Asadabad Director of Communications turned over an ordnance cache to Special Operations Forces members at the firebase at Asadabad, in Kunar province yesterday. The cache included: seven boxes of 12.7mm ammunition, 37 boxes of 14.5mm ammunition, one box of 7.62x54 ammunition, four 82mm recoilless rifle rounds, and 16 x 107mm rockets. Much of the ammunition was rusty, but the 107mm and 82mm rounds were serviceable. The director said the ammunition was left over from the conflict with the Russians. All usable ammunition will be given to the Afghan National Army and unserviceable ammunition destroyed.

Three rockets impacted in the vicinity of the firebase in Asadabad, in Kunar province this morning. There were no casualties or damage to equipment.

BAGRAM AIR BASE, Afghanistan — In an update to yesterday's press statement: The AH-64 Apache helicopter that crash-landed Tuesday northwest of Orgun-E was destroyed in place yesterday. There was only minor damage to windows at a nearby school from the detonation. The Civil Affairs team on site is coordinating repairs.

Task Force Devil Civil Affairs personnel supported an 812th Romanian-led team in distributing 350 Humanitarian Rations and toys to the villages of Haji Mohammad Zai Kalacha and Haji Parman Kalacha, south of Kandahar, in Kandahar province yesterday.

A 25-year old Afghan male was medically evacuated from Orgun-E to Kandahar airfield with a gunshot wound to his left thigh yesterday afternoon. He is in stable condition at this time. The cause of the wound is unknown.

An Improvised Explosive Device exploded near a Special Operations Forces convoy one kilometer from the Gardez firebase yesterday morning. The convoy continued to the firebase and returned with other forces to investigate. There were no casualties and only a cracked windshield to one vehicle.

JUNE
/4

DefendAmerica News - Afghanistan Update



## Security & Reconstruction

Coalition Joint Task Force-180 is a coalition military operation in Afghanistan with military forces from 20 coalition partner countries focused on creating the conditions for security, stability and reconstruction. Each day, CJTF-180 Public Affairs Press Center provides news and information about operations in the coalition joint operating area and about coalition partner military activities and their operations in Afghanistan.

### July 25

**Spin Buldak, Afghanistan** - The village of Atel Muhammad removed all of their religious items, including the Korans from the village before Special Operations Forces and AMF arrived. When Special Operations Forces found the items in a flour sack in a nearby dry creek bed during the search they proceeded to return it to the village elder. The elder, once pressed for an answer, stated that some of the villagers felt that the Americans would kill them for being Muslims and these religious items were proof of their faith. Special Operations Forces explained in depth that this was not the case. The villagers secured the items and returned them to their homes. Special Operations Forces wanted to know who made them think this.

**Paktia Province, Afghanistan** - Special Operations Forces in Operation Warrior Sweep recovered two weapons caches in the vicinity of Zormat in Paktya province. The first cache recovered Wednesday west of Khost, contained eight submachine guns, one machine gun barrel, 32 magazines, six 100mm tank rounds, 12, RPG-7 rounds, 2,000 .30 caliber rounds, 80 14.5mm rounds, 48, 82mm mortar rounds, two 85mm artillery rounds, one 122mm mortar rounds, 36 assorted mines, 262 107mm rockets and four 80mm rocket assisted mortar rounds. The second cache recovered Thursday in a Madrassa, an Islamic school, in Zormat contained 150, 60mm mortar rounds, 100, 82mm mortar rounds, 500 recoilless rifle rounds and 600 cases 12.7mm ammunition. All of the items were taken to the firebase at Chapman for later distribution or destruction. No information was provided about how the caches were found.

### July 24

### Rockets Turned-in Asadabad

**Kunar Province, Afghanistan** - Two SA-7 rockets with launchers and firing mechanisms were turned in to coalition forces by an Afghan citizen in Asadabad late Tuesday. No information was given as to how the individual came into

*July 22*

### July 20

### U.S. Special Forces Engage Enemy Forces in Afghanistan

**Kandahar Province, Afghanistan** - Special Operations Forces killed approximately 22-24 enemy soldiers when an unknown element attacked a coalition convoy in the vicinity of the fire base at Spin Boldak Saturday, according to officials at Combined Joint Task Force 180.

The coalition forces drove through the kill zone, requested close air support and engaged the enemy forces, killing approximately five enemy and pursuing the remaining forces into the surrounding hills, officials said. AH-64 Apaches provided the air support, making several passes on the hill, killing approximately 17-19 more enemy. There were no coalition casualties.

Two rockets impacted in the vicinity of the fire base at Spin Boldak Saturday night, officials said. The suspected launch site is the nearby village of Muijawan. Local police are searching the village. There were no casualties or damage to equipment.

In an incident in Kunar Province, task force officials said three coalition soldiers were wounded and one vehicle was damaged when an improvised explosive device detonated in the middle of their convoy approximately eight kilometers south of Asadabad yesterday afternoon. The three soldiers were medically evacuated to Bagram Air Base yesterday and are in stable condition. The names of the soldiers and their injuries are being withheld for privacy. The damage to the vehicle is unknown at this time.

*July 19*

### July 19

### Coalition Forces Ambushed, Three Wounded

**Bagram Air Field, Afghanistan** - Two coalition soldiers and one Afghan Military Forces soldier were wounded when their patrol was ambushed north of Orgun-E about 11 a.m. today.

The wounded soldiers were evacuated to Forward Operating Base Salerno near Khowst. They are in stable condition and are being moved to the U.S. Army hospital at Bagram.

Enemy forces that engaged the patrol were armed with AK-47 rifles and Rocket Propelled Grenades

*6-11*

possession of the rockets.

### Rocket Attack Asadabad

Kunar Province, Afghanistan - Two rockets impacted in the vicinity of the firebase at Asadabad last night. Mortars were fired at the suspected point of origin and close air support requested. A B-52 responded first, then two AV-8 Harriers. The B-52 dropped a Joint Direct Attack Munitions bomb and the Harriers dropped one 1,000-pound laser-guided bomb on enemy fighters observed at the suspected location. There were no coalition casualties or damage to equipment and battle damage assessment of the bombsite will be accomplished today.

### Rocket Attack Firebase Ghecko

Kandahar Province, Afghanistan - One rocket impacted in the vicinity of the firebase at Ghecko in northwest Kandahar province last night. The suspected point of origin was the village of Mirabon to the southeast of the firebase. There were no casualties or damage to equipment. The village will be investigated this morning.

### AMF Arrest IED Suspect

Khost Province, Afghanistan - An Afghan Militia Forces soldier took a man under control when he was observed placing an improvised explosive device in a woodpile along the Khowst-Gardez road last night, north of the forward operating base at Salerno near the village of Dwammnoay. AMF forces in the area cleared and destroyed the IED. There were no casualties or damage to equipment.

### Harrier Hard Landing

Bagram, Afghanistan - An AV-8 Harrier made a hard landing here last night after returning from a combat mission. The aircraft veered off of the runway on the east side. The pilot was not injured. Damage to the aircraft has not been furnished. The incident is under investigation at this time.

### Nibbio Activities Warrior Sweep

Khost Province, Afghanistan - Italian forces of Task Force Nibbio conducted force protection operations in the vicinity of Forward Operating Base Salerno in support of Operation Warrior Sweep. Their vehicle control point searched 67 cars, 38 commercial trucks, and 157 people.

They also found a cache near Arabkel, southeast of Gardez, which contained: 25, 107mm rockets, four 107mm rocket propellers, two 107mm rocket heads, four RPG rocket propellers, 20 mortar fuses, three unknown fuses and three boxes of various caliber ammunition. Items considered too hazardous to move were destroyed on site and the remaining items were brought back to FOB Salerno for destruction.

### July 23

### Operation Warrior Sweep Begins;
### Afghan National Army Conducts First Combat Operation

Kabul, Afghanistan -- The Afghan National Army is now 5,000 strong. They are a trained, disciplined fighting force capable of conducting both combat and civil military affairs operations in conjunction with coalition forces.

Two days ago, six ANA companies numbering about 1,000 soldiers departed for the Zormat Valley Region in the southern

The names of the wounded service members are being withheld for privacy.

### July 18

### Gulbahar Bridge Opening

Parwan Province, Afghanistan - The opening ceremony for the Gulbahar Bridge was held yesterday northeast of Bagram. The bridge crosses the Panjir River and will serve as a conduit between the Parwan and Kapisa provinces, improving commerce and communication. The governors of the Parwan and Kapisa provinces and local media were there to celebrate the achievement.

### SOF CACHE

Helmand Province, Afghanistan - Special Operations Forces confiscated a cache in a compound in the vicinity of the firebase at Gereshk yesterday. The cache contained: three AK-47s, 12 hand grenades, 10 hand grenade fuses, two AK-47 vests, 10 full AK-47 magazines, two bayonets, eight 200 gram blocks of plastic explosive (unserviceable and extremely old) and one radio. They also had an individual walk-in to the firebase and turn in two anti-tank mines. All of the munitions are being held pending future destruction.

### Rocket Attack Khowst

Khowst Province - Three to four rockets were fired at border checkpoint number four in the vicinity of the firebase at Khowst last night. There were no casualties or damage to equipment.

### July 17

### Yulmarab Girls School Opening

Balkh Province, Afghanistan - The Yulmarab Girls School in Mazar-i-Sharif opened yesterday following electrical, concrete and roof repairs. The $8,000 Overseas Humanitarian Disaster and Civic Aid project began in March. The school serves 1,600 girls between the ages of 7 and 18. The deputy governor of Balkh province thanked CJTF180 and the United States Army for their assistance in rebuilding this and many other schools in the province at the opening ceremony yesterday. Students of the school performed two plays that focused on the great chance for education they now have because of the rebuilt school.

### Task Force Nibbio destroys cache

Khowst province, Afghanistan - Task Force Nibbio destroyed a weapons cache west of Khowst yesterday. Italian forces found the cache in a cave during a security patrol Tuesday. The cache was destroyed in place because some of the ammunition was damaged. The cache contained 400 mortar rounds, 520 artillery rounds, 150 107mm rockets, and 500 fuses of various types.

