UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:04-CR-211-1-BO



FILED

JAN 2 6 2005

CLERK
US DISTRICT COURT, EDNC
BY_____ DEP. CLK

| | | |
|---|---|---|
| UNITED STATES AMERICA | ) | GOVERNMENT' RESPONSE TO MOTION |
| | ) | TO DISMISS RE: COMMANDER-IN-CHIEF'S |
| v. | ) | WAR-MAKING AUTHORITY |
| | ) | (UNDER SEAL) |
| DAVID. A. PASSARO | ) | |

The United States of America, by and through the United States Attorney for the Eastern District of North Carolina, hereby responds in opposition to defendant's Motion to Dismiss Indictment as an unconstitutional infringement of the Commander-in-Chief's War-Making Duties and, in support of such opposition shows unto the Court the following.[1]

## INTRODUCTION

The essence of the defendant's argument is that the instant prosecution, brought by the Executive Branch in the person of the Attorney General, infringes upon the Executive Branch's war-making powers. This argument is patently frivolous and incoherent. Simply stated, the separation of powers is not implicated when the only powers in question reside within the Executive Branch. It is entirely for that branch to determine whether a particular criminal prosecution is consistent with other Executive Branch

---

[1] The Government notes that with no opposition from the defense the Court extended the response time to January 26, 2005.



Unsealed 4/12/05
Unclassified

responsibilities, and its determination in that regard is not subject to judicial review. Indeed, the only separation of powers concern raised by defendant's motion is that the relief requested – dismissal of the indictment – would represent a serious intrusion by the Judiciary on the constitutional authority of the President to act as Commander-in-Chief and to "take care that the Laws be faithfully executed."

In short, it is the province of the Executive Branch, not criminal defendants, to regulate the conduct of military forces, and those contracted to their employ, in the execution of armed conflict. Inherent to the bringing of the subject prosecution is a finding by the Executive Branch that the commission of the sort of brutal assault on a helpless detainee charged here is detrimental to the effective prosecution of the war effort. It is not for the defendant, or this Court, to define either what criminal standards apply in a theater of war nor when to enforce them. Such decisions are central to the exercise of the powers the defendant disingenuously seeks to protect by his motion.

### FACTUAL/PROCEDURAL BACKGROUND

On June 17, 2004, a grand a jury of this District returned a four count indictment charging the defendant with two counts of assault with a dangerous weapon, in violation of 18 U.S.C. § 113(a)(3); and two counts of assault resulting in serious bodily

injury, in violation of 18 U.S.C. § 113(a)(6).[2]  All of the counts allege that the offenses were committed by a United States national and occurred within the "special maritime and territorial jurisdiction of the United States, within the meaning of 18 U.S.C. § 7(9), that is, "at a United States Army base near the town of Asadabad, in Kunar Province, Afghanistan."

As set out in the indictment, the government anticipates proving at trial that the defendant, a former member of the U.S. Army, was an independent contractor working on behalf of the Central Intelligence Agency (CIA) to engage in paramilitary activities in support of United States military personnel in Kunar Province, in the nation of Afghanistan.  On June 18, 2003, the defendant was contracted to be at a U.S. Army base near the town of Asadabad, Afghanistan, a location approximately five miles from the Pakastani border.  The compound was employed by U.S. personnel as a base from which to launch missions against terrorists, gather intelligence, and train fledgling Afghani military forces to assume responsibility for their own defense.  During the months preceding June 19, 2003, it was the target of sporadic rocket attacks by hostile paramilitary forces.

The indictment also alleges (and the government anticipates proving at trial), that on June 19, 2003, Abdul Wali, voluntarily

---

[2]  The counts were predicated upon the defendant's alleged activities on June 19, 2003 and June 20, 2003.

surrendered himself at the front gate of Asadabad base. It bears noting that United States authorities were provided the common Arabic name, Abdul Wali, prior to the surrender as a person of interest regarding the attacks. Between June 19 and June 20, 2003, the defendant interrogated him at the Asadabad Army base concerning the attacks. During the interrogations, the defendant is alleged to have beaten Wali with his hands, his feet and a large flashlight. Wali died in a cell on Asadabad Base on June 21, 2003.

LEGAL BACKGROUND

On September 18, 2001 - a week after the terrorist attacks on the World Trade Center and the Pentagon - Congress passed a Joint Resolution authorizing the President to use the armed forces against those responsible for the attacks. Specifically, it authorized the President to "use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks . . . or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons. " Publ. L. 107-40, 115 Stat. 224. (Motion to Dismiss, Attachment. 2)("hereafter "Mot. To Dismiss" and "Att.".)

