UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:04-CR-211-BO


FILED
FEB 1 1 2005
CLERK
US DISTRICT COURT, EDNC
BY_____ DEP. CLK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DAVID ANTHONY PASSARO | REPLY TO GOVERNMENT'S RESPONSE TO MOTION TO DISMISS INDICTMENT AS UNCONSTITUTIONAL INFRINGEMENT OF THE COMMANDER-IN-CHIEF'S WAR-MAKING DUTIES AND POWERS, AND CONTRARY TO THE CONGRESSIONAL JOINT RESOLUTION AUTHORIZING PREEMPTIVE USE OF "NECESSARY AND APPROPRIATE FORCE"<br><br>Under Seal |

✓ DAVID ANTHONY PASSARO, defendant in the above-captioned case, by and through counsel, respectfully submits to this Honorable Court this reply to the government's response to the motion to dismiss the indictment (DE-65). This reply clarifies the issue presented for this Court's review and corrects a key inaccuracy in the government's response.

The issue for this Court to decide is this:

Whether the prosecution in an Article III Court of one who served the Commander-in-Chief on the field of battle for actions taken in hostile enemy territory that allegedly violated a provision of the criminal code not designed for application in combat zone, unconstitutionally infringes upon the Commander-in-Chief's exclusive war-making duties, or contravenes the Congressional authorization to use "all necessary and appropriate force" against the enemy.

It is not, as the government characterizes it, that this prosecution "infringes upon the Executive Branch's war-making powers." (DE-82, p. 1). Indeed, as developed in Mr. Passaro's supporting

memorandum (DE-66, pp. 10-12), the Constitution vests the war-making powers and duties in one person, the Commander-in-Chief, not the collective body of the Executive Branch. U.S. Const. art II, § 2 ("The President shall be Commander in Chief of the Army and Navy of the United States"); *Hamilton v. Dillin*, 88 U.S. (21 Wall) 73, 87 (1874) ("[T]he President alone [] is constitutionally invested with the entire charge of hostile operations").

Mr. Passaro maintains that bringing a prosecution in an Article III Court that utilizes a provision of the criminal code which criminalizes tortious assaults to prosecute actions taken in the field of battle violates the Commander-in-Chief's exclusive power and duty to determine the degree of force necessary on that field of battle. *See Brig Amy Warwick*, 67 U.S. 635, 670 (1863) ("If a war be made by invasion of a foreign nation, the President is not only authorized but bound to resist force by force. He does not initiate the war, but is bound to accept the challenge without waiting for any special legislative authority . . . [and] [h]e must determine what degree of force the crisis demands").

Thus, it matters not whether the same Chief Executive, motivated by "buyer's remorse," or a subsequent Chief Executive, acting as a "Monday Morning Quarterback," brings such a prosecution. The result is the same: the unconstitutional "dulling" of the Commander-in-Chief's sword by employing a civilian jury to judge the degree of force employed in battle with a provision of the criminal code not designed for the battlefield, and by using an Article III Court to impose judgment for those battlefield actions.[1]

The government asserts that this constitutional issue "is not subject to judicial review," but

---

[1] Mr. Passaro does not contest the constitutional authority of the Commander-in-Chief to regulate the conduct of those who serve in battle, as the government suggests (DE-82, p. 2). However, here, the constitutional vehicle is not in an Article III Court. *See*, i.e., Article 2(a)(10) of the U.C.M.J. 10 U.S.C. § 802(a)(10).

2

rather "reside[s] within the Executive Branch." (DE-82, p. 1). Mr. Passaro contends otherwise, and asserts that such review is the highest duty our Constitution vests in the Judicial Branch. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is").

The government's response not only misconstrues the constitutional issue, it also contradicts the position of the new Attorney General, Judge Alberto Gonzales. The government incorrectly presumes that the "humane treatment" directive in the President's February 7, 2002 Memorandum, which excluded Taliban and al Qaeda detainees from Geneva protection yet directed the "Armed Forces ... to treat [them] humanely," applied to forces operating under the authority of the Central Intelligence Agency. (DE-82, pp. 5, 7, 8). In fact, in Judge Gonzales' responses to written questions posed by Senator Patrick Leahy after his confirmation hearing, Judge Gonzales confirmed what a careful reading of the President's directive reveals – it did not "apply to the CIA or any other non-military personnel." Attach. 1.

