UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:04-CR-211-1-BO


FILED
FEB 0 9 2005
CLERK
US DISTRICT COURT, EDNC
BY_____ DEP. CLK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DAVID ANTHONY PASSARO | REPLY TO GOVERNMENT'S RESPONSE TO MOTION TO COMPEL DISCOVERY AND COMPULSORY PROCESS<br>(Filed In Camera and Under Seal with the Court Security Officer) |

DAVID ANTHONY PASSARO, defendant in the above-captioned case, by and through undersigned counsel, hereby submits this Reply Memorandum to the Government's Opposition to Defendant's Motion to Compel Discovery and Motion for Compulsory Process.

ARGUMENT

Through this reply, Mr. Passaro will addresses his constitutionally guaranteed right to compulsory process, and the Government's obligations to produce discovery.

A. Motion for Compulsory Process

On November 16, 2004, Mr. Passaro filed a Motion for Compulsory Process seeking an order from the Court directing the government to "immediately produce the names, current locations, business addresses, and telephone numbers of anyone who was present in Asadabad, Afghanistan during the detention and questioning of Abdul Wahli on June 19 and 20, 2003, and/or anyone whose responsibilities required any such person to take action as a result of the same." (D.E. # 49 at 1). Essentially, Mr. Passaro's request encompassed the production of a list

1

Unsealed 4/12/05
IC: AUSA Unclassified

of persons, whose location, real names, and addresses are known to the government alone because of national security purposes, who were present at the Asadabad, Afghanistan facility (a location which the defendant has contended consists of an abandoned, mud-walled compound of approximately 7 mud huts), and who witnessed or participated in the detention of Abdul Wahli during two days in June of 2003. Furthermore, it his motion, Mr. Passaro presented dispositive case law demonstrating his right to have the Government produce such information, and showed that this information was material to his defense. Contrary to the government's assertion, Mr. Passaro's invocation of his constitutional rights is a far cry from what the government describes in their response as a "groundless fishing expedition the Federal Rules of Criminal Procedure were designed to prevent." (D.E. # 81 at 10).

"The importance of the Sixth Amendment right to compulsory process is not subject to question – it is integral to our adversarial criminal justice system[.]" *United States v. Moussaoui*, 382 F.3d 453, 471 (4th Cir. 2004). The Fourth Circuit has addressed the standard to be used in compelling witnesses within the CIPA context, stating, "a defendant is entitled to the disclosure of classified information upon showing that the information "'is relevant and helpful to the defense . . . or is essential to a fair determination of a cause.'" *United States v. Moussaoui*, 382 F.3d at 472 (quoting *Roviaro v. United States*, 353 U.S. 53, 60-61 (1957)). Furthermore, in cases that involve national security, the defendant is not required to "show materiality with the degree of specificity that applies in the ordinary case." *Id.* Instead, the defendant need only make a "plausible showing of materiality." *Id.* (citing *Valenzuela-Bernal*, 458 U.S. 858, 873 (1982)). The Government can invoke its evidentiary privileges only at the price of letting the defendant go free. *United States v. Moussaoui*, 382 F.3d at 476-77. Finally, in the *Moussauoui* case, the

Fourth Circuit quoted *Jencks v. U.S.*, 353 U.S. 657, 670-71 (U.S. 1957) emphasizing that "'it is unconscionable to allow [the government] to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense.'" *Moussaoui*, 382 F.3d at 484.

In this case, the testimony of any and all persons present in Asadabad, Afghanistan during the detention and questioning of Abdul Wahli, and/or anyone whose responsibilities required them to take action as a result of the same, is material to Mr. Passaro's defense, as the examination of these witnesses will likely produce evidence in Mr. Passaro's favor. At the time Mr. Passaro wrote his Motion for Compulsory Process, his defense team was trying to determine what military units were involved. Since that time, the government has identified the relevant military units. However, other governmental agencies were also involved, and the government has only provided Mr. Passaro with the first name and last initial of at least five different witnesses. The defense has no way to identify these witnesses, nor is there any indication that the first name and last initial is in actuality, the real names of these individuals. Thus, the defense has no fair opportunity to interview or subpoena these witnesses. Although the government is not ordinarily required to assist the defense, they should not be allowed to conceal or "secret" witnesses that are material to the Mr. Passaro's case, as noted in the case law presented *supra*.

