UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:04-CR-211-BO(1)


FILED
JUL 2 6 2005
FRED L. BORCH III, CLERK
US DISTRICT COURT, EDNC
BY_____ DEP. CLK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DAVID A. PASSARO | SUPPLEMENTAL MEMORANDUM IN<br>SUPPORT OF MOTION TO DISMISS<br>FOR LACK OF JURISDICTION<br>(Filed In Camera and Under Seal with the Court<br>Security Officer) |

DAVID ANTHONY PASSARO, defendant in the above-captioned case, by and through undersigned counsel, submits to this Court this Supplemental Memorandum in Support of the Motion to Dismiss for Lack of Jurisdiction. This supplemental brief addresses the Court's comments during the hearing on July 20, 2005, questioning whether Congress intended to control and to protect American citizens when enacting 18 U.S.C. § 7(9). This memorandum also highlights two ways the government has inconsistently interpreted and applied 18 U.S.C. § 7(9).

1. **Persons Congress Intended to Control and to Protect through the Patriot Act**

Congress enacted 18 U.S.C. § 7(9) in response to legitimate concerns that foreign nationals repeatedly attacked American citizens overseas, and the sovereign nations where the attacks occurred lacked either the will or ability to prosecute the perpetrators. The plain language of § 7(9) shows that Congress desired to reach acts occurring at our embassies or missions, on the grounds surrounding them, and nearby areas used by Americans stationed at the embassies or missions. Congress did not intend to repeal the other subsections of § 7, because Congress surely knows how to repeal statutes, yet left those provisions unchanged. If this Court reads § 7(9) as expansively as

1

cc: AUSA   Unclassified & Unsealed            126

the government desires, it would expand special maritime jurisdiction to include any tactical encampment engaged in combat, and would swallow, and thus, effectively repeal the other subsections of § 7 which Congress left intact. The government thus requests that this Court engage in judicial activism and overreaching, contrary to the legislature's intention.

Congress clearly intended to control terrorists through § 7(9), as President Bush affirmed upon signing the Patriot Act, stating, it "gives intelligence and law enforcement officials important new tools to fight a present danger . . . These terrorists must be pursued, they must be defeated, and they must be brought to justice. And that is the purpose of this legislation." DE-66, at p. 4 & Attach. 1, pp. 8-9. The placement of 18 U.S.C. § 7(9) within Title VIII of the Patriot Act, "Strengthening The Criminal Law Against Terrorism," clearly demonstrates Congressional intent to target suspected terrorists, such as Abdul Wali, and not law enforcement officials commissioned by the Commander-in-Chief to bring such targets to justice. Pub. Law No. 107-56, Title VIII, Section 804 (2001). Thus, to employ a provision of the Patriot Act to impede the battlefield interrogation of this terrorist linked to recent and imminent rocket attacks on Americans perverts the law's intent, heralded by the Commander-in-Chief, who sent Mr. Passaro to battle the terrorists on their own turf.

Moreover, the exclusion of persons subject to Military Extraterritorial and Extradition Act ("MEJA") from the purview of 18 U.S.C. § 7(9) indicates that Congress did not intend § 7(9) to extend jurisdiction over CIA paramilitaries serving with the military, wherever those troops tactically deployed on foreign soil. While Mr. Passaro was not subject to MEJA during his service in Afghanistan in 2003, the recent amendments to MEJA bring civilians outside of the Department of Defense within the scope of that statute. 18 U.S.C. §§ 3267(1)(A) & (2); DE-44, 7 & n.1; DE-47, 15 & n.6. Arguably, when it enacted 18 U.S.C. § 7(9), Congress assumed paramilitaries like Mr. Passaro were already covered by MEJA. Such an assumption, though mistaken, would nonetheless

support the argument that Congress did not intend for 18 U.S.C. § 7(9) to control paramilitaries serving on the battlefield alongside military troops.

