# CONTAINS
# REDACTED PAGES



FILED WITH THE
COURT SECURITY OFFICER
CSO:
DATE: 10/4/05

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:04-CR-211-BO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DEFENDANT'S MODIFIED |
| | ) | NOTICE OF INTENTION TO |
| v | ) | DISCLOSE CLASSIFIED |
| | ) | INFORMATION DURING |
| | ) | JURY TRIAL |
| DAVID A. PASSARO | ) | |

Defendant, by and through the undersigned counsel, pursuant to 18 U.S.C.S. Appx. § 5, notifies the Court and attorneys for the United States that he reasonably expects to disclose or cause the disclosure of classified information during the trial of this case.

On September 2, 2005, Defendant filed notice of intent to disclose classified information during the upcoming jury trial of this cause. Pursuant to the September 20, 2005 hearing on the issue of defendant's notice of intent to disclose classified information, and the Court's subsequent September 28, 2005 order, the Defendant now modifies his previous submission to provide more specific notice.

Defendant now provides the Court and Government with its intention to elicit, through either cross-examination of Government witnesses, direct examination of defense witnesses, through documents, or through motion for judicial notice by the Court, of the following facts, which Defendant believes may be considered as classified by the Government:

1. ████████████████████████, is a CIA field officer and was████████████████████ ███ at Asadabad, Konar Province, Afghanistan, during May and June 2003;

2. ███ was David Passaro's immediate supervisor during the time Mr. Passaro was at Asadabad, until ███ was replaced ███████ by ████████████████, another CIA field officer;

3. ███ and ███ were responsible for training and supervising Mr. Passaro during the time he served in Afghanistan;

4. The Asadabad firebase is a forward operating command post whose mission included search patrols and raids against terrorist operatives in the Konar Province, located on Afghanistan's northeastern border shared with Pakistan;

5. Konar Province is adjacent to the province containing the terrorist stronghold known as Tora Bora, where Osama Bin Laden and his chief deputies hid shortly after September 11, 2001;

6. This firebase is not far from the area where intelligence sources believe Osama Bin Laden and his chief deputies currently hide and continue to evade detection from our forces;

7. The Asadabad firebase consisted of units from the U.S. Army Special Forces, 82d Airborne, CIA operatives and their contract employees, and support personnel;

8. The CIA relied upon ███████████████████████████ to provide contract paramilitary specialists for deployment to Afghanistan and Iraq;

9. ███████████ coordinated the employment of Mr. Passaro and some of the other contract employees who participated in combat actions in Afghanistan;

10. Mr. Passaro was such a contract paramilitary specialist;

11. The CIA expected its contract paramilitary specialists to engage in combat operations and to operate under hostile fire;

12. The CIA arranged for its contract paramilitary specialists to be appropriately armed for such combat operations;

13. The CIA ensured that Mr. Passaro was armed and equipped to operate in combat and under hostile fire;

2

14. Mr. Passaro did operate under hostile fire and in combat in Afghanistan under the auspices of the CIA;

15. The CIA arranged for Mr. Passaro to operate under multiple aliases, that is ██████████ and ████████ ;

16. Mr. Passaro's assignments included training and operating on missions ████████████████████ ██████████ );

17. The ██████ consisted of at least one CIA operative or contractor, specially recruited and trained Afghan Nationals, with local interpreters;

18. The ██████ mission assignments included conducting patrols, gathering intelligence, and locating, ████████████████████ terrorists;

19. ████████████████████████████████████████████

20. ████████████████████████████████████████████

21. ████████████████████████████████████████████

22. ████████████████████████████████████

23. US military forces took four Afghan male subjects, and brought them back to Asadabad firebase into custody;

24. ████████████████████████████████████████████

3



25. The parties received AK-47 fire upon making entry into the compound;

26.

27. ▮▮▮▮▮▮ was the paramilitary chief ▮▮▮▮ Afghanistan ▮▮▮▮ was the next senior
command for the CIA personnel ▮▮▮▮▮▮▮▮▮

28. ▮▮▮▮▮▮ was another CIA contract employee who served with Mr. Passaro at Asadabad and
other locations in Afghanistan;

29. ▮▮▮▮▮▮ was a CIA communications officer at Asadabad at the same time ▮ and Mr.
Passaro served there;

30. Major Mark Miller, U.S. Army, was the commanding officer of military personnel at Asadabad;

31. Captain Dan Eggars, U.S. Army, was second in command of military personnel at Asadabad;

32. Captain Eggars was killed by an improvised explosive device (IED) near Asadabad, less than
one year after Abdul Wali was taken into custody;

33. Chief Warrant Officer 3rd (CWO-3) Brian Halstead was third in command of military personnel
at Asadabad;

34. Staff Sergeant Dan McHone was a Special Forces Medic assigned to Asadabad during the time
Wali was in custody;

35. Governor Said Fazel Akbar is the Afghani political leader of Konar Province;

36.

