Filed 12/27/05 [initials]

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:04-CR-211-BO(1)

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DAVID A. PASSARO | MOTION TO DISMISS INDICTMENT FOR SELECTIVE PROSECUTION AND INCORPORATED MEMORANDUM OF LAW |

DAVID A. PASSARO, defendant in the above-captioned case, by and through counsel, hereby moves this Honorable Court to dismiss the indictment on selective prosecution grounds. The government has singled out for prosecution a CIA contractor and declined to prosecute any CIA employee, to maintain a "token" CIA prosecution that provides political coverage for the Justice Department to avoid accountability for its role in issuing legal opinions that authorized the CIA to employ harsh interrogation methods that fell outside the Justice Department's restrictive definition of "torture." In addition to singling out Mr. Passaro, the government has steadfastly refused to disclose the full extent of the CIA's interrogation authority, while basing this indictment on the unsupported assertion that Mr. Passaro exceeded that authority.

## STATEMENT OF CASE

On June 17, 2004, a grand jury returned an unsealed indictment that identified Mr. Passaro as "a contractor working on behalf of the Central Intelligence Agency" and charged him with assaulting an Afghani suspected of launching rocket attacks on American and Afghani forces, during Mr. Passaro's questioning of the terrorist suspect on June 19 and 20, 2003. The current

1

/C: [handwritten] Unclassified          SCANNED

motions filing deadline is December 27, 2005. This case is not yet calendared for trial.

## STATEMENT OF FACTS

### A. Terrorist Attacks and America's Response

On September 11, 2001, members of the al Qaeda terrorist organization highjacked four passenger aircraft and used them as flying bombs, crashing two into the World Trade Center towers and one into the Pentagon. The fourth aircraft, which had apparently targeted the United States Capitol, crashed in rural Pennsylvania after passengers conducted a heroic assault on the cockpit. The terrorists murdered over 3,000 men, women, and children.

On September 12, 2004, President Bush declared:

> The deliberate and deadly attacks which were carried out yesterday against our country were more than acts of terror. They were acts of war. . . . The American people need to know that we're facing a different enemy than we have ever faced. This enemy hides in shadows, and has no regard for human life. This is an enemy who preys on innocent and unsuspecting people, then runs for cover. But it won't be able to run for cover forever. . . . The United States of America will use all our resources to conquer this enemy.

Docket Entry 66, p. 2 & Attach. 1, p. 3.[1]

On September 18, 2001, Congress passed Senate Joint Resolution 23, which authorized "the use of United States Armed Forces against those responsible for the recent attacks launched against the United States." Pub. L. No. 107-40, 115 Stat. 224 (2001). Docket Entry 66, p. 2 & Attach. 2. Joint Resolution 23 described the attacks as "treacherous acts of violence" that continued to pose "an unusual and extraordinary threat to the national security and foreign policy of the United States." *Id.* It recognized the President's "authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States," and authorized the President "to

---

[1] To facilitate the court security review, where this motion includes documents submitted in previous motions, the docket entry of that previous motion is cited.

use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks . . ., or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations, or persons." *Id.*

On October 7, 2001, President Bush launched a military campaign against terrorist forces in Afghanistan, where al Qaeda and its leader Osama bin Laden operated with the tacit support of the Taliban, Afghanistan's extremist Islamic regime. The attack began with air strikes against the al-Qaeda terrorist training camps and against the Taliban's infrastructure and military installations throughout the country. Insertion of Special Operations forces and CIA operatives followed the air strikes. These forces assisted local militias in the effort to topple the Taliban regime and hunt for al Qaeda terrorists.

By the end of 2001, the Taliban regime had fallen, yet Taliban supporters and Al-Qaeda members maintained strongholds in eastern Afghanistan along the Afghan-Pakistani border. Forces from the Special Operations Command and CIA agents and paramilitaries operated from tactical firebases within striking distance of the Taliban and al Qaeda strongholds. These forces and paramilitaries took hundreds of al Qaeda and Taliban forces into custody.

**B. Relying on the Justice Department's Legal Opinions, President Bush Concludes the Geneva Convention does not Apply to Taliban and al Qaeda Detainees, and Exempts the CIA from his "Humane Treatment" Directive.**

Several of those in CIA custody were high-value targets with information of the inner-workings of al Qaeda's leadership and operational plans. R. Jeffrey Smith and Dan Eggen, *Gonzales Helped Set the Course for Detainees*, Wash. Post, Jan. 5, 2005, A1. These detainees proved resistant to the CIA's interrogation methods. *Id.* The CIA then sought legal guidance from the White House and the Department of Justice, guidance that would establish a standard between

3

lawful and unlawful interrogation methods. *Id.*; Michael Isikoff, Daniel Klaidman and Michael Hirsch, *Torture's Path*, Newsweek, Dec. 27, 2004, p. 54.

