

| UNITED STATES OF AMERICA | SUPPLEMENTAL FILING IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS FOR SELECTIVE PROSECUTION AND IN SUPPORT OF DEFENDANT'S OPPOSITION TO GOVERNMENT'S MOTION IN LIMINE |
|---|---|
| v. | |
| DAVID A. PASSARO | |

DAVID A. PASSARO, defendant in the above-captioned case, by and through counsel, hereby notifies the Court of recently reported facts that are relevant to at least two pending motions – Defendant's Motion to Dismiss for Selective Prosecution and the Government's Motion in Limine to exclude, pre-trial, Mr. Passaro's assertion of the public authority defense. With respect to the government's motion in limine, the facts reported below contradict the government's unsupported assertion that nobody within the CIA had authority to engage in the conduct charged in the instant indictment.

Citing "former and current intelligence officials and congressional and administration sources," the Washington Post recently reported the following:[1]

1. Six days after the September 11th attacks, President Bush signed a "top secret presidential finding" that ordered the creation and execution of a covert program to fight al

---

[1] Dana Priest, *Covert CIA Program Withstands New Furor*, Wash. Post, Dec. 30, 2005, A1. Attach. 1.

1

SCANNED

k: Boyle Unclassified

Qaeda, a program that is now "the largest covert action program since the height of the Cold War."

2. This covert action program is "compartmentalized into dozens of highly classified individual programs," including those that allow the CIA "to maintain secret prisons abroad, to use interrogation techniques that some lawyers say violate international treaties, and to maintain a fleet of aircraft to move detainees around the globe."

3. According to "a dozen current and former intelligence officials and congressional and executive branch sources," the presidential finding also "permitted the CIA to create paramilitary teams to hunt and kill designated individuals anywhere in the world . . .."

4. This power to authorize lethal action was delegated to then-CIA Director George J. Tenet, who in turn "delegated most of the decision making on lethal action to the CIA's Counterterrorist Center."

5. According to "four former government lawyers," killing an al Qaeda person "was classified as an act of self-defense and therefore was not an assassination."

6. The White House relied upon "a small circle of lawyers for legal interpretations [to] justify the CIA's covert programs . . .."

7. As legal justification for the covert programs, all of which are ongoing, "the administration contends it is still acting in self-defense after the Sept. 11 attacks, that the battlefield is worldwide, and that everything it has approved is consistent with the demands made by Congress on Sept. 14, 2001, when it passed a resolution authorizing 'all necessary and appropriate force against those nations, organizations, or persons [the president]

2

determines planned, authorized, committed or aided the terrorist attacks.'"

Mr. Passaro respectfully submits these additional facts in support of the conclusion that the CIA's actual authority with respect to the capture, detention, and interrogation of suspected terrorists such as Abdul Wali far surpassed the conduct charged by the present indictment. These facts contradict the government's unsupported assertion, made in support of it's motion in limine for pre-trial exclusion of the public authority defense, that nobody in the CIA had the authority to engaged in the conduct charged by this indictment.

The means by which the CIA acquired this authority – through top secret presidential findings and legal justifications issued by a small group of lawyers within the Justice Department's Office of Legal Counsel – support Mr. Passaro's motion to dismiss on selective prosecution grounds. Specifically, these recently reported facts lend further support to the conclusion that the Department of Justice has initiated and maintained a token CIA prosecution to provide itself and the White House with political coverage, and that it seeks to secure a token conviction against a CIA operative for an allegedly illegal interrogation of a terrorist suspect, while at the same time refusing to disclose to the defendant or to the jury the true scope of the CIA's legal authority to employ aggressive interrogation methods in the war on terror.

Respectfully submitted this 5th day of January, 2006.

Thomas P. McNamara

THOMAS P. McNAMARA
Federal Public Defender
N.C. State Bar No. 5099

3

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served upon:

JAMES A. CANDELMO
Assistant United States Attorney
Suite 800, Federal Building
310 New Bern Avenue
Raleigh, NC 27601-1461

by hand delivering to Jennifer Myers, United States District Court Clerk, for courier pick-up by the United States Attorneys Office with a copy of the foregoing sent via secure facsimile to the Court Security Officer for classification review on,

This the 5th day of January, 2006.

