# CONTAINS
# REDACTED PAGES

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:04-CR-211-BO(1)

**FILED**

**MAR - 2** 2006

FRED L. BORCH III, CLERK
US DISTRICT COURT, EDNC
BY _____ DEP CLK

FILED WITH THE
COURT SECURITY OFFICER
CSO: _____
DATE _____

UNITED STATES OF AMERICA

v.

DAVID A. PASSARO

SUPPLEMENTAL MEMORANDUM OF
LAW ON THE PUBLIC AUTHORITY
DEFENSE

Defendant DAVID A. PASSARO, by and through counsel, respectfully submits this

supplemental memorandum regarding the application of the public authority defense to the facts of

this case – a custodial interrogation conducted by the Central Intelligence Agency ("CIA") in a

combat zone, of a terrorist suspect linked to previous, recent hostile attacks on American and

Afghani forces and civilians.

These facts raise two crucial issues addressed below. The first involves the government's

heavy burden to prove a criminal assault in a custodial situation by proving an excessive use of

force. The second involves the application of the "actual authority" element when a CIA operative

raises a public authority defense.

**1. To prove a criminal assault, the government must prove beyond a reasonable doubt Mr.
Passaro used excessive force, beyond those measures reasonably required by the
circumstances and authorized by the controlling standard for CIA custodial interrogations.**

The affirmative defense known as "public authority" does not arise until and unless the

government proves criminal liability beyond a reasonable doubt. To meet its burden in this case, the

government must prove that Mr. Passaro's conduct during his custodial interrogation of Abdul Wali

1

constituted a criminal assault.

Common sense and case law have established the principle that only the *excessive* use of force against one held in lawful custody will amount to a criminal assault. As this Court noted during the February 8, 2006 Status Conference: "The custodian has the right to maintain that person in custody. It may be by handcuffing him, it may be by forcing him to sit down if he attempts to escape, it may be by deterring the escape by reasonable and equivalent force to maintain his custody." Tr. at 58, Ex. 1.

Case law supports this common sense recognition that maintaining someone in lawful custody inherently requires the use of force. Accordingly, to prove a law enforcement officer commits a criminal assault in a custodial situation, the prosecution must prove the officer used "extreme measures" that exceeded "'the measure of force . . . which an ordinarily prudent and intelligent person, *with the knowledge and in the situation of the arresting officer*, would have deemed necessary.'" *Barrett v. United States*, 64 F.2d 148, 149 (D.C. Cir. 1933) (internal citations omitted) (emphasis added).

Here, to prove Mr. Passaro guilty of a criminal assault on Abdul Wali – a terrorist suspect linked to past and anticipated future attacks on friendly forces and civilians – the government must prove beyond a reasonable doubt Mr. Passaro used "extreme measures" that exceeded the "measure of force" required to safely maintain Wali in custody. If the government fails to prove the use of excessive force, it fails to prove a criminal assault, and fails to prove Mr. Passaro's criminal liability. *See id.* at 149 (emphasizing that to prove the custodial use of force constitutes a criminal assault, "the burden is on the [prosecution] to show the use of extreme measures").

Furthermore, in order to prove excessive use of force in the context of a CIA custodial interrogation, the government must supply the jury with the CIA's standards for such interrogations.

As this Court noted during the February 8, 2006 Conference, "[t]he jury doesn't know, by common sense, what the standard of behavior is . . .." Tr. at 70-71. The CIA's standards, or rules of engagement, will, as the Court observed, "give the standard of behavior against which they may judge the assault." Tr. at 70.

The government has not yet disclosed the rules of engagement that applied to the CIA during the relevant time period, June 18-21, 2003. It has only summarized portions of a CIA cable sent to the field on December 3, 2002. Ex. 2. According to that summary, a CIA interrogator could employ "significant physiological aspects," such as "direct physical contacts, unusual mental duress, unusual physical restraints, [and] deliberate environmental deprivations, . . . reasonably required to ensure the safety and security of our officers and to prevent the escape of the detainee." Ex. 2.

