UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO: 5:04-CR-211-1



| UNITED STATES AMERICA | ) |
|---|---|
| | ) |
| v. | ) |
| | ) |
| DAVID A. PASSARO | ) |
| | ) |
| Defendant. | ) |
| | ) |

**NOTICE OF INTENT TO INTRODUCE EVIDENCE OF PRIOR MISCONDUCT AND
MOTION *IN LIMINE* FOR LEAVE TO INTRODUCE SUCH EVIDENCE**

The United States of America, by and through the United States Attorney for the Eastern District of North Carolina, hereby gives notice in accordance with Fed. R. Evid. 404(b), of its intent to introduce evidence of other crimes, wrongs or acts thereunder and seeks the leave of this Court to introduce such evidence at trial. In support of that motion we aver as follows:

**STATEMENT**

1. On June 17, 2004, a grand jury of this District returned a four count indictment charging Passaro with two counts of assault with a dangerous weapon with intent to do bodily harm, in violation of 18 U.S.C. § 113(a)(3); and two counts of assault resulting in serious bodily injury, in violation of 18 U.S.C. §

1

113(a)(6).[1] All of the counts alleged that the offenses were committed by a United States national and occurred within the "special maritime and territorial jurisdiction of the United States, within the meaning of 18 U.S.C. § 7(9)."

The government anticipates proving at trial that Passaro, a former U.S. Army Special Forces medic, was an independent contractor working on behalf of the Central Intelligence Agency (CIA) to engage in paramilitary activities in support of United States military personnel in Kunar Province, in the nation of Afghanistan. On June 18, 2003, Passaro was contracted to be at a U.S. Army base near the town of Asadabad, Afghanistan, a location approximately five miles from the Pakastani border. The compound was employed by U.S. military personnel as a base from which to launch missions against terrorists, gather intelligence, and train fledgling Afghani military forces to assume responsibility for their own defense. During the months preceding June 18, 2003, it was the target of sporadic rocket attacks by hostile paramilitary forces.

The government also anticipates proving at trial, that on June 18, 2003, Abdul Wali, a local Afghani national who was

---

[1] The counts were predicated upon the defendant's alleged activities on June 19, 2003 and June 20, 2003.

2

suspected of participating in the rocket attacks, voluntarily appeared at the front gate of Asadabad base. Passaro assisted military personnel in detaining him and, between June 19 and June 20, 2003, interrogated him in a detention cell at the Asadabad Army base concerning the attacks. During the interrogations, Passaro is alleged to have beaten Wali with his hands, his feet and a large flashlight, at times striking him about his elbows, knees, hips, wrists, hands and mid-section with the flashlight. At times, Passaro would temporarily blind Wali by shining the flashlight directly into his eyes, so that he could not see the ensuing blow. Wali died in a cell on Asadabad Base on June 21, 2003. That conduct constitutes the basis of the allegations in the indictment that Passaro assaulted him with a dangerous weapon with intent to do bodily harm and resulting in serious bodily injury.

2. Within the past two weeks, a prosecutor and Special Agent of the Federal Bureau of Investigation interviewed Passaro's former step-son, Matthew Michael Newman, a former member of the U.S. Marine Corps who is now medically retired as the result of combat wounds received in Afghanistan. To assist in establishing that Passaro intended to inflict injury upon Wali, the government seeks to introduce at trial the testimony of Newman that, shortly after his mother married Passaro when he (Newman) was six years

3

of age, Passaro began beating him. Passaro's weapon of choice was frequently a "Mag light" flashlight, with which, over the years, during separate distinct occasions, he repeatedly used to strike Newman. He also ground the mag light into Newman's wrists. On one occasion, Passaro demonstrated to Newman how to use the Mag light to temporarily blind a subject and then, while the victim was temporarily blinded, strike him with the light. In one instance, Passaro accompanied Newman in seeking revenge upon another child who had repeatedly stolen Newman's candy. Passaro ordered Newman to beat the child about the head with the flashlight after first temporarily blinding him. Passaro also demonstrated to Newman how to inflict pain on a victim by striking him on or about pressure points on the human body and, in fact, would regularly strike Newman on the elbows, behind the elbows, behind the upper arms, on the legs and on or about the outer upper thighs.[2] On one occasion, Newman reported the beatings to school authorities who simply informed Passaro of the report. Passaro then boasted to Newman that he was an experienced interrogator and knew how to beat a person without

---

[2] According to Newman's mother and sister, Passaro would beat Newman at locations between his waist and his knees, knowing that Newman would be unlikely to lower his trousers to display his injuries to the authorities. Passaro's sister recalls him expressly admitting this.