### July 15

### Afghanistan-Pakistan-U.S.
### Tripartite Commission Meets in Kabul

The Tripartite Commission, composed of senior diplomatic and military representatives of the United States, Afghanistan and Pakistan held its second meeting at the Ministry of Foreign Affairs today in Kabul to discuss mutual concerns, including activities in the border region.

American, Afghan and Pakistani officials assessed recent

6-12

Paktya Province. Operation Warrior Sweep marks the ANA's first major combat operation.

The ANA's mission is to kill, capture and deny sanctuary to anti-coalition fighters and to disrupt anti-coalition activity in the Zormat Valley Region in support of the Islamic Transitional Government of Afghanistan. ANA combat operations complemented by coalition security operations are designed to disrupt the anti-coalition network and advance security and stability within the region.

In addition to combat operations, the ANA is supporting Civil-Military Affairs operations to help Afghan citizens in the Zormat Valley. The ANA will speak with village leaders to assess their needs and help identify locations for eventual cooperative medical assistance visits in the valley region.

At this time the operation is ongoing and we are not prepared to discuss other details on ANA or coalition force structure, capabilities or activities. The ANA will establish a long term presence in the Zormat Valley Region and from this point on the ANA will be a key contributor to Afghanistan's security.

## July 21

### ANA Officer Graduation

Kabul, Afghanistan - Over 30 Afghan National Army officers received their certificates at a graduation ceremony for the third Brigade Staff Officer Course held at the Kabul Military Training Center on 17 July.

The eight-week course prepared 3rd Brigade, Central Corps staff officers, Lieutenant to Colonel, to perform staff functions at brigade level. The course curriculum covered subjects ranging from the role of a staff officer, preparing and conducting briefings, staff estimates and operational orders. Additionally, officers learned to apply the principles of the Military Decision Making Process.

The course, taught by members of a US civilian contractor staff and ANA instructors, underscores the combined efforts of the Coalition and the Ministry of Defense to educate and improve the professional skill set of the officer ranks.

### Coalition Soldiers, AMF Wounded

Bagram Air Base, Afghanistan - Two coalition soldiers and one Afghan Military Forces soldier were wounded when their patrol was ambushed north of Orgun-E Saturday. The wounded soldiers were evacuated to the U.S. Army hospital at Bagram where they are presently in stable condition. Enemy forces that engaged the patrol were armed with AK-47 rifles and Rocket Propelled Grenades. The names of the wounded service members and AMF soldier are being withheld for privacy.

### 20 anti-coalition personnel killed near Spin Boldak

Kandahar Province, Afghanistan - Special Operations Forces killed approximately 22-24 enemy personnel when an unknown sized element attacked a two-vehicle coalition convoy in the vicinity of the firebase at Spin Boldak Saturday. The coalition forces drove through the kill zone, requested close air support and engaged the enemy forces, killing approximately five enemy and pursuing the remaining forces into the surrounding hills. AH-64 Apaches provided the air support, making several passes on the hill, killing 17-19 more. There were no coalition casualties.

progress in combating al-Qa'ida and Taliban remnants, and shared information and analysis of the security situation. The commission reviewed the recent developments along the Pakistan-Afghanistan border and decided to set up a sub committee consisting of representatives from all three participating countries. The sub committee will carry out ground verifications within a week to address each other's concerns and submit its findings as soon as possible to the Tripartite Commission.

The Afghan delegation was led by National Security Advisor, Dr. Zalmai Rassoul, assisted by the Deputy Minister of the Interior General Hilalludin Hilal and General Sher Mohammad Karimi of the Ministry of Defense. The Pakistani delegation was led by the Director General of Military Operations, Major General Ashfaq Parvez Kayani and assisted by Director General Additional Secretary Rashed Saleem Khan of the Ministry of Foreign Affairs. Major General Franklin Hagenbeck and Ambassador Victor Jackovich led the US delegation, which also included representatives from the US embassies in Kabul and Islamabad.

### Coalition Vehicle Attacked in Kabul

Bagram Air Base, Afghanistan - A suspected improvised explosive device disabled a coalition vehicle about 8:55 p.m. yesterday near the U.S. Embassy in Kabul. The two soldiers who were riding in the vehicle departed the vehicle and made their way to the U.S Embassy. There were no reported injuries. The incident is under investigation.

### Special Operations Forces Convoy Under Fire

Kunar Province, Afghanistan - An improvised explosive cevice detonated near a Special Operations Forces convoy in the vicinity of Asadabad yesterday afternoon. Immediately after the explosion the convoy received small arms fire from unknown gunmen. The convoy cleared the attack zone and continued to Asadabad. There were no injuries or vehicle damage reported.

## July 14

### Rocket Attack Bagram

Bagram Air Base, Afghanistan - One suspected rocket impacted in the vicinity of the perimeter fence at approximately 8:55 pm local here Saturday. There were no injuries or damage to equipment. The attack is under investigation.

### Coalition employee killed in Deh Rawood

Deh Rawood, Afghanistan - An Afghan man working as an interpreter for coalition forces was murdered Sunday. The man was found dead in a coalition vehicle near the Deh Rawood Bazaar. He had earlier left the coalition firebase in the vehicle to escort a mechanic back to town. Local police are investigating the death.

### Nibbio Seizes Cache

Khowst province, Afghanistan -- During a security patrol conducted in the Task Force Nibbio area of responsibility, in Khowst province, Italian forces discovered and seized a huge ammunition cache in Dokana Savakel village. The cache was hidden in a school along the road between Khowst and Gardez and contained 40, 80 mm rockets, many mortar shells, anti-tank ammunition and fuses. The entire cache will be destroyed.

### Weapons Caches

Gardez, Afghanistan - Two weapons caches were turned into

Sunday morning Special Operations Forces and Afghan Militia Forces conducted follow-up mounted and dismounted patrols through the area finding indicators of wounded enemy, clothing, shoes, discarded equipment, expended ammunition and RPG casings.

During the assessment, the patrol was engaged with small arms fire from five enemy fighters. The Special Operations Forces pursued the enemy who broke contact.

The AMF forces meanwhile entered a nearby village and discovered a cache in buildings there. They also took five people under control who were in the vicinity of the cache and later turned them over to Special Operations Forces. The cache contained two, anti-tank mines; one, 82mm mortar tube with base plate; 40, 82mm rounds; 10 cases of 12.5mm rounds; seven cases of 14.5mm rounds; eight Soviet claymore mines; 45 RPG rounds; 70 RPG fuses; six, 107mm rocket fuses; 14, 75mm recoilless rifle rounds; one case of 20-gauge shotgun shells; 300 meters of detonation cord; and one anti-personnel mine.

### Troops in Contact Shkin
### Rocket Attack Shkin

Paktika Province, Afghanistan - An improvised explosive device detonated near a coalition forces' mounted patrol in the vicinity of the firebase at Shkin yesterday. The patrol averted the explosion, continued on the patrol and returned to the firebase without further incident. In a separate incident, but occurring at about the same time of day, one rocket impacted in the vicinity of the firebase. There were no casualties or damage to equipment from either incident.

### Four Italian Nibbio Forces Injured in IED Attack

Bagram Air Base, Afghanistan - Four coalition soldiers of Task Force "Nibbio" were slightly injured when their vehicle was forced off the road into a ditch when an improvised explosive device detonated on the road approximately twenty kilometers south-east of Gardez yesterday afternoon. The soldiers were injured during the impact but reacted immediately by shooting towards the enemy. Three of the soldiers were treated and released and the fourth was air evacuated to Bagram Air Base for examination yesterday and is reported in good condition. Enemy casualties are unknown.

Kandahar Province, Afghanistan - Special Operations Forces killed approximately 22-24 enemy soldiers when an unknown element attacked a coalition convoy in the vicinity of the fire base at Spin Boldak Saturday , according to officials at Combined Joint Task Force 180.

Special Operations Forces in Gardez by the 24th Border Brigade commander Saturday. One of the caches was found outside Gardez along the Gardez-Kabul road and the other in central Gardez near the governor's office. The cache along the Gardez-Kabul road was in an underground bunker in a compound, and had approximately six cargo truckloads of munitions, including RPGs, 82mm mortar rounds, 14.7mm rounds and SPG9 self-propelled guided rockets, in different degrees of serviceability. The size and composition of the other cache is unknown at this time.

### July 12

### ANA NCOs Graduate from Afghan
### Military Training Course

Kabul, Afghanistan — One hundred and five Afghan National Army soldiers graduated from the Noncommissioned Officers Course at Kabul Military Training Center on July 10. The soldiers came from 11 different kandaks, or battalions, and received five individual awards: most improved student, best shot, best lesson, best fitness and best student. The British Army instructors also gave out two squad awards and one platoon level award. Also, the instructors invited six students to come back as future instructors in the course. Following the graduation ceremony, the soldiers returned to their kandak of origin.

---

6 - 15

# ATTACHMENT
# 7





 PRINT THIS

Powered by 🔘Clickability

# Afghan official: Heart attack may not have killed prisoner

KABUL, Afghanistan (AP) — Days after a former CIA contractor was charged in the death of an Afghan in U.S. custody, an regional official Saturday cast doubt on a defense lawyer's claim that the prisoner died of a heart attack.

David Passaro, a 38-year-old former Army special operations soldier, became the first American Thursday to face civilian charges over prisoner abuse in either Iraq or Afghanistan.

Passaro faces four counts of assault and assault with a dangerous weapon — a flashlight — on Abdul Wali, who died at a U.S. base in the Afghan town of Asadabad on June 21, 2003. Wali was 28.

Passaro's defense has seized on a June 27, 2003, comment made to an Iranian radio station by Fazel Akbar, the governor of Kunar province where the base is located, as evidence that Wali died of a heart attack.

But the governor's spokesman said Saturday that Akbar had only suspected heart problems because U.S. officials insisted the man was not mistreated and after a cursory examination by Afghan officials of the corpse.

Spokesman Hyder Akbar, who is also the governor's son, said that his father's initial assessment was "just speculation."

Hyder Akbar said Wali turned himself in to the governor's office because he was suspected of involvement in rocket attacks on the American base at Asadabad, 120 miles east of the capital, Kabul.

Hyder Akbar, a fluent English speaker from studies in the United States, said he accompanied Wali to the base to act as an interpreter. But he said he walked out of the interrogation in disgust after Passaro began threatening the prisoner.