In connection with the subsequent prosecution of military operations in Afghanistan and acting on the advice of the Department of Justice Office of Legal Counsel (Hereafter "OLC"), on

February 7, 2002, the President issued a Memorandum addressing the "Humane Treatment of al- Qaeda and Taliban Detainees." Mot. To Dismiss Att. 1. Specifically, the President determined that the 1949 Geneva Convention Relative to the Treatment of Prisoners of War, 6 U.S.T. 3316, 75 U.N.T.S. 135 (entered into force August 12, 1949) (hereafter "GPW"), was inapplicable to al-Qaeda members operating in Afghanistan and elsewhere and that, although GPW applied to the conflict with the Taliban regime in that country, Taliban detainees did not qualify for protection as prisoners of war under GPW art. 4. Nonethless, the President stressed that "our values as a Nation . . . call for us to treat detainees humanely, including those who are not legally entitled to such treatment." Accordingly, the President "reaffirm[ed] the order previously issued by the Secretary of Defense to the United States Armed Forces requiring that the detainees be treated humanely and, to the extent appropriate and consistent with military necessity, in a manner consistent with the principles of Geneva." <u>Id.</u> Att. 1 at 2.

Finally, pertinent to the defendant's instant claim, on August 1, 2002, OLC transmitted to the Counsel to the President a Memorandum addressing the scope of the federal torture statute, 18 U.S.C. §§ 2340-2340A, enacted in 1994 to implement the "Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment." In analyzing the elements of a violation of the

statute, it concluded that "for an act to constitute torture as defined in Section 2340, it must inflict pain that is difficult to endure. Physical pain amounting to torture must be equivalent in intensity accompanying serious physical injury, such as organ failure, impairment of bodily function or even death." Mot. To Dismiss Att 5. The White House and the Department of Justice however withdrew the Memorandum on or about June 22, 2004. See The Washington Post at A1 (June 24, 2004).

ARGUMENT

Passaro's argument - as we understand it - is that his indictment and pending prosecution for assaulting an Afghani detainee in connection with an interrogation session, is fundamentally at odds with both the President's war-making power and the Congressional resolution empowering him to conduct military operations against terrorists in Afghanistan particularly because it contravenes his authority to detain combatants and to promulgate policies relating to the prosecution of such operations -- including the treatment of detainees - such as his February 7, 2002 Memorandum concerning the application of GPW to detainees and the OLC Memorandum concerning the torture statute.

In the first place, the criminal prosecution of members of the armed forces and U.S. nationals accompanying them in the field who torture, assault or mistreat local nationals detained in the course of such operations, in no way infringes upon the President's

authority to *detain* such persons.  Indeed, it is a fundamental principle of law of armed conflict that, although an enemy combatant can be detained until the cessation of hostilities (e.g., GPW art. 118), acts of violence, intimidation or any other form of inhumane treatment are not properly a part of such detention (e.g., GPW art. 13).  See also Hague Convention No. IV Respecting the Laws and Customs of War on Land and Annex Thereto 30 Stat. 2277, T.S. No. 539 annex. Ch. 2 (1907).

Further, none of the pronouncements upon which the defendant relies, evidence that - contrary to universally recognized principles of armed conflict - either the President or Congress intended to license U.S. military personnel and civilians accompanying them to engage in such practices.  More specifically, the President's memorandum addressing the application of GPW to military operations in Afghanistan simply asserts that Al-Qaeda and Taliban detainees, do not qualify for the full panoply of prisoner of war protections under that Convention.  It contains no suggestion that the custodians of detainees, even those conducting interrogations, possess a *carte blanche* to assault them.  To the contrary, as the defendant concedes, the memorandum stresses that detainees will be treated humanely without regard to their status under the Convention and reaffirms the direction of the Secretary of Defense requiring that detainees be treated humanely.  Mot. To Dismiss Att. 4 at 2.  A subsequent Memorandum to the President from

his Counsel also reaffirms that while, GPW does not apply to Al-Qaeda and Taliban combatants, "in its treatment of [such] detainees, the U.S. will continue to be constrained by (1) its commitment to treat the detainees humanely and, to the extent appropriate and consistent with military necessity, in a manner consistent with GPW . . . ." See Mot. To Dismiss Att 3 at 4.

Similarly, although the September 18, 2001, Congressional Joint Resolution authorizes the President to use all necessary and appropriate force to destroy nations, organizations and persons he determines were involved in the September 11, 2001, terrorist attacks or he deems necessary to prevent future attacks, nothing in the Resolution suggests that, in conducting such operations, the President or his subordinates were exempt from legislation enacted to constrain the conduct of US military forces on the battlefield[3] and to regulate the behavior of civilians accompanying them overseas.[4]

Finally, the draft memorandum from OLC to the Counsel to the President concerning the federal torture statute provide no

_____

[3] For example, 18 U.S.C. § 2441 makes punishable the commission of "war crimes" when perpetrated by or against U.S. military forces.