Judge Gonzales went on to state that those persons would nonetheless be bound by the prohibition on torture contained in 18 U.S.C. §§2340, 2340A, which codified America's obligation as a signatory to the Convention Against Torture. Attach. 1. That statute was the subject of the August 1, 2002 Memorandum issued by Judge Jay Bybee, then head of the Department of Justice's Office of Legal Counsel, a memorandum which defined the statutory term "torture" as "severe pain . . . of an intensity akin to that which accompanies serious physical injury such as death or organ failure." Bybee Memorandum, p. 46, (DE-66, Attach. 5).[2]

---

[2] The government asserts that the Office of Legal Counsel "disavowed" Judge Bybee's Memorandum in June 2004, and cites a Washington Post article. (DE-82, p. 6). Curiously, the Office of Legal Counsel did not issue a replacement memorandum until December 30, 2004. Regardless, the Bybee Memorandum represented the authoritative interpretation of the Executive

3

Judge Gonzales also stated, "Depending on the circumstances, they are bound by other criminal statutes as well, such as those defining crimes in the special maritime and territorial jurisdiction of the United States. . . . In fact, the Department of Justice is currently prosecuting a CIA contract employee for various charges of assault under 18 U.S.C. § 113. *See United States v. Passaro*, No. 5:04-CR-211-1 (E.D.N.C.)." Attach. 1.

Given his familiarity with the instant prosecution, the above answers indicate that Judge Gonzales' position is this: He would not prosecute Mr. Passaro for any acts which fall "south" of torture, so long as he interrogated the terrorist suspect far from the mud-walled compound of the Asadabad firebase, which the government contends qualifies as within the "special territorial jurisdiction" of the United States. However, the decision to interrogate a terrorist suspect within the compound (at least free from the ambushes and improvised explosive devices, if not from rocket attacks, DE-66, Attach. 6), would expose Mr. Passaro to prosecution for even negligently causing the terrorist suspect to experience a reasonable apprehension of harm. *See United States v. Guilbert*, 692 F.2d 1340, 1343 (11th Cir. 1982) (as used in 18 U.S.C. § 113, "assault" incorporates a tortious assault).

The Executive Branch remains free to evaluate the irony and counter-productivity of this position. However, it does not possess the judicial authority to review whether a prosecution brought in an Article III Court for battlefield actions which allegedly exceeded the authorized degree of force unconstitutionally infringes upon the Commander-in-Chief's exclusive war-making duties or contravenes a congressional authorization to use "all necessary and appropriate force" against the forces of terror who killed and continue to kill Americans. That decision abides with this Honorable

---

Branch during the time period relevant to this prosecution.

4

Court.

Respectfully submitted this the 11th day of February, 2005.

*Thomas P. McNamara*

THOMAS P. McNAMARA
Federal Public Defender
N.C. State Bar No. 5099


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that pursuant to paragraph 20 of the Protective Order issued by the Court on July 29, 2004, a copy of the foregoing was submitted to Deputy Clerk Jennifer Myers, as directed by Jennifer H. Campbell, one of the Court Security Officers as identified in paragraph 4 of the Protective Order, by hand delivering a copy of same who in turn will provide a copy to:

JAMES A. CANDELMO
Assistant United States Attorney
310 New Bern Avenue, Suite 800
Raleigh, NC 27601-1461

This the 11th day of February, 2005.

*Thomas P. McNamara*

THOMAS P. McNAMARA
Federal Public Defender
N.C. State Bar No. 5099

Responses of Alberto R. Gonzales
Nominee to be Attorney General
to the Written Questions of Senator Patrick Leahy

## Treatment of Detainees

1. You testified at the hearing, "It has always been the case that *everyone* should be—that *the military* would treat detainees humanely, consistent with the President's February order" (emphasis added).

    (A) Does the President's February 7, 2002, directive regarding humane treatment of detainees apply to the CIA or any other non-military personnel?