**B. Government Produced Discovery**

In its response, the government asserts that it "has already produced an extensive quantity of material containing much of its case-in-chief" to the defense. (D.E. # 81 at 6; *see also* 3). To the extent that the government has provided discovery to the defense, it consists of the following: (1) a duty roster of the military guards during the relevant period of time; (2) two copies of the

same twelve pages of Mr. Passaro's notes; (3) copies of approximately seven cables that went from camp to headquarters which restate Mr. Passaro's notes; (4) photographs of Wahli and the scene of the alleged assault; and (5) a copy of Mr. Passaro's independent contractor agreement. It is disingenuous for the government to say they have provided "an extensive quantity of material."

Additionally, Mr. Passaro addresses the following:

1. It is Mr. Passaro's hope that the government will comply with its *Brady* and *Giglio* obligations and produce any exculpatory material or material which could lead to the discovery of exculpatory material in a timely fashion.

2. Mr. Passaro's Request Nos. 5 & 8 seek evidence of the interrogation rules of engagement and practices in effect for suspected members of the Taliban, al Qaeda, and other terrorist organizations. (D.E. # 51). The government refuses to produce this evidence and characterizes it as "groundless." (D.E. #81. at 10, 12). Mr. Passaro respectfully submits that interrogation rules and practices are directly material to the public authority defense in a prosecution based on alleged acts which occurred during the interrogation of a suspected terrorist. With respect to Request No. 8, Mr. Passaro is fully prepared to present evidence of the "migratory patterns" of interrogation practices utilized by Department of Defense personnel and those utilized by other governmental agencies.

3. With respect to the relevancy to the public authority defense of Request No. 5, information regarding Survival, Evade, Resist and Escape Training (SERE) which Mr. Passaro endured while in the Special Forces, the attached New York Times article reports: "Many of the interrogation techniques in the C.I.A.'s list were adopted from the Air Force's Survival, Evasion,

Rescue, and Escape training program." David Johnston, Neil A. Lewis and Douglas Jehl, *Nominee Gave Advice to C.I.A. on Torture Law*, N.Y. Times, January 29, 2005, at A1. (Attach. 1, p. 2). Unless the government contends that the Army's SERE training is nothing like the Air Force's SERE training, it cannot maintain that "there is no legitimate basis to require its production." (D.E. # 81 at 11).

4. With respect to Request No. 11, which seeks both the criminal records and military service records of expected military witnesses, and the governmental service records for civilian witnesses (D.E. # 51), the government challenges the relevance of the service records (D.E.# 81 at 11-12). Mr. Passaro asserts that the service records of the guards on duty during the relevant period of time are necessary and material to the defense. Criminal records alone will not contain all the *Giglio* material for each person, as the service records would contain *Giglio* material which does not derive from a criminal proceeding.

To the extent that the above records qualify as "*Jencks* material," Mr. Passaro respectfully requests that the court order the early disclosure of such for the purposes of judicial economy and in order to avoid any additional delay of the trial. Mr. Passaro further notes that his request for early production of *Jencks* material is also based on due process concerns. As noted in his supporting memorandum (D.E. # 52), the government began this prosecution by insisting on an unnecessarily expansive protective order which impeded Mr. Passaro from mounting his defense. The government then re-classified the case as "a simple assault case" requiring no classified information. (D.E. # 52 at 6; *see also* Attach. 7). In it's response, the government asserts that it has produced "material containing its case-in-chief." (D.E. # 81 at 6). This representation, combined with its blanket refusal to Mr. Passaro's requests such as Request Nos. 5 & 8,

demonstrate that the government maintains the position that it should be able to secure a conviction with unclassified information so long as Mr. Passaro does not present a defense. (D.E. # 52 at 8-9, 10-11). Early production of *Jencks* material will help correct this unfair imbalance created by the government's unimpeded ability to prepare this prosecution while utilizing an unnecessarily over-broad protective order which has prevented Mr. Passaro from mounting his defense.