Based on the MEJA exclusion provision Congress inserted into 18 U.S.C. § 7(9), Congress likely did not intend that § 7(9) would provide jurisdiction over a person subject to the Uniform Code of Military Justice ("UCMJ"). Counsel for the government cited *United States v. Averette*, 41 C.M.R. 363 (C.M.A. 1970), to assert that Mr. Passaro is not subject to the UCMJ as one who, "in time of war . . . "serv[ed] with the armies of the United States in the field." 10 U.S.C. § 802(a)(10). However, the Supreme Court recognized the constitutional vitality of Article 2(a)(10) in *Reid v. Covert*, 354 U.S. 1, 33-34 & n.61 (1957). And, in *Averette*, the court did not declare military jurisdiction over paramilitaries unconstitutional, it merely interpreted the phrase "time of war" as one formally declared by Congress. *Id.* at 365-66. Thus, the Article I court's opinion does not pose a constitutional bar to military prosecution of a civilian who served the Commander-in-Chief on the battlefield. Moreover, as one commentator recently noted, *Averette's* strict construction of "time of war" is ripe for challenge. *See* Lawrence J. Schwarz, *The Case for Court-Martial Jurisdiction over Civilians Under Article 2(a)(10) of the Uniform Code of Military Justice*, 2002 Nov. Army Law. 31, 37 (concluding "Courts and practitioners should reconsider this excessively strict construction of Article 2(a)(10)").

The Department of Justice initiated this prosecution in direct contradiction to its own binding legal opinion. That opinion concluded that the Constitution barred the Department from prosecuting alleged violations of the anti-torture statute, 18 U.S.C. § 2340A, since such a prosecution would "interfere[] with the President's direction of such core war matters as the detention and interrogation of enemy combatants . . .." DE-65, Attach. 5, 36. It therefore seems odd for the government to ignore its own binding legal opinion while pointing to an Article I military

3

court's opinion, to enable this prosecution.

With respect to those persons Congress intended for the Patriot Act to protect, a terrorist suspect with links to attacks on American troops and Afghan civilians most certainly was not on the list of protected persons. In fact, the Patriot Act intended people like Abdul Wali as targets, not protected classes.

## 2. Department of Justice's Contradictory Interpretation and Application of 18 U.S.C. § 7(9)

Two contradictions in the way the Department of Justice has interpreted and applied 18 U.S.C. § 7(9) support Mr. Passaro's arguments that the presumption against extraterritoriality and the rule of lenity require that this Court should strictly construe § 7(9) to encompass only those U.S. facilities on foreign soil that Congress clearly intended to classify as a federal enclave. DE-44, 9-15; DE-59, 3-7.

First, during the July 20, 2005 Motions Hearing, the government asserted it did not read 18 U.S.C. § 7(9) to reach everywhere a soldier on patrol would pitch a pup tent. It merits mention that the troops who served alongside Mr. Passaro at the Asadabad firebase slept in tents in the open, sleeping in their boots to enable rapid reaction in response to the frequent rocket attacks. Attach. 1; DE-44, Attach. 5. Moreover, the government's assertion contradicts its own expansive definition, espoused in its brief, that § 7(9) "would embrace any land" used by a military "entity" to provide "training or in furtherance of any other operation conducted by the occupying unit." DE-47, 7-8.

Second, in the Spring of 2004, the same time former U.S. Attorney General Ashcroft announced the instant prosecution in a televised press conference, the Department of Justice declined prosecution in another case involving interrogations at a much larger detention facility in Afghanistan. The United States government financed all operations within the 10-acre facility, operations which included U.S. military training for the Afghan counter-terrorism force. Attach. 2.

The Department of Justice concluded the status of the complex as a "host-nation facility" defeated jurisdiction. *Id.* This reliance on the formal status of a facility to determine the jurisdictional reach of 18 U.S.C. § 7(9) directly contradicts the expansive functional criteria the prosecution employs in the instant case to stretch jurisdiction to a remote firebase occupied and maintained by military force alone.