4

37. [redacted]

38. [redacted]



39. Hyder Akbar is Governor Akbar's son, who travels between the United States and Afghanistan, and who is writing a book about the detention of Abdul Wali;

40. [redacted]

41. [redacted]



42. Asadabad is the location where terrorists shot down a military helicopter in June 2005, as we attempted to rescue Navy SEAL team members trapped in Konar Province (at least 14 U.S. service members were killed in that combat incident);

43. [redacted] is a CIA contractor who served with Mr. Passaro and participated in training in the United States with Mr. Passaro;

44. Mr. Passaro and the other CIA contractors participated in training [redacted]

[redacted] before deploying to Afghanistan;

45. [redacted] was a CIA contractor who served with Mr. Passaro [redacted];

46. [redacted] was a CIA contract interpreter at Asadabad;

47. [redacted] accompanied the [redacted] during pursuit of suspected terrorists;

48. [redacted] has traveled to the United States, and told [redacted] that he desired to attend

5

university in the Washington D.C. area to study political science;

49. ████ continues as a contract employee of the United States to this date;

50. ████ is a native of Kabul, Afghanistan and has a university degree from Pakistan;

51. ████ worked in an Afghan refugee camp in Pakistan, teaching English language and grammar;

52. ████ speaks Pashto, Dari, Farsi, and several languages indigenous to Pakistan;

53. ████ was interviewed by Frederick Klare and Thomas Jansen, both of the CIA's Office of Inspector General on July 3, 2003;

54. ████ had been employed by the CIA for more than one year at the time of his interview in July, 2003;

55. ████ was initially in ████ but had been at Asadabad more than one year at the time of his interview;

56. ████ was with Mr. Passaro on every occasion when Mr. Passaro interviewed Wali;

57. ████ never saw Mr. Passaro kick Wali;

58. During the July 3, 2003 interview ████ told Messrs. Klare and Jansen that he never saw Mr. Passaro kick Wali;

59. On May 16, 2003, ████ sent a message to higher headquarters about ████ 's ambitions;

60. The message pointed out that ████ spoke with ████ about his interest in ████
████ ;

61. ████ noted that ████ appeared to be a well qualified ████ ;

62. ████ stated that this would give ████ an opportunity to further his stated goals of helping his country while at the same time staying close to his "American" contacts;

63. ████ was very interested ████ and indicated his availability at any time ████

6

64. ██████ noted that if ██████ was accepted ████████, his training would likely take place somewhere in the Washington, D.C. area, where he could pursue advanced university studies in political science or foreign relations;

65. Wahid expressed a high interest and desire ████████████████████████;

66. ████████████████████████████████████████

67. ████████████████████████████████████████

68. ████████████████████████████████████████

69. ████████████████████████████████████████

70. ████████████████████████████████████████

71. ████████████████████████████████████████

72. ████████████████████████████████████████



78. During the time before Abdul Wali was taken into custody, personnel at Asadabad detained various suspected terrorist operatives;

79. Major Miller and the other military personnel at Asadabad had general responsibility for operating the Asadabad detention facility;

80. Military personnel believed that they could hold a detainee in custody for up to 72 hours;

81. Military personnel believed that the CIA could hold detainees indefinitely;

82. ▮▮▮▮▮▮ routinely submitted daily status reports to higher headquarters, including ▮▮▮ and CIA headquarters;

83. During the few weeks before Wali was taken into custody, the Asadabad Firebase received incoming rocket attacks of high explosives, on average twice each day;

84. During one such attack, a rocket containing white phosphorous narrowly missed a U.S Army soldier standing watch at an observation post next to the firebase;

85. The Geneva Convention and other rules of war prohibit the use of white phosphorous as an anti-

8

personnel weapon;

86. The rockets fired upon Asadabad would have killed or maimed anyone within the effective casualty radius of such a weapon;

87. The rockets were launched from the hillsides and mountains surrounding Asadabad firebase, and military personnel attempted to return fire to such positions whenever possible;

88. Measures used by military forces to return fire are commonly called counter-battery fire, and consist of mortars, artillery fire and air strikes, when available;

89. Receiving incoming rocket attacks, and engaging in counter-battery fire are inherently dangerous aspects of combat;

90. During this period of rocket attacks ███████████, Passaro was also receiving rocket attacks

████████████████████████████████████████████████████████;

91. After receiving the rocket fire, military and CIA personnel ████████████████ determine who was behind the attacks;

92. ████████████████████████████████████████████████████████████████

93. ████████████████████████████████████████████████████████████████

94. Abdul Wali was labeled a force protection target after ████████████████████████ indicated that he was behind the rocket attacks upon Asadabad firebase;

95. On June 13, 2003, ███████ reported an update on the search for Adbul Wali, one of the individuals responsible for rocket attacks against ███████ around June 5th and 6th;

96. ████████████████████████████████████████████████████████████████

9



97.