As chronicled by the current Attorney General, Alberto Gonzales (then White House Counsel), in January of 2002, the Justice Department's Office of Legal Counsel ("OLC") issued a "definitive" legal opinion, which concluded that al Qaeda and Taliban detainees did not qualify for protection under the Geneva Convention on the Treatment of Prisoners of War ("GPW"), 6 U.S.T. 2216. Docket Entry 66, pp. 3-5 & Attach. 3.

On January 25, 2002, Mr. Gonzales urged President Bush to adopt the OLC opinion, which Gonzales described as binding on the Executive Branch. Mr. Gonzales also opined that the realities of the war on terror rendered the Geneva protections "obsolete." *Torture's Path*, supra.

Citing his authority as Commander in Chief, on February 7, 2002, President Bush declared, "none of the provisions of Geneva apply to our conflict with al Qaeda in Afghanistan or elsewhere throughout the world . . . ." Docket Entry 66, p. 5 & Attach. 4. He also determined that the Taliban detainees were unlawful combatants and therefore did not qualify for Geneva protection as prisoners of war. *Id.* The President further concluded that while Taliban and al Qaeda detainees were not "legally entitled" to humane treatment, "[a]s a matter of policy, the United States Armed Forces shall continue to treat detainees humanely and, to the extent appropriate and consistent with military necessity, in a manner consistent with the principles of Geneva." *Id.* In addition to the "military necessity" exception, during his confirmation hearings for his current position, Mr. Gonzales confirmed the "humane treatment" policy did not "apply to the CIA or any other non-military personnel." Docket Entry 91, p. 3 & Attach. 1.

In March of 2002, the CIA reportedly authorized six "Enhanced Interrogation Techniques" for use on its high-value detainees. Brian Ross and Richard Esposito, *CIA's Harsh Interrogation*

4

*Techniques Described*, ABC News, Nov. 18, 2005, at <http://abcnews.go.com>. Two of these methods, the "attention slap" and the "belly slap," involved a hard open-handed slap intended to cause pain. *Id.* A third, called "waterboarding," triggered a terrifying fear of drowning by strapping a person to an inclined board, wrapping cellophane over his face and pouring water over him. *Id.* In another method, the "cold cell," the prisoner is kept in a 50 degree cell for hours and has cold water poured over him. *Id.*

In July of 2002, Mr. Gonzales, still serving as White House Counsel, chaired several meetings with Justice Department officials at which those present discussed legal justifications for the CIA's use of harsh interrogation techniques. *Torture's Path*, supra. He reportedly encouraged those present to "lean forward" in determining legally permissible interrogation techniques by focusing on the Administration's "offensive approach to the war on terror." *Id.*

Following these meetings, on August 1, 2002, in response to Mr. Gonzales' request for legal guidance to the CIA, the Justice Department's Office of Legal Counsel issued a legal opinion regarding the application of the anti-torture statutes of 18 U.S.C. § 2340, 2340A to the CIA interrogations. Docket Entry 66, p. 6 & Attach. 5, p. 1; David Johnston, Neil A. Lewis and Douglas Jehl, *Nominee Gave Advice to CIA on Torture Law*, N.Y. Times, Jan. 29, 2005, A1.

Authored by then-Assistant Attorney General Jay Bybee, head of the Office of Legal Counsel "(OLC"),[2] the opinion concluded "that torture as defined in and proscribed by Sections 2340-2340A, covers only extreme acts" intended to cause "[s]evere pain . . . of the kind difficult for the victim to endure." Docket Entry 66, p. 6 & Attach. 5, p. 46. Judge Bybee also concluded that "under the circumstances of the current war against al Qaeda and its allies, application of Section

---

[2] Judge Bybee now sits on the Ninth Circuit Court of Appeals.

5

2340A to interrogations undertaken pursuant to the President's Commander-in-Chief powers may be unconstitutional." *Id.*

The Office of Legal Counsel subsequently issued another opinion that authorized the CIA's interrogation authority, this time specifically authorizing several "enhanced" interrogation techniques, to include the six initially proposed by the CIA in March of 2002. Jane Mayer, *A Deadly Interrogation; Can the CIA Legally Kill a Prisoner*, The New Yorker, November 14, 2005, pages 44 & ff. A third, still-secret OLC opinion, described as "breathtaking" by one familiar with all three OLC memos, "dismissed virtually all national and international laws regulating the treatment of prisoners, including war-crimes and assault statutes." *Id.* The Administration has refused to disclose these documents to the public or to members of Congress. All three were reportedly signed by Judge Bybee, with Professor John Yoo, another former OLC attorney, drafting a significant portion of each.