*Thomas P. McNamara*
THOMAS P. McNAMARA
Federal Public Defender
N.C. State Bar No. 5099

1 of 26 DOCUMENTS

Copyright 2005 The Washington Post
The Washington Post

December 30, 2005 Friday
Final Edition

**SECTION:** A Section; A01

**LENGTH:** 2726 words

**HEADLINE:** Covert CIA Program Withstands New Furor;
Anti-Terror Effort Continues to Grow

**BYLINE:** Dana Priest, Washington Post Staff Writer

**BODY:**

The effort President Bush authorized shortly after Sept. 11, 2001, to fight al Qaeda has grown into the largest CIA covert action program since the height of the Cold War, expanding in size and ambition despite a growing outcry at home and abroad over its clandestine tactics, according to former and current intelligence officials and congressional and administration sources.

The broad-based effort, known within the agency by the initials GST, is compartmentalized into dozens of highly classified individual programs, details of which are known mainly to those directly involved.

GST includes programs allowing the CIA to capture al Qaeda suspects with help from foreign intelligence services, to maintain secret prisons abroad, to use interrogation techniques that some lawyers say violate international treaties, and to maintain a fleet of aircraft to move detainees around the globe. Other compartments within GST give the CIA enhanced ability to mine international financial records and eavesdrop on suspects anywhere in the world.

Over the past two years, as aspects of this umbrella effort have burst into public view, the revelations have prompted protests and official investigations in countries that work with the United States, as well as condemnation by international human rights activists and criticism by members of Congress.

Still, virtually all the programs continue to operate largely as they were set up, according to current and former officials. These sources say Bush's personal commitment to maintaining the GST program and his belief in its legality have been key to resisting any pressure to change course.

"In the past, presidents set up buffers to distance themselves from covert action," said A. John Radsan, assistant general counsel at the CIA from 2002 to 2004. "But this president, who is breaking down the boundaries between covert action and conventional war, seems to relish the secret findings and the dirty details of operations."

ATTACH. 1

The administration's decisions to rely on a small circle of lawyers for legal interpretations that justify the CIA's covert programs and not to consult widely with Congress on them have also helped insulate the efforts from the growing furor, said several sources who have been involved.

Bush has never publicly confirmed the existence of a covert program, but he was recently forced to defend the approach in general terms, citing his wartime responsibilities to protect the nation. In November, responding to questions about the CIA's clandestine prisons, he said the nation must defend against an enemy that "lurks and plots and plans and wants to hurt America again."

This month he went into more detail, defending the National Security Agency's warrantless eavesdropping within the United States. That program is separate from the GST program, but three lawyers involved said the legal rationale for the NSA program is essentially the same one used to support GST, which is an abbreviation of a classified code name for the umbrella covert action program.

The administration contends it is still acting in self-defense after the Sept. 11 attacks, that the battlefield is worldwide, and that everything it has approved is consistent with the demands made by Congress on Sept. 14, 2001, when it passed a resolution authorizing "all necessary and appropriate force against those nations, organizations, or persons [the president] determines planned, authorized, committed, or aided the terrorist attacks."

"Everything is done in the name of self-defense, so they can do anything because nothing is forbidden in the war powers act," said one official who was briefed on the CIA's original cover program and who is skeptical of its legal underpinnings. "It's an amazing legal justification that allows them to do anything," said the official, who like others spoke on the condition of anonymity because of the sensitivity of the issues.

The interpretation undergirds the administration's determination not to waver under public protests or the threat of legislative action. For example, after The Washington Post disclosed the existence of secret prisons in several Eastern European democracies, the CIA closed them down because of an uproar in Europe. But the detainees were moved elsewhere to similar CIA prisons, referred to as "black sites" in classified documents.

The CIA has stuck with its overall approaches, defending and in some cases refining them. The agency is working to establish procedures in the event a prisoner dies in custody. One proposal circulating among mid-level officers calls for rushing in a CIA pathologist to perform an autopsy and then quickly burning the body, according to two sources.

In June, the CIA temporarily suspended its interrogation program after a controversy over the disclosure of an Aug. 1, 2002, memorandum from the Justice Department's Office of Legal Counsel that defined torture in an unconventional way. The White House withdrew and replaced the memo. But the hold on the CIA's interrogation activities was eventually removed, several intelligence officials said.

The authorized techniques include "waterboarding" and "water dousing," both meant to make prisoners think they are drowning; hard slapping; isolation; sleep deprivation; liquid diets; and stress positions -- often used, intelligence officials say, in combination to enhance the effect.