Assuming *arguendo* that this field cable comprises the complete custodial rules of engagement for the CIA, a point which Mr. Passaro does not concede, it partially provides the jurors with what the Court described as "the standard of behavior against which they may judge the assault." Tr. at 70. The original field cable might provide the standard to discern criminal use of force from its lawful use during a custodial interrogation conducted by the CIA. If so, this Court should not permit the government to edit and translate the standard via its own selective summary. Otherwise, neither Mr. Passaro, this Court[1], nor the jurors will know the true and complete standard necessary to measure Mr. Passaro's conduct. To proceed with a trial in which the government hides the applicable "law" from the defendant, from the jury, and from the Court, clearly deprives Mr.

---

[1] Mr. Passaro assumes, without knowing, that the government has not provided the Court, *ex parte*, the original cable summarized in Exhibit 2, because such a document is clearly material and relevant to the crucial issues in this case.

3

Passaro of his constitutional right to a fair trial secured by the Fifth and Sixth Amendments.

Moreover, ambiguities in the government's proffered summary render it an inadequate substitute for the actual field cable. For example, in addition to authorizing "significant physiological measures" that are "reasonably required" for safety and security, the field cable apparently also allows these same measures with "prior and specific headquarters guidance." Ex. 2. This presumably includes situations where a CIA operative employs such measures to extract crucial intelligence information from a terrorist suspect, not merely to maintain the suspect in custody. However, since the government has only provided a summary of this crucial field cable, what constitutes "prior and specific headquarters guidance" remains unclear.[2] Abdul Wali had been categorized by the CIA and U.S. military as a Taliban leader, Al Qaeda operative, "force protection target" [REDACTED] The documents hidden by the government, but believed to have provided specific guidance to the CIA by the Attorney General, approving certain interrogation methods for specific categories of detainees such as Abdul Wali, would reasonably qualify as "prior and specific headquarters guidance."[3]

In sum, to convict Mr. Passaro of a criminal assault, the government must prove beyond a reasonable doubt he used excessive force, beyond those measures reasonably required by the circumstances and authorized by the controlling standard or "rules of engagement" for CIA

---

[2] Because the government only provided a summary, "reasonably required" and "safety and security" also remain unclear.

[3] The government has refused Mr. Passaro's discovery requests for the CIA's rules of engagement and/or guidelines that address the capture, detention, interrogation of detainees categorized as "force protection targets," just as it has refused all discovery requests related to the true scope of the CIA's post 9-11 interrogation authority during the relevant time period. Docket Entry ("DE") 45, no. 8; DE 53, nos. 1-6. Mr. Passaro is unaware whether or not these documents have been shown to the Court *ex parte*.

4

custodial interrogations.

If at the close of its case-in-chief, the government has failed to make a prima facie showing of such a criminal assault, the case should end with a directed verdict of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. If the government survives a Rule 29 motion, then Mr. Passaro should have the opportunity to raise a defense, including the assertion of the affirmative defense of public authority. The need to invoke the public authority affirmative defense is only triggered if the government proves a criminal assault.

**2. A CIA operative satisfies the "actual authority" element of the public authority defense by showing reasonable reliance on the statements and/or conduct of CIA officials authorized to communicate a CIA decision sanctioning the conduct charged, and that the CIA had authority to sanction such conduct.**

"[T]he public authority defense is available when a defendant commits an illegal act in reasonable and sincere reliance on statement or act of a government agent with actual legal authority to empower the commission of that illegal act." *United States v. Giffen*, 379 F. Supp. 2d 337, 341 (S.D.N.Y. 2004) (emphasis added). There are two elements to this affirmative defense – "reasonable reliance" and "actual authority."

With respect to the "reasonable reliance" element, the public authority defense recognizes a person may *mistakenly* rely upon a government official's statements and or conduct, so long as such reliance is reasonable. *See United States v. Burrows*, 36 F.3d 875, 882 (9th Cir. 1994) (clarifying that in the public authority defense, "a government official makes some statement or performs some act and the defendant relies on it, *possibly mistakenly*, and commits an offense in so doing") (emphasis added). Thus, the "reasonable reliance" element does not require a showing that the government official or officials upon whose statements or conduct the defendant relied actually authorized the charged conduct. Nor does it require defendant to demonstrate awareness of the

5

source of the authority.