4

leaving any visible marks on the victim's body.[3] Over the next six months, Passaro began to systematically beat Newman using different objects, such as a spoon, a hammer and the Mag light, which he would force Newman to first select, before inflicting the beating.

Passaro would also beat Newman as a means of interrogating him in connection with minor household mishaps, such as a cupboard spill or a damaged screen door. On such occasions, he would remind Newman that he was trained in interrogation techniques and could tell whether a subject was lying by simply looking into his eyes. Sometimes Passaro would use a cloth-wrapped stick to administer the interrogation beatings. He told Newman that, by wrapping the stick, it would not leave marks on his body and that therefore no one would believe Newman if he reported the assaults. Passaro's beatings became more infrequent when Newman reached 14 years of age because of Newman's physical development and ability to resist as well as Passaro's concern that Newman would disclose his abuse to military authorities and thereby ruin his military career. The beatings ceased in their

---

[3] The Government does not offer this as proof of the Defendant's actual training, in reality the Defendant was trained as a medic.

5

entirety when custody of Newman was awarded to his biological father due to the abuse.

Newman reports that the beatings caused such extreme pain that he would frequently give Passaro false confessions to various allegations of household misconduct leveled at him and his sister.

On the basis of our interviews with Newman's mother and sister, we further anticipate that, if called to testify, both would corroborate Newman's proffered testimony concerning his childhood abuse at the hand of Passaro. Particularly if Passaro denies such conduct, we anticipate presenting the rebuttal testimony of these potential witnesses.

**ARGUMENT**

Fed. R. Evid. 404 provides in part:

> (b) **Other, Crimes, Wrongs, or Acts**. – Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

As the Fourth Circuit explained in United States v. Mohr, 318 F.3d 613 (4th Cir. 2003), Rule 404(b) "is understood as one of inclusion." Id. at 417, quoting United States v. Queen, 132 F.3d 991, 994 (4th Cir. 1997). The law of this Circuit requires the application of a four-part test to determine admissibility

under the Rule: specifically, "[t]he evidence must be (1) relevant to an issue, such as an element of the offense; (2) necessary 'in the sense that is probative of an essential claim or an element of the offense'; (3) reliable; and (4) admissible under Federal Rule of Evidence 403, in that its prejudicial nature does not substantially outweigh[]' its probative value." Id., quoting Queen, 132 F.3d at 997.

In the context of this case, evidence that Passaro would interrogate his young son by the calculated use of physical violence administered with the aid of a Mag light and other objects in a manner calculated to inflict pain without leaving physical indicia of injury, plainly satisfies each of these criteria.

With respect to the requirements of relevance and necessity, "[u]nder federal law, specific intent is an element of the offense [charged in Counts 1 and 3] of assault with intent to commit bodily harm." United States v. Gibson, 896 F.2d 206, 209 (6th Cir. 1990).[4] As one commentator has observed, "the

---

4
    In this connection, we note also that Counts 2 and 4 allege that Passaro assaulted Wali resulting in "serious bodily injury," in violation of 18 U.S.C. § 113(6). The phrase "serious bodily injury" is defined by 18 U.S.C. § 1365(h)(3)(B) as "bodily injury which involves – [inter alia] extreme physical pain." The proffered Rule 404(b) evidence also demonstrates that Passaro fully intended to inflict such pain.

7

prosecution has the greatest need for [the introduction of] uncharged misconduct [evidence demonstrating intent or knowledge] when the crime is a specific intent offense." I Edward J. Imwinkelreid, <u>Uncharged Misconduct Evidence</u>, § 5.10 at 37 (2005). Consequently, "when a defendant is charged with a specific intent crime, the government may present other acts evidence to prove intent." <u>United States v. Lewis</u>, 110 F.3d 417, 420 (7th Cir. 1997). In such cases, the relevance of uncharged acts evidence is predicated upon the principle of chance – <u>i.e.</u>, that "an unusual or abnormal element [affording an innocent explanation] might be present in one instance, but the oftener similar instances occur with similar results, the less likely is the abnormal element likely to be the true explanation of them." <u>Id</u>. at § 5.06, quoting 2 <u>Wigmore, Evidence</u>, § 302 (3d ed). For example in <u>Mohr</u>, <u>supra</u>, the defendant, a K-9 police officer, was charged with wilfully violating the federal civil rights laws by releasing a police dog on a wholly passive detainee. Because "the government clearly bore the burden of proving, beyond a reasonable doubt that [the defendant] released her dog *willfully intending* to deprive [the victim] of his constitutional right to be free of excessive force," (318 F.3d at 619), the court of appeals held that the requirement of necessity permitted it to introduce evidence that, on a subsequent occasion, she released

8

her dog upon an entirely innocent victim without reason or provocation. In its view, such evidence was probative of the defendant's state of mind with respect to the charged offense. Id.