"There was only hearsay evidence, but he was treating Abdul Wali with such contempt it got me off the wrong way," Hyder Akbar said in a telephone interview from Asadabad. "He was huffing and puffing and playing the role of bad cop."

Hyder Akbar declined to say what the threats were and said he saw no abuse.

He said Afghan officials were informed three days later of the death and went to view the body. No autopsy was carried out to determine the exact cause of Wali's death.

"In retrospect, we realized we didn't see his back or his thighs, and that the room was dimly lit, just through the door," Hyder Akbar said. "We couldn't see any marks that could show extreme torture that could lead to death."

He said that U.S. officials including Passaro told the Afghans "that Abdul Wali was not beaten or abused in any way."

Wali's relatives said he had suffered from health problems and that he had passed out at times, Hyder Akbar said.

*ATTACH. 7. 1*

"As far as the heart attack is concerned, that was just speculation," he said.

Hyder Akbar, a student of Diablo Valley College, in Pleasant Hill, Calif., said he had spoken to U.S. federal prosecutors in Washington but didn't know if he would be called to testify in court.

Passaro has a detention hearing scheduled Tuesday morning in U.S. District Court in Raleigh, N.C.

If convicted, Passaro faces up to 40 years in prison and a $1 million fine.

No civilians have been charged in connection with alleged abuses at Abu Ghraib in Iraq. Seven soldiers were charged by the military.

The furor over detainee mistreatment there has drawn fresh attention to similar allegations in Afghanistan.

Military spokesman in Afghanistan, Lt. Col. Tucker Mansager, declined to comment Saturday on the death of Abdul Wali. But he said the charges against his interrogator showed American resolve in rooting out mistreatment.

"That's good testimony to the fact that we are making sure that we treat all people with dignity and respect," Mansager said.

Two more prisoners died at Bagram, the main U.S. base north of Kabul, in December 2002. Both were ruled homicides after autopsies, but the military has yet to release any results of its criminal investigation.

The military says it has already begun making unspecified changes to its prison regime in Afghanistan as a result of an internal review begun last month. Findings are to be released by early July, though commanders say procedures used on prisoners will remain confidential.

---

Copyright 2004 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.

**Find this article at:**
http://www.usatoday.com/news/world/2004-06-19-afghan-death_x.htm

☐ Check the box to include the list of links referenced in the article.



ATTACHMENT
8

**washingtonpost.com**

# Memo on Torture Draws Focus to Bush

Aide Says President Set Guidelines for Interrogations, Not Specific
Techniques

By Mike Allen and Dana Priest
Washington Post Staff Writers
Wednesday, June 9, 2004; Page A03

The disclosure that the Justice Department advised the White House in 2002
that the torture of al Qaeda terrorist suspects might be legally defensible has
focused new attention on the role President Bush played in setting the rules
for interrogations in the war on terrorism.

White House press secretary Scott McClellan said yesterday that Bush set
broad guidelines, rather than dealing with specific techniques. "While we will
seek to gather intelligence from al Qaeda terrorists who seek to inflict mass
harm on the American people, the president expects that we do so in a way
that is consistent with our laws," McClellan said.

White House Counsel Alberto R. Gonzales said in a May 21 interview with
The Washington Post: "Anytime a discussion came up about interrogations
with the president, . . . the directive was, 'Make sure it is lawful. Make sure it
meets all of our obligations under the Constitution, U.S. federal statutes and
applicable treaties.' "

An Aug. 1, 2002, memo from the Justice Department's Office of Legal
Counsel, addressed to Gonzales, said that torturing suspected al Qaeda
members abroad "may be justified" and that international laws against torture
"may be unconstitutional if applied to interrogation" conducted against
suspected terrorists.

The document provided legal guidance for the CIA, which crafted new, more
aggressive techniques for its operatives in the field. McClellan called the
memo a historic or scholarly review of laws and conventions concerning
torture. "The memo was not prepared to provide advice on specific methods or techniques," he said. "It
was analytical."

Attorney General John D. Ashcroft yesterday refused senators' requests to make public the memo, which
is not classified, and would not discuss any possible involvement of the president.

In the view expressed by the Justice Department memo, which differs from the view of the Army,
physical torture "must be equivalent in intensity to the pain accompanying serious physical injury, such
as organ failure, impairment of bodily function, or even death." For a cruel or inhuman psychological
technique to rise to the level of mental torture, the Justice Department argued, the psychological harm
must last "months or even years."

A former senior administration official involved in discussions about CIA interrogation techniques said
Bush's aides knew he wanted them to take an aggressive approach.



Better than Botox*?

dermatologist recommended

► try it for *free
*Click Here For Details

"He felt very keenly that his primary responsibility was to do everything within his power to keep the country safe, and he was not concerned with appearances or politics or hiding behind lower-level officials," the official said. "That is not to say he was ready to authorize stuff that would be contrary to law. The whole reason for having the careful legal reviews that went on was to ensure he was not doing that."

The August memo was written in response to a CIA request for legal guidance in the months after Sept. 11, 2001, as agency operatives began to detain and interrogate key al Qaeda leaders. The fact that the memo was signed by Jay S. Bybee, head of the Office Legal Counsel, who has since become a federal judge, and is 50 pages long indicates that the issue was treated as a significant matter.

"Given the topic and length of opinion, it had to get pretty high-level attention," said Beth Nolan, commenting on the process that was in place when she was President Bill Clinton's White House counsel, from 1999 to 2001, and, previously, when she was a lawyer in the Office of Legal Counsel.

Unlike documents signed by deputies in the Office of Legal Counsel, which are generally considered by federal agencies as advice, a memorandum written by the head of the office is considered akin to a legally binding document, said another former Office of Legal Counsel lawyer.

The former administration official said the CIA "was prepared to get more aggressive and re-learn old skills, but only with explicit assurances from the top that they were doing so with the full legal authority the president could confer on them."

Critics familiar with the August 2002 memo and another, similar legal opinion given by the Defense Department's office of general counsel in March 2003 assert that government lawyers were trying to find a legal justification for actions -- torture or cruel and inhumane acts -- that are clearly illegal under U.S. and international law.

"This is painful, incorrect analysis," said Scott Norton, chairman of the international law committee of the New York City Bar Association, which has produced an extensive report on Pentagon detentions and interrogations. "A lawyer is permitted to craft all sorts of wily arguments about why a statute doesn't apply" to a defendant, he said. "But a lawyer cannot advocate committing a criminal act prospectively."

The August 2002 memo from the Justice Department concluded that laws outlawing torture do not bind Bush because of his constitutional authority to conduct a military campaign. "As Commander in Chief, the President has the constitutional authority to order interrogations of enemy combatants to gain intelligence information concerning the military plans of the enemy," said the memo, obtained by The Washington Post.

Critics say that this misstates the law, and that it ignores key legal decisions, such as the landmark 1952 Supreme Court ruling in *Youngstown Steel and Tube Co v. Sawyer*, which said that the president, even in wartime, must abide by established U.S. laws.

© 2004 The Washington Post Company

ATTACH  E

ATTACHMENT
9



### Prepared Remarks of Attorney General John Ashcroft
### Passaro Indictment Announcement
### Thursday - June 17, 2004

Good afternoon. Joining me today are Assistant Attorney General Christopher Wray of the Criminal Division, and U.S. Attorney Frank Whitney of the Eastern District of North Carolina.

This morning, a federal grand jury in Raleigh, North Carolina, has indicted a contractor working on behalf of the Central Intelligence Agency for brutally assaulting an Afghan detainee on a U.S. military base in Afghanistan.

David A. Passaro, age 38, a resident of Lillington, N.C., faces two counts of assault with a dangerous weapon and two counts of assault resulting in serious bodily injury. Each charge carries a maximum penalty of 10 years in prison and a $250,000 fine. I note that an indictment is merely an accusation and the defendant is presumed innocent unless and until proven guilty.

Passaro was arrested this morning in Fayetteville, North Carolina, and he is scheduled for an initial appearance before a federal magistrate judge in Raleigh today. The charges Passaro faces relate to his alleged activities in Afghanistan working as a contractor on behalf of the Central Intelligence Agency (CIA).

As the indictment details, Passaro was in Afghanistan working in support of United States military personnel at a base near the town of Asadabad. The military base was called Asadabad Base.

Asadabad is located in the northeastern province of Kunar. It is a mountainous region, and Asadabad is about five miles from the Pakistani border. During the past two years, U.S. Army Special Forces units and Air Force bombers have been active in the area. It is an area in which remnants of al Qaeda and the Taliban remain active.

As alleged in the indictment, on June 18, 2003, a local Afghani man named Abdul Wali, who was suspected of participating in rocket attacks on the Asadabad Base, surrendered voluntarily at the front gate of the base. Defendant Passaro allegedly assisted military personnel in detaining Wali, who was held in a detention cell at the base.

The indictment alleges that beginning on the day after Wali's detention began, Passaro began interrogating him about the rocket attacks. During these interrogations on June 19th and 20th, 2003, it is alleged that Passaro beat Wali repeatedly, using his hands and feet and a large flashlight. Wali died in a cell on Asadabad Base on June 21, 2003.

Authorities immediately began an investigation, and the CIA formally referred the case to the Department of Justice last fall. After the Criminal Division determined that venue was in the Eastern District of North Carolina, the matter was sent there earlier this

year for a grand jury investigation.

The American people are familiar by now with the images of prisoner abuse committed in our detention facilities overseas. Today, a wholly different - and more accurate - picture of our nation emerges. Today, we see a nation dedicated to its ideals of freedom, respect for human dignity, to its insistence for justice, and the rule of law.

Regarding other prisoner abuse allegations, I can report that the Justice Department has received one referral from the Department of Defense, and additional referrals from the CIA. These are ongoing investigations; I cannot offer further details at this time.

I have assigned all of our other ongoing prisoner abuse cases to a prosecution team at the United States Attorney's Office for the Eastern District of Virginia. Any new referrals will also be assigned to that office whose jurisdictional boundaries encompass the Pentagon and the CIA. The Eastern District of Virginia has shown consistently its ability to handle complex cases involving national security, classified information and military intelligence and associated personnel.