[4] See 18 U.S.C. § 3261 (making subject to trial in a federal district court persons employed by or accompanying the armed forces outside the United States who commit certain felony offenses); 18 U.S.C. § 7(9) (making subject to prosecution US nationals who commit certain offenses, including assault, on the premises of US missions and other entities overseas).

basis for an argument that the Executive has *sub silentio,* rendered inapplicable federal statutes constraining the conduct of US nationals with respect to detainees.  In the first place, in June 2004, that memorandum was disavowed and withdrawn by both the Counsel to the President and the Department of Justice because it contained unnecessary and over-broad discussions of Presidential authority and exemptions from prosecution.  <u>See</u> <u>The Washington Post</u>, at A1 (June 23, 2004). Furthermore, as publicly reported and disseminated, the purpose of the Memorandum was to address the application of the federal torture statute, 18 U.S.C. § 2340 - a statute that required "specific inten[t]" to torture - to detainees.  It expressed no opinion concerning the application of federal statutes prohibiting murder and assaults, committed by US nationals on federal enclaves overseas, to the treatment of detainees.[5]  And it contained no statement that could conceivably

_____

[5]  Passaro also observes that certain techniques authorized by the Secretary of Defense for use in the interrogation of enemy combatants incarcerated at Guantanamo Naval Base would constitute a simple assault prohibited by 18 U.S.C. § 113.  See Mot. to Dismiss at 15, citing a November 22, 2002 Memorandum to the Secretary of Defense from the DoD General Counsel.  Although the Memoranda might provide a hypothetical US national acting under directions issued in conformity therewith a defense against an assault charge, Passaro does not and, indeed, cannot claim that it licensed him to commit the acts of which he stands charged. Obviously, such conduct occured in Afghanistan, a location not embraced by the document and, again, the nature and scope of the assault in which he allegedly engaged exceeded anything that was arguably authorized by that document.

By the same token, Passaro argues (Mot. To Dismiss at 14) that, insofar as Section 113 embraces assaults unconsummated by a

be construed to authorize or justify the nature and scope of the aggravated assault alleged in the indictment.

More fundamentally, however, the gravamen of Passaro's claim is that the decision of the Executive to undertake the instant prosecution undermines policy pronouncements -- also issued by the Executive -- that address the conduct of military operations in Afghanistan. See Mot. to Dismiss at 13 (arguing that the instant prosecution "interferes" with the President's war-making powers).

It is difficult to perceive of a matter that is less amenable to resolution by the judicial branch. As both the command of the armed forces and the authority to enforce the law repose with the Executive, it is properly within the province of that branch – and that branch alone – to determine where to draw the line between permissible combatant activities and conduct that is sufficiently beyond the pale of operational requirements that it should be the subject of criminal charges. The courts have recognized that with respect to the execution of the President's constitutional responsibility as Commander-in-Chief, "'[i]t is difficult to conceive of an area of governmental activity in which the courts

---

battery, "tortious assaults" and assaults resulting from negligence, its application to acts against detainees during interrogation would contravene the latitude afforded by the Secretary of Defense in the application of certain threatening techniques during the interrogation of detainees. Whatever may be the merit of this claim in the context of prisoner interrogation at Guantanamo with respect to such assaults, the aggravated assault charges lodged against the defendant in this case are of a far graver nature.

have less competence. The complex, subtle, and professional decisions as to the . . . control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches." Rostker v. Goldberg, 453 U.S. 57, 65-66 (1981), quoting Gilligan v. Morgan, 413 U.S. 1, 10 (1973). See, e.g., Chappel v. Wallace. 462 U.S. 296, 301 (1983), quoting Orloff v. Willoughby, 345 U.S. 83, 93-94 (1953) ("'[J]udges are not given the task of running the Army'"); Dreyfus v. Von Finck, 534 F.2d 24, 29 (2d Cir. 1976) ("In times of war, executive decisions are generally political in nature, and neither judicially-manageable nor reviewable").

Under the Uniform Code of Military Justice (hereafter "UCMJ"), members of the armed forces conducting military operations under the authority of the President and with the approval of Congress are subject to prosecution for the maltreatment of detainees, as well as for offenses such as murdering or assaulting suspected enemy combatants consigned to their custody.[6] In connection with military operations in Afghanistan, the Armed Forces have repeatedly conducted criminal investigations and initiated proceedings under the UCMJ against members of the armed forces for

---

[6] See, e.g., 10 U.S.C. § 894 (Art. 94, UCMJ) (maltreatment of a prisoner); 10 U.S.C. § 918 (Art. 118, UCMJ) (murder); 10 U.S.C. § 928 (assault) (Art. 128, UCMJ) (assault).

the alleged maltreatment of Afghani detainees.[7]  Such action is the strongest form of evidence that the Commander-in-Chief and his principal subordinates in the theater of operations do not perceive disciplinary proceedings for conduct similar to that of which he defendant stands charged to undermine the policy pronouncements of the Executive and the Congress regarding military operations in Afghanistan.  The instant indictment against the defendant is of the very same character, and the statute under which that indictment has been returned simply places him *in pari materia* with his uniformed counterparts.