    Response: No. By its terms, the February 7, 2002, directive "reaffirm[s] the order previously issued by the Secretary of Defense to the United States Armed Forces." However, the CIA and other non-military personnel are still subject to the legal obligations of the United States under Article 16 of the Convention Against Torture regarding cruel, inhuman or degrading treatment, as subject to understandings and reservations by the Senate at the time of ratification.

    (B) Has the President ever directed or otherwise instructed the CIA and other non-military personnel to treat detainees humanely?

    Response: The President has repeatedly condemned torture and made clear that the United States will not condone torture. The CIA and other non-military personnel are fully bound by this clear policy set forth by the President. All U.S. personnel are also bound to abide by the terms of the Convention Against Torture as subject to understandings and reservations attached by the Senate at the time of ratification.

    (C) Are the CIA and other non-military personnel under any legal obligation to treat captured al Qaeda and Taliban humanely and, if so, what is the source of that legal obligation?

    Response: The CIA and other non-military personnel are fully bound by the prohibition on torture that the United States undertook in the Convention Against Torture and by the criminal prohibition on torture contained in 18 U.S.C. § 2340 & § 2340A. Depending on the circumstances, they are bound by other criminal statutes as well, such as those defining crimes in the special maritime and territorial jurisdiction of the United States, which generally includes overseas U.S. facilities (except for certain persons, particularly members of the armed forces and those employed by or accompanying them, who are subject to the United

1

ATTACH 1

States Code of Military Justice and the Military Extraterritorial Jurisdiction Act, 18 U.S.C. § 3261). *See* 18 U.S.C. § 7(9). Those statutes prohibit, for example, assault (18 U.S.C. § 113), maiming (18 U.S.C. § 114), manslaughter (18 U.S.C. § 1112), and murder (18 U.S.C. § 1111). These criminal prohibitions prevent abuse of detainees by the CIA and other non-military personnel. In fact, the Department of Justice is currently prosecuting a CIA contract employee for various charges of assault under 18 U.S.C. § 113. *See United States v. Passaro*, No. 5:04-CR-211-1 (E.D.N.C.).

2. **The President's February 7, 2002, directive stated that humane treatment should be accorded as a matter of values and policy, including to "those who are not legally entitled to such treatment." Is it your view that some detainees are not legally entitled even to humane treatment?**

   Response: The President's February 7, 2002, directive addressed the legal status of al Qaeda and Taliban detainees under the Geneva Conventions. It did not address other legal obligations of the United States with respect to these detainees. As other members of the Administration and I have made clear repeatedly, the fact that al Qaeda and Taliban detainees do not have POW status under the GPW does not mean that there is no law governing their treatment. To the contrary, there are several sources of law that may apply, depending upon the precise circumstances. For example, the United States has committed under the CAT not to engage in torture. Congress embodied that commitment in a criminal statute, 18 U.S.C. §§ 2340 & 2340A, which prohibits torture outside the United States. (Conduct constituting torture within the United States is subject to the Constitution and various federal and state criminal laws.) In addition, for those held by the armed forces, the UCMJ applies to the members of the armed forces everywhere. It defines specific offenses, including maiming, assault, and cruelty or maltreatment, that would apply to conduct with respect to detainees. (It is my understanding that court martial proceedings under these provisions have been instituted in response to the abuses at Abu Ghraib in Iraq). Furthermore, various criminal statutes prohibiting, for example, assault (18 U.S.C. § 113), maiming (18 U.S.C. §114), manslaughter (18 U.S.C. § 1112), and murder (18 U.S.C. § 1111), apply within the special maritime and territorial jurisdiction of the United States, which generally includes overseas U.S. facilities (except for certain persons, particularly the armed forces and those employed by or accompanying them, who are subject to other statutes). *See* 18 U.S.C. § 7(9). Also, under the Military Extraterritorial Jurisdiction Act, 18 U.S.C. § 3261, the same criminal prohibitions that apply in the special maritime and territorial jurisdiction of the United States are applied to persons employed by or accompanying the armed forces abroad.

3. **When you were asked at the hearing if other world leaders might have the authority to authorize the torture of American citizens if they deemed**