## CONCLUSION

In light of the foregoing, Mr. Passaro respectfully requests that this Honorable Court enter an order granting his motion for compulsory process and his motions to compel discovery.

Respectfully requested this 9th day of February, 2005.


*Thomas P. McNamara*

THOMAS P. McNAMARA
Federal Public Defender
N.C. State Bar No. 5099

# ATTACHMENT 1

3 of 3 DOCUMENTS

Copyright 2005 The New York Times Company
The New York Times

January 29, 2005 Saturday
Late Edition - Final

SECTION: Section A; Column 1; National Desk; Pg. 1

LENGTH: 1247 words

HEADLINE: NOMINEE GAVE ADVICE TO C.I.A. ON TORTURE LAW

BYLINE: This article is by David Johnston, Neil A. Lewis and Douglas Jehl.

DATELINE: WASHINGTON, Jan. 28

BODY:
Michael Chertoff, who has been picked by President Bush to be the homeland security secretary, advised the Central Intelligence Agency on the legality of coercive interrogation methods on terror suspects under the federal anti-torture statute, current and former administration officials said this week.

Depending on the circumstances, he told the intelligence agency, some coercive methods could be legal, but he advised against others, the officials said.

Mr. Chertoff's previously undisclosed involvement in evaluating how far interrogators could go took place in 2002-3 when he headed the Justice Department's criminal division. The advice came in the form of responses to agency inquiries asking whether C.I.A. employees risked being charged with crimes if particular interrogation techniques were used on specific detainees.

Asked about the interaction between the C.I.A. and Mr. Chertoff, now a federal appeals court judge in Newark, Erin Healy, a White House spokeswoman, said, "Judge Chertoff did not approve interrogation techniques as head of the criminal division."

Ms. Healy added, "We're not aware that anyone in the criminal division was involved in approving techniques because that responsibility would have belonged in the Office of Legal Counsel," another Justice Department unit.

One current and two former senior officials with firsthand knowledge of the interaction between the C.I.A. and the Justice Department said that while the criminal division did not explicitly approve any requests by the agency, it did discuss what conditions could protect agency personnel from prosecution.

Mr. Chertoff's division was asked on several occasions by the intelligence agency whether its officers risked prosecution by using particular techniques. The officials said the C.I.A. wanted as much legal protection as it could obtain while the Justice Department sought to avoid giving unconditional approval.

One technique that C.I.A. officers could use under certain circumstances without fear of prosecution was strapping a subject down and making him experience a feeling of drowning. Other practices that would not present legal problems were those that did not involve the infliction of pain, like tricking a subject into believing he was being questioned by a member of a security service from another country.

But in other instances Mr. Chertoff opposed some aggressive procedures outright, the officials said. At one point, they said, he raised serious objections to methods that he concluded would clearly violate the torture law. While the details remain classified, one method that he opposed appeared to violate a ban in the law against using a "threat of imminent death."

Mr. Chertoff and other senior officials at the Justice Department also disapproved of practices that seemed to be clearly prohibited, like death threats against family members, administration of mind-altering drugs or psychological procedures designed to profoundly disrupt a detainee's personality. It is not clear whether the C.I.A. or any other agency proposed these techniques.

But Mr. Chertoff left the door open to the use of a different set of far harsher techniques proposed by the C.I.A., saying they might be used under certain circumstances. He advised that they could be used depending on factors like the detainee's physical condition and medical advice as to how the person would react to some practices, the officials said.