In sum, the Department of Justice, which actually drafted 18 U.S.C. § 7(9), has inconsistently interpreted and applied its own creation, both in selecting cases for prosecution and in defining the key jurisdictional terms in cases it decides to prosecute. Assuming this inconsistency does not result from a politically-driven exercise of prosecutorial discretion, it can only be attributed to the ambiguities contained in 18 U.S.C. § 7(9). Such ambiguities in the intended territorial reach of this provision should, as even the prosecution concedes, "readily be applied to resolve the [jurisdictional] issue against the government." DE-47, 13 & n.5; DE-59, 6-7. Again, this written acknowledgment that the presumption against extraterritoriality applies to this case contradicts the position the government adopted at the July 20, 2005 Motions Hearing.

The government's contradictory interpretation and application of 18 U.S.C. § 7(9) indicates that the government merely seeks to stretch § 7(9) as far as it takes to maintain the instant prosecution. This posture demonstrates why this Court should disregard the government's disparagement of the rule of lenity and why the due process principle served by the rule – fair notice – counsels the Court to resolve any doubts as to whether Congress intended to reach the Asadabad firebase via § 7(9), in favor of Mr. Passaro.

Application of this "fair notice" principle especially applies to this case, in light of the position expressed by Attorney General Alberto Gonzales during his recent confirmation process. Essentially, General Gonzales told the Senate that he would not prosecute a CIA paramilitary for

5

any acts which fall below the torture standard, so long as the interrogation takes place outside the special maritime and territorial jurisdiction of the United States. DE-15, pp. 3-4 & Attach. 1. Within such a federal enclave, however, General Gonzales stands ready to prosecute a warrior of the Commander-in-Chief for any action employed in the battlefield interrogation of a suspected terrorist, where such actions constitute an "assault," including negligently creating a reasonable apprehension of fear. *Id.*

The standard of law at the time of Wali's interrogation, according to General Gonzales' later explanations and the government's position defining special maritime jurisdiction, would have permitted Mr. Passaro to interrogate Abdul Wali by any means less than torture, so long as the site was just beyond the mud walls, or in the mountains overlooking the Asadabad firebase, among the hideouts of Al Qaeda, the Taliban, and regional warlords. Virtually any battlefield commander would find such a tactical choice absurd. Moreover, General Gonzales apparently believes 18 U.S.C. § 7(9) provided Mr. Passaro with "fair notice" of where the torture standard applied to interrogations and where the tort-based assault standard would apply. Again, in light of the fact that General Gonzales' own department has inconsistently interpreted and applied this provision, such a belief is equally absurd.

This case amply demonstrates why a prosecution that applies a civilian criminal code to a battlefield interrogation and which is brought in an Article III court unconstitutionally infringes upon the Commander-in-Chief's exclusive war-making duties and powers.

Respectfully submitted this 26th day of July, 2005.

*Thomas P. McNamara*
THOMAS P. McNAMARA
Federal Public Defender
N.C. State Bar No. 5099

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served upon:

JAMES A. CANDELMO
Assistant United States Attorney
Suite 800, Federal Building
310 New Bern Avenue
Raleigh, NC 27601-1461

by hand delivering to Jennifer Myers, United States District Court Clerk, for courier pick-up by the United States Attorneys Office with a copy of the foregoing sent via secure facsimile to the Court Security Officer for classification review on,

This the 26th day of July, 2005.

*Thomas P. McNamara*
THOMAS P. McNAMARA
Federal Public Defender
N.C. State Bar No. 5099



Close this window

Published on 2004-08-19

# Passaro served in harsh Afghan outpost

By Kevin Maurer
Staff writer

The only signs of the last soldiers to occupy Asadabad, Afghanistan before the Americans came are their bloody hand prints.