98.

99.

100.

101.

102.

103.

104.

105.

███████████████████████████████████████████████

106. The latter three individuals are prominent targets in the war on terror;

107. CIA and military personnel shared intelligence information regarding Wali;

108. Military personnel at Asadabad recognized Wali as a valid Force Protection Target;

109. Military personnel agreed to take Wali into custody and to detain him;

110. On June 17, 2003, ███████ clarified that Wali was a "force protection target";

111. The same date, Major Miller and CWO-3 Halstead agreed to accept Wali as a "Person Under Control (PUC), upon his capture;

112. US military and CIA both hoped to learn valuable information from Wali;

113. On June 18, 2003 military and CIA operators learned that Abdul Wali went to Governor Akbar's residence, at the Governor's request;

114. Military and CIA operators prepared ███████ to apprehend Wali at the Governor's residence;

115. In the days just before June 18, 2003, ███████ information about Wali's whereabouts to assist in attempts to capture Wali;

116. On June 18, 2003, ███████████████ learned that Wali was at the Governor's residence, and planned to surrender at 2:00 that afternoon;

117. US military and CIA operators agreed to apprehend Wali before that time, to reduce the risk of his absconding;

118. The Governor's son brought Wali to the firebase for 'questioning;

119. US military personnel took Wali into custody about 11:00 a.m. on June 18, 2003;

120. Military personnel did not conduct a physical/medical examination on Wali when he was taken

11

into custody;

121. Just before Wali arrived            met in the tactical operation center (TOC) to discuss CWO-3 Halstead's plan to capture Wali at the Governor's residence;

122. ▮▮▮▮Passaro, CWO-3 Halstead and interpreter ▮▮▮▮met with Wali in a meeting room at the edge of ▮▮▮▮▮;

123. Passaro left the meeting briefly to "stand down" ▮▮▮▮and to secure his combat equipment;

124. CWO-3 Halstead was interviewing Wali when Passaro returned to the meeting room;

125. CWO-3 Halstead asked Passaro for input on questioning;

126. CWO-3 Halstead continued questioning until he decided that custody was appropriate;

127. CWO-3 Halstead provided a bag to secure Wali's belongings;

128. CWO-3 Halstead put ankle cuffs on Wali;

129. CWO-3 Halstead had one of his men take a digital photo of Wali;

130. ▮▮▮▮took Governor Akbar's son Hyder off ▮▮▮▮premises during the pat-down and photo session;

131. CWO-3 Halstead placed a sandbag on Wali's head and escorted him to a detention cell;

132. CWO-3 Halstead secured Wali to an anchor point on the cell floor;

133. CWO-3 Halstead informed Wali that he was a detainee in Halstead's custody;

134. CWO-3 Halstead informed Wali that Halstead was responsible for his custody, and that he would not be mistreated;

135. CWO-3 Halstead told Wali to communicate with his guards directly if he needed visits to the latrine, water, medical care, etc.;

12

FEB.11.1999 12:23HM FPD RHLEIGH

136. CWO-3 Halstead told Wali to call for him if felt he was being mistreated during his detention;

137. At no time during his detention did Wali attempt to communicate any mistreatment to CWO-3 Halstead;

138. Upon leaving the cell, CWO-3 Halstead provided guidance to the military guards;

139. CWO-3 Halstead admitted to possessing limited knowledge of what exactly to do next, other than materials he had read on the subject of detentions;

140. CWO-3 Halstead recommended food and sleep deprivation based upon his SERE training;

141. CWO-3 Halstead said he would put together a six to eight man "interview roster";

142. CWO-3 Halstead stated that he thought these steps would be effective to derive information, and to ensure sleep deprivation;

143. At that time, CWO-3 Halstead neither informed, requested, nor instructed CIA personnel on their role, if any toward the PUC;

144. A Military Intelligence operator named Marty Dixon interviewed Wali with the assistance of
▮▮▮ as interpreter;

145. CWO-3 Halstead interviewed Wali with the assistance of ▮▮▮ interpreter;

146. After Wali had been detained for 24 hours, CWO-3 Halstead turned questioning over to the CIA;

147. On June 19, 2003, around mid-day, ▮▮▮ told Passaro that US military personnel had Wali for the past 24 hours, and asked if "we wanted to take a crack at him";