## C. Abu Ghraib Prisoner Abuse Scandal Coincides with Dip in Polls for President Bush.

During the Spring of 2004, the release of pictures from the military's Abu Ghraib detention center in Iraq created intense worldwide scrutiny of the treatment of detainees in Iraq, Guantanamo Bay, and Afghanistan. David Paul Kuhn, *Bush Ratings Fall Amid Iraq Woes*, CBS News, May 12, 2004, at <http://www.cbsnews.com/stories/2004/05/12/politics/prinable61722.shtml>. Release of the photos coincided with a drop in President Bush's approval ratings to 44 percent, "the lowest level of his presidency." *Id.* The Abu Ghraib scandal also coincided with President Bush's worst months during the 2004 Presidential Campaign. Between April and July of 2004, his monthly polls failed to top 46 percent, the only time this occurred during the campaign. *See Election 2004: Month-by-Month*, Rasmussen Reports, at <http://www.rasmussenreports.com/Monthly%20summary.htm>.

**D. General Ashcroft Refuses to Disclose August 1, 2002 OLC Opinion to Senate.**

In early June of 2004, the Washington Post obtained a copy of the August 1, 2002 OLC Opinion. Dana Priest and R. Jeffrey Smith, *Memo Offered Justification for Use of Torture: Justice Dept. Gave Advise in 2002*, Wash. Post, June 8, 2004, A1. Media scrutiny focused on two controversial conclusions: (1) the anti-torture statute only proscribed the intentional infliction of pain "equivalent in intensity to the pain accompanying serious, physical injury, such as organ failure, impairment of bodily function, or even death"; and (2) the conclusion that the Commander-in-Chief had the constitutional authority to order interrogations that violated the anti-torture statute (the "constitutional over-ride"). Mike Allen and Dana Priest, *Memo on Torture Draws Focus on Bush*, Wash. Post, June 9, 2004, A3.

On June 8, 2004, Attorney General John Aschroft appeared before the Senate Judiciary Committee. General Ashcroft refused to disclose or discuss the contents of the August 1, 2002 OLC Opinion, though warned his refusal could result in the Senate finding him in contempt. *Id.*

**E. White House Counsel Alberto Gonzales Conducts Press Conference at Which He Refuses to discuss the CIA's Interrogation Authority, but Asserts all Approved Methods are "Lawful and do not Constitute Torture."**

On June 22, 2004, Attorney General Gonzales, then serving as White House Counsel, conducted a press conference to address public concern over the two controversial provisions of the leaked OLC Opinion. He assured those present the Department of Justice would review that Opinion's definition of "torture." Docket Entry 66, p. 9 & Attach. 11. He also sought to re-assure the press that the President had not exercised the "constitutional over-ride" provision of the August 1, 2002 OLC Opinion, stating, "the President has given no order or directive that would immunize from prosecution anyone engaged in conduct that constitutes torture." Docket Entry 66, Attach. 11, pp. 2-3.

7

During the press conference, the White House released several of the documents former Attorney General Ashcroft had refused to disclose to the Senate Judiciary Committee just two weeks earlier. *Id.* Some documents – including the President's February 7, 2002 "Humane Treatment" Directive, which did not apply to the CIA, and a Defense Department memoranda on interrogation techniques – were de-classified between June 17 and 21, 2004, despite the fact that those documents were not scheduled for de-classification until 2012. Docket Entry 66, Attachments 4, 12, and 13.

During the press conference, Mr. Gonzales repeatedly refused to discuss interrogation methods approved for use by the CIA. At the beginning, he announced, "this briefing does not include CIA activities. I will say that *all interrogation techniques authorized for use by the Agency and against the Taliban and al Qaeda and in Iraq are lawful and do not constitute torture.*" Docket Entry 66, Attach. 11, p. 3 (emphasis added). When questioned later whether the CIA had authorization to employ interrogation methods other than those approved for DOD personnel, General Gonzales again emphasized:

> I'm not going to get into discussions about the CIA, except to repeat what I just said, and that is that the techniques that they used that have been approved – *they've been approved and vetted by the Department of Justice*, are lawful and do not constitute torture.

*Id.*, p. 17 (emphasis added).

### F. Attorney General Aschroft Conducts Nationally-Televised Press Conference To Announce Indictment against Mr. Passaro.