Behind the scenes, CIA Director Porter J. Goss -- until last year the Republican chairman of the House intelligence committee -- has gathered ammunition to defend the program.

After a CIA inspector general's report in the spring of 2004 stated that some authorized interrogation techniques violated international law, Goss asked two national security experts to study the program's effectiveness.

Gardner Peckham, an adviser to then-House Speaker Newt Gingrich (R-Ga.), concluded that the interrogation techniques had been effective, said an intelligence official familiar with the result. John J. Hamre, deputy defense secretary under President Bill Clinton, offered a more ambiguous conclusion. Both declined to comment.

The only apparent roadblock that could yet prompt significant change in the CIA's approach is a law passed this month prohibiting torture and cruel and inhumane treatment of prisoners in U.S. custody, including in CIA hands.

It is still unclear how the law, sponsored by Sen. John McCain (R-Ariz.), will be implemented. But two intelligence experts said the CIA will be required to draw up clear guidelines and to get all special interrogation techniques approved by a wider range of government lawyers who hold a more conventional interpretation of international treaty obligations.

"The executive branch will not pull back unless it has to," said a former Justice Department lawyer involved in the initial discussions on executive power. "Because if it pulls back unilaterally and another attack occurs, it will get blamed."

The top-secret presidential finding Bush signed six days after the Sept. 11 attacks empowered the intelligence agencies in a way not seen since World War II, and it ordered them to create what would become the GST program.

Written findings are required by the National Security Act of 1947 before the CIA can undertake a covert action. A covert action may not violate the Constitution or any U.S. law. But such actions can, and often do, violate laws of the foreign countries in which they take place, said intelligence experts.

The CIA faced the day after the 2001 attacks with few al Qaeda informants, a tiny paramilitary division and no interrogators, much less a system for transporting terrorism suspects and keeping them hidden for interrogation.

Besides fighting the war in Afghanistan, the agency set about to put in place an intelligence-gathering network that relies heavily on foreign security services and their deeper knowledge of local terrorist groups. With billions of dollars appropriated each year by Congress, the CIA has established joint counterterrorism intelligence centers in more than two dozen countries, and it has enlisted at least eight countries, including several in Eastern Europe, to allow secret prisons on their soil.

Working behind the scenes, the CIA has gained approval from foreign governments to whisk terrorism suspects off the streets or out of police custody into a clandestine prison system that includes the CIA's black sites and facilities run by intelligence agencies in other countries.

The presidential finding also permitted the CIA to create paramilitary teams to hunt and kill designated individuals anywhere in the world, according to a dozen current and former intelligence officials and congressional and executive branch sources.

In four years, the GST has become larger than the CIA's covert action programs in Afghanistan and Central America in the 1980s, according to current and former intelligence officials. Indeed, the

CIA, working with foreign counterparts, has been responsible for virtually all of the success the United States has had in capturing or killing al Qaeda leaders since Sept. 11, 2001.

Bush delegated much of the day-to-day decision-making and the creation of individual components to then-CIA Director George J. Tenet, according to congressional and intelligence officials who were briefed on the finding at the time.

"George could decide, even on killings," one of these officials said, referring to Tenet. "That was pushed down to him. George had the authority on who was going to get it."

Tenet, according to half a dozen former intelligence officials, delegated most of the decision making on lethal action to the CIA's Counterterrorist Center. Killing an al Qaeda leader with a Hellfire missile fired from a remote-controlled drone might have been considered assassination in a prior era and therefore banned by law.

But after Sept. 11, four former government lawyers said, it was classified as an act of self-defense and therefore was not an assassination. "If it was an al Qaeda person, it wouldn't be an assassination," said one lawyer involved.

This month, Pakistani intelligence sources said, Hamza Rabia, a top operational planner for al Qaeda, was killed along with four others by a missile fired by U.S. operatives using an unmanned Predator drone, although there were conflicting reports on whether a missile was used. In May, another al Qaeda member, Haitham Yemeni, was reported killed by a Predator drone missile in northwest Pakistan.

Refining what constitutes an assassination was just one of many legal interpretations made by Bush administration lawyers. Time and again, the administration asked government lawyers to draw up new rules and reinterpret old ones to approve activities once banned or discouraged under the congressional reforms beginning in the 1970s, according to these officials and seven lawyers who once worked on these matters.