The "actual authority" element necessarily contains two components, the authority of the government official(s) relied upon by the defendant and the actual authority of the government agency involved. Mr. Passaro acknowledges that, as this Court noted in its Order denying the government's motion *in limine* to exclude the public authority defense, "the Fourth Circuit has held that the validity of this defense depends upon whether the government official in fact had the authority to empower the defendant to perform the acts in question." January 31, 2006 Order (citing *United States v. Fulcher*, 250 F.3d 244, 253 (4th Cir. 2001)).

Mr. Passaro submits that in the context of a public authority defense raised by a *CIA operative*, the government official's authority to communicate a decision authorizing the charged conduct satisfies the requisite "authority to empower" that conduct. As the following two cases demonstrate, the CIA's authority to condone the alleged acts, and the form in which that authority is communicated to the field, are not only legally relevant, but crucial to a CIA operative's assertion of the public authority defense. Both cases conclude that the CIA official relied upon by the defendant need not possess the authority to sanction the charged conduct, so long as that authority existed within the CIA, and the CIA official relied upon by defendant had authority to communicate that decision to the defendant.

In *United States v. Lopez-Lima*, 738 F. Supp. 1404 (S.D. Fl. 1990), the defendant faced air piracy charges for hijacking a plane from Florida to Cuba. He invoked the public authority defense (described as the "real authority defense") based on the assertion that CIA officials had authorized the hijacking as part of the CIA's anti-Castro campaign. Seeking to block this defense, the government argued, "the named [officials] lacked the authority or status within the CIA to authorize the hijacking." *Id.* at 1413.

6

The court rejected this argument, concluding, "if Lopez-Lima were mistaken as to who within the CIA hierarchy had the status to sanction such a mission, this mistake would not defeat his real authority defense even if viewed as a mistake of law." *Id.* at 1412. The court explained, "while the named assets might 'have no authority themselves to sanction [the hijacking of an airplane], they undoubtedly have authority to communicate decisions made by those in the CIA who have authority.'" *Id.* at 1413, (quoting *United States v. Smith,* 592 F. Supp. 424, 432 n.10 (E.D. Va. 1984) (vacated on other grounds, 780 F.2d 1102 (4th Cir. 1985)). The court concluded by noting, "few people are likely to know the internal workings of the CIA, as that information is doubtless a closely guarded secret." *Id.* at 1413.

Similarly, in *Smith,* a district court from the Eastern District of Virginia concluded, "[a] mistake as to who in the CIA has authority" to sanction the conduct charged "would not fall within the general rule that a mistake of law is no defense." 592 F. Supp. at 432 n.10. As in *Lopez-Lima,* the court in *Smith* noted, one "cannot be fairly charged with knowledge of the CIA's internal structure of authority since this structure is no doubt a well kept secret." *Id.* The court instead focused upon whether the CIA in fact had authority to sanction otherwise unlawful conduct and whether the CIA officials relied upon by the defendant had "authority to communicate decisions made by those who in the CIA hierarchy who have authority." *Id.*[4]

Applying *Smith* and *Lopez-Lima* to the public authority defense raised here, evidence of the CIA's authority to sanction interrogation measures that would otherwise constitute a criminal assault and of the authority of ▮▮▮▮▮▮▮▮▮▮▮▮ to communicate that decision to Mr. Passaro

---

[4] The Fourth Circuit vacated this decision based on the district court's application of the Classified Information Procedures Act, not upon the lower court's construction of the public authority defense as applied to the CIA. *United States v. Smith,* 780 F.2d 1102, 1104-5 (4th Cir. 1985).

7

would satisfy the "actual authority" element of the public authority defense.