Similar reasoning also frequently informs the introduction of prior acts evidence in prosecutions for child abuse or infanticide. In such cases, prior acts evidence demonstrates that, because the defendant had intentionally inflicted prior injuries upon the victim (or the victim's siblings), it was therefore unlikely the charged offense was the product of an accident. See, e.g., United States v. Lewis, 92 F.3d 1371, 1383 (5th Cir. 1996) (admitting photographic evidence and testimony evidencing previous acts of child abuse as "relevant to the issue of the defendants' intent and the issue regarding absence of accident"); United States v. Leight, 818 F.2d 1297, 1301-04 (7th Cir. 1987) (noting that, "[b]ecause of the difficulties commonly encountered in showing that a child has been abused, courts have often treated evidence of abuse of other children as relevant and admissible"); United States v. Grady, 481 F.2d 1106, 1108 (D.C. Cir. 1973)(admitting evidence of prior acts of child abuse); United States v. White, 23 M.J. 84, 87 (C.M.A. 1986)(evidence of prior act of child abuse admissible to show defendant's intent or state of mind in striking the child and the absence of accident).

The same analytical approach governs the proffered evidence demonstrating that Passaro intentionally inflicted pain upon his step-son in the course of interrogating and disciplining him. Particularly in view of the content of Passaro's pretrial motions, we anticipate, as in <u>Mohr</u>, 318 F.3d at 619, that he will claim he was justifiably acting in accordance with what he understood to be government policy, <u>i.e.</u>, that he sought to intimidate or otherwise control Wali in order to extract information from him but that he never harbored the specific intent to inflict bodily harm as Section 113(a)(3) requires. Consequently, the government must not only establish prima facie evidence of the necessary *mens rea*, (which is, of itself, a sufficient basis to introduce prior acts evidence), it must also be able to rebut assertions that Passaro has made and will surely repeat at trial that he only intended to intimidate or control Wali. Evidence tending circumstantially to demonstrate that Passaro did, in fact, intend to inflict bodily injury upon Wali therefore not only satisfies the threshold requirement of relevance to an element of the offense, but is also "necessary" in the sense that it is essential to prove this controverted issue. See <u>United States v. Mohr</u>, 318 F.3d at 619.

As in <u>Mohr</u> and the infant homicide cases we have cited, in the instant prosecution the government must rely largely upon

10

extrinsic evidence to demonstrate that Passaro was fully cognizant of the consequences of what he was doing and that his infliction of injury was not the product of mistake or accident. Cf. Leight, 818 F.2d at 1301. In many instances of infanticide or child abuse, the condition of the victim's body would itself provide strong circumstantial evidence of an assailant's intent to inflict injury. In this case, however, even that evidence is unavailable to the government, as religious practice and local custom required Wali's family members to effect the immediate burial of Wali's body, thereby precluding a forensic examination and the preservation of evidence potentially probative of Passaro's state of mind.[5]

The testimony of Newman concerning Passaro's record of abusing him as a child, however, constitutes powerful evidence tending to establish that Passaro, likewise, fully intended to inflict pain upon Wali as a means of extracting a confession from him. Most significantly, much of that abuse arose in the context of what Passaro viewed as "interrogation" sessions - efforts

---

[5] Indeed, Passaro has sought to exclude from the knowledge of the jury the fact that Wali died in the wake of his interrogation by seeking to have that fact stricken from the indictment, and any evidence relating to it prohibited from introduction at trial. See Defense Motion to Strike Surplusage. The Court has not yet ruled on that motion.

calculated to extract from Newman admissions of responsibility for various household calamities. On those and other occasions, Passaro would remind Newman that he was an experienced interrogator, and that, in order to extract an admission, he could inflict pain in such a manner as would make subsequent detection impossible. He gave effect to those warnings by striking Newman with a padded stick, and by hitting him on particularly sensitive parts of his body in a manner that would maximize pain while minimizing the physical manifestations of injury so as to conceal his conduct from persons to whom Newman might complain. Such evidence is probative to demonstrate that, in his interrogation of Wali, it was also likely that, far from merely seeking to instill fear, Passaro engaged in similar acts of sadism intentionally calculated to maximize the infliction of pain while minimizing the evidence of injury and that he was fully cognizant of the effects of such assaults upon a human body. The prominent use of a Mag light as a means of inflicting pain, during the occasions he "interrogated Newman," are indicative of his purpose in putting a similar flashlight to a similar use during the interrogation of Wali.