I also note that this case would have been more difficult to investigate and prosecute were it not for the USA PATRIOT Act. The Act expanded U.S. law enforcement jurisdiction over crimes committed by or against U.S. nationals on land or facilities designated for use by the United States government.

In the reports of abuse of detainees by United States personnel in Iraq and Afghanistan over the past two months, the world has witnessed a betrayal of America's most basic values by a small group of individuals. Their actions call us to the defense of our values - our belief in decency and respect for human life - through the enforcement of the law.

President Bush has made clear that the United States will not tolerate criminal acts of brutality such as those alleged in this indictment. The types of illegal abuse detailed run counter to our values and our policies and are not representative of our men and women in the military and associated personnel serving honorably and admirably for the cause of freedom.

Those who are responsible for such criminal acts will be investigated, prosecuted and, if found guilty, punished.

I thank Chris Wray, Assistant Attorney General of the Criminal Division and U.S. Attorney Frank Whitney and his team in the Eastern District of North Carolina for their leadership and work in this criminal matter. I also note with appreciation the investigative efforts of the CIA's Office of the Inspector General.

### 

9-2

# ATTACHMENT
# 10



United States Department of Defense.

# News Transcript

On the web: http://www.dod.gov/cgi-bin/dlprint.cgi?
http://www.dod.gov/transcripts/2004/tr20040617-secdef0881.html
Media contact: +1 (703) 697-5131
Public contact: http://www.dod.mil/faq/comment.html or +1 (703) 428-0711

**Presenter:** Secretary of Defense Donald Rumsfeld and General Peter Pace, Vice Chairman, Joint Chiefs of Staff

Thursday, June 17, 2004
2:31 p.m. EDT

## Defense Department Regular Briefing

SEC. RUMSFELD: Good afternoon.

Media reports in the last few days have focused on what some have termed a surge in violence in Iraq, the attacks being waged by enemies of freedom who are threatened by the steady advances that are being made in that country. The extremists' efforts to intimidate the Iraqi people I believe will fail.

A new Iraqi government is being established with the endorsement of the United Nations and the international community. Iraqis are working to build a free and peaceful society, and the new leaders have thanked the American people for their support and for their sacrifices. A recent survey found that 63 percent of Iraqis believe that the interim government will improve life in their country.

Growing numbers of Iraqi security forces and coalition soldiers will continue to help provide security and train the new Iraqi army and police forces so security responsibilities can be passed to them as rapidly as is possible. Thousands of courageous Iraqis have stepped forward to defend their country, and thousands more are volunteering every day. The number of recruits standing in line to join the various elements of the Iraqi security forces is impressive. As we have seen, this is something that terrorists and assassins want desperately to prevent.

This much is certain: coalition forces cannot be defeated on the battlefield. The only way this effort could fail is if people were to be persuaded that the cause is lost or that it's not worth the pain, or if those who seem to measure progress in Iraq against a more perfect world convince others to throw in the towel. I'm confident that that will not happen.

On another note, I want to address recent suggestions that somehow the war in Iraq might derail our efforts to transform the armed forces to enable them to be better equipped to confront the new threats of the 21st century. I would say that just the opposite is true.

As with any large organization, change can be slow. Sometimes it takes a major event to cause people to realign their priorities. The global war on terror was such an event, and the requirements of its new challenges have allowed us, for example, to begin the urgent task of rebalancing the active and reserve components of our armed forces, moving skill sets that are now found almost exclusively in the Guard and Reserve into the active force so that we're not excessively reliant on the Guard and Reserve for those frequently needed skills.

Second, we're transforming the Army to make brigades more self-contained, more self-sustaining, and available to serve any division commander.

*ATTACH.10-1*

And third, we're adjusting our global posture from a somewhat static, Cold War era defense to one that will enable us to work closely with our friends and allies both within and across regions, and to develop more rapidly deployable capabilities rather than focusing on presence and mass.

These and other changes are needed, and in some cases they were long overdue. The global war on terror has compelled us to take action, and the men and women in uniform and our strong civilian workforce are, in my view, working effectively to achieve these needed changes.

General Pace?

GEN. PACE: Thank you, Mr. Secretary.

There is certainly some good news for the forces that are working in Haiti in support of the new Haitian government. As you know, we've been there about three months now -- U.S. forces, French forces, Canadian and Chilean -- to restore stability over the last three months. At the end of April, the U.N. Security Council voted unanimously to support a resolution to support the Haitian government and the Haitian people, and to have it under U.N. mandate. Brazil has stepped forward as the lead nation. They have the lead elements of their command team there now. During the rest of this month of June the current forces that are there will be replaced by other coalition forces underneath Brazilian leadership. And the U.N. and the coalition countries that have volunteered will continue to provide stability so that the Haitian people can get about forming their own government and becoming more prosperous.

With that, we'll take your questions.

SEC. RUMSFELD: Charlie?

Q    Mr. Secretary, I'd like to ask why last November you ordered the U.S. military to keep a suspected Ansar al-Islam prisoner in Iraq secret from the Red Cross. He's now been secret for more than seven months. And there are other such shadowy prisoners in Iraq who are being kept secret from the Red Cross.

SEC. RUMSFELD: With respect to the -- I want to separate the two. Iraq, my understanding is that the investigations on that subject are going forward.

With respect to the detainee you're talking about, I'm not an expert on this, but I was requested by the Director of Central Intelligence to take custody of an Iraqi national who was believed to be a high-ranking member of Ansar al-Islam. And we did so. We were asked to not immediately register the individual. And we did that. It would -- it was -- he was brought to the attention of the Department, the senior level of the Department I think late last month. And we're in the process of registering him with the ICRC at the present time.

Q    Well, why did you not register the individual, and has this man simply been lost in the system for -- why didn't you tell the Red Cross that you had him?

SEC. RUMSFELD: The decision was made that it would be appropriate not to for a period. And he wasn't lost in the system. They've known where he was, and that he was there in Iraq, for this period of time.

Q   How is that appropriate, sir, when you say that you -- all prisoners in Iraq are being treated humanely under rules set up --

SEC. RUMSFELD: He has been treated humanely. There's no implication of any problem. He was not at Abu Ghraib. He is not there now. He has never been there, to my knowledge. There's no question at all about whether or not he's received humane treatment.

Q   But then why wasn't the -- why wasn't the Red Cross told, and there are other such prisoners being detained without the knowledge of the Red Cross?

SEC. RUMSFELD: There are -- there are instances where that occurs. And a request was made to do that, and we did.

Q   I -- I mean -- excuse me, is there a reason for that, sir, why -- why they're not told? There are those who would say, I guess, that -- that you're not telling them because you might be mistreating such prisoners. That might be the suspicion.

SEC. RUMSFELD: That -- I understand that. That's not the case at all. And I think that will be clear.

Q   Well, the other thing is General Taguba has criticized this practice in his report, calling them ghost detainees.

SEC. RUMSFELD: I recall that. And as I say, that's being investigated. This -- this individual, this Ansar al-Islam individual I think should be looked at separately from that.

Q   Why is that? Is he a ghost detainee --

Q   Which --

Q   -- was he a ghost detainee?

SEC. RUMSFELD: We've had subject matter experts down here to brief you, and they've been briefing the Congress, and the Congress has been briefed on this extensively, I think, Dan, is that correct? And they've been down here and briefed the press as they're able to.

The -- you say why treat them differently. Because, as I understand it, the people who briefed you on the Taguba report have indicated that they are looking into that, that was part of his investigation, and that is ongoing. This is not one of those cases, is my point.

Q   Mr. Secretary?

SEC. RUMSFELD: Yes.

Q   First of all, where have you been? We've missed you.

SEC. RUMSFELD: (Laughs.) God, where have I been?

(Laughter.)

10-5

Q    The Army chief of staff, General Schoomaker, the other day, in answer to a question, referred to the difference between pneumonia and cancer, and the implication was that terrorism is a cancer incurable and will be with us forever. Do you agree? And if not, have you taken him to the woodshed?

(Light laughter.)

SEC. RUMSFELD: Pretty big guy to be going to the woodshed. No, I certainly agree with him that this is a long-term proposition. And we've said that repeatedly -- the president has; I have.

You say where have I been. I'm told by Larry that I've done something like eight press and media availabilities since I've been here, and seven major speeches with Q&As and three testimonies before Congress and six media interviews of various types. So I've been very much involved.

Q    We just want to see you up there, sir.

SEC. RUMSFELD: Do you?

(Laughter.)

Q    Mr. Secretary, I'm wondering, when you get a call or a contact from CIA Director Tenet, and he asks you to do something like this, I have two questions.

SEC. RUMSFELD: Mmm hmm.

Q    How does that go about? Does he say -- in other words, "We need you to do this," and then doesn't tell you necessarily why for, you know, as an agreement, and you trust him?

And then second, do you sort of them monitor the progress of an individual like this? In other words, how's he or she doing?

SEC. RUMSFELD: Okay, let me -- yeah. As I recall, it wasn't a phone call in this case, and Dan Dell'Orto is here. I think it was a letter, but I could be wrong. It was a phone call?

DANIEL DELL'ORTO (DoD deputy general counsel): If it was, it was certainly followed up by a letter shortly thereafter.

SEC. RUMSFELD: Yeah. So it was a letter. We know from our knowledge that he has the authority to do this.

And second, I can't speak for every case, but I have some confidence that in most every case, it has been either in writing or very well understood orally that the -- that the specifics that were provided are accurate. And --

Q    (Inaudible) -- why the request is made.

SEC. RUMSFELD: And the nature of this individual and why it's important to do what they're doing.

Q    And then do you get then follow-up information on, say, the intelligence gleaned from this

individual? I'm trying to ascertain how you get the intelligence on him and other key people.

SEC. RUMSFELD: I don't. I tend not to get the interrogation reports. There are, what, how many thousand detainees in various types and various places? And they're being interviewed, and the people who have the responsibility for doing the interrogating and for integrating that type of intelligence feed the intelligence to people who need it. In some cases -- if you arrest somebody, for example, in a IED manufacturing facility, the question is where did they put the last ones? And so it's more immediate information. If it's a high-ranking Ansar al-Islam individual like this, it's a different type, and then it goes more into the macro or strategic intelligence as to how we might address the entire network.