With respect to enforcement of the law, it is axiomatic that the "Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." <u>United States v. Nixon</u>, 418 U.S. 683, 693 (1974).  The Attorney General and the United States Attorneys "are designated by statute as the President's delegates to help him discharge his constitutional responsibility to 'take care that the Laws be faithfully executed." <u>United States v. Armstrong</u>, 517 U.S. 456, 464 (1996); <u>see</u>, <u>e.g.</u>, <u>United States v. Russell</u>, 411 U.S. 423, 435 (1973) ("the execution

---

[7] <u>See</u>, <u>e.g.</u>, <u>The Washington Post</u> at A24 (Dec. 14, 2004)(reporting that two servicemen have been charged with crimes related to the deaths of Afghani detainees and that other similar incidents are under investigation ); <u>The Washigton Post</u>, at A 18 (June 5, 2004)(reporting 16 criminal investigations into possible misconduct by US servicemembers against Afghani and Iraqi detainees); <u>The Christian Science Monitor</u>, (June 23, 2004)(reporting criminal investigations concerning detainee maltreatment by US forces in Afghanistan).

of the federal laws under our Constitution confided primarily to the Executive Branch of Government"). Here, by virtue of the indictment obtained by the United States Attorney, the Executive has determined that the defendant's behavior falls sufficiently beyond the scope of activity permitted by the exigencies of combat (under guidelines also devised by the Executive) to warrant prosecution.

Under our tri-partite system of government, absent evidence that such a decision was based upon some unjustifiable standard such as race, religion, or some other arbitrary classification, it is not appropriate for the judicial branch to exercise a "chancellor's foot veto" over that determination. <u>Russell</u>, 411 U.S. at 435; see <u>Armstrong</u>, 571 U.S. at 464; <u>See also</u> <u>United States v. Soto-Beniquez</u>, 356 F.3d 1, 28-29 (1st Cir. 2003)(rejecting, as beyond the scope of judicial competence, claim that defendant should not have been prosecuted by federal authorities because he pled guilty to state charges).

If the defendant truly believes that the conduct for which he stands indicted was directed or authorized by superiors within the Executive Branch, or was undertaken upon a good-faith belief that it was justified by the exigencies of combat or Executive Branch authority, rejection of the instant motion to dismiss on separation-of-powers grounds will not leave him without recourse. His proper vehicle for relief is to proffer and present evidence as

13

to each component of any legally-cognizable defense he believes himself entitled to assert,[8] and to request an appropriate instruction relating to any such defense. The Government suspects that his motivation in bringing the instant motion is the realization that such a defense is not supported by the evidence and thus not likely persuasive to a jury. See <u>United States v. Bailey</u>, 444 U.S. at 415. It is not, however, to seek dismissal of the indictment on the novel ground that it contravenes other actions undertaken by the Executive Branch.

<u>CONCLUSION</u>

For the foregoing reasons, the Motion to Dismiss the Indictment on the ground that it infringes on the President's war-making powers should be denied.

Respectfully submitted on this 26th day of January, 2005.

FRANK W. WHITNEY
United States Attorney


BY: ERIC D. GOULIAN
Assistant United States Attorney
Criminal Division

---

[8] See, <u>e.g.</u>, <u>United States v. Bailey</u>, 444 U.S. 394, 409 (1980)(necessity); <u>United States v. Yunis</u>, 924 F.2d 1086, 1098 (D.C.Cir. 1991) (obedience to military orders); <u>United States v. Duggan</u>, 743 F.2d 59, 83-84 (2d Cir. 1984)(government authority); <u>United States v. Lindh</u>, 212 F. Supp. 2d 541, 553 (E.D.V.A. 2002)(combatant immunity).

## CERTIFICATE OF SERVICE

This is to certify that I have this _26th_ day of January, 2004, served a copy of the foregoing **GOVERNMENT'S RESPONSE TO MOTION TO DISMISS RE: COMMANDER-IN-CHIEF'S WAR-MAKING AUTHORITY** defendant in this action by hand delivery to the CSO who in turn will provide a copy to:

THOMAS MCNAMARA
Federal Public Defender
Raleigh, North Carolina


ERIC D. GOULIAN
Assistant United States Attorney
Criminal Division