In responding, Mr. Chertoff's division said that whether the techniques were not allowed depended on the standards outlined in an August 2002 memorandum from the Office of Legal Counsel that has since been disclosed and which defined torture narrowly. That memorandum, signed by Jay S. Bybee, then the head of the legal counsel's office, said inflicted pain, for example, qualified as torture only if it was of a level equivalent to organ failure or imminent death.

The officials said that when the agency asked about specific practices, Mr. Bybee responded with a second memorandum, which is still classified. They said it said many coercive practices were permissible if they met the narrow definition in the first memorandum.

The officials said Mr. Chertoff was consulted on the second memorandum, but Ms. Healy of the White House said he had no role in it.

The C.I.A. was seeking to determine the legal limits of interrogation practices in cases like that of Abu Zubaydah, the Qaeda lieutenant captured in March 2002.

The officials said Mr. Chertoff was directly involved in these discussions, in effect, evaluating the legality of techniques proposed by the C.I.A. by advising the agency whether its employees could go ahead with proposed interrogation methods without fear of prosecution.

Mr. Chertoff is scheduled to appear on Wednesday before the Senate Homeland Security and Government Affairs Committee. Senators have said that Mr. Chertoff, a highly respected former prosecutor, will have little difficulty being confirmed.

Still, questions about interrogation practices dominated the confirmation hearing of Alberto R. Gonzales as attorney general, and Mr. Gonzales's unwillingness to discuss his legal advice on the issue was a reason some Democratic senators on the Judiciary Committee gave for voting against sending his nomination to the full Senate for approval.

The C.I.A. declined to comment on the agency's discussions with the Justice Department.

In interviews, former senior intelligence officials said C.I.A. lawyers went to extraordinary lengths beginning in March 2002 to get a clear answer from the Justice Department about which interrogation techniques were permissible in questioning Abu Zubaydah and other important detainees. The lawyers involved included Scott Muller, then the agency's general counsel, and John Rizzo, his top deputy, the officials said.

"Nothing that was done was not explicitly authorized," a former senior intelligence said. "These guys were extraordinarily careful."

In recent weeks, some former intelligence officials have expressed concern that a new legal opinion about torture the Justice Department issued in late December might leave C.I.A. officers exposed to prosecution. It defined torture more broadly than an August 2002 memorandum later repudiated by the Bush administration, thus implicitly allowing less latitude for extreme interrogation measures.

<u>Many of the interrogation techniques in the C.I.A.'s list were adopted from the Air Force's Survival, Evasion, Rescue, and Escape training program.</u>

As head of the criminal division, Mr. Chertoff was known in legal circles as an aggressive prosecutor who advocated the use of the civilian court system to handle many terrorism cases, which put him at odds with those in the administration who advocated a system of military tribunals. He successfully argued that Zacarias Moussaoui, charged as an operative of Al Qaeda, should be tried in a civilian court. That case has been bogged down in court by legal challenges, including objections to the use of classified evidence.

In November 2003, Mr. Chertoff, then a federal judge, delivered a widely noted speech in which he said the policy of open-ended detentions for terror suspects needed to be changed.

"We need to debate a long-term and sustainable architecture for the process of determining when, why and for how long someone may be detained as an enemy combatant, and what judicial review should be available," he said at a judicial conference in Philadelphia.

URL: http://www.nytimes.com

**GRAPHIC:** Photo: Michael Chertoff at a news conference this month in Washington. (Photo by Doug Mills/The New York Times)(pg. A16)

**LOAD-DATE:** January 29, 2005

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that pursuant to paragraph 20 of the Protective Order issued by the Court on July 29, 2004, a copy of the foregoing was submitted to Deputy Clerk Jennifer Myers, as directed by Jennifer H. Campbell, one of the Court Security Officers as identified in paragraph 4 of the Protective Order, by hand delivering a copy of same who in turn will provide a copy to:

JAMES A. CANDELMO
Assistant United States Attorney
Raleigh, NC 27601-1461

This the 9th day of February, 2005.

*Thomas P. McNamara*
THOMAS P. McNAMARA
Federal Public Defender
N.C. State Bar No. 5099