Afghans told U.S. soldiers that mujahedeen freedom fighters massacred the Russian garrison at the small fire base during the Soviet occupation in the 1980s.



Passaro

Almost 20 years later, the old Russian base has become an isolated outpost in the hunt for Osama bin Laden. It was there, federal authorities allege, that David Passaro beat Abdul Wali with a flashlight during an interrogation. Wali later died.

At the time, a platoon of soldiers from Fort Bragg's 82nd Airborne Division was based at the camp more than 100 miles northeast of Kabul. The soldiers - who spoke about their time at the camp and their recollections of Passaro on condition that their names not be used - said the area near the Pakistani border is a popular crossing point for Taliban and al-Qaida fighters.

There, the soldiers lived in harsh conditions and under constant threat of rocket attacks. On the walls of the compound were the hand prints of their Russian predecessors to remind them of how dangerous their corner of Afghanistan could be.

### A CIA job

Passaro was in Afghanistan from May to August 2003. He took a leave of absence from his job as an intelligence analyst at the Army Special Operations Command at Fort Bragg to take a CIA contract in Afghanistan.

Most of the 82nd paratroopers said they remembered him. He was one of the Special Forces soldiers, Navy Seals, CIA operators and Rangers who worked out of the camp.

Passaro spoke Dari and Pashto, the main languages of Afghanistan, and often visited the medical tent to talk with patients, 82nd soldiers said.

Passaro is a former Special Forces medic. He was part of a paramilitary team composed of CIA operatives and Special Forces soldiers who captured and questioned members of al-Qaida and the Taliban.

The 82nd soldiers, meanwhile, guarded the base and patrolled the town of Asadabad. They also guarded the jail.

The government says that Passaro beat Wali while interrogating him there.

The 82nd soldiers said the jail was a small mud building with four rooms - three cells and an interrogation room. The prisoners were given cots and blankets. The soldiers would take them to the bathroom, allow them to pray and feed them.

**Previous**
- Butner prison won't accept Passaro (Aug. 14)
- CIA mum on Passaro (Aug. 5)
- Passaro's interrogation abilities called into question (June 23)
- Civilian arrested in Afghanistan prison death (June 18)

ATTACH. 1

The paratroopers said they were told by Special Forces soldiers and CIA operatives to keep the prisoners separated. Detainees were not allowed to talk to each other.

"We would make them stand in the corner like a little kid," one paratrooper said.

Some of the paratroopers interviewed by The Fayetteville Observer said they saw detainees being interrogated, but none of them saw anyone get beaten.

Federal prosecutors have indicated, however, that some 82nd soldiers did see beatings. They plan to call three paratroopers to testify that Passaro hit a detainee with a metal flashlight 10 to 30 times and kicked him so hard that he flew in the air.

Passaro is facing four charges of assault and could be sentenced to 40 years in prison if he is convicted. He says the Bush administration is making him a scapegoat in the wake of other abuse allegations about Abu Ghraib prison in Iraq.

### The detainee

The detainee Passaro is accused of beating turned himself in at the gate to the camp, news reports have said. He was suspected of shooting rockets at the camp.

Rocket attacks were common, 82nd paratroopers said. About twice a week, guerrillas would fire at the camp. The soldiers were forced to sleep in their boots to be ready to run for bunkers at a second's notice.

Once, a rocket armed with white phosphorous fell short of the camp and set a nearby hillside afire. The incendiary round could have destroyed the camp's canvas tents.

Life at Asadabad was hard in general, the paratroopers said. The camp was surrounded by a horseshoe of mountains. Supplies were brought in by helicopter. The paratroopers said it was an hour and a half ride from Bagram airfield.

The walled camp was made up of about a dozen canvas tents, in which the soldiers slept, and several mud huts. The base was about the size as a small parking lot.

"You could literally throw a rock from one side to the other," said one paratrooper. Soldiers went on patrols just to escape the monotony of camp life.