148. ▮▮▮ then informed Wali that the CIA would be later questioning him;

149. The purpose of providing this information to Wali was to create stress through anticipatory fear;

13

150. About 10:00 p.m. on June 19, 2003, Passaro and the guards and interpreter entered the cell to question Wali after making much noise in the adjacent cell;

151. Wali appeared visibly scared, his eyes were wide, and he was shaking during the interview;

152. Passaro told Wali that if he told the truth it would result in less stress and that he could sooner be reunited with his family;

153. During the interview, Wali tried to attack Passaro at least three times;

154. After the interview, the guards were instructed to keep Wali awake, and to place him in an uncomfortable position (the air chair) if he became aggressive toward them;

155. On June 19, 2003, the ▮▮▮▮ status report indicated that Abdul Wali, ▮▮▮▮

▮▮▮▮ was taken into custody and being interviewed ▮▮▮▮;

156. During initial interviews, Wali denied participating in the rocket attacks, but ▮▮▮▮

▮▮▮▮ CWO-3 Halstead, and Mr. Passaro all noticed discrepancies in Wali's stories;

157. U.S. military forces decided to bring in sources who had identified Wali as a participant in the rocket attacks;

158. U.S. military forces intended to show the sources a digital photograph of Wali to see if they could identify Wali as the individual seen on June 5th and 6th, carrying rockets and weapons into the mountains around the Asadabad firebase;

159. During questioning, Wali claimed he was a poor, humble farmer, but CIA questioners noted that his hands were clean and without callouses, he wore a gold colored wrist watch, and his clothing was of much better quality than that worn by simple farmers living in the area;

160. On June 20, 2003, a person known to the government, but not revealed to the defense, interviewed Wali;

14

161. That person known to the government, but not revealed to the defense was able to get Wali to admit the locations of two weapons caches around the base, but not any information concerning the owners of the caches;

162. That person known to the government, but not revealed to the defense denied ever striking or using physical force against Wali in a later report▮▮▮▮

163. After Wali was held for about 24 hours in isolation, ▮▮▮ and Marty Dixon interviewed him with interpreter▮▮▮

164. ▮▮▮ did all the talking and attempted to convince Wali to tell the truth and to cooperate because it would help him;

165. Wali did not disclose anything, and they collectively decided that Wali was not going to talk;

166. After this first interview, ▮▮▮ asked for and received permission to talk to Wali alone;

167. ▮▮▮ had successfully interrogated two detainees previously;

168. ▮▮▮ informed the guards that he had permission to speak to Wali alone;

169. After five minutes, Wali told ▮▮▮ that he could lead him to two weapons caches;

170. ▮▮▮ informed ▮▮▮ of these results;

171. When ▮▮▮ accompanied Passaro to interview Wali, Passaro inquired about Wali's health;

172. Wali said his health was okay, but he sometimes gets stomachaches;

173. Passaro told Wali to drink plenty of water and raise his finger to indicate to the guards if he needed to use the latrine;

174. Wali told Passaro, though▮▮▮, that if Passaro released him, he would tell him about the bad people in Pakistan and lead him to the weapons caches;

175. ▮▮▮ when asked by CIA investigators, said he had no recollection of Passaro hitting Wali

15

in the stomach with the metal flashlight;

176. During a subsequent interview, Passaro had a spotlight, and ▇▇▇▇ did not see Passaro ever hit Wali with that light;

177. During that interview, Wali said he could lead Passaro to two big weapons caches, including heavy weapons and mortars;

178. When Passaro and ▇▇▇ checked on Wali and gave him the fruit bar, Wali said he felt fine, although he had received medicine from a doctor for a stomachache;

179. Passaro gave Wali the fruit bar and water and instructed the guards to ensure that Wali had enough to drink;

180. Around mid-day on June 20, 2003, Passaro and ▇▇▇ brought food to Wali;

181. They asked if Wali had any information for them, but he said he did not;

182. ▇▇▇ explained to Wali that he must drink water to remain healthy;

183. Around mid-day on June 21, 2003, Passaro and ▇▇▇ took Wali a power bar and loaf of bread, and checked to see that he was drinking water;

184. When Passaro was not present in the detention area, Wali attempted to break free and take one of the military guard's pistol;

185. Wali, attempted to break free of his restraints and fell to the floor several times;

186. Wali struck his own head against the wall several times during his detention;

187. Shortly after this, Wali began to pull at his foot shackle by walking forward in his cell;

188. Guards told Wali to stop doing this;

189. Wali then became completely uncooperative;

190. Wali began stumbling around and running into the wall in his cell;

16

191. Later, after returning from the latrine, Wali began stumbling as he paced in his cell;

192. A few moments later, Wali showed no signs of balance, and made an aggressive move at the guard who tried to put him back on his feet;