On June 17, 2004, just days before the press conference conducted by the current Attorney General, his predecessor, John Ashcroft, conducted a nationally televised press conference to announce the indictment against Mr. Passaro. Docket Entry 44, p. 5 & Attach. 8. In addition to identifying Mr. Passaro as a CIA operative, General Ashcroft also asserted that Mr. Passaro

8

"brutally" assaulted the terrorist suspect. *Id.* Placing the indictment in the context of the Abu Ghraib scandal, he sought to re-assure the public the Administration did not condone such conduct. *Id.* Referencing this scandal, which he blamed on "a small group of individuals," General Ashcroft claimed the indictment against Mr. Passaro demonstrated the Bush Administration's dedication to the "ideals of freedom, respect for human dignity, to its insistence for justice, and the rule of law." *Id.* Finally, General Ashcroft reported that the CIA had referred other cases to the Justice Department for investigation and possible prosecution. *Id.*

### G. The Justice Department Has Only Prosecuted Mr. Passaro, a CIA Contractor, and Reportedly Will Not Prosecute Any Career CIA Employee.

Since the War on Terror began, the CIA has reportedly captured and interrogated 3,000 people. Dana Priest, *Wrongful Imprisonment: Anatomy of a CIA Mistake*, Wash. Post, December 4, 2005, A1. It remains unknown how many of those were subject to interrogation methods the Department of Justice approved for use by the CIA, but details of widespread and systemic use of harsh treatment in secret detention centers are emerging. *See* Carlota Gall, *Rights Group Reports Afghanistan Torture*, N.Y. Times, Dec. 19, 2005, A4.

Use of the one of the approved techniques, the "cold cell," led to the death of at least one detainee, at the "Salt Pit," a detention center used by the CIA in Afghanistan. Dana Priest, *CIA Avoids Scrutiny of Detainee Treatment*, Wash. Post, March 3, 2005, A1. Another detainee died of asphyxiation while in CIA custody, with a plastic bag over his head and his body shackled to the wall in a crucifixion-like stress position. *A Deadly Interrogation*, supra. The Justice Department has not prosecuted any CIA interrogators involved in these two interrogations. Nor has the Justice Department prosecuted any CIA employee involved the other cases referred to it by the CIA. *Id.* Relying on "current and former intelligence and law enforcement officials," the New York Times

9

recently reported that the Department of Justice will decline to prosecute any of the cases referred by the CIA, to include the "Salt Pit" case above and three other cases where the detainee died in CIA custody. Douglas Jehl and Tim Golden, *CIA Is Likely to Avoid Charges In Most Prisoner Deaths*, N.Y. Times, Oct. 23, 2005, Section 1, p.6.

Thus, to date, the Department of Justice has only brought charges against Mr. Passaro, who served in a contract capacity with the CIA; it appears unlikely the Justice Department will prosecute any career CIA employee for unlawful conduct during an interrogation.

## H. The Government has Refused to Disclose Requested Discovery on Interrogation Methods Approved by the White House and the Justice Department for Use by CIA.

Since bringing this prosecution on June 17, 2004, the government has refused to disclose any of the OLC Opinions, other Justice Department memoranda, Presidential authorizations or orders, and CIA documents address the scope of the CIA's authority to interrogate members of the Taliban, al Qaeda, and other terrorist organizations, all of which Mr. Passaro has specifically requested. *See* Docket Entries 51 and 54.

The government has also stymied counsel's efforts to interview former and present Justice Department and CIA officials who likely have knowledge of the interrogation methods the Justice Department and White House approved for CIA use and the policies and standards for CIA interrogations during the relevant time period, June of 2003. *See Defendant's Motion to Compel Witness Interviews*, December 15, 2005.

### ARGUMENT

Mr. Passaro has been unfairly targeted and singled out by the prosecution in this case because he is a contractor working for the CIA rather than a career CIA employee. Had he been a CIA employee, he would have enjoyed the same freedom from prosecution that the Justice

10

Department has afforded CIA employees. The Justice Department's recent indication that it would not prosecute the other CIA cases referred to it for prosecution demonstrates an intent to maintain this case as a "token" CIA prosecution. Moreover, the government has chosen to prosecute a contract employee rather than a regular CIA employee, because such a choice provides the best chance it can secure a "token" CIA conviction while at the same time concealing the full extent of the Administration's responsibility in crafting harsh interrogation methods for use by the CIA.

Within the Fourth Circuit, a claim of selective prosecution is properly brought where the defendant establishes, "both (1) that 'similarly situated individuals . . . were not prosecuted,' . . . 'and (2) that the decision to prosecute was invidious or in bad faith.'" *United States v. Olvis*, 97 F.2d 739 (4th Cir. 1996) (citations omitted).