Gen. Michael V. Hayden, deputy director of national intelligence, has described the administration's philosophy in public and private meetings, including a session with human rights groups.

"We're going to live on the edge," Hayden told the groups, according to notes taken by Human Rights Watch and confirmed by Hayden's office. "My spikes will have chalk on them. . . . We're pretty aggressive within the law. As a professional, I'm troubled if I'm not using the full authority allowed by law."

Not stopping another attack not only will be a professional failure, he argued, but also "will move the line" again on acceptable legal limits to counterterrorism.

When the CIA wanted new rules for interrogating important terrorism suspects the White House gave the task to a small group of lawyers within the Justice Department's Office of Legal Counsel who believed in an aggressive interpretation of presidential power.

The White House tightened the circle of participants involved in these most sensitive new areas. It initially cut out the State Department's general counsel, most of the judge advocates general of the military services and the Justice Department's criminal division, which traditionally dealt with international terrorism.

"The Bush administration did not seek a broad debate on whether commander-in-chief powers can trump international conventions and domestic statutes in our struggle against terrorism," said

Radsan, the former CIA lawyer, who is a professor at William Mitchell College of Law in St. Paul, Minn. "They could have separated the big question from classified details to operations and had an open debate. Instead, an inner circle of lawyers and advisers worked around the dissenters in the administration and one-upped each other with extreme arguments."

At the CIA, the White House allowed the general counsel's job, traditionally filled from outside the CIA by someone who functioned in a sort of oversight role, to be held by John Rizzo, a career CIA lawyer with a fondness for flashy suits and ties who worked for years in the Directorate of Operations, or D.O.

"John Rizzo is a classic D.O. lawyer. He understands the culture, the intelligence business," Radsan said. "He admires the case officers. And they trust him to work out tough issues in the gray with them. He is like a corporate lawyer who knows how to make the deal happen."

These lawyers have written legal justifications for holding suspects picked up outside Afghanistan without a court order, without granting traditional legal rights and without giving them access to the International Committee of the Red Cross.

CIA and Office of Legal Counsel lawyers also determined that it was legal for suspects to be secretly detained in one country and transferred to another for the purposes of interrogation and detention -- a process known as "rendition."

Lawyers involved in the decision making acknowledge the uncharted nature of their work. "I did what I thought the best reading of the law was," one lawyer said. "These lines are not obvious. It was a judgment."

One way the White House limited debate over its program was to virtually shut out Congress during the early years. Congress, for its part, raised only weak and sporadic protests. The administration sometimes refused to give the committees charged with overseeing intelligence agencies the details they requested. It also cut the number of members of Congress routinely briefed on these matters, usually to four members -- the chairmen and ranking Democratic members of the House and Senate intelligence panels.

John D. Rockefeller IV (W.Va.), ranking Democrat on the Senate Select Committee on Intelligence, complained in a 2003 letter to Vice President Cheney that his briefing on the NSA eavesdropping was unsatisfactory. "Given the security restrictions associated with this information, and my inability to consult staff or counsel on my own, I feel unable to fully evaluate, much less endorse, these activities," he wrote.

Rockefeller made similar complaints about the CIA's refusal to allow the full committee to see the backup material supporting a skeptical report by the CIA inspector general in 2004 on detentions and interrogations that questioned the legal basis for renditions.

Some former CIA officers now worry that the agency alone will be held responsible for actions authorized by Bush and approved by the White House's lawyers.

Attacking the CIA is common when covert programs are exposed and controversial, said Gerald Haines, a former CIA historian who is a scholar in residence at the University of Virginia. "It seems to me the agency is taking the brunt of all the recent criticism."

Duane R. "Dewey" Clarridge, who directed the CIA's covert efforts to support the Nicaraguan contras in the 1980s, said the nature of CIA work overseas is, and should be, risky and sometimes

ugly. "You have a spy agency because the spy agency is going to break laws overseas. If you don't want it to do those dastardly things, don't have it. You can have the State Department."

But a former CIA officer said the agency "lost its way" after Sept. 11, rarely refusing or questioning an administration request. The unorthodox measures "have got to be flushed out of the system," the former officer said. "That's how it works in this country."

Researcher Julie Tate contributed to this report.

**LOAD-DATE:** December 30, 2005