With respect to the CIA's interrogation authority, publicly available information cited in several previously filed documents and statements during motion hearings, demonstrates that a narrow definition of "torture" contained in a legally-binding opinion of the Justice Department's Office of Legal Counsel provided the outer limit of the CIA's post 9-11 interrogation authority during the relevant time period. This publicly available information includes Attorney General Gonzales' testimony to the Senate Judiciary Committee. *See* DE 83, pp. 3-4, DE 146a, pp. 1-4, DE 147, pp. 1-4. The authority of ▇▇▇▇▇▇▇▇▇ to communicate decisions from CIA headquarters and to provide guidance to CIA field operatives cannot be reasonably challenged.

Even if this Court does not employ the "actual authority" element espoused by the courts in *Smith* and *Lopez-Lima*, and instead requires evidence that the CIA officials upon whose statements and conduct Mr. Passaro reasonably relied had authority to sanction the charged conduct, the government's unsupported and inconsistent representations about the CIA's interrogation authority do not provide a basis upon which to conclude officials such as ▇▇▇▇▇▇▇▇▇ did not have the requisite authority.

The government first asserted in its motion *in limine* that "no CIA official had legal authority to authorize the acts for which Passaro has been charged." DE 139, p. 11. Again, during the December 16, 2005 Hearing on its motion, counsel for the government repeatedly and "emphatically" denied that anyone in the CIA had authority to engage in the charged conduct. The government relied upon this unsupported and incredible assertion to argue that Mr. Passaro's assertion of the public authority defense failed as a matter of law. DE-139, pp. 11-15. Then, in its reply brief, in an apparent concession that the CIA had the authority to employ interrogation methods that would otherwise constitute criminal assault, the government instead argued that Mr.

8

Passaro's public authority defense failed as a matter of law because, "none of the individuals mentioned in Defendant's proffer had the authority to empower Defendant to commit the acts in the indictment . . .." DE 158, pp. 12 & 15.

This Court should be suspicious of current government assertions about the authority of the CIA officials Mr. Passaro relied upon, after having experienced the government's initial bold assertions that **no one** had authority to authorize Mr. Passaro's alleged assaultive conduct. Open source (unclassified) documents and testimony by government officials, coupled with previously classified documents released to the press by the executive branch, caused the government to reassess and change its earlier pronouncements that no one had authority to assault terror suspects. If the government is confident that Mr. Passaro's interrogation was excessive, when viewed against the rules permitting interrogation techniques in existence during June 2003, it should not hide the documents that would show that the government's position is correct. Until the government backs up its claims with such documents or other proof, the Court should give its bold factual assertions no weight.

The case of *United States v. Wilson*, 289 F. Supp. 2d 801 (S.D. Tex. 2003), demonstrates the danger of relying upon the government's unsupported representations to defeat a CIA operative's assertion of the public authority defense. In that case, the court vacated a twenty-year-old conviction after discovering the prosecution had introduced at trial a false affidavit denying defendant's association with the CIA. *Id.* at 807-810. In reflection, the court concluded:

> [W]hile the government may choose to prosecute, it may not prosecute without telling the whole truth. If secrets or errors are too important to use in a 'speedy and public trial,' the government simply makes the policy decision not to prosecute. If it chooses the criminal process, it will have to yield its information about both the offense and defense.

*Wilson, 289 F.Supp.* at 817.

9

Mr. Passaro offers this memorandum of law to assist the Court in anticipated rulings of law regarding the government's burden, the public authority defense, and the need for candid disclosures by the government, to ensure a fair trial.

Respectfully submitted, this 2nd day of March, 2006.

THOMAS P. MCNAMARA
FEDERAL PUBLIC DEFENDER

JOSEPH B. GILBERT
Assistant Federal Public Defender
N.C. State Bar No. 21395

10

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served upon:

JAMES A. CANDELMO, ESQUIRE
Assistant United States Attorney
Suite 800, Federal Building
310 New Bern Avenue
Raleigh, NC 27601-1461

via filing with Jennifer Myers for hand delivery, and sent via secure facsimile to the Court Security
Officer for classification review on,

This the 2nd day of March, 2006.