We anticipate that, as in Mohr, supra, Passaro will argue that, even if our proffered "other crimes evidence" satisfies the

12

first three criteria for the admission of such evidence,[6] it should, nonetheless, be excluded under Fed. R.Evid. 403, because it unfairly prejudices him by portraying him as a child abuser. But, as the Mohr court explained, "Rule 403 only requires suppression of [other crimes] evidence that results in unfair prejudice – prejudice that damages an opponent for reasons other than its probative value, for instance an appeal to emotion and only when that unfair prejudice *substantially* outweigh[s] the probative value of the evidence." Mohr, 318 F.3d at 619-20 (internal quotations omitted)(emphasis added).

In this case, as we have explained, the necessity for introducing the proffered "other acts" evidence is every bit as great as it was in Mohr, to enable the government to establish the element of specific intent and to rebut likely claims of justification. The prejudicial effect of such testimony is

---

[6] As to the third factor – that of reliability – the proffered testimony will be presented as a first-hand account by a combat-wounded and medically retired Marine of acts of child abuse visited upon him as a youth, which are subject to corroboration by two eyewitnesses. There is no reason whatsoever to controvert the reliability of such testimony presented by a person who, unlike an informant or an immunized witness, possesses no personal stake in the prosecution. And, of course, if Newman's testimony is admitted, Passaro will have the opportunity to cross-examine him and the jury will be the ultimate arbiter of his credibility and the reliability of his testimony.

largely the product of similarities between the charged offense and Passaro's antecedent "interrogations" of his step son. But, as Mohr, supra, makes clear, that sort of prejudice is not the type of "unfair" prejudice toward which Rule 403 is directed. Indeed, where the purpose of the uncharged acts evidence is to establish specific intent, the greater the similarity between the charged offense and the extrinsic offense, the less likely that its introduction will be deemed unduly prejudicial under Rule 404(b). See United States v. Zapata, 139 F.3d 1355, 1358 (11th Cir. 1998).[7]

Finally, the government is capable of ameliorating any such prejudice by carefully tailoring Newman's testimony to that essential necessary to demonstrate specific intent and rebut and pertinent defense Passaro may mount. This Court can likewise

---

[7] Although not the governing rule in this Circuit, some commentators have suggested that the principle of probability, upon which Rule 403 is based, requires some proof of similarity between the charged offense and the uncharged misconduct. See I. Imwinkelreid, § 5.06 at 16. Cf. Mohr, 318 F.3d at 618 (noting similarity between charges offense and other act evidence). There is little question but that such a requirement is fully satisfied here. Both the charged offenses and the uncharged acts evidence involve what Passaro perceived as "interrogation" sessions of a hostile subject over whom he exercised a mantle of authority. Both also involved Passaro's apparent interrogation tool of choice – a large flashlight and both required the intentional infliction of pain.

14

minimize the potential for "unfair" prejudice by giving the jury a cautionary instruction concerning the limited use to which it can make of such evidence immediately after it is presented and again during its final instructions. See <u>Mohr</u>, 318 F.3d at 620.

CONCLUSION

As argued above, the proffered evidence is powerfully probative of knowledge, intent, and lack of mistake. Furthermore, it is offered in the context of charges in which these issues are central. The Government's motion to introduce should be granted.

Respectfully submitted by this 9th day of March, 2006.

FRANK D. WHITNEY
United States Attorney

BY: JAMES A. CANDELMO
Assistant United States Attorney

CERTIFICATE OF SERVICE

This is to certify that I have this 9<u>TH</u> day of March, 2006, served a copy of the foregoing Government's Notice of Intent to Introduce Evidence of Prior Misconduct and Motion in Limine for Leave to Introduce Such Evidence in this action via courier as follows:

Thomas P. McNamara, Esq.
Federal Public Defender's Office
Raleigh, North Carolina

/S Bowler
jan
―――――――――――――――――
JAMES A. CANDELMO
Assistant United States Attorney
Criminal Division