Q    But you're not --

GEN. PACE: It's also important to reaffirm, very important to reaffirm that regardless of how the U.S. military gets custody of an individual that we are expected to treat them humanely -- we will treat them humanely -- and that the orders that go out with regard to those kinds of things are humane treatment. So there's a question --

Q    But you're not on the blower saying, "Hey, what's new with the intelligence? Tell me when you hear something new from these folks."

SEC. RUMSFELD: That's true not only of anyone that we might be asked to hold for another government agency, but it's also true of those that we pull in, our forces pull in, whether it's in Afghanistan or in Iraq.

You know, let me say one thing to follow on Pete's comment. I've been kind of following the headlines and the bullets in the television -- the big, powerful hits on torture and this type of thing that we've seen. Needless to say, I can't read all the articles, and so I'm no expert on what every person says, and I know headline writers and people dramatize things.

But in thinking about it all, and I have to be a little careful -- we know that there's still more investigations going on, and we're going to learn more information, so no one can speak with finality or definitively or conclusively at this stage. But -- and second, I have to be a little careful about what I say because of the risk of command influence. But let me just say this: I have read this -- editorials, "torture" -- and one after another. Washington Post the other day -- I forget when it was -- just a great, bold "torture."

The implication -- think of the people who read that around the world. First of all, our forces read it. And the implication is that the United States government has, in one way or another, ordered, authorized, permitted, tolerated torture. Not true. And our forces read that, and they've got to wonder, do we? And as General Pace said, we don't. The President said people will be treated humanely, and that is what the orders are. That's what the requirements are.

Now, we know that people have done some things they shouldn't do. Anyone who looks at those photographs know that. But that's quite a different thing. And that is not the implication that's out there. The implication that's out there is the United States government is engaging in torture as a matter of policy, and that's not true. Think of the second group of people who see it. All these people in the region and in Iraq and in Afghanistan, that we need their cooperation, we need their help, the people in those countries, the people in the neighboring countries, and think how unhelpful that is for them to gain the inaccurate impression that that is what's taking place.

# ATTACHMENT 11


President George W. Bush

Click to Print
this document 

For Immediate Release
Office of the Press Secretary
June 22, 2004

## Press Briefing by White House Counsel Judge Alberto Gonzales, Dod General Counsel William Haynes, Dod Deputy General Counsel Daniel Dell'Orto and Army Deputy Chief of Staff for Intelligence General Keith Alexander

Room 350
Eisenhower Executive Office Building

3:12 P.M. EDT

JUDGE GONZALES: I've got a fairly lengthy opening statement, but there are some important points I need to make in order to frame our discussion this afternoon. And I want to begin by reminding everyone who we're fighting and what our enemy is trying to do to us, from using airplanes to kill thousands of citizens, to using daggers to behead our citizens. And so we must -- (inaudible) -- American citizens and manage our solemn obligation under the law.

America today does face a different kind of enemy in al Qaeda and its affiliates. And we face an enemy that targets innocent civilians, and we have seen certainly graphic evidence of that in recent days. We face an enemy that lies in the shadows, an enemy that doesn't sign treaties, they don't wear uniforms, an enemy that owes no allegiance to any country, they do not cherish life. An enemy that doesn't fight, attack or plan according to accepted laws of war, in particular Geneva Conventions.

President Bush knows his most important job is to protect this nation. At the same time, he's made it clear, in the war against al Qaeda and its supporters, the United States will follow its treaty obligations and U.S. law, both of which prohibit the use of torture. And this has been firm U.S. policy since the outset of this administration and it remains our policy today.

We're releasing a series of documents this afternoon that highlight the thorough deliberative process the administration used to make policy decisions on how we wage a global war against a teacher organization.

Now, we have been attacked by terrorists prior to September 11th -- the Khobar Towers bombing, the attack on the USS Cole, and the bombings of our embassies in East Africa, among others -- the government had previously dealt with these attacks as primarily a law enforcement matter. But after September 11th, President Bush shifted our nation from the law enforcement approach to dealing with terrorism to a strategy that marshals all elements of national power to help fight terrorism.

After President Bush declared that the U.S. was at war with al Qaeda and its supporters, he made clear that our military would respond in al Qaeda attacks. Our government had fundamental decisions to make concerning how to apply treaties and U.S. law to an enemy that did not wear uniform, owed no allegiance to any country, and was committed to no treaty, and did not fight -- most importantly -- according to the laws of war. I must tell you that these differences really imposed legal and practical questions for policymakers trying to defend the United States against the deadly and shadowy adversary, unlike any enemy we've ever seen before.

Now, some questions we faced were, for example: What is the legal status of individuals caught in this battle? How will they be treated? To what extent can those detained be questioned to attain information concerning possible future terrorist attacks? What are the rules? What will our policies be?

As we debated these questions, the President made clear that he was prepared to protect and defend the United States and its citizens, and he would do so vigorously, but as the documents we are releasing today show, that he would do so in a manner consistent with our nations values and applicable law, including our treaty obligations.

ATTACH+ 11

You have two distinct set of documents, those that were generated by government lawyers to explore the limits of the legal landscape as to what the Executive Branch can do within the law and the Constitution as an abstract matter; you also have documents that reflect the actual decisions issued by the President and senior administration officials directing the policies that our military would actually be obliged to follow. So you have before you the legal theory and you have before you the actual policy guidance that the President and his team directed. And as these documents show, the policies ultimately adopted by the President are more narrowly tailored than advised by his lawyers, and are consistent with our treaty obligations, our Constitution and our laws.

As you look through the first set, you can see lawyers trying to think through the potential legal implications of the war on al Qaeda and it supporters. Just as military theorists thought about new strategies and tactics to fight terrorists, so, too, did lawyers in looking at how this war fit into the current legal landscape.

These are tough issues, and some of the conclusions by the lawyers you may find controversial. These opinions set forth a broad legal framework in which the President and his team considered and ultimately adopted more narrowly tailored policies.

Now, to the extent that some of these documents, in the context of interrogations, explored broad legal theories, including legal theories about the scope of the President's power as Commander-in-Chief, some of their discussion, quite frankly, is irrelevant and unnecessary to support any action taken by the President. The administration has made clear before, and I will reemphasize today that the President has not authorized, ordered or directed in any way any activity that would transgress the standards of the torture conventions or the torture statute, or other applicable laws.

Unnecessary, over-broad discussions in some of these memos that address abstract legal theories, or discussions subject to misinterpretation, but not relied upon by decision-makers are under review, and may be replaced, if appropriate, with more concrete guidance addressing only those issues necessary for the legal analysis of actual practices. But I must emphasize that the analysis underpinning the President's decisions stands and are not being reviewed.

It's also important to note that these opinions were circulated among lawyers and some Washington policymakers only. To my knowledge, they never made it to the hands of soldiers in the field, nor to the President. Now, they're interesting for lawyers to debate, and for the public to debate what the rules should be as we try to deal with this new threat. But, in reality, they do not reflect the policies that the administration ultimately adopted.

The other set of documents you have consists of the President's February 2002 directive and the memorandum issued by Secretary Rumsfeld in the fall of 2002 and the winter of 2003. And these demonstrate clearly the limits that the administration actually placed on treatment and questioning of detainees in this war. These are our policies, and they guide those in the field who are responsible for implementing policies regarding treatment and questioning of detainees in this conflict.

Now, there's been much confusion because of the leaks of legal opinions concerning whether the administration in any way encouraged or authorized torture, and what policies were actually authorized. We are releasing these documents to highlight the policies that were, in fact, authorized to give you insight into the great degree of care taken in the policy-making process, and to inform the public that the policy decisions made by the President are in keeping with the values of our nation, our Constitution, our laws, and our treaty obligations. And we believe the American people, when they understand the policies that have actually been adopted to help us prevent future terrorist attacks and save innocent lives, will understand and support what has been done.

But if there still remains any question, let me say that the U.S. will treat people in our custody in accordance with all U.S. obligations including federal statutes, the U.S. Constitution and our treaty obligations. The President has said we do not condone or commit torture. Anyone engaged in conduct that constitutes torture will be held accountable. The President has not directed the use of specific interrogation techniques. There has been no presidential determination necessity or self-defense that would allow conduct that constitutes torture. There has been no presidential determination that circumstances warrant the use of torture to protect the mass security of the United States.

The President has given no order or directive that would immunize from prosecution anyone engaged in conduct that constitutes torture. All interrogation techniques actually authorized have been carefully vetted, are lawful, and

do not constitute torture.

Now, a few of the misinformed have asked whether the President's February 7th determination contributed to the abuses at Abu Ghraib. We categorically reject any connection. There are two separate legal regimes that govern action in those arenas. In Iraq, it has always been U.S. position that Geneva applies. From the early days of the conflict, both the White House and the Department of Defense have been very public and clear about that.

The President made no formal determination with respect to our conflict in Iraq because it was automatic that Geneva would apply. Our soldiers are trained from the first day in our service to follow the Geneva Conventions.

Now, interrogation and detention policies in Iraq were issued by General Sanchez in the field. They do not involve input from Washington and are not related to legal opinions I have discussed concerning the war against al Qaeda. The war in Iraq is covered by the Geneva Conventions, so our policies there must meet those standards, in addition to the torture convention. And military lawyers in the field determine that the policies embodied in those memos comply with Geneva Conventions.

As for the incidents at Abu Ghraib, they were not authorized and have nothing to do with the policies contained in any of these memos. The President has made clear that he condemns this conduct. He has made clear that these activities are inconsistent with the specific policy guidance. As you know, full investigations into the abuses at Abu Ghraib are ongoing, and those engaged in this conduct will be held accountable.

Two final points before quickly summarizing documents. First, this briefing does not include CIA activities. I will say that all interrogation techniques authorized for use by the Agency against the Taliban and al Qaeda and in Iraq are lawful and do not constitute torture. But to disclose anything more would be irresponsible during this period of ongoing conflict.

And finally, the government is releasing an extraordinary set of documents today, and this should not be viewed as setting any kind of precedent. But we felt it important to set the record straight. Additional documents may be withheld in the future for national security and other reasons.

Now, let me very quickly just walk you through the documents. The most important document is under Tab A, the President's February 7th determination regarding humane treatment of al Qaeda and Taliban detainees.