The paratroopers joked that the detainees lived better than they did. The tents leaked when it rained. There was no contractor providing hot food and there were few amenities. The main water source was a creek. Soldiers could purify the water, but many were still sick.

"That is the worst place I've ever been," one soldier said.

Staff writer Kevin Maurer can be reached at maurerk@fayettevillenc.com or 486-3587.

Copyright 2004 The Fayetteville (N.C.) Observer (http://www.fayettevillenc.com)

*The Washington Post* March 3, 2005 Thursday

Copyright 2005 The Washington Post

# The Washington Post
# washingtonpost.com

The Washington Post

**March** 3, 2005 Thursday
Final Edition

**SECTION:** A Section; A01

**LENGTH:** 1356 words

**HEADLINE:** CIA Avoids Scrutiny of Detainee Treatment;
Afghan's Death Took Two Years to Come to Light;
Agency Says Abuse Claims Are Probed Fully

**BYLINE:** Dana **Priest,** Washington Post Staff Writer

**BODY:**

In November 2002, a newly minted CIA case officer in charge of a secret prison just north of Kabul allegedly ordered guards to strip naked an uncooperative young Afghan detainee, chain him to the concrete floor and leave him there overnight without blankets, according to four U.S. government officials aware of the case.

The Afghan guards -- paid by the CIA and working under CIA supervision in an abandoned warehouse code-named the Salt Pit -- dragged their captive around on the concrete floor, bruising and scraping his skin, before putting him in his cell, two of the officials said.

As night fell, so, predictably, did the temperature.

By morning, the Afghan man had frozen to death.

After a quick autopsy by a CIA medic -- "hypothermia" was listed as the cause of death -- the guards buried the Afghan, who was in his twenties, in an unmarked, unacknowledged cemetery used by Afghan forces, officials said. The captive's family has never been notified; his remains have never been returned for burial. He is on no one's registry of captives, not even as a "ghost detainee," the term for CIA captives held in military prisons but not registered on the books, they said.

"He just disappeared from the face of the earth," said one U.S. government official with knowledge of the case.

The CIA case officer, meanwhile, has been promoted, two of the officials said, who like others interviewed for this article spoke on the condition of anonymity because they are not authorized to talk about the matter. The case is under investigation by the CIA inspector general.

The fact that the Salt Pit case has remained secret for more than two years reflects how little

ATTACH. 2.

is known about the CIA's treatment of detainees and its handling of allegations of abuse. The public airing of abuse at Abu Ghraib prompted the Pentagon to undertake and release scathing reports about conduct by military personnel, to revise rules for handling prisoners, and to prosecute soldiers accused of wrongdoing. There has been no comparable public scrutiny of the CIA, whose operations and briefings to Congress are kept classified by the administration.

Thirty-three military workers have been court-martialed and an additional 55 received reprimands for their mishandling of detainees, according to the Defense Department. One CIA contractor has been charged with a crime related to allegations of detainee abuse. David A. Passaro is on trial in federal court in North Carolina, facing four assault charges in connection with the death of Abdul Wali, a prisoner who died while at a U.S. military firebase in Afghanistan in June 2003.

The CIA's inspector general is investigating at least half a dozen allegations of serious abuse in Iraq and Afghanistan, including two previously reported deaths in Iraq, one in Afghanistan and the death at the Salt Pit, U.S. officials said.

A CIA spokesman said yesterday that the agency actively pursues allegations of misconduct. Other U.S. officials said CIA cases can take longer to resolve because, unlike the military, the agency must rely on the Justice Department to conduct its own review and to prosecute when warranted.

"The agency has an aggressive, robust office of the inspector general with the authority to look into any CIA program or operation anywhere," said a CIA representative who spoke on the condition of anonymity. "The inspector general has done so and will continue to do so. We investigate allegations of abuse fully." The spokesman declined to comment on any case.