193. The Sergeant of the Guard was notified of Wali's aggressive and bizarre actions;

194. On June 21, 2003, at around 3:00 p.m., the guards called for Passaro and told him that Wali had fallen down and would not stand up;

195. Passaro and ▓▓▓▓ drove to the detention cell to discover Wali non-responsive;

196. Passaro called for medical assistance, did a sternum rub to check for a response, then attempted first aid including CPR techniques;

197. When Passaro first arrived to respond to Wali's crisis, the guards informed Passaro that Wali had been acting much more aggressively, and had been exhibiting much more resistant behavior than he had the past couple of days;

198. The guards reported that Wali had removed his hands from the flex cuffs on a couple of occasions, and had tried to take a pistol from one of the guards;

199. The guards stated that Wali had hit his head upon the wall and floor a couple of times in his struggles, as they explained an apparent injury on Wali's face, but Passaro did not see any other apparent head injuries on initial examination, immediately preceding the first aid attempts;

200. Major Miller arrived as Medic McHone was removing medical equipment from the body;

201. Major Miller asked McHone who had performed Wali's initial physical exam;

202. Major Miller was upset that no intake exam had been conducted;

203. Major Miller commented that "shit will hit the fan," then "this (the lack of an intake physical) will create a huge paperwork trail";

17

204. Major Miller appeared to be speaking to McHone, but made these comments in the presence of Passaro,⬛, and⬛ the interpreter then shortly thereafter, Major Miller left⬛ for Bagram;

205. The Governor came to the base, with a religious leader named Mullah Rauf, after Wali died and received the body for return to the family;

206. The Governor recounted that Wali had a heart condition that ran in the family;

207. On June 18, 2003, CIA operators at Asadabad firebase notified⬛ and other higher headquarters about the apprehension and detention of Wali, via classified message traffic;

208. On June 20, 2003, CIA operators at Asadabad firebase notified⬛ and other higher headquarters that Wali had still not yet admitted his role in the rocket attacks, nor been cooperative in identifying others involved in the rocket attacks;

209. In the same message, CIA operators at Asadabad firebase opined that Wali may become more cooperative after several more days in the detention area;

210. At 0530, Greenwich Mean Time, on June 21, 2003, CIA operators notified⬛ and other CIA offices, that Wali,⬛ and participant in the rocket attacks of June 5th and 6th upon Asadabad firebase, had been taken into custody;

211. The same message pointed out that for the previous two days, Wali had been uncooperative, but his story had been deteriorating;

212. The same message pointed out that Wali admitted to knowing the location of two weapons caches in the mountains near the Asadabad firebase, and that he knew the spot from which the rockets were fired;

213. The same message opined that there is a high probability that Wali will soon begin cooperating

18

and may divulge significant information on Taliban members;

214. On June 24, 2003, ████████ sent a message to inform ████ and higher headquarters the status of relations between Afghanis and personnel at Asadabad firebase;

215. The subject of the message was "Post Incident Atmospherics Following the Death of Force Protection PUC Abdul Wali ███████;



221. On June 23, 2003, the Governor held a council meeting, including some of Wali's village elders, discussing a number of topics, but no mention was made of Wali's death;

222. Village elders expressed no concerns after Mullah Rauf explained the circumstances of Wali's death;

223. Upon discussions of remunerations to the family, the Governor made it known that he was well aware of Wali's links to terrorist organizations and attacks against ████████ personnel;

224. On June 24, 2003, ████████ reported to ████ and higher headquarters about the impact of CIA relationships with U.S. military ██████;

19

225. ▮▮▮▮▮ described the relationship as "generally cooperative with some lingering animosity on the part of a few, mostly misinformed, low level USMil personnel stationed here";

226. The same message reported "misrepresentations by the military of the facts surrounding this matter";

227. On June 25, 2003, ▮▮▮▮▮ sent instructions to ▮▮▮▮▮

228. The message stated that ▮▮▮▮▮ and HQS continue to investigate [redacted] incident ▮▮▮▮▮
▮▮▮▮▮

229. The message added that the military was conducting its own parallel investigation, and requested that ▮▮▮▮▮ immediately comply with the following instructions:

a. (Passaro) will depart ▮▮▮▮▮ on June 25, 2003, for assignment to work at the [redacted] compound pending completion of the investigation or end of his current temporary duty period, whichever occurs first;

b. (Passaro) and other ▮▮▮▮▮ officers are advised not to discuss this incident or the ongoing investigations with base colleagues, other agency officers, with the military, or with any other parties unless specifically authorized to do so by ▮▮▮▮▮ in advance. Inquiries should be treated politely but deferred to ▮▮▮▮▮ management;

c. ▮▮▮▮▮ will continue to report on local atmospherics and actions following this incident, but will avoid comments directly pertaining to the incident itself unless specifically authorized by ▮▮▮▮▮ to do so;

d. Cooperation with the USMil on all other matters will continue at levels consistent with pre-incident activities;