Although the selective prosecution claim typically involves a claim of discrimination against a suspect class such as race, the U.S. Supreme Court has noted that a "prosecutor's discretion is subject to constitutional constraints.'" *United States v. Armstrong,* 517 U.S. 456, 464 (1996) (citing *United States v. Batchelder*, 442 U.S. 114 (1979) (parallel citations omitted). The decision to prosecute may not be based on an "arbitrary classification." *Id.* (citing *Oyler v. Boles*, 368 U.S. 448, 456 (1962) (parallel citations omitted). Moreover, "[a] defendant may demonstrate that the administration of a criminal law is 'directed so exclusively against a particular class of persons . . . with a mind so unequal and oppressive' that the system of prosecution amounts to 'a practical denial' of equal protection under the law." *Id.* at 464-465 (citing *Yick Wo, v. Hopkins*, 118 U.S. 356, 373 (1886) (parallel citations omitted).

In Mr. Passaro's case, the government has undeniably singled Mr. Passaro out for prosecution. He is the only CIA person being prosecuted and likely will remain the only one prosecuted. Moreover, the government has unjustifiably distinguished between regular CIA

11

employees and a temporary contract employee. In an analogous case, a district court found that discrimination between persons working for the Federal Government and private persons was made on an unjustifiable basis. *United States v. Robinson*, 311 F. Supp. 1063 (1969 W.D. Missouri). In *Robinson*, a defendant was charged with violating federal wiretapping laws. The court found that the government could not target a private citizen for violating the same laws that the government itself had systematically violated, and that the application of the statute in this biased manner "represented a systematic fixed and continuous policy of unjust discrimination. . . " *Id.* at 1066.

A career CIA employee likely has the institutional knowledge of the full extent of the CIA's interrogation authority. Thus, a prosecution of such a person would pose a much greater risk of public exposure of this still-secret scope of authority. In addition, a career employee benefits from greater institutional protection, as the career employee will benefit from the relationships he or she has developed within the CIA. Notwithstanding the risks of prosecuting a career CIA employee, the distinction between an employee and a contractor unfairly singles out the latter for criminal prosecution.

Not only has the Justice Department singled-out a contract-employee for prosecution, it has sought and maintained this "token" CIA prosecution for an improper motive, to provide the Administration, particularly the White House and the Department of Justice, with political coverage to avoid accountability for the Administration's role in facilitating an environment in which prisoner abuse could flourish.

In June of 2004, after the release of the August 1, 2002 OLC Opinion focused attention on the Administration's role in paving the way to the Abu Ghraib scandal, the sequence outlined above indicates an orchestrated public relations battle waged by the White House and Department of Justice. This campaign culminated with the two press conferences conducted by the former and

12

current Attorney Generals, both of whom sought to assure the public that a few "bad apples," not the Administration's policies, were responsible for the prisoner abuse scandal.

In January of 2005, Attorney General Gonzales again relied on this "token" CIA prosecution, during his confirmation hearings for his current position. Confronted with his role in the August 1, 2002 OLC Opinion and forced to clarify that the President's February 7, 2002 "humane treatment" directive did not apply to the CIA, Attorney General Gonzales went on to emphasize the Administration's readiness to prosecute CIA detainee cases, making specific reference to the instant prosecution against Mr. Passaro. Docket Entry 91.

Not only did the government initiate a token CIA prosecution to provide itself with political coverage, it seeks to secure a token conviction against a CIA operative for conducting an illegal interrogation while at the same time refusing to disclose to the defendant or to the jury the true scope of the CIA's legal authority to employ aggressive interrogation methods in the war on terror.

## CONCLUSION

For the foregoing reason, this Court should dismiss the indictment returned against Mr. Passaro, who served under the Commander-in-Chief in the field of battle in Afghanistan, only to return from battle to face a "token" prosecution that charges him with exceeding the authority vested in the CIA, while refusing to reveal to Mr. Passaro or to the jury the full extent of that authority.

Respectfully submitted this 27th day of December, 2005.

*Thomas P. McNamara*

THOMAS P. McNAMARA
Federal Public Defender
N.C. State Bar No. 5099

13

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served upon:

JAMES A. CANDELMO
Assistant United States Attorney
Suite 800, Federal Building
310 New Bern Avenue
Raleigh, NC 27601-1461

by hand delivering to Jennifer Myers, United States District Court Clerk, for courier pick-up by the United States Attorneys Office with a copy of the foregoing sent via secure facsimile to the Court Security Officer for classification review on,

This the 27th day of December, 2005.

*Thomas P. McNamara*

THOMAS P. McNAMARA
Federal Public Defender
N.C. State Bar No. 5099