                    THOMAS P. McNAMARA
                    FEDERAL PUBLIC DEFENDER

                    JOSEPH B. GILBERT
                    Assistant Federal Public Defender
                    N.C. State Bar No. 21395

11



EXHIBIT 1

1  HONOR.  OUR CONCERN, IF I MAY RESPECTFULLY POINT OUT, THAT
2  WE'RE NOT CHARGING THE DEFENDANT WITH KIDNAPPING.  WE'RE
3  NOT CHARGING HIM WITH SOME UNLAWFUL DETENTION.

4         THE COURT:  YOU ARE CHARGING HIM WITH AN ASSAULT
5  AND THE EXERCISE OF FORCE AGAINST WILL AND THE THREAT OF
6  MAINTAINING FORCE IS AUTHORIZED WITH A PERSON WHO'S
7  LEGALLY IN CUSTODY.

8     THE CUSTODIAN HAS THE RIGHT TO MAINTAIN THAT PERSON
9  IN CUSTODY.  IT MAY BE BY HANDCUFFING HIM, IT MAY BE BY
10  FORCING HIM TO SIT DOWN IF HE ATTEMPTS TO ESCAPE, IT MAY
11  BE BY DETERRING THE ESCAPE BY REASONABLE AND EQUIVALENT
12  FORCE TO MAINTAIN HIS CUSTODY.  THAT'S ALL I'M SAYING.

13         MR. CANDELMO:  AND THE GOVERNMENT WOULD POINT
14  OUT, THROUGH NUMEROUS POLICE FROM THE DEFENSE, NO LESS
15  THAN TWO HOURS AGO THE DEFENSE HAS TAKEN THE POSITION ALL
16  ALONG THAT THE DEFENDANT DIDN'T HAVE THE INDIVIDUAL
17  CUSTODY, THAT THE MILITARY HAD THE INDIVIDUAL CUSTODY.

18         THE COURT:  BUT HE WAS IN THE CUSTODY OF THE
19  GOVERNMENT, SO THERE WAS THE RIGHT FOR THE PUBLIC
20  AUTHORITY TO KEEP HIM IN CUSTODY.

21         MR. CANDELMO:  YES, YOUR HONOR.

22         THE COURT:  AND ALL I'M SAYING IS THAT UNTIL THE
23  EVIDENCE IS HEARD, YOU CAN'T KNOW -- I MEAN, IF YOUR
24  EVIDENCE IS THAT THE GUY TRIED TO BREAK AWAY AND HE PUSHED
25  HIM BACK INTO A CHAIR AND THAT'S AN ASSAULT, THEN HE WOULD

1 | THAT'S THE ONE, I THINK, IF I CAN MAYBE GO OUT OF TURN A

2 | LITTLE BIT, MY ANSWER TO --

3 | **THE COURT:** -- JUST TELL ME WHAT YOU WANT. MAKE

4 | IT SIMPLE.

5 | **MR. GILBERT:** WE'RE TRYING TO GET THEM TO GIVE

6 | US THE MEMORANDA THAT WERE EXCHANGED BETWEEN THE CIA AND

7 | DEPARTMENT OF JUSTICE WHERE THE CIA WENT TO JUSTICE AND

8 | SAID WE WANT YOU TO TELL US WHAT THE RULES ARE AND WHAT

9 | WE'RE ALLOWED TO DO, AND SO FORTH.

10 | **THE COURT:** OKAY. THIS IS NOT SPECIFIC TO THIS

11 | CASE; THIS IS RULES OF ENGAGEMENT, THEATER CONDUCT

12 | DISCOVERY.

13 | **MR. GILBERT:** WELL, WE THINK IT IS SPECIFIC.

14 | **THE COURT:** I MEAN, IT'S NOT ABOUT THE DEATH.

15 | **MR. GILBERT:** NO, SIR. IT'S BASICALLY THE

16 | MEMORANDA THAT WAS EXCHANGED BETWEEN THE CIA AND

17 | DEPARTMENT OF JUSTICE AND WERE KIND OF LAYING OUT THE

18 | RULES THAT WERE GOING TO BE FOLLOWED.

19 | **THE COURT:** DO YOU NEED TO TELL THEM THAT IN

20 | ORDER FOR THEM TO KNOW WHAT THE PARAMETERS OF THE LAW ARE?