This is the only formal, written directive from the President regarding treatment of detainees. The President determined that Geneva does not apply with respect to our conflict with al Qaeda. Geneva applies with respect to our conflict with the Taliban. Neither the Taliban or al Qaeda are entitled to POW protections.

But the President also determined -- and this is quoting from the actual document, paragraph 3; this is very important -- he said, "Of course, our values as a nation, values that we share with many nations in the world, call for us to treat detainees humanely, including those who are not legally entitled to such treatment. Our nation has been, and will continue to be, a strong supporter of Geneva and its principles. As a matter of policy, the Armed Forces are to treat detainees humanely, and to the extent appropriate and consistent with military necessity, in a manner consistent with the principles of Geneva.

Now, of course, the logic of Geneva applies to reciprocal behavior. I agree to treat your captured soldiers in accordance with certain standards in exchange for similar treatment. But to protect terrorists when they ignore the law is to give incentive to continued ignoring that law.

The President's determination is not controversial within the Executive Branch. It is supported by various opinions from the Department of Justice, and the legal advisor at the State Department agrees that the President's decisions are consistent with our treaty obligations and customary with international law.

Tab B is a memo to me from Jay Bybee, Assistant Attorney General, regarding the application of treaties and laws to al Qaeda and Taliban detainees. And basically, this memorandum provides the advise concerning the application of Geneva Conventions and formed sort of the basis for the President's February 7th determination.

Tab C is a letter to the President from the Attorney General confirming that under either two legal theories, the

JUDGE GONZALES: Okay, I'll defer on second one to DOD. The definition of torture that the administration uses is the definition that Congress has given us in the torture statute and the reservation of the torture convention. And that is -- that definition is a very -- I mean, Congress looked at conduct of the various leaders. The definition that Congress used was a specific intent to inflict severe physical or mental harm or suffering. That's the definition that Congress has given us and that's the definition that we use.

Q If you would, as we're talking about the difference between al Qaeda, for instance, and other people, would prolonged isolation, for instance, be considered torture or no? And what is the difference between al Qaeda and other sorts of people that are detained, other detainees?

MR. HAYNES: The best answer to your question will be reflected in the document dated April 16th from the Secretary of Defense to the Commander of the Southern Command about how individuals detained at Guantanamo would be interrogated. In each case, starting at the interrogator level, there will be an evaluation of an individual involved -- and I may even be supplementing in just a minute -- but the individual involved, the information the interrogators believe he may have. His particular physical circumstances, the circumstances of what we know about him from other sources of information of prior interrogations and the like, and there will be a specific plan developed with input from lawyers and medical people about how best to question, starting with the least intrusive means available. But a plan that is very elaborate, the documents are often very (inaudible). And depending on what techniques may be applied, will need to be approved at various levels in the chain of command.

JUDGE GONZALES: But, Jim, let me -- didn't understand your question. One thing that's clear, whether you're talking about in Guantanamo and Afghanistan, the President said, we don't torture people. And so it doesn't matter where you're at, we don't torture people.

Q So it doesn't matter whether you're talking about Khalid Shaykh Muhammad and Bin al-Shibh or --

JUDGE GONZALES: The President said we don't commit torture, we don't condone torture.

MR. HAYNES: But the reason I -- and the Judge is correct to say that, and there is no question -- no question in the chain of command that torture is not allowed. Indeed, the President has said all detainees held by the Department of Defense shall be treated humanely. There is a floor below which we cannot go.

And the reason I was referring to the April 16th document is because you will see that -- and Mr. Dell'Orto described -- the vast majority of the techniques employed are an existing Army doctrine, decades old, which were developed in the context of Geneva governing conflicts for prisoners of war, which are so much more protected than unlawful combatants in it's conflict. So there the standard --

Q Just one clarification --

MR. HAYNES: -- well below torture.

Q Just one clarification, and then I'll defer to my colleagues. The question that I think there's a lot of confusion about whether or not things like stress techniques and prolonged isolation, those kinds of things are considered torture under U.S. laws and treaties, or whether those are just more aggressive interrogation techniques?

MR. HAYNES: Well, one of the points I tried to make earlier is that techniques cannot be considered an isolation. Certainly, any one technique improperly applied could, you know, produce all sorts of undesirable consequences, including perhaps torture. But we -- the United States is not permitted to go near that.

Q I have two questions based on the documents for Judge Gonzales. First, in the presidential determination that (inaudible) read us about, the President -- it's the United States Armed Forces to treat detainees in a manner consistent with the principles of Geneva -- there's an "except" clause -- to the extent appropriate and consistent with military necessity.

Well, why is that in there? It seems like some people could argue that those would be appropriate exceptions -- it's a pretty broad word -- and the "consistent with military necessity" exception could swallow the rule.

JUDGE GONZALES: Which memo that was leaked are you referring to? (Laughter.)

Q One of the elements that has caused a lot of controversy was not just the Commander-in-Chief's authority to allegedly waive it, but the actual definition of the torture. It was criticized as a very narrow definition. I read the memo, like, over a week ago, but there were all sorts of things in there, like, if you didn't -- if you weren't doing it just to make someone suffer, but for the purposes of gathering information, maybe it wasn't torture then. It was just a very narrow construction. And so far I've heard you say that, well, we haven't tortured.

What's your interpretation of the congressional statute? Is it the same one that was in the memo leaked in The Washington Post, or have you adapted a different interpretation of that statute and treaty?

JUDGE GONZALES: I haven't looked at that memo closely recently. So in terms of what that memo actually says, I'm not going to comment specifically on it. I can say, as I said earlier, that the Department of Justice is going to be giving a briefing, and so they can certainly talk about their definition of torture. It is their analysis of Congress' definition of torture.

And as I said earlier, and I said repeatedly, we are going to be very aggressive in the interrogation of these detainees, because they have information that may save American lives and the lives of our allies. But the President has also been very, very clear about the need to do this in a way that is consistent with our domestic and international obligations. So I'm just going to leave it there.

Q Just to follow up, in any place -- in these other holding facilities are you going beyond the 24 methods that the Secretary has approved for Guantanamo, either through a special access program or through another government agency, besides the Defense Department, or just through ordinary Defense Department programs and other --

JUDGE GONZALES: We're not going to comment on anything beyond what is -- accepted Department of Defense. Let me just say that throughout the entire government, the directive is clear: no agency is to engage in torture; every agency is expected to follow the law. As far as I'm told, every interrogation technique that has been authorized or approved throughout the government is lawful and does not constitute torture.

Q On just what the Judge was saying, are we wrong to assume then, that the CIA is not subject to these categories of interrogation technique? For instance, if DOD -- if the military was --

JUDGE GONZALES: I'm not going to get into questions related to the CIA.

Q But we know in certain instances that you had Agency people along with military people, and isn't that just a convenient loophole to allow one person to use certain techniques that are prohibited by the other?

JUDGE GONZALES: I'm not going to get into discussions about the CIA, except to repeat what I just said, and that is that the techniques that they used that have been approved -- they've been approved and vetted by the Department of Justice, are lawful and do not constitute torture.

Q Judge, can you tell us which memos the President actually had access to, or any one of you? I understand that he didn't have access to all the directives -- Pentagon directives.

JUDGE GONZALES: I don't -- I can't say with certainty. I don't believe -- with respect to Pentagon documents, I'm not -- I'd be surprised if he had access to those. But it's possible that the Secretary may have brought them to the President. I don't think so. With respect to the opinions, I don't believe the President had access to any legal opinions from the Department of Justice.

Q You just mentioned that the presidential memo and two directives from Rumsfeld were ones that formed the policy. Can you tell us which ones?

JUDGE GONZALES: The February 7th determination by the President and the current policy -- the interrogation policy -- is the April 16th directive from the Secretary of Defense.

# ATTACHMENT
# 12



UNCLASSIFIED
~~SECRET/NOFORN~~



THE SECRETARY OF DEFENSE
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

APR 1 6 2003

MEMORANDUM FOR THE COMMANDER, US SOUTHERN COMMAND

SUBJECT: Counter-Resistance Techniques in the War on Terrorism (S)

(U) (S/NF) I have considered the report of the Working Group that I directed be established on January 15, 2003.

(U) (S/NF) I approve the use of specified counter-resistance techniques, subject to the following:

(U) a. The techniques I authorize are those lettered A-X, set out at Tab A.

(U) b. These techniques must be used with all the safeguards described at Tab B.

(U/S) c. Use of these techniques is limited to interrogations of unlawful combatants held at Guantanamo Bay, Cuba.

(U/S) d. Prior to the use of these techniques, the Chairman of the Working Group on Detainee Interrogations in the Global War on Terrorism must brief you and your staff.

(U) (S/NF) I reiterate that US Armed Forces shall continue to treat detainees humanely and, to the extent appropriate and consistent with military necessity, in a manner consistent with the principles of the Geneva Conventions. In addition, if you intend to use techniques B, I, O, or X, you must specifically determine that military necessity requires its use and notify me in advance.

(U) (S/NF) If, in your view, you require additional interrogation techniques for a particular detainee, you should provide me, via the Chairman of the Joint Chiefs of Staff, a written request describing the proposed technique, recommended safeguards, and the rationale for applying it with an identified detainee.

(U/S) Nothing in this memorandum in any way restricts your existing authority to maintain good order and discipline among detainees.

Attachments:
As stated

Declassified Under Authority of Executive Order 12958
By Executive Secretary, Office of the Secretary of Defense
William P. Marriott, CAPT, USN
June 18, 2004

NOT RELEASABLE TO
FOREIGN NATIONALS

UNCLASSIFIED

Classified By: Secretary of Defense
Reason: 1.5(a)
Declassify On: 2 April 2013

ATTACH 12


TAB A

## INTERROGATION TECHNIQUES

(U)

(S//NF) The use of techniques A - X is subject to the general safeguards as provided below as well as specific implementation guidelines to be provided by the appropriate authority. Specific implementation guidance with respect to techniques A - Q is provided in Army Field Manual 34-52. Further implementation guidance with respect to techniques R - X will need to be developed by the appropriate authority.

(U)

(S//NF) Of the techniques set forth below, the policy aspects of certain techniques should be considered to the extent those policy aspects reflect the views of other major U.S. partner nations. Where applicable, the description of the technique is annotated to include a summary of the policy issues that should be considered before application of the technique.