The Salt Pit was the top-secret name for an abandoned brick factory, a warehouse just north of the Kabul business district that the CIA began using shortly after the United States invaded Afghanistan in October 2001. The 10-acre facility included a three-story building, eventually used by the U.S. military to train the Afghan counterterrorism force, and several smaller buildings, which were off-limits to all but the CIA and a handful of Afghan guards and cooks who ran the prison, said several current and former military and intelligence officers.

The CIA wanted the Salt Pit to be a "host-nation facility," an Afghan prison with Afghan guards. Its designation as an Afghan facility was intended to give U.S. personnel some insulation from actions taken by Afghan guards inside, a tactic used in secret CIA prisons in other countries, former and current CIA officials said.

The CIA, however, paid the entire cost of maintaining the facility, including the electricity, food and salaries for the guards, who were all vetted by agency personnel. The CIA also decided who would be kept inside, including some "high-value targets," senior al Qaeda leaders in transit to other, more secure secret CIA prisons.

"We financed it, but it was an Afghan deal," one U.S. intelligence officer said.

In spring 2004, when the CIA first referred the Salt Pit case to the Justice Department for possible prosecution, the department cited the prison's status as a foreign facility, outside the jurisdiction of the U.S. government, as one reason for declining to prosecute, U.S. government officials aware of the decision said.

The case officer who was put in charge of the Salt Pit was on his first assignment. Described by colleagues as "bright and eager" and "full of energy," he was the kind of person the agency needed for such a dismal job. The officer was working undercover, and his name could not be learned.

"A first-tour officer was put in charge because there were not enough senior-level volunteers," said one intelligence officer familiar with the case. "It's not a job just anyone would want. More senior people said, 'I don't want to do that.' There was a real notable absence of high-ranking people" in Afghanistan.

Besides, the intelligence officer said, "the CIA did not have a deep cadre of people who knew how to run prisons. It was a new discipline. There's a lot of room to get in trouble."

Shortly after the death, the CIA briefed the chairmen and vice chairmen of the House and Senate intelligence committees, the only four people in Congress whom the CIA has decided to routinely brief on detainee and interrogation issues. But, one official said, the briefing was not complete.

The Afghan detainee had been captured in Pakistan along with a group of other Afghans. His connection to al Qaeda or the value of his intelligence was never established before he died. "He was probably associated with people who were associated with al Qaeda," one U.S. government official said.

The brick factory has since been torn down, and the CIA has built a facility somewhere else.

A team of federal prosecutors in the Eastern District of Virginia recently convened to handle allegations of detainee abuse is now taking a second look at the case.

The pace of the CIA investigations has tested the patience of some in Congress, as was evident two weeks ago when Sen. Carl M. Levin (D-Mich.), a member of the Senate intelligence panel, asked CIA Director Porter J. Goss when the inspector general's inquiry would be complete and available to the oversight committees.

"I haven't asked him what day he's going to finish all these cases," Goss replied.

"Or a month?" shot back Levin.

"As soon as they are through," Goss answered. ". . . I know there is still a bunch of other cases."

In recent weeks, the ranking Democrats on the House and Senate intelligence panels have asked their Republican chairmen to investigate the CIA's detention and interrogations. Sen. Pat Roberts (R-Kan.) has declined the request from Sen. John D. Rockefeller IV (D-W.Va.).

The CIA inspector general, meanwhile, recently completed a review of detention procedures in Afghanistan and Iraq and gave Goss 10 recommendations for improving administrative procedures for holding, moving and interrogating prisoners. The recommendations included more detailed reporting requirements from the field, increased safeguards against abuse and including more CIA officials in decisions affecting interrogation tactics.

Two have been fully adopted, officials said.

Researcher Julie Tate contributed to this report.

**LOAD-DATE:** March 3, 2005

Source: News & Business > News > By Individual Publication > W > The Washington Post
Terms: byline (priest) and date(geq (03/3/05) and leq (03/03/05)) (Edit Search)