230. On June 26, 2003, ▮▮▮▮▮ sent a message to CIA headquarters requesting an

20

Inspector General or Directorate of Operations senior team to conduct an investigation into the detention of Wali;

231. The message reported that:

a. ▇▇▇▇▇▇ CIA officer who had no previous foreign assignments or languages, and no military experience, arrived as part of "the most recent surge" on May 25, 2003, and took command ▇▇▇▇ on June 8, 2003;

b. Passaro arrived in Afghanistan around May 17, 2003, and deployed ▇▇▇▇ around May 20, 2003;

c. Passaro was assigned to ▇▇▇▇ away from ▇▇▇▇ shortly after arrival, and returned to ▇▇▇ in early June, 2003;

d. Both ▇▇ and Passaro were very new to the environment and were sent to a dangerous and remote post to carry out high threat intelligence collection and counter terrorist work;

e. ▇▇▇▇ reported to CIA headquarters that "given the nature of the surge requirements and competing demands on the (Director of Operations) for Manpower, these officers, and many others who end up in Afghanistan, inevitably do not have all the language, cultural knowledge, operational experience or liaison experience with US military forces minimally required to be effective in the field";

f. ▇▇▇▇ reported to CIA headquarters that due to the deficiency noted in the line above, ▇▇▇ has therefore attempted to match up (paramilitary) and (operations) officers in the most effective combinations to accomplish the (counter terrorist) mission";

232. ▇▇▇▇ was initially notified by secure telephone that Wali had died in military custody ▇▇▇▇

21

233. ███████ gave explicit guidance to ██████ on areas to cover ██████ documenting the death, including clear delineation of actions between USMIL and CIA;

234. ███████ advised CIA headquarters that it learned through a Bagram agent that Major General Vines (the senior military commander in the region) had learned from USMIL at Asadabad that "a PUC had died in custody, and the CIA was trying to leave a body on his doorstep";

235. The Bagram CIA representative reported that General Vines was extremely angry;

236. ██████ reported to CIA headquarters ████████ the results of discussions with General Vines in the aftermath;

237. 

238. During the meeting, the focus was ensuring that CIA officers understood their roles in tracking, arresting and detaining Persons Under Control (PUC);

239. Of secondary importance to the meeting was reacting to General Vines' complaints that CIA was not helpful in disposing of the body, calming the family, and attempting to mollify an angry local population and governor;



240.

241.

242.

22



243. Lcol Boardman was General Vines' Intelligence Staff Officer (J2), and was assigned by General Vines to conduct an administrative investigation (15-6) required by Army regulations;

251. [redacted] reported to CIA headquarters that it requested a specialty investigative team as soon as possible, stating that "we want to protect our employees, preserve the integrity of our relations with the US military, and learn the truth concerning this event as soon as possible";

252. On July 14, 2003 CIA representatives met with Governor Akbar [redacted]

253. Defense intends to disclose the identities of the attendees of that meeting;

23

254. ▓▓▓▓▓▓▓▓ reported this meeting to higher headquarters;

255. One purpose of the meeting was to elicit the Governor's opinion about exhuming Wali's body for autopsy;

256. The Governor responded firmly that exhuming Wali's body would certainly cause bad feelings;

257. The Governor added that such a move would adversely effect relations with the family, elders, and villagers in the region;

258. The Governor pointed out that the situation was calm at that time;

259. The Governor warned of a high probability that exhumation would lead to renewed rocket attacks▓▓▓▓▓▓▓▓

260. On July 14, 2003 the Director of the CIA sent a message▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓

261. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

262. The message required action;

263. The action required was to brief the Ambassador as soon as possible using guidance provided below;

264. The message also required an update on ▓▓▓▓▓▓▓ s interaction with the military investigation of the incident;

265. The message suggested that ▓▓▓▓▓▓▓▓ consider coordinating the Ambassador's briefing with General Vines;

266. The Director of the CIA felt ▓▓▓▓▓▓▓ should make certain points in the briefing;

267. The first point to be made was that Wali was detained by the US Military in Asadabad after

24

Governor Akbar convinced Wali to turn himself in;

268. The next point to be made was that Wali was detained because of his reported involvement in the 5-6 June rocket attacks on the US Mission Support Site (MSS) in Asadabad;

269. The next point to be made was that Wali was interrogated by [redacted] and US Military personnel in an effort to acquire Force Protection information;