21 | DO YOU NEED TO TELL THE DEFENDANT, AS A PART OF THE CASE,

22 | WHAT THE GAME RULES WERE, WHAT THE RULES OF ENGAGEMENT

23 | WERE IN ORDER TO BE ABLE TO SHOW THAT HIS CONDUCT WAS IN

24 | VIOLATION OF IT?

25 | I MEAN, THE RULES OF ENGAGEMENT -- IT'S NOT LIKE

1  YOU'RE, YOU KNOW, IN APEX, NORTH CAROLINA AND EVERYONE

2  KNOWS THAT THE GENERAL STATUTES OF NORTH CAROLINA, THEY

3  EITHER KNOW OR SHOULD KNOW APPLY, AND THAT YOU CAN'T GO,

4  YOU KNOW, PUSH SOMEBODY DOWN ON THE SIDEWALK BECAUSE

5  THERE'S A CIVIL CRIMINAL LAW.  BUT WHAT HAPPENS IN A PLACE

6  LIKE THIS, IN A COMBAT SITUATION IN AFGHANISTAN?  ARE

7  THERE RULES THAT HAVE TO BE POSTED WITH RESPECT TO THIS

8  PARTICULAR ENVIRONMENT?

9       MR. CANDELMO:  WELL, YOUR HONOR, I DON'T THINK

10  WE HAVE TO GET TO THAT ISSUE.  HE'S TALKING ABOUT THE

11  INTERROGATION RULES AND THE PUBLIC AUTHORITY THAT YOUR

12  ORDER DOES NOT CONTEMPLATE.  THE PUBLIC AUTHORITY THAT HE

13  WAS ALLOWED TO DO A MYRIAD OF THINGS TO THE DEFENDANT,

14  WHICH WOULD NOT FALL UNDER SELF-DEFENSE, WOULD NOT FALL

15  UNDER AUTHORITY --

16       THE COURT:  -- DO YOU SAY WHAT HE'S ALLOWED TO

17  DO?  DO YOU OFFER THAT TO GIVE THE STANDARD OF BEHAVIOR

18  AGAINST WHICH THEY MAY JUDGE THE ASSAULT?

19       MR. CANDELMO:  YES.  I THINK WE PROVIDED THEM

20  THAT IN DISCOVERY, A GENERAL CIA INSTRUCTION ON WHAT THEY

21  ARE SUPPOSED TO DO AND NOT TO DO.

22       THE COURT:  ISN'T THAT RELEVANT TO THE ISSUE OF

23  THE ASSAULT?

24       MR. CANDELMO:  WE PROVIDED THEM THAT.

25       THE COURT:  NO, I SAY AT TRIAL.  THE JURY JUST

1    DOESN'T KNOW, BY COMMON SENSE, WHAT THE STANDARD OF

2    BEHAVIOR IS BECAUSE IT'S IN A PARTICULARIZED ENVIRONMENT.

3            MR. CANDELMO:  BUT THAT'S THE EXTRA-TERRITORIAL

4    JURISDICTION THAT MAKES THE ASSAULT APPLICABLE IN THE U.S.

5    MILITARY BASE OR FOREIGN MISSION, HITTING WITH A METAL

6    FLASHLIGHT, KICKING WITH A SHOD FOOT.  THEY ARE TALKING

7    ABOUT THE PUBLIC AUTHORITY EXCEPTION, TRYING TO GET, IF IT

8    EXISTS, INTERNAL DOCUMENTATION THAT AUTHORIZES SPECIFIC

9    INTERROGATION METHODS WHICH WERE NOT APPLICABLE TO THE

10   DEFENDANT.  THE VERY PURPOSE OF THE EXTRA-TERRITORIAL

11   JURISDICTION IS TO PUT -- TO MAKE THOSE U.S. CRIMINAL LAWS

12   UNDER TITLE 18 APPLICABLE IN THAT SITUATION.

13           THE COURT:  OKAY.

14           MR. CANDELMO:  ANYTHING ELSE WOULD HAVE TO BE

15   PUBLIC AUTHORITY, AND THAT IS MY UNDERSTANDING.  THE JUDGE

16   CLARIFIED ON HIS MOST RECENT ORDER THAT IS EXPRESSLY

17   PUBLIC AUTHORITY, THAT YOU HAVE NOT DEEMED AT THIS POINT

18   IN TIME RELEVANT TO THE CASE.

19           THE COURT:  WELL, BUT HE HAS THE RIGHT TO

20   EXERCISE THE DEGREE OF FORCE AND CONTROL THAT IS LAWFUL IN

21   THE DETENTION OF THE SUBJECT.

22           MR. CANDELMO:  YES, YOUR HONOR.