(U)

A. (S//NF) Direct: Asking straightforward questions.

(U)

B. (S//NF) Incentive/Removal of Incentive: Providing a reward or removing a privilege, above and beyond those that are required by the Geneva Convention, from detainees. [Caution: Other nations that believe that detainees are entitled to POW protections may consider that provision and retention of religious items (e.g., the Koran) are protected under international law (see, Geneva III, Article 34). Although the provisions of the Geneva Convention are not applicable to the interrogation of unlawful combatants, consideration should be given to these views prior to application of the technique.]

(U)

C. (S//NF) Emotional Love: Playing on the love a detainee has for an individual or group.

(U)

D. (S//NF) Emotional Hate: Playing on the hatred a detainee has for an individual or group.

(U)

E. (S//NF) Fear Up Harsh: Significantly increasing the fear level in a detainee.

(U)

F. (S//NF) Fear Up Mild: Moderately increasing the fear level in a detainee.

(U)

G. (S//NF) Reduced Fear: Reducing the fear level in a detainee.

(U)

H. (S//NF) Pride and Ego Up: Boosting the ego of a detainee.

| | |
|---|---|
| Classified By: | Secretary of Defense |
| Reason: | 1.5(a) |
| Declassify On: | 2 April 2013 |

NOT RELEASABLE TO
FOREIGN NATIONALS



Tab A

(U)
1. (S//NF) Pride and Ego Down: Attacking or insulting the ego of a detainee, not beyond the limits that would apply to a POW. [Caution: Article 17 of Geneva III provides, "Prisoners of war who refuse to answer may not be threatened, insulted, or exposed to any unpleasant or disadvantageous treatment of any kind." Other nations that believe that detainees are entitled to POW protections may consider this technique inconsistent with the provisions of Geneva. Although the provisions of Geneva are not applicable to the interrogation of unlawful combatants, consideration should be given to these views prior to application of the technique.]

(U)
J. (S//NF) Futility: Invoking the feeling of futility of a detainee.

(U)
K. (S//NF) We Know All: Convincing the detainee that the interrogator knows the answer to questions he asks the detainee.

(U)
L. (S//NF) Establish Your Identity: Convincing the detainee that the interrogator has mistaken the detainee for someone else.

(U)
M. (S//NF) Repetition Approach: Continuously repeating the same question to the detainee within interrogation periods of normal duration.

(U)
N. (S//NF) File and Dossier: Convincing detainee that the interrogator has a damning and inaccurate file, which must be fixed.

(U)
O. (S//NF) Mutt and Jeff: A team consisting of a friendly and harsh interrogator. The harsh interrogator might employ the Pride and Ego Down technique. [Caution: Other nations that believe that POW protections apply to detainees may view this technique as inconsistent with Geneva III, Article 13 which provides that POWs must be protected against acts of intimidation. Although the provisions of Geneva are not applicable to the interrogation of unlawful combatants, consideration should be given to these views prior to application of the technique.]

(U)
P. (S//NF) Rapid Fire: Questioning in rapid succession without allowing detainee to answer.

(U)
Q. (S//NF) Silence: Staring at the detainee to encourage discomfort.

(U)
R. (S//NF) Change of Scenery Up: Removing the detainee from the standard interrogation setting (generally to a location more pleasant, but no worse).

(U)
S. (S//NF) Change of Scenery Down: Removing the detainee from the standard interrogation setting and placing him in a setting that may be less comfortable; would not constitute a substantial change in environmental quality.

(U)
T. (S//NF) Dietary Manipulation: Changing the diet of a detainee; no intended deprivation of food or water; no adverse medical or cultural effect and without intent to deprive subject of food or water, e.g., hot rations to MREs.





(u)
U. (S//NF) Environmental Manipulation: Altering the environment to create moderate discomfort (e.g., adjusting temperature or introducing an unpleasant smell). Conditions would not be such that they would injure the detainee. Detainee would be accompanied by interrogator at all times. [Caution: Based on court cases in other countries, some nations may view application of this technique in certain circumstances to be inhumane. Consideration of these views should be given prior to use of this technique.]

(u)
V. (S//NF) Sleep Adjustment: Adjusting the sleeping times of the detainee (e.g., reversing sleep cycles from night to day.) This technique is NOT sleep deprivation.

(u)
W. (S//NF) False Flag: Convincing the detainee that individuals from a country other than the United States are interrogating him.

(u)
X. (S//NF) Isolation: Isolating the detainee from other detainees while still complying with basic standards of treatment. [Caution: The use of isolation as an interrogation technique requires detailed implementation instructions, including specific guidelines regarding the length of isolation, medical and psychological review, and approval for extensions of the length of isolation by the appropriate level in the chain of command. This technique is not known to have been generally used for interrogation purposes for longer than 30 days. Those nations that believe detainees are subject to POW protections may view use of this technique as inconsistent with the requirements of Geneva III, Article 13 which provides that POWs must be protected against acts of intimidation; Article 14 which provides that POWs are entitled to respect for their person; Article 34 which prohibits coercion and Article 126 which ensures access and basic standards of treatment. Although the provisions of Geneva are not applicable to the interrogation of unlawful combatants, consideration should be given to these views prior to application of the technique.]





TAB B

GENERAL SAFEGUARDS

(S//NF) Application of these interrogation techniques is subject to the following general safeguards: (i) limited to use only at strategic interrogation facilities; (ii) there is a good basis to believe that the detainee possesses critical intelligence; (iii) the detainee is medically and operationally evaluated as suitable (considering all techniques to be used in combination); (iv) interrogators are specifically trained for the technique(s); (v) a specific interrogation plan (including reasonable safeguards, limits on duration, intervals between applications, termination criteria and the presence or availability of qualified medical personnel) has been developed; (vi) there is appropriate supervision; and, (vii) there is appropriate specified senior approval for use with any specific detainee (after considering the foregoing and receiving legal advice).

(U) The purpose of all interviews and interrogations is to get the most information from a detainee with the least intrusive method, always applied in a humane and lawful manner with sufficient oversight by trained investigators or interrogators. Operating instructions must be developed based on command policies to insure uniform, careful, and safe application of any interrogations of detainees.

(S//NF) Interrogations must always be planned, deliberate actions that take into account numerous, often interlocking factors such as a detainee's current and past performance in both detention and interrogation, a detainee's emotional and physical strengths and weaknesses, an assessment of possible approaches that may work on a certain detainee in an effort to gain the trust of the detainee, strengths and weaknesses of interrogators, and augmentation by other personnel for a certain detainee based on other factors.

(S//NF) Interrogation approaches are designed to manipulate the detainee's emotions and weaknesses to gain his willing cooperation. Interrogation operations are never conducted in a vacuum; they are conducted in close cooperation with the units detaining the individuals. The policies established by the detaining units that pertain to searching, silencing, and segregating also play a role in the interrogation of a detainee. Detainee interrogation involves developing a plan tailored to an individual and approved by senior interrogators. Strict adherence to policies/standard operating procedures governing the administration of interrogation techniques and oversight is essential.

Classified By:  Secretary of Defense
Reason:         1.5(a)
Declassify On:  2 April 2013



NOT RELEASABLE TO
FOREIGN NATIONALS



Tab B

Page 5 of 6



(U)
(S//NF) It is important that interrogators be provided reasonable latitude to vary techniques depending on the detainee's culture, strengths, weaknesses, environment, extent of training in resistance techniques as well as the urgency of obtaining information that the detainee is known to have.

(U)
(S//NF) While techniques are considered individually within this analysis, it must be understood that in practice, techniques are usually used in combination; the cumulative effect of all techniques to be employed must be considered before any decisions are made regarding approval for particular situations. The title of a particular technique is not always fully descriptive of a particular technique. With respect to the employment of any techniques involving physical contact, stress or that could produce physical pain or harm, a detailed explanation of that technique must be provided to the decision authority prior to any decision.



Tab B

Page 6 of 6

# ATTACHMENT
# 13

# UNCLASSIFIED



**GENERAL COUNSEL OF THE DEPARTMENT OF DEFENSE**
1600 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-1600

2002 DEC -2 AM 11: 03

OFFICE OF THE
SECRETARY OF DEFENSE

### ACTION MEMO

November 27, 2002 (1:00 PM)

DEPSEC _____

FOR:        SECRETARY OF DEFENSE

FROM:     William J. Haynes II, General Counsel

SUBJECT:   Counter-Resistance Techniques

- The Commander of USSOUTHCOM has forwarded a request by the Commander of Joint Task Force 170 (now JTF GTMO) for approval of counter-resistance techniques to aid in the interrogation of detainees at Guantanamo Bay (Tab A).

- The request contains three categories of counter-resistance techniques, with the first category the least aggressive and the third category the most aggressive (Tab B).

- I have discussed this with the Deputy, Doug Feith and General Myers. I believe that all join in my recommendation that, as a matter of policy, you authorize the Commander of USSOUTHCOM to employ, in his discretion, only Categories I and II and the fourth technique listed in Category III ("Use of mild, non-injurious physical contact such as grabbing, poking in the chest with the finger, and light pushing").

- While all Category III techniques may be legally available, we believe that, as a matter of policy, a blanket approval of Category III techniques is not warranted at this time. Our Armed Forces are trained to a standard of interrogation that reflects a tradition of restraint.

RECOMMENDATION: That SECDEF approve the USSOUTHCOM Commander's use of those counter-resistance techniques listed in Categories I and II and the fourth technique listed in Category III during the interrogation of detainees at Guantanamo Bay.

SECDEF DECISION

Approved _____   Disapproved _____   Other _____

Attachments
As stated

cc: CJCS, USD(P)

*However, I stand for 8-10 hours a day. Why is standing limited to 4 hours?*

*D.R.* DEC 0 2 2002

Page 1 of 2

Declassified Under Authority of Executive Order 12958
By Executive Secretary, Office of the Secretary of Defense
William P. Marriott, CAPT, USN
June 18, 2004

# UNCLASSIFIED

ATTACH 13.