270. The next point to be raised was that on June 21, 2003 Wali was discovered by US Military guards lying motionless on the ground of his cell;

271. The next briefing point was after approximately ninety minutes of effort by US Military medics Wali expired;

272. The next point to be made was the cause of death is unknown and since the body has been returned to the family for customary burial within 24 hours of death, and an autopsy to determine cause of death is unlikely;

273. The next point suggested was the US Military is investigating the death of Wali, concurrently the CIA is undertaking its own review of the circumstances, and the CIA Inspector General has initiated an investigation;

274. The final point recommended was to state a regret for the delay in informing the Ambassador of the incident;

275. CIA Director Tenet sent his regards;

276. On July 16, 2003 CIA Investigator Frederick Klare prepared an interview report after questioning

277. The purpose of the interview as to discuss the unattended death                        , case number 2003-7285-IG;

278. The interview report covers seven and one half single spaced type written pages;

279. The report consists of more than twenty five paragraphs;

280. The Government has only revealed two of the paragraphs to the defense;

281. In paragraph 23, Investigator Klare reported that▉▉▉ estimated that Passaro interviewed Wali four or five times;

282. ▉▉▉responded that he does not know how many times Passaro "laid hands on Wali";

283. ▉▉▉ said there is no way of knowing the figure;

284. ▉▉▉ said he has no way of knowing if Passaro would confide in him as his supervisor with that information;

285. ▉▉▉described Passaro as "an aggressive guy," who did not disobey orders and was working well as a part of their team▉▉▉▉▉

286. ▉▉▉ reported that Passaro hit Wali on one occasion after Wali menaced Passaro;

287. ▉▉▉reported that Wali had possessed a range of movement that allowed him to have access to Passaro during the interview;

288. ▉▉▉is familiar with the term "iron chair," where a detainee is leaned against the wall;

289. ▉▉▉reported that there is no physical abuse associated with the use of the "iron chair" or with sleep deprivation;

290. ▉▉▉ did not ever tell Passaro not to use sleep deprivation nor the "iron chair" as interview methods;

291. Investigator Klare asked if▉▉▉ was aware of "cuts" on Wali's face at the time of his death, and▉▉▉ acknowledged awareness of such;

292. ▉▉▉told Investigator Klare that it was possible Wali suffered abrasions when he fell down;

26

293. On July 16, 2003, ███████████ sent a message to higher headquarters;

294. The subject of that message was "[redacted] Update on Investigation into ███████████ Detainee";

295. ████████████████████████████████████████████████

296. Lcol Boardman had initiated the request for the statement of authorities and limitations;

297. ████████████████████████████████████████████████

298. ████████████████████████████████████████████████

299. ████████████████████████████████████████████████

300. ████████████████████████████████████████████████

301. ████████████████████████████████████████████████

302. ████████████████████████████████████████████████

303. ████████████████████████████████████████████████

304. All the investigations in this matter were jointly conducted in coordination with the interested

parties/commanders;

305. The CID investigation was closed for a lack of evidence, but later reopened after widespread publicity about the Abu Ghraib prison abuses, around May 2004;

306. ▆▆▆▆ also pointed out that:

    a. The military had received permission from the family to disinter Wali's body for autopsy,

    b. J-2 claims that the US military does not have a pathologist in country; and

    c. HQS IG team has worked closely with CID investigators during their TDY to Afghanistan;

307. On August 5, 2003, persons known to the government, but not disclosed to Defendant, met to discuss matters not disclosed to Defendant;

308. On August 20, 2003, Barry Sabin of the Department of Justice, Tom Jansen, Frederick Klare and Marizol Etter, CIA IG investigators, met with Dr. Craig T. Mallak, CDR, MC, US Navy at the Armed Forces Institute of Pathology in Rockville, Maryland;

309. The purpose of the meeting was to follow-up on the August 5, 2003 meeting;

310. Sabin asked specific questions of Dr. Mallak;

311. In response to the specific questions, Dr. Mallak provided the following information:

    a. Weather conditions in Afghanistan are likely to preserve Wali's body and relevant evidence is likely to exist even with the passage of time;

    b. Hot and dry weather conditions make it difficult for bacteria, which decomposes a body, to exist;

    c. Without decomposition, the body is likely to be preserved;

    d. The fact that Wali's body left ▆▆▆▆ wrapped in a sheet is good because, if the family buried him wrapped in the sheet, there will be less air circulation and Wali's body is likely well

28

preserved;

e. The passage of time matters little because the weather is very hot and there is little to no humidity;

f. It matters little how deep the family buried Wali's body in the ground;

g. The records [photographs, statements] that presently exist show certain things, for example, Wali may have bled internally; however, in order to make a determination with any medical certainty, it is necessary to conduct an autopsy on Wali's body;

h. Dr. Mallak cannot rule out the possibility Wali died of natural causes without an autopsy;