23           THE COURT:  SO IT ISN'T JUST THE PLAIN OLD

24   TERRITORIAL JURISDICTION OF THE UNITED STATES.  IT'S NOT

25   LIKE I'M A LAY CITIZEN WALKING ACROSS THE STREET ON FORT

1  BRAGG AND SOMEBODY WALKS UP AND PUSHES ME DOWN ON THE

2  GROUND.  WELL, THAT'S, YOU KNOW, THE EXTRA-TERRITORIAL

3  JURISDICTION OF THE UNITED STATES.

4       MR. CANDELMO:  YES, YOUR HONOR, I UNDERSTAND

5  YOUR LOGIC.

6       THE COURT:  IT'S SOMEONE WHO'S EXERCISING LAWFUL

7  DETENTION IN A VALID ARREST OVER SOMEONE AND WHAT FORCE

8  THEY CAN USE.

9       MR. CANDELMO:  WELL, THAT WOULD BE EQUALLY

10  APPLICABLE TO THE POLICE DEPARTMENT OF APEX, NORTH

11  CAROLINA.

12       THE COURT:  CORRECT.

13       MR. CANDELMO:  HOWEVER, WE'RE NOT -- THE

14  ALLEGATION IN THE INDICTMENT -- WE'RE NOT CHARGING HIM

15  WITH THE CONFINEMENT.  WE'RE NOT CHARGING HIM WITH FORCE

16  THAT WAS NECESSARY TO CONFINE THE INDIVIDUAL.  WE'RE

17  CHARGING HIM WITH THE SPECIFIC ASSAULTS.

18       THE COURT:  OKAY.

19       MR. GILBERT:  YOUR HONOR, MAY I JUST MAKE TWO

20  OBSERVATIONS ABOUT THAT?

21       THE COURT:  YES.

22       MR. GILBERT:  FIRST, THEY KEEP TALKING ABOUT HOW

23  THEY'VE GIVEN US THIS STUFF.  THEY GAVE US A PIECE OF

24  PAPER THAT MR. CANDELMO TRANSLATED AS HIS SUMMARY, IF YOU

25  WILL, OF WHAT THE MESSAGE WAS THAT WENT FROM, I GUESS,

1   WASHINGTON TO ASADABAD THAT SAID THIS IS WHAT YOU ARE

2   PERMITTED TO DO. AND SO WE HAVEN'T GOT THE ORIGINAL THING

3   AND WE STILL ASK THE GOVERNMENT TO PROVIDE US WITH THE

4   ACTUAL DOCUMENT, NOT HIS TRANSLATION OF IT.

5   WE'RE WEARY OF THAT, NOT TO IMPUGN THE GOVERNMENT,

6   BUT ONCE THEY TOLD US NOBODY IN THE CIA AT ALL HAD ANY

7   AUTHORITY TO EVER TOUCH ANYONE, THEN THEY BACKED OFF FROM

8   THAT LATER WHEN THEY REALIZED THAT WAS A MISSTATEMENT.

9   THEN THEY SAID NO, THIS GUY DIDN'T HAVE THAT AUTHORITY.

10   THEN THEY SAID WE READ WHAT HE'S ALLOWED TO DO. WE WON'T

11   LET YOU SEE WHAT HE WAS ALLOWED TO DO, BUT WE'LL GIVE YOU

12   A LITTLE SUMMARY.

13   I THINK THE GOVERNMENT HAS AN OBLIGATION, IF YOU ARE

14   GOING TO CHARGE AND CONVICT A PERSON OF DOING THIS, IS SAY

15   THIS IS WHAT HE'S ALLOWED TO DO AND WE THINK HE EXCEEDED

16   THAT. BY YOUR EXAMPLE, YOUR HONOR, YOU WOULDN'T SAY IF AN

17   OFFICER OF THE WAKE COUNTY SHERIFF'S DEPARTMENT IS ON

18   TRIAL FOR MISHANDLING SOMEONE -- THE WAKE COUNTY SHERIFF'S

19   DEPARTMENT HAS A LIST OF RULES. THEY TELL THEIR GUARDS

20   THIS IS WHAT YOU ARE ALLOWED TO DO WHEN YOU HANDLE

21   PRISONERS. YOU WOULDN'T SAY TO ONE OF THE GUARDS, WHEN

22   YOU PUT HIM ON TRIAL LATER, WE'RE NOT GOING TO LET YOU SEE

23   THE LIST, WE'RE JUST GOING TO TELL EVERYONE YOU DIDN'T

24   HAVE THE PERMISSION TO DO WHAT YOU DID, AND THE LIST MAY

25   ANSWER THE JURY'S QUESTION.

# EXHIBIT 2

Classified summary of CIA operational cable distributed to
the field