**DEPARTMENT OF DEFENSE**
UNITED STATES SOUTHERN COMMAND
OFFICE OF THE COMMANDER
3511 NW 91ST AVENUE
MIAMI, FL 33172-1217

REPLY TO
ATTENTION OF

SCCDR                                               25 October 2002

MEMORANDUM FOR Chairman of the Joint Chiefs of Staff, Washington, DC 20318-9999

SUBJECT: Counter-Resistance Techniques

1. The activities of Joint Task Force 170 have yielded critical intelligence support for forces in combat, combatant commanders, and other intelligence/law enforcement entities prosecuting the War on Terrorism. However, despite our best efforts, some detainees have tenaciously resisted our current interrogation methods. Our respective staffs, the Office of the Secretary of Defense, and Joint Task Force 170 have been trying to identify counter-resistant techniques that we can lawfully employ.

2. I am forwarding Joint Task Force 170's proposed counter-resistance techniques. I believe the first two categories of techniques are legal and humane. I am uncertain whether all the techniques in the third category are legal under US law, given the absence of judicial interpretation of the US torture statute. I am particularly troubled by the use of implied or expressed threats of death of the detainee or his family. However, I desire to have as many options as possible at my disposal and therefore request that Department of Defense and Department of Justice lawyers review the third category of techniques.

3. As part of any review of Joint Task Force 170's proposed strategy, I welcome any suggested interrogation methods that others may propose. I believe we should provide our interrogators with as many legally permissible tools as possible.

4. Although I am cognizant of the important policy ramifications of some of these proposed techniques, I firmly believe that we must quickly provide Joint Task Force 170 counter-resistance techniques to maximize the value of our intelligence collection mission.

Encls

James T. Hill
General, US Army
Commander

1. JTF 170 CDR Memo
dtd 11 October, 2002
2. JTF 170 SJA Memo
dtd 11 October, 2002
3. JTF 170 J-2 Memo
dtd 11 October, 2002

Declassify Under the Authority of Executive Order 12958
By Executive Secretary, Office of the Secretary of Defense
by William P. Marriott, CAPT, USN
June 21, 2004

SECRET/NOFORN





DEPARTMENT OF DEFENSE
JOINT TASK FORCE-170
GUANTANAMO BAY, CUBA
APO AE 09860

JTF 170-CG                                          11 October 2002

MEMORANDUM FOR Commander, United States Southern Command, 3511 NW 91st
Avenue, Miami, Florida 33172-1217

SUBJECT: Counter-Resistance Strategies

1. Request that you approve the interrogation techniques delineated in the enclosed Counter-
Resistance Strategies memorandum. I have reviewed this memorandum and the legal review
provided to me by the JTF-170 Staff Judge Advocate and concur with the legal analysis
provided.

2. I am fully aware of the techniques currently employed to gain valuable intelligence in support
of the Global War on Terrorism. Although these techniques have resulted in significant
exploitable intelligence, the same methods have become less effective over time. I believe the
methods and techniques delineated in the accompanying J-2 memorandum will enhance our
efforts to extract additional information. Based on the analysis provided by the JTF-170 SJA, I
have concluded that these techniques do not violate U.S. or international laws.

3. My point of contact for this issue is LTC Jerald Phifer at DSN 660-3476.

2 Encls                                       MICHAEL B. DUNLAVEY
1. JTF 170-J2 Memo,                           Major General, USA
   11 Oct 02                                  Commanding
2. JTF 170-SJA Memo,
   11 Oct 02



**DEPARTMENT OF DEFENSE**
**JOINT TASK FORCE 170**
**GUANTANAMO BAY, CUBA**
**APO AE 09360**



JTF 170-SJA                                                        11 October 2002

MEMORANDUM FOR Commander, Joint Task Force 170

SUBJ: Legal Review of Aggressive Interrogation Techniques

1. I have reviewed the memorandum on Counter-Resistance Strategies, dated 11 Oct 02, and agree that the proposed strategies do not violate applicable federal law. Attached is a more detailed legal analysis that addresses the proposal.

2. I recommend that interrogators be properly trained in the use of the approved methods of interrogation, and that interrogations involving category II and III methods undergo a legal review prior to their commencement.

3. This matter is forwarded to you for your recommendation and action.

2 Encls                                      DIANE E. BEAVER
1. JTF 170-J2 Memo,                          LTC, USA
   11 Oct 02                                 Staff Judge Advocate
2. JTF 170-SJA Memo,
   11 Oct 02



OCT. 10. 2002  9:46AM    CJA
NO. 285   P. 5
NO. 075   P. 2

UNCLASSIFIED

DEPARTMENT OF DEFENSE
JOINT TASK FORCE 170
GUANTANAMO BAY, CUBA
APO AE 09360

JTF-J2                                              11 October 2002

MEMORANDUM FOR Commander, Joint Task Force 170

SUBJECT: Request for Approval of Counter-Resistance Strategies

1. (S/NF) PROBLEM: The current guidelines for interrogation procedures at GTMO
limit the ability of interrogators to counter advanced resistance.

2. (S/NF) Request approval for use of the following interrogation plan.

    a. Category I techniques. During the initial category of interrogation the detainee
should be provided a chair and the environment should be generally comfortable. The
format of the interrogation is the direct approach. The use of rewards like cookies or
cigarettes may be helpful. If the detainee is determined by the interrogator to be
uncooperative, the interrogator may use the following techniques.

    (1) Yelling at the detainee (not directly in his ear or to the level that it would cause
physical pain or hearing problems)

    (2) Techniques of deception:

    (a) Multiple interrogator techniques.

    (b) Interrogator identity. The interviewer may identify himself as a citizen of a foreign
nation or as an interrogator from a country with a reputation for harsh treatment of
detainees.

    b. Category II techniques. With the permission of the OIC, Interrogation Section, the
interrogator may use the following techniques.

    (1) The use of stress positions (like standing), for a maximum of four hours.

    (2) The use of falsified documents or reports.

    (3) Use of the isolation facility for up to 30 days. Request must be made to through the
OIC, Interrogation Section, to the Director, Joint Interrogation Group (JIG). Extensions
beyond the initial 30 days must be approved by the Commanding General. For selected

Declassify under the Authority of Executive Order 12958.
By Executive Secretary, Office of the Secretary of Defense
By William P. Marriott, CAPT, USN
June 21, 2004

UNCLASSIFIED

SECRET//NOFORN

JTF 170-J2
SUBJECT: Request for Approval of Counter-Resistance Strategies

(4) Use of mild, non-injurious physical contact such as grabbing, poking in the chest with the finger, and light pushing.

3. (U) The POC for this memorandum is the undersigned at x3476.

JERALD PHIFER
LTC, USA
Director, J2

SECRET//NOFORN          UNCLASSIFIED
3



# Daniel William Eggers
## Captain, United States Army

No. 522-04
**IMMEDIATE RELEASE** May 31, 2004
DoD Identifies Army Casualties

The Department of Defense announced today the death of three soldiers supporting Operation Enduring Freedom. They died May 29,2004, in Kandahar, Afghanistan, when their vehicle hit a land mine. Killed were:

Captain Daniel W. Eggers, 28, of Cape Coral, Florida. He was assigned to the 1st Battalion, 3rd Special Forces Group (Airborne), from Fort Bragg, North Carolina.

Sergeant First Class Sergeant <u>Robert J. Mogensen,</u> 26, of Leesville, Louisiana. He was assigned to the 1st Battalion, 3rd Special Forces Group (Airborne), Fort Bragg, North Carolina.

Private First Class Joseph A. Jeffries, 21, of Beaverton, Oregon He was assigned to the Army Reserve's 329th Psychological Operations Company, Portland, Oregon.

The incident is under investigation.

For further information related to this release, contact Army Public Affairs at (703) 692-2000.



THE CITADEL
THE MILITARY COLLEGE OF SOUTH CAROLINA

By Kathy Cleveland
Courtsy of the Hollis Brookline Journal
June 4, 2004

Daniel Eggers was a fearless soldier who died in the way he would

SECRET/NOFORN

JTF 170-J2
SUBJECT: Request for Approval of Counter-Resistance Strategies

detainees, the OIC, Interrogation Section, will approve all contacts with the detainee, to
include medical visits of a non-emergent nature.

(4) Interrogating the detainee in an environment other than the standard interrogation
booth.

(5) Deprivation of light and auditory stimuli.

(6) The detainee may also have a hood placed over his head during transportation and
questioning. The hood should not restrict breathing in any way and the detainee should be
under direct observation when hooded.

(7) The use of 20-hour interrogations.

(8) Removal of all comfort items (including religious items).

(9) Switching the detainee from hot rations to MREs.

(10) Removal of clothing.

(11) Forced grooming (shaving of facial hair etc...)

(12) Using detainees individual phobias (such as fear of dogs) to induce stress.

c. Category III techniques. Techniques in this category may be used only by submitting
a request through the Director, JIG, for approval by the Commanding General with
appropriate legal review and information to Commander, USSOUTHCOM. These
techniques are required for a very small percentage of the most uncooperative detainees
(less than 3%). The following techniques and other aversive techniques, such as those used
in U.S. military interrogation resistance training or by other U.S. government agencies,
may be utilized in a carefully coordinated manner to help interrogate exceptionally resistant
detainees. Any of these techniques that require more than light grabbing, poking, or
pushing, will be administered only by individuals specifically trained in their safe
application.

(1) The use of scenarios designed to convince the detainee that death or severely
painful consequences are imminent for him and/or his family.

(2) Exposure to cold weather or water (with appropriate medical monitoring).

(3) Use of a wet towel and dripping water to induce the misperception of suffocation.

SECRET/NOFORN   UNCLASSIFIED
2

Standing are his wife, Rebecca, from left, son John, 6, parents
Margaret, William, and son William, 3.



Army Brigadier General Gary Jones presents a medal to Margaret
Eggers, mother of Captain Daniel W. Eggers, during his funeral services
at Arlington National Cemetery, Tuesday June 22, 2004.
Eggers' son John, 6, watches.

### EGGERS, DANIEL WILLIAM
### CPT US ARMY
VETERAN SERVICE DATES: 05/01/1995 - 05/29/2004
DATE OF BIRTH: 07/15/1975
DATE OF DEATH: 05/29/2004
DATE OF INTERMENT: 06/22/2004
BURIED AT: SECTION 60  SITE 7990

Posted: 7 June 2004  Updated: 17 June 2004 Updated: 23 June 2004 Updated: 29
June 2004
Updated: 1 November 2004