312. AFIP has extensive experience conducting autopsies on individuals who practice the Muslim religion;

313. Muslims have allowed AFIP to autopsy Muslim bodies when AFIP conducts autopsies for investigative purposes, but Muslims do not agree to autopsies for research purposes only;

314. AFIP conducted hundreds of autopsies on Muslims buried in Kosovo and Iraq, with the consent of the families;

315. No Muslim family has ever objected to an autopsy to Mallak because the families wanted to know what happened to their loved ones;

316. AFIP provides families with full disclosure of autopsy results; some families have even asked to see photographs, which AFIP provides upon request;

317. According to Dr. Mallak, an autopsy does not affect the appearance of the body and it is not obvious that AFIP conducted an autopsy, in fact, an autopsy, in and of itself, does not prevent an open casket viewing;

318. According to Dr. Mallak, an autopsy can be conducted anywhere, even in a tent with the body

on a cot; however, it would be necessary to get Wali's body to a location where full body X-rays could be taken;

319. According to Dr. Mallak, Bagram could conduct full body X-rays;

320. According to Dr. Mallak, AFIP can return the body to a family quickly, usually within 24 hours if there are no transportation problems;

321. Dr. Mallak said Wali's injuries, as shown in the post-death photographs, are not consistent with the story told in the statements taken by the military;

322. Dr. Mallak reaffirmed that, without Wali's body, Dr. Mallak cannot identify the manner and cause of Wali's death with any medical certainty, and he cannot rule death by natural causes;

323. Passaro qualified for additional pay for weapons firing and training on May 17, 22, 23, 25, 26, 27, 28, 29, 2003;

324. Passaro qualified for additional pay for weapons firing/training on June 3, 4, 9, 10, 11, 2003;

325. Passaro qualified for additional pay for weapons/demolitions firing/training on June 12, 13, 14, 15, 16, 17, 18, 19, 20, 22, 23, 2003;

326. On December 16, 2003, CIA Investigator Frederick Klare prepared an interview report after questioning ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

327. The purpose of the interview as to discuss the unattended death ▮▮▮▮▮▮▮▮ case number 2003-7285-IG;

328. The interview report covers eight and one half single spaced type written pages;

329. The report consists of more than nineteen paragraphs;

330. The Government has only revealed paragraphs 10, 11 and part of paragraph 19 to the defense;

331. ▮▮▮▮▮▮ has a law degree, however when he spoke with Passaro, ▮▮▮▮▮ informed him that

30

█████ was not there in the capacity of an attorney, or to provide advice to Passaro;

332. ██████ observed that Passaro appeared worried or nervous, and that he was concerned that military personnel at Asadabad may be lying about him;

333. ██████ traveled to Asadabad with ████████, shortly after Wali's death, to ensure that message traffic between ████████ and ████ satisfied ████;

334. ██████ typed the ███████████ message from █████████ reporting the incident events to ████, after █████ became concerned that messages from █████████ were not compatible with reports █████ was receiving from their CIA source in Bagram;

335. ██████ reported that Passaro told him he only touched Wali in self defense;

336. ██████ reported that Passaro stated that Wali lunged at Passaro;

337. ██████ reported that █████████ was not present when Passaro answered ██████'s questions, so he had Passaro repeat the information to ██████;

338. Passaro asked █████ if there would be an investigation, and █████ told Passaro not to worry;

Defendant also hereby notifies the Court and Government of his intent to disclose all facts contained in the copy of the Independent Contractor Agreement previously disclosed to defendant on pages Bates stamped 277-287 (attached).

Respectfully submitted this 4th day of October 2005.

Thomas P. McNamara
_____
THOMAS P. McNAMARA
Federal Public Defender
N.C. State Bar No. 5099

31

## *CERTIFICATE OF SERVICE*

I HEREBY CERTIFY that a copy of the foregoing was served upon:

JAMES A. CANDELMO
Assistant United States Attorney
Suite 800, Federal Building
310 New Bern Avenue
Raleigh, NC 27601-1461

by hand delivering to Jennifer Myers,* United States District Court Clerk, for courier pick-up by the United States Attorneys Office with a copy of the foregoing sent via secure facsimile to the Court Security Officer for classification review on,

This the 4th day of October, 2005.

*Thomas P. McNamara*

THOMAS P. McNAMARA
Federal Public Defender
N.C. State Bar No. 5099

\* Delivery to Ms Myers
on October 5, 2005.
*Joseph Batt*

32

THE REMAINING
ELEVEN (11) PAGES
HAVE BEEN REDACTED