The following is an excerpt of guidance provided to the
field on 03 December 2002 in support of ongoing CIA
operations in Afghanistan and along the Pakistan border.

When CIA officers are involved in interrogation of a
detainee, the conduct of such interrogation should not
encompass any significant physiological aspects (e.g.,
direct physical contacts, unusual mental duress, unusual
physical restraints, or deliberate environmental
deprivations) - beyond those reasonably required to ensure
the safety and security of our officers and to prevent the
escape of the detainee - without prior and specific
headquarters guidance.

CL BY:
CL REASON: 1.4(c)
DECL ON: 20300908
DRV FROM:

FILED WITH THE
COURT SECURITY OFFICER
CSO: _____
DATE: 2/28/06

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NORTH CAROLINA
# WESTERN DIVISION

NO. 5:04-CR-211-BO(1)

| UNITED STATES OF AMERICA | RESPONSE TO GOVERNMENT'S MOTION FOR MORE TIME TO COMPLY |
|---|---|
| v. | WITH COURT ORDER TO PRODUCE REPORTS |
| DAVID A. PASSARO | |

Mr. Passaro, through undersigned counsel OPPOSES the government's request to have ten additional days to comply with this Court's order to produce for *in camera* review, copies of the three investigations conducted in this case.

On February 27, 2006, the government served Defendant Passaro's counsel with their request for additional time to conduct security review before producing documents for inspection by the Court.

The government cites no authority, and offers no plausible reason why it cannot trust this Court with the documents it has possessed for over two years. Neither the Classified Information Protection Act (CIPA), nor any other authority supports the government's attempts to delay compliance with a valid order by this Court.

The latest filing by the government demonstrates either a misunderstanding and misuse of CIPA procedures, or an attempt to further delay the trial while Mr. Passaro remains in custody. This Court should not countenance such abuse of process by the government.

WHEREFORE, Mr. Passaro requests that this Court order the government to show cause

23

why it should not be held in contempt for failure to satisfy the Court's order to produce.

Respectfully requested this 28th day of February, 2006.

> THOMAS P. McNAMARA
> Federal Public Defender

*Joseph B Gilbert*

JOSEPH B. GILBERT
Assistant Federal Public Defender
N.C. State Bar No. 21395

## *CERTIFICATE OF SERVICE*

I HEREBY CERTIFY that a copy of the foregoing was served upon:

JAMES CANDELMO
Assistant United States Attorney
Suite 800, Federal Building
310 New Bern Avenue
Raleigh, NC 27601-1461

by hand delivering a copy of same, and by facsimile transmission to the Court Security Officer.

This the 28th day of February, 2006.

*Joseph B Gilbert*

JOSEPH B. GILBERT
Assistant Federal Public Defender
N.C. State Bar